# Exhibit 4

```
          IN THE UNITED STATES DISTRICT COURT
      FOR THE MIDDLE DISTRICT OF NORTH CAROLINA


   MARILYN KEEPSEAGLE, et al.,    )
                                  )
          Plaintiffs,             )
                                  )
   vs.                            )  Civil Action No.
                                  )  99-cv-3119 (D.D.C.)
   TOM VILSACK, Secretary, United )  (EGS, AK)
   States Department of Agriculture,)
                                  )
          Defendant.              )
                             ____ )

                    DEPOSITION

                       OF

                 DAVID WINNINGHAM

                   * * * * *

                Taken By Plaintiffs

              Durham, North Carolina

                  May 22, 2009

                   * * * * *

              Reported by:
              LINDA D. CRANE, RPR
            Registered Merit Reporter
           Certified Realtime Reporter
```

HUDSON REPORTING & VIDEO          1-800-310-1769

Page 22

```
 1      A.   They were Farm Service Agency people that
 2   ranged from the different disciplines, like Program
 3   Assistant, to Farm Loan Technician, to Farm Loan Chief,
 4   Deputy Administrator of Management, Assistant Deputy
 5   Administrator of Management -- I mean Farm Loan
 6   Administration, Farm Loan Officers, District Credit
 7   Specialists, Farm Loan Specialists, the Administrator
 8   of the FSA was there, District Directors, Training
 9   Coordinators, Farm Loan Officers, Specialists.  So it
10   covered the whole array of people that were involved in
11   administering the Farm Loan Program.
12      Q.   By the way, I assume the people in Exhibit
13   A, listed in Exhibit A, were the people who came to the
14   first meeting of your study group; is that correct?
15      A.   That's correct.
16      Q.   Were these people selected because they had
17   a lot of years of experience with the various facets of
18   the Farm Loan Program?
19      A.   I wouldn't say that.  What I would say is
20   that we wanted the very best people involved in this
21   process, the most knowledgeable folk.  So that was the
22   criteria that I used in determining who would be there.
23      Q.   Did you finish your answer?
24      A.   Yes.
25      Q.   Then the names on Exhibits B and C, their
```

Page 23

```
 1   names, some of them are on Exhibit A as well.  In what
 2   respect does the group in Exhibit B and Exhibit C
 3   differ from Exhibit A?  What did they do differently?
 4      A.   Exhibit B was a composite of Exhibit A in
 5   that these were the folk that we used to finalize --
 6   not finalize, but to -- to condense the report and
 7   begin to draw inferences from the information that was
 8   filed in the initial session.  So these were the very
 9   best people that were -- that had the expertise to do
10   that.
11      Q.   So, together the people in Exhibits A, B,
12   and C listed, comprised the Qualitative Study Group; is
13   that correct?
14      A.   That's correct.
15      Q.   You said a moment ago that you were asked by
16   the Administrator of the FSA to undertake this study;
17   is that correct?
18      A.   Yes.
19      Q.   Do you know what prompted the Administrator
20   of the FSA to think that this was worth doing?
21      A.   Because the Farm Loan Program had a
22   disproportionate share of complaints per participant in
23   FSA, the program participants in FSA.  So we wanted to
24   know why -- why did that exist?  Why did you get more
25   program complaints filed in our Farm Loan area than you
```

Page 24

```
 1   would in the other area?
 2      Q.   How many other areas were administered by
 3   the FSA than the Farm Loan Program?  Two, four, ten?
 4      A.   I don't know how to answer that.  What I
 5   know is that the Farm Loan Program dealt with loans.
 6   And the Farm Program dealt with subsidy programs.
 7   In other words, producers got subsidies from the
 8   government for participating in the program.  So with
 9   the Farm Programs, there was only probably about five
10   percent of the total complaints filed.  In other words,
11   95 percent of the complaints that were filed against
12   FSA came out of the Farm Loan side.
13      Q.   I see.  That would appear to be striking
14   because the Farm Loan Program was a smaller part of
15   all the programs that FSA administered; is that
16   correct?
17      A.   That's correct.
18      Q.   Now, after the study group met these three
19   times, how was this report that's Exhibit 2 created?
20      A.   Victoria Pilate took the information -- she
21   was an economist on my staff -- and drew the analysis
22   from the information that had been compiled, to issue
23   the final report.
24      Q.   But the report that's Exhibit 2 ultimately
25   bears your editing and your final decisions about what
```

Page 25

```
 1   should be included; correct?
 2      A.   Yes.
 3      Q.   Do you know roughly when this report that's
 4   Exhibit 2 was issued, what year it was?  It doesn't
 5   appear to have a date on it.
 6      A.   Sometime in '99.
 7      Q.   Okay.  Now, I think you said a moment ago,
 8   the focus of the report was both on the perceptions of
 9   the program that could give rise to -- things that
10   could prompt customers to perceive the program as being
11   discriminatory and ways in which people could use the
12   program to actually discriminate?
13      A.   That's correct.
14      Q.   Did the report identify particular ways in
15   which the program might be perceived -- might be caused
16   to be perceived to be discriminating?
17      A.   Yeah, there were 24 areas we decided that
18   could cause a perception of discrimination.
19      Q.   Are those listed in this report?
20      A.   Yes, they are.
21      Q.   Can you show us where they are?
22      A.   Appendix B.
23      Q.   Begins on page 30?
24      A.   Page 30 through page 38 -- 39.
25      Q.   So each of those items called a "Factor"
```

Page 26

1    at the top of those that's in bold was one of the
2    factors that your group concluded might cause people to
3    perceive the program as operating in a discriminatory
4    way?
5        A.   That's correct.
6        Q.   If you just go to Factor 1, as an example,
7    on page 30, below Factor 1 are three numbered points.
8    Do you see those?
9        A.   Yes, I do.
10       Q.   What were those intended to convey?
11       A.   These were to give examples that would
12   clarify what the factor meant.
13       Q.   So these were examples to illustrate what
14   Factor 1 meant?
15       A.   Yes.
16       Q.   In Appendix B, Factor 1, there were three
17   examples given; is that correct?
18       A.   That's correct.
19       Q.   Were these examples formulated by the team
20   that you assembled?
21       A.   Yes.
22       Q.   Where did they come up with these examples?
23       A.   Based on their knowledge of the Farm Loan
24   Program.
25       Q.   So this is drawn from their experience?

Page 27

1        A.   Yes.
2        Q.   Then were there also -- you said you
3    explored ways in which the Farm Loan Program might
4    actually be used to commit discrimination; is that
5    correct?
6        A.   That's correct.
7        Q.   Were there particular ways that were
8    identified?
9        A.   Yes, there were.
10       Q.   Can you show us where those are listed?
11       A.   On page 40 through 44.
12       Q.   So page 40 through 44 lists nine factors; is
13   that correct?
14       A.   That's correct.
15       Q.   Once again, if you just take Factor 1 on
16   page 40, there are seven numbered subparagraphs or
17   points there. Do you see those?
18       A.   Yes.
19       Q.   Are those again examples to illustrate what
20   Factor 1 meant?
21       A.   That's correct.
22       Q.   Where did those examples and others like
23   them in this area come from?
24       A.   This came from the group.
25       Q.   These again came from their substantive

Page 28

1    knowledge of the Farm Loan Program?
2        A.   That's correct.
3        Q.   Now, I realize that these were grouped by
4    certain particular factors. If you look at Factor 1,
5    it says:
6            "The subjective nature of loan making and
7    servicing involves personal judgment."
8            Do you see that?
9        A.   Yes.
10       Q.   Then the examples below are intended to
11   illustrate how that might operate in a manner that
12   could be discriminatory; is that right?
13       A.   That's correct.
14       Q.   Okay. I assume that the subjectivity issue,
15   that is, the subjective nature of loan-making and
16   loan-servicing that is described in Factor 1 and
17   illustrated below, could also, that same subjectivity
18   could affect other areas that are identified as other
19   avenues of discrimination?
20           Let me give you an example. If you look at
21   Factor 6, which is on page 43, it says:
22           "FSA loan officers have the ability to
23   discourage a potential applicant from applying for
24   a loan."
25           Do you see that?

Page 29

1        A.   Uh-huh.
2        Q.   Below that, there are a series of bulleted
3    points, I guess, I gather, also intended to illustrate
4    how that could happen. Is that right?
5        A.   Yes.
6        Q.   Some of those might have been -- those
7    examples might be the product of the exercise of
8    discretion or subjectivity by the people who are
9    administering the Farm Loan Program; isn't that
10   correct?
11       A.   I see it a little bit different. The first
12   one deals with -- the subjective nature deals with the
13   part of the program where the Farm Loan officer has to
14   make a decision. And he can make a decision, he or she
15   can make a decision that isn't necessarily dictated by
16   their procedure. They had latitude in there for making
17   the decision.
18           The second one, where the:
19           "Farm Loan Officers have the ability to
20   discourage a potential applicant from applying for a
21   loan"
22           -- is where a person wanted to be
23   deliberately mischievous.
24       Q.   I see.
25           MR. CAMPBELL: Are you done with your

Page 30

```
 1  answer?
 2         THE WITNESS:  Yes.
 3     Q.  Okay, I understand.
 4         Now, you remained at the USDA for about
 5  four years after you issued the Qualitative Study,
 6  Qualitative Report; isn't that right?  The report
 7  was issued in 1999 --
 8     A.  Approximately four years.
 9     Q.  I am not trying to trick you.  But you said
10  you issued the report in 1999, and you left in 2003.
11  So that's about four years; isn't that correct?
12     A.  Yes.
13     Q.  After you issued this Qualitative Study,
14  Qualitative Report, what did you expect to happen at
15  the FSA?  Did you expect any changes to be made?
16         MR. CAMPBELL:  Objection.  Compound
17  question.
18     Q.  You can answer.
19     A.  My thoughts were that they would take the
20  information in this report to see whether there were
21  areas -- whether there could be opportunities to
22  mitigate or eliminate the perceptions or the ability
23  to discriminate.
24     Q.  Did you have any notion of how that process
25  might work, what you expect?
```

Page 31

```
 1     A.  No, I didn't.
 2     Q.  Did you in any way expect changes to the FLP
 3  procedures or protocols for the program?
 4     A.  My expectation is that they would make
 5  improvements, so there would be some changes made
 6  where there were opportunities to do so.
 7     Q.  When you say, changes made, you mean changes
 8  made in the Farm Loan Program?
 9     A.  Yes.
10     Q.  By the time you left USDA in 2003, were you
11  aware of any changes that were made in the Farm Loan
12  Program in response to the Qualitative Study?
13     A.  No.
14     Q.  Now, on page 26 of the Qualitative Study, if
15  I could direct your attention there, please -- do you
16  have 26 in front of you?
17     A.  Yes.
18     Q.  The first section is called "Future
19  Investigation."  And it says:
20         "The Agency has continuing efforts in place
21  to resolve issues of disparity and to assure that all
22  civil rights laws are enforced within the Farm Service
23  Agency.  Below is an abbreviated list of those
24  projects."
25         Do you see that?
```

Page 32

```
 1     A.  Yes.
 2     Q.  That's at the very top of page 26.
 3     A.  Yes, I see it.
 4     Q.  Let me direct your attention down below to
 5  the section marked "CR&SBUS."  First of all, what does
 6  "CR&SBUS" stand for?
 7     A.  Civil Rights and Small Business Utilization
 8  Staff.
 9     Q.  Was that the full name of the Civil Rights
10  Office at the FSA?
11     A.  That's correct.
12     Q.  So when this refers in this report to things
13  being undertaken by the Acting Director of CR&SBUS,
14  that would have been you; is that correct?
15     A.  That's right.
16     Q.  So here, it says "CR&SBUS Research."  If I
17  can just read the first portion of this to you.  It
18  says:
19         "The CR&SBUS is conducting three studies of
20  civil rights issues in the Agency.  One study is a
21  quantitative analysis of the FLP" -- that's the Farm
22  Loan Program -- "to examine if and where disparity
23  exists."
24         To your knowledge, did any such study ever
25  occur?
```

Page 33

```
 1     A.  No.
 2     Q.  Then it says:
 3         "Two others are qualitative analyses.  One
 4  examines the similarities and differences of program
 5  complaints."
 6         To your knowledge, did that study ever take
 7  place?
 8     A.  No.
 9     Q.  Then it says:
10         "The other deals with determining racial and
11  gender similarities and differences of the success and
12  failure of farm operations."
13         To your knowledge, did that study ever
14  occur?
15     A.  No.
16     Q.  Now, once this study, this report was
17  issued, do you know whether, were copies sent to
18  members of the study group, Qualitative Study group?
19     A.  I'm not sure.
20     Q.  Okay.  Before we leave this, let me just
21  turn your attention to the section beginning on page 17
22  of Exhibit -- this is Exhibit 2 again.  Do you have
23  that in front of you?
24     A.  Yes.
25     Q.  Here, it appears again that the factors,
```

9 (Pages 30 to 33)