# Exhibit 26

## EXPERT REPORT OF WILLIAM T. BIELBY, PH.D.

*Marilyn Keepseagle, et al. v. Tom Vilsack, Secretary,*

*United States Department of Agriculture*

### ASSIGNMENT, QUALIFICATIONS, AND MATERIALS REVIEWED

1.  I have been retained by Jenner & Block, LLP and Cohen Milstein Sellers & Toll PLLC, attorneys for the plaintiffs ("Class Counsel") in *Keepseagle v. Vilsack*, a class action race discrimination lawsuit alleging that the United States Department of Agriculture ("USDA" or "Department") discriminated against Native Americans in the processing and granting of direct farm loans and farm loan servicing.  I have been asked by Class Counsel to review materials relating to the criteria and processes used to make decisions about loans and loan servicing and to determine whether the decision-making process is likely to be vulnerable to stereotyping and bias that disadvantages Native Americans.

2.  I have testified about stereotypes and bias as an expert witness in both state and federal cases involving discrimination in employment and in public contracting, and I have also prepared an expert report for litigation involving allegations of discrimination in police procedures.  A list of cases in which I have been identified as an expert or have given expert testimony since 2004 is attached as Exhibit A.  My rate of pay for consultation as an expert in this matter is $525 per hour.  My rate for time spent testifying in deposition or at trial is $800 per hour.

3.  I received a Ph.D. in Sociology from the University of Wisconsin--Madison in 1976.  I also have a B.S. in Electrical Engineering and a M.A. in Social Sciences from the University of Illinois.  I am a Professor of Sociology at the University of Illinois at Chicago ("UIC").  I am also a Professor Emeritus at the University of California, Santa Barbara ("UCSB"), where I served on the faculty of the Department of Sociology from 1977 to 2004.  At UCSB I was affiliated with the Department of Statistics and Applied Probability, and I chaired my department from 1992 to 1998.  Prior to coming to UIC this academic year I was a Professor of Sociology at the University of Pennsylvania, where I was Undergraduate Chair of my department from 2005 to 2007.

4.  I have taught courses on employment discrimination at both the undergraduate and graduate levels at UCSB, at the University of California Washington Center in the District of Columbia, at Northwestern University, and at UIC.  Among my former positions are Visiting Professor of Management at UCLA, Fellow at the Center for Advanced Study in the Behavioral Sciences at Stanford, Visiting Distinguished John D. MacArthur Professor of Sociology at Northwestern University, and Visiting Scholar at the American Bar Foundation.  At the University of Pennsylvania I taught graduate level courses on statistics and research methods in the social sciences, and I continue to teach those courses at UIC.  In addition to courses on discrimination, research methods, and statistics, I have taught graduate and undergraduate courses on organizational behavior, labor markets, and social inequality.

5.  My research specialties are in the areas of organizational behavior, gender and racial inequality, and social science research methods.  Over the past twenty-five years, much of my research has focused on issues of workplace discrimination and on

organizational policies and practices more generally.  My research on these topics has been supported by four grants from the National Science Foundation, and it has been published in leading peer-reviewed social science research journals.  My Curriculum Vitae is attached as Exhibit B.

6.  I have received national awards from three different professional associations for my research.  I have served on numerous panels, advisory committees, and professional workshops on topics relating to workplace discrimination, organizational personnel policies and practices, and research methodology.  I have served as an advisor, consultant, or reviewer for the following organizations and agencies:  the U.S. Bureau of the Census, the U.S. Department of Justice, the U.S. Department of Labor, the Equal Employment Opportunity Commission, the National Science Foundation, the National Institute of Mental Health, the National Academy of Sciences, the University of Michigan's Institute for Social Research, Stanford University, the Writers' Guild of America, West and the Bar Association of San Francisco.  I have also served on the editorial boards of leading social science journals, and I regularly review manuscripts for scientific journals on topics relating to organizational behavior, employment discrimination, and research methodology.  I have been elected to several offices in the American Sociological Association.  I served for three years on the ASA Council, the organization's governing body in addition to serving as the Association's President in 2003.

7.  My analysis is based mainly on deposition testimony of USDA officials designated under Rule 30(b)(6) to testify on behalf of the Department on topics relating to farm loans and loan servicing and on exhibits to those depositions which are mostly

official Department documents relating to loans and loan servicing.  I have been provided with and have reviewed the 30(b)(6) deposition testimony (and accompanying exhibits) of the following current or former USDA officials:  Theresa Bulla, Carolyn Cooksie, Katherine Gugulis, Sherie Hinton Henry, Walter Michael Hill, Kenneth Nagel, James Radintz, James Rowe, Johnny Toles, Gladys Gary Vaughan, and Josi Woodley-Jones.  I have also reviewed the deposition testimony of Mr. Hill that was not taken under Rule 30(b)(6) and accompanying exhibits.  I have also reviewed declarations of Lloyd E. Wright and Rosalind Gray pertaining to their experiences in the USDA's Office of Civil Rights.  It is my understanding that Mr. Wright and Ms. Gray have provided deposition testimony in this litigation and that the transcripts of their testimony is not yet available. I may review those transcripts when they becomes available.[1]  A list of the depositions and other materials provided to me appears in Exhibit C.  Below, where I cite to 30(b)(6) deposition testimony, I identify the relevant transcript by the deponent's last name and the topic number as listed in the "Plaintiffs Notice of Deposition Pursuant to Rule 30(B)(6)," dated January 4, 2006 and in "Plaintiffs Amended Second Notice of Deposition Pursuant to Rule 30(b)(6)," dated November 1, 2006.

8.  I have also relied upon academic articles, chapters, and books written by social scientists and management scholars.  Citations to this body of scholarship appear in the footnotes to this report.  Social research conducted across many decades has generated considerable knowledge about the features of decision-making contexts that make them

---

[1]At my request, counsel for plaintiffs arranged for me to speak with Ms. Gray by telephone.  We spoke by phone for approximately 40 minutes on February 17, 2009.  In that conversation, Ms. Gray described for me her knowledge of how compliance reviews were conducted when she was Director of the USDA's Office of Civil Rights, how the office was staffed during her tenure, how complaints were received and processed, and her observations from visiting FSA field offices.  The information she conveyed in our phone conversation is consistent with what I have learned from her declaration and from the other documents and testimony I have reviewed.  As a result, I have not relied on the phone conversation in forming my opinions.

vulnerable to bias.  That same research, either directly or by implication, points to the kinds of policies and practices that are likely to minimize bias.  The relevant research has applied multiple methodologies in a variety of contexts, including experiments in controlled laboratory settings; ethnographies and case studies in "real world" organizations both large and small, public and private, and in a range of industries; surveys done with representative samples of individuals employed in organizations; and historical studies based on archival materials from the United States and abroad.  Thus, the scientific evidence about bias and discrimination in organizational decision-making has substantial external validity and provides a sound basis for analyzing an organization's (or a government agency's) policies and practices.  My method is to look at distinctive features of the organization's policies and practices and to evaluate them against what social science research shows to be factors that permit bias to affect decision making and those that minimize bias.  My method in this litigation is the same as the method I have applied in reports admitted into evidence in state and federal courts in other discrimination litigation.  It is similar to the approach taken by other social scientists who have testified in matters relating to discrimination, and it is sometimes called "social framework analysis."[2]

**FOCUS OF MY ANALYSIS**

9.  Plaintiffs allege that Native Americans who sought loans were less likely to receive them than were whites and that the servicing options offered to Native Americans

---

[2]See E. Borgida, C. Hunt, and A. Kim, "Research in Sex Discrimination Litigation," *Journal of Law and Policy,* Vol. 13, 2005, p. 613-628; D. L. Faigman and J. Monahan, "Psychological Evidence at the Dawn of the Law's Scientific Age," *Annual Review of Psychology*, Vol. 56, 2005, p. 631-659; and E. Borgida and S. T. Fiske (eds.), *Beyond Common Sense:  Psychological Science in the Courtroom*, Blackwell, 2008.

were less favorable than those offered to whites.  There are additional related allegations

in this litigation such as the placement of offices in areas inaccessible to Native

Americans, but only the allegations described above are addressed in this report.  In

particular I focus on whether there are discretionary and subjective features of the process

used by the USDA's Farm Service Agency ("FSA") and by its predecessor, the Farmers

Home Administration ("FmHA"), to make decisions about loan applications and loan

servicing that are vulnerable to stereotyping and bias in a way that disadvantages Native

American applicants, and whether the USDA had in place adequate monitoring and

oversight to minimize the effects of this stereotyping and bias on Native Americans.

10.   Below, I first describe the combination of objective and subjective factors

that are relied upon in making decisions about loans and loan servicing.  Second, I

summarize social science research on how discretion and subjectivity in decision making

can lead to bias.  Third, I explain how that research provides a framework for

understanding disadvantages faced by Native Americans in obtaining direct loans and

loan servicing.  Fourth, I describe FmHA's and FSA's policies and practices for

monitoring and oversight of loan programs and assess whether they are adequate for

minimizing bias against Native Americans.

## FSA'S AND FmHA'S PROCESSES FOR MAKING DECISIONS ABOUT DIRECT LOANS AND LOAN SERVICING

11.  FSA makes direct loans to farmers on family-sized farms who are unable to

obtain credit from banks or from other lenders.  For such farmers, often beginning

farmers with limited resources or established farmers who have experienced financial

difficulties, FSA is the "lender of last resort."[3]  For a farmer who holds FSA loans and is

at least 90 days delinquent due to financial troubles, the Agency is required to offer the

borrower modified loan servicing options (sometimes called 1951-S servicing, after the

statute prescribing the program).[4]  The purpose of servicing is to keep the farm operation

viable.[5]  Through loan servicing, the farmer's debt is restructured through, for example,

reamortization, rescheduling, debt settlement, or foreclosure.[6]

   12.  Currently, direct loans and loan servicing are administered out of FSA's

county offices, where they are managed by Farm Loan Managers who supervise Farm

Loan Officers.[7]  At present there are approximately 2400 county offices, and about 750 of

the offices administer farm loans.[8]  Currently, depending on the size of the loan,

decisions about loan applications are made by a Farm Loan Officer or a Farm Loan

Manager in the county office, by a District Director, or by a State Director.[9]  Advising

county-level managers and officers in each office is a county committee, with members

elected by local farmers.[10]  Prior to 1985, county committee members were appointed,

with appointment authority delegated from the Secretary of Agriculture to the state

directors of FmHA.[11]  From 1985 until 1995 county committees had three members:  two

elected and one appointed.[12]  Since then, the committees have typically had three to five

---

[3]http://www.fsa.usda.gov/FSA/webapp?area=home&subject=fmlp&topic=landing (retrieved 1/27/09);
Cooksie Topic 2 depo., p. 152.
[4]Cooksie Topic 1 depo., p. 90-91; Rowe Topic 6 depo., p. 24; Rowe Topic 11 depo., p. 9-10.
[5]Rowe Topic 7 depo., p. 61.
[6]Cooksie Topic 1 depo., p. 91; Rowe Topic 6 depo., p. 19; Rowe Topic 11 depo., p. 11-13.
[7]http://www.fsa.usda.gov/FSA/webapp?area=about&subject=landing&topic=sao (retrieved 1/27/09);
Cooksie Topic 1 depo., p. 60-61, 79-80, 86.
[8]Cooksie Topic 1 depo., p. 68-69.
[9]Cooksie Topic 1 depo., p. 82-83, 150; Radintz Topic 3 depo., p. 41-42; Radintz Topic 7 depo., p. 17-19,
23.
[10]Cooksie Topic 1 depo., p. 126-128.
[11]Nagel Topic 9 depo., p. 25-33.
[12]Nagel Topic 9 depo., p. 38.  Also see Cooksie Topic 1 depo., p. 136; Cooksie Topic 2 depo., p. 30-31;
Radintz Topic 7 depo., p. 17-19.

members.  In addition to advising on management issues and hiring the County Executive Director,[13] the committees are charged with "ensuring that all FSA programs are delivered properly and the public is informed properly about them."[14]  Until approximately 2000, county committees made decisions about which applicants are eligible for FSA loan programs, and they also made decisions about approving debt servicing and debt settlement plans.[15]  In 2000, authority for making eligibility decisions was removed from county committees and delegated to agency officials with loan approval authority.  However, as part of that change, the committees were charged with acting in an advisory capacity for Farm Loan Program loans, and for a year or two after 2000 they were responsible for certifying the eligibility determinations made by Farm Loan Managers.[16]

13.   When a farmer seeks a loan from FSA, a determination is made about whether the farmer is *eligible* for a loan.[17]  If eligible, a second decision is made about whether the farmer's business plan for operating the farm is *feasible*.[18]  The two-stage process has been in place at FSA and FmHA since 1981.[19]  A similar process exists for loan servicing, it must be determined whether a farmer with a delinquent loan from FSA (or its predecessor agency) is *eligible* for servicing, and if so, whether the business plan is *feasible* for meeting the obligations of revised servicing options.[20]  Mr. Radintz, the

---

[13]Cooksie Topic 1 depo., p. 127-129; Nagel Topic 9 depo., p. 52-53.  A similar hierarchical structure was in place prior to the restructuring put in place by the Department of Agriculture Reorganization Act of 1994; see Cooksie Topic 1 depo., p. 63-69.
[14]Nagel Topic 9 depo., p. 184.
[15]Nagel Topic 9 depo., p. 115-121, 153-160, 165-166; Cooksie depo., Topic 1, p. 130-131, 135-136; Radintz Topic 6 depo., p. 115-117.
[16]Nagel Topic 9 depo., p. 169-173, 189-192.
[17]Radintz Topic 6 depo.,  p. 36-39.
[18]Radintz Topic 6 depo., p. 35.
[19]Cooksie Topic 1 depo., p. 62-63.
[20]Rowe Topic 7 depo., p. 21-23.

Director of FSA's Loan Making Division, testified that in his experience the denial of an
application for a direct loan was more often due to failure to meet feasibility standards
than due to a determination that the applicant was not eligible for a loan.  Mr. Rowe,
FSA's Branch of the Direct Loan Servicing Division, gave similar testimony regarding
denials of applications for loan servicing.[21]

### *Eligibility and Feasibility Determinations for Direct Loans*

14.  Currently, according to statute, to be eligible for a direct loan, an applicant
must satisfy several criteria.  Among them, he or she must have "either training or
farming experience that ... is sufficient to assure reasonable probability of success" in
farming operations, have acceptable credit history but be unable to obtain credit
elsewhere, and be the operator (or tenant operator) of a family farm after the loan has
closed.[22]

15.  FSA occasionally issues guidance beyond the relevant statute that elaborates
on the interpretation of specific criteria or requirements.  For example, guidelines have
been distributed that specify that the requirement regarding "sufficient experience" for
ownership loans can be met by having at least one year's experience in operating a
farm.[23]  However, using the same example, there has been no further guidance issued on
what constitutes "reasonable probability of success,"[24] it is left to the agency official's
discretion to decide what kind of job within farming is sufficient to satisfy the experience

---

[21]Radintz Topic 7 depo., p. 16-17; Rowe Topic 7 depo., p. 20.
[22]The quoted passage is from Statute 7 USCS Article 1922 which is Exhibit 2 to Radintz Topic 6 depo.
Also see "Direct Loan Program," USDA Farm Service Agency, Dated December 12, 2008,
http://www.fsa.usda.gov/FSA/webapp?area=home&subject=fmlp&topic=dfl (retrieved January 20, 2009).
There is also a citizenship requirement, the individual has to have the legal capacity to take on the loan
obligation, he or she must not have had a prior loan that resulted in a loss to FSA, and the applicant must
not be delinquent on any Federal Debt.
[23]Radintz Topic 6 depo., p. 52-54.  Also see Radintz Topic 6 depo., p. 100-102.
[24]Radintz Topic 6 depo., p. 51--52, 56-58.

requirement, and FSA has issued no guidance on the time frame within which the applicant is expected to achieve success.[25]

16.  Under prior versions of the eligibility rules for direct loans, those making eligibility decisions were instructed to make highly subjective personality assessments of applicants.  Under the 1988 version of the eligibility requirements, loan officers and county committees were charged with making judgment calls about whether applicants had the "character" and "industry" to carry out the proposed operation, and the assessment of these traits were part of the eligibility requirements from at least 1981 until 1994.[26]  Around the same time (until at least 1994), County Committees were also instructed to rely upon their "personal knowledge" of the applicant in making eligibility decisions.[27]

17.  Even determining whether an applicant meets the seemingly self-evident standard of operating a "family farm" requires loan officers to exercise judgment.  FmHA and FSA have issued notices that attempt to elaborate and clarify what kind of operation meets the agency definition of a family sized farm, but even these notices state that there is no single objective basis for making the determination, which must be made with the application of judgment on a case by case basis.[28]

18.  If deemed eligible, the applicant completes a loan application, meets with an FSA loan officer or manager, and develops a farm business plan (called a "farm and home plan" prior to 1996) that is evaluated for feasibility, based on an assessment of the

---

[25]Radintz Topic 6 depo., p. 60-66.  Also see Radintz Topic 6 depo., p. 102-105.
[26]Cooksie Topic 2 depo., p. 84-89 and Exhibit 5 to that deposition, FmHA Instruction 1941-A; Nagel Topic 13 depo., p. 16-17; Radintz Topic 6 depo., p. 39-40, 132-154.
[27]Radintz Topic 6 depo., p. 115-117.
[28]Cooksie Topic 2 depo., p. 69-83.

applicant's "repayment ability, security, and compliance with other regulations."[29]  A

direct loan application is feasible when "the income generated by the farm and any other

sources of income is sufficient to pay expenses and taxes, pay any debt installments that

are due and have a reasonable standard of living for the family."[30]  In 2004 the agency

adopted an automated financial planning system for constructing farm business plans,

however the feasibility criteria and interactive process for developing plans were not

altered by this technical change in the format of the farm plan.[31]  If the application is

deemed feasible, a determination is made about whether there the collateral is adequate

for the size of loan being requested.[32]

19.   An applicant's farm business plan is developed as part of an interactive "joint

process" between the applicant and the loan officer.  In that process, the loan officer uses

his or her own judgment in assisting the applicant in developing a realistic plan.[33]  While

the end product is a quantitative representation of the farm business' cash flow, there is

considerable discretion and exercise of judgment in the formulation of the numbers that

go into the plan.[34]  In particular, loan officers have discretion to explore with an applicant

alternatives to a plan that was deemed not feasible, but only if the applicant took the

initiative to request that kind of reconsideration.[35]  Loan officers were instructed to only

consider "realistic" alternatives, which by necessity requires subjective judgment on their

---

[29]"Direct Loan Program," *op cit.*; Radintz Topic 7 depo., p. 24-27, 36-37.
[30]Radintz Topic 7 depo., p. 11.  From 1981 to 1988, the definition of feasibility also required that the income is also sufficient "to provide for maintenance of the farm and the farm assets" (Radintz Topic 7 depo., p. 12).
[31]Radintz Topic 7 depo., p. 37-42.
[32]Radintz Topic 7 depo., p 18.
[33]Radintz Topic 7 depo., p. 59-63, 95.
[34]Radintz Topic 7 depo., p. 70
[35]Radintz Topic 7 depo., p. 77-83.

part.[36]  Moreover, prior to the establishment of the National Appeals Division in 1989, there was no formal mechanism for an applicant to appeal a finding by the agency that the plan was not feasible.[37]

### Eligibility and Feasibility Determinations for Loan Servicing

20.   To be eligible for loan servicing assistance:  (1) the delinquency or financial distress must be due to circumstances beyond the farmer's control; (2) he or she must have acted in "good faith" regarding the loan; (3) the farmer must present a plan containing "reasonable assumptions" that demonstrates an ability to meet family living and farm operating expenses and service all debts; and (4) the restructured loan must provide a net recovery to the Federal Government equal to or greater than that which could be obtained by liquidation or foreclosure.[38]  The Code of Federal Regulations specifies specific circumstances that are allowed to be considered in determining whether circumstances are beyond the control of the farmer, including:  unemployment; illness, injury, or death; natural disasters; and widespread economic factors.  Making determinations on these factors can involve discretion and the exercise of judgment on the part of the individual deciding about eligibility.  For example, unemployment of the borrower or spouse must be "due to circumstances beyond their control," and the economic factors must be "widespread and not limited to an individual case."[39] Similarly, determination of whether a borrower has operated in good faith in attempting to meet the obligations of current or prior loans involves the exercise of judgment.[40]

---

[36]Radintz Topic 7, depo., p. 91-92, 123.
[37]Radintz Topic 7 depo., p. 72-73.
[38]Rowe Topic 6 depo., Exhibit 2, 7 UCS 2001 Article 7, "Debt Restructuring and Loan Servicing," p. 1.
[39]CFR Article 1951.909,  7 CFR Ch. XVIII (1-1-05 Edition), p. 124-125 (Exh. 3 to Rowe Topic 6 depo.).
[40]Cooksie Topic 2 depo., p. 89-91, 110-114.

21.  The standards for determining feasibility of applications for loan servicing are identical to those for applications for direct loans.[41]  The elements of discretion and subjectivity in loan feasibility determinations are evident as well in the process for determining feasibility in applications for servicing.[42]

## SOCIAL SCIENCE RESEARCH ON STEREOTYPES, SUBJECTIVITY, AND DISCRETION

### *Stereotypes and Bias in Decision Making*

22.  A stereotype is a set of beliefs that links personal traits of individuals to specific social groups.[43]  The association of such traits as "assertive" and "rational" with the category male, "nurturing" and "emotional" with the category female, "violent" and "hostile" with the category African American, and "gang-banger" and "macho" with Latino, are examples of stereotypes.[44]  In the process of stereotyping, the generalized beliefs about the group are applied to individual members of the group; the impressions and evaluations we form of individuals of the stereotyped group are biased to conform to

---

[41]Rowe Topic 7 depo., p. 13-14.

[42]Rowe Topic 7 depo., p. 21-28, 31-32, 45, 63-65.

[43]S. L. Gaertner and J. F. Dovidio, "Understanding and Addressing Contemporary Racism:  From Aversive Racism to the Common Ingroup Identity Model," *Journal of Social Issues*, Vol. 61, 2005, p. 615-639; S. T. Fiske, A. J. C. Cuddy, P. Glick, and J. Xu, "A Model of (Often Mixed) Stereotype Content:  Competence and Warmth Respectively Follow from Perceived Status and Competition," *Journal of Personality and Social Psychology*, Vol. 82, 2002, p. 878-902; J. F. Dovidio, J. C. Bringham, B. T. Johnson, and S. L. Gaertner, "Stereotyping, Prejudice, and Discrimination:  Another Look," p. 276-319 in *Stereotypes and Stereotyping*, edited by C. N. MacRae, C. Stangor, and M. Hewstone, Guilford Press, 1996; D. F. Mackie, D. L. Hamilton, J. Susskind, and F. Roselli, "Social Psychological Foundations of Stereotype Formation," p. 41-78 in *Stereotypes and Stereotyping*, edited by C. N. MacRae, C. Stangor, and M. Hewstone, Guilford Press, 1996.

[44]P. G. Devine and A. J. Elliot, "Are Racial Stereotypes Really Fading?  The Princeton Trilogy Revisited," *Personality and Social Psychology Bulletin*, " Vol. 21, 1995, p. 1139-1150; and for a review of research see D. J. Schneider, *The Psychology of Stereotyping*, Guilford Press, 2004 (Chapter 11, Content of Stereotypes, at p. 452-466).

societal stereotypes.[45]  Social psychological research shows Native Americans are subject

to stereotypes of being "unskilled, uneducated, 'potlatching' wastrels who are nepotistic,

naïve, unable to focus on long-term goals, and generally unable to manage their own

affairs effectively."[46]  When stereotypes such as these are allowed to influence social

judgments, decisions about members of minority groups will be based on general beliefs

about the behaviors, traits, and qualities associated with their gender or race/ethnicity

instead of the actual traits of the individuals being judged.[47]  Applied to the context of

the process of making decisions about FSA loans and loan servicing, when stereotypes

about Native American influence those decisions, Native Americans seeking to

participate in these FSA programs are likely to be viewed as incompetent in business

affairs and less able than whites to develop and execute plans to successfully operate a

family-sized farm.

   23.  Closely related to the psychological concept of stereotyping is the concept of

outgroup bias.  Individuals understand their social worlds in terms of categorical

---

[45]Schneider, *op cit*.  Also see N. E. Evans, and R. B. Tyler, "Racial Stereotypes:  The Contents of Their Cognitive Representations," *Journal of Experimental Social Psychology*, Vol. 22, 1986, p. 22-37; J. F. Dovidio, J. C. Bringham, B. T. Johnson, and S. L. Gaertner, *op cit*., S. B. Blinder, "Dissonance Persists Reproduction of Racial Attitudes Among Post–Civil Rights Cohorts of White Americans," *American Politics Research*, Vol. 35, 2007, p. 299-335.  For articles and chapters providing reviews of relevant research in organizational contexts, see L. H. Krieger, "The Contents of our Categories:  A Cognitive Bias Approach to Discrimination and Equal Employment Opportunity," *Stanford Law Review*, Vol. 47, 1995, p. 1161-248; B. F. Reskin, *The Realities of Affirmative Action in Employment,* American Sociological Association, 1998; W. T. Bielby, "Minimizing Workplace Gender and Racial Bias," *Contemporary Sociology*, Vol. 29, 2000, p. 120-129; W. T. Bielby, "Promoting Racial Diversity at Work:  Challenges and Solutions," p. 53-88 in *Diversity at Work*, edited by Arthur P. Brief, Cambridge, 2008.
[46]Quoted from K. James, W. Wolf, C. Lovato, and S. Byers, "Barriers to Workplace Advancement Experienced by Native Americans," Cornell University ILR School, 1994 (http://digitalcommons.ilr.cornell.edu/key_workplace/123/, retrieved 1/30./09); also see J. E. Trimble, "Stereotyped Images, American Indians, and Prejudice," p. 181-202 in *Eliminating Racism:  Profiles in Controversy*, edited by P. A. Katz and D. A. Taylor, Plenum, 1988.
[47]N. Dasgupta, "Implicit Ingroup Favoritism, Outgroup Favoritism, and Their Behavioral Manifestations," *Social Justice Research*, Vol. 17, June 2004, p. 143-169; J. F. Dovidio and S. L. Gaertner, "Stereotypes and Evaluative Intergroup Bias," p. 167-193 in *Affect, Cognition, and Stereotyping*, edited by D. M. Mackie and D. L. Hamilton, Academic Press, 1993; P. G. Devine, "Stereotypes and Prejudice:  Their Automatic and Controlled Components," *Journal of Personality and Social Psychology*, Vol. 56, 1989.

distinctions and classify others into ingroups and outgroups.  We automatically prefer and are more trusting of ingroup members (individuals in the same category as ourselves), we attribute positive attributes to them, and we favor them in allocating rewards.  We devalue and distrust outgroup members, we attribute successful performance by them to situational factors such as assistance from others or good luck, while we attribute any negative performance to personal shortcomings such as lack of ability or talent.[48]

Applied to the context of FSA decision making, white loan officers and decision-makers are likely to consider Native Americans to be members of an "outgroup" especially in counties where few if any Native Americans serve as elected committee members or are employed as loan officers.

**Discretion and Bias in Decision Making**

24.  At issue, then, is whether the decision making context at FSA (and its predecessor agency) have features that are likely to make decisions about direct loans and loan servicing vulnerable to stereotyping and outgroup bias.  One other area of social science scholarship is useful for understanding whether this is the case -- research on

---

[48]C. W. Perdue, J. F. Dovidio, M. B. Gurtman, and R. B. Tyler, "Us and Them: Social Categorization and the Process of Intergroup Bias," *Journal of Personality and Social Psychology*, Vol. 59, p.1990,  475-486; R. M. Kramer, "Intergroup Relations and Organizational Dilemmas: The Role of Categorization Processes," *Research in Organizational Behavior*, Vol. 13, 1991, p. 191-228; M. B. Brewer and R. J. Brown, "Intergroup Relations," p. 554-594 in *Handbook of Social Psychology, Vol. 2 (4th ed.)*, edited by D. T. Gilbert, S. T. Fiske, and G. Lindzey, Oxford, 1998;  M. B. Brewer, "The Psychology of Prejudice: Ingroup Love or Outgroup Hate?" *Journal of Social Issues*, Vol. 55, 1999, p. 429-444; and M. Hewstone, M. Rubin, and H. Willis, "Intergroup Bias," *Annual Review of Psychology*, Vol. 53, 2002, p. 575-604.  For reviews and relevant research on attribution bias, see J. K. Swim and L. J. Sanna, "He's Skilled, She's Lucky:  A Meta-Analysis of Observers' Attributes for Women's and Men's Successes and Failures," *Personality and Social Psychology Bulletin*, Vol. 22, 1996, p. 507-519; S. T. Fiske and S. E. Taylor, *Social Cognition*, Second Edition, McGraw-Hill, 1991, Chapter 3; M. Hewstone, "The 'Ultimate Attribution Error'?  A Review of the Literature on Intergroup Causal Attribution," *European Journal of Social Psychology*, Vol. 20, 1990, p. 311-335.  For studies of attribution bias in organizational contexts, see J. H. Greenhaus and S. Parasuraman, "Job Performance Attributions and Career Advancement Prospects:  An Examination of Gender and Race Effects," *Organizational Behavior and Human Decision Processes*, Vol. 55, 1991, p. 273-297; M. Igbaria and J. Baroudi, "The Impact of Job Performance Evaluations on Career Advancement Prospects:  An Examination of Gender Differences in the IS Workplace, *Management Information Systems Quarterly,* Vol. 19, 1995, p. 107-123

discretion in making decisions about members of minority groups or outgroups.  This

research shows that stereotypes and outgroup bias are especially likely to affect decisions

about minorities when the criteria used to make decisions are vague and ambiguous and

when decision-makers have substantial discretion about which criteria to use and how to

weigh them.[49]  This research demonstrates that substantial discretion in assessing and

weighing evaluative criteria invites bias.  Indeed, in a highly discretionary system with

limited monitoring, even objective factors can be evaluated in a way that leads towards

favoritism to the majority group and discrimination against those in the minority.  For

example, social psychologists Samuel Gaertner and John Dovidio have conducted

research showing that when white evaluators have discretion in how to weigh evaluative

criteria, they tend to do so selectively, in a way that biases outcomes against African

American ratees and favors whites.  In one part of their study, participants were told they

were assisting a university in making admission decisions, and they were given

information on factors such as test scores and high school grades for (hypothetical)

African American and white applicants.  When applicants were strong on one dimension

and weak on the other, raters tended to give the stronger dimension a greater weight for

white applicants and the weaker one a greater weight for African American applicants.[50]

---

[49] On bias and the exercise of discretion, see G. Hodson, G., J. F. Dovidio and S. L. Gaertner, "Processes in Racial Discrimination:  Differential Weighting of Conflicting Information," *Personality and Social Psychology Bulletin*, Vol. 28, 2002, p. 460-471; M. I. Norton, J. A. Vandello, and J. M. Darley, "Casuistry and Social Category Bias," *Journal of Personality and Social Psychology*, Vol. 87, 2004, p. 817-831; S. L. Gaertner, J. F. Dovidio, J. Nier, G. Hodson, and M. A. Houlette, "Aversive Racism:  Bias Without Intention," p. 377-393 in *Handbook on Employment Discrimination Research:  Rights and Realities,* edited by R. L. Nelson and L. B. Neilson, Kluwar Academic Press, 2005; and E. L. Uhlmann and G. L. Cohen, "Constructed Criteria:  Redefining Merit to Justify Discrimination," *Psychological Science*, Vol. 16, 2005, p. 474-480; S. T. Fiske and T. L. Lee, "Stereotypes and Prejudice Create Workplace Discrimination," p. 13-52 in *Diversity at Work*, edited by A. P. Brief, Cambridge, 2008.

[50] G. Hodson, G., J. F. Dovidio and S. L. Gaertner, "Processes in Racial Discrimination:  Differential Weighting of Conflicting Information," *Personality and Social Psychology Bulletin*, Vol. 28, 2002,  p. 460-471.

In other words, they exercised their discretion in a way that denied African Americans access to a valued resource.  The authors summarize their findings as follows:

> White college participants (whom, relative to the general population may be regarded as generally moderate to low prejudiced...), give White candidates the "benefit of the doubt," a benefit they do not extend to Blacks.[51]

25.  In a study of gender bias with a similar experimental design, Eric Uhlmann and Geoffrey Cohen found that when given discretion on defining and weighing qualifications, evaluators redefined criteria of success so that men were assigned to stereotypically male jobs and females were assigned to stereotypically female jobs.[52] They concluded (p. 474) that "even without ambiguity in applicants' credentials, the criteria used to assess merit can be defined flexibly in a manner congenial to the idiosyncratic strengths of applicants who belong to desired groups."  By acting in this way, decision-makers can justify biased decisions by appealing to seemingly "objective" criteria.  Uhlmann and Cohen conclude their study by linking it to the research of Gaertner and Dovidio described above, noting (p. 479) that it "dovetails with work on aversive racism in suggesting that prejudice often expresses itself in rationalizable ways..."  In sum, this body of research demonstrates that discretion in the definition and weighing of evaluative criteria, even with regard to ostensibly objective criteria, contributes to bias, and it often does so in a way that allows decision-makers to justify to themselves and to others that their actions are fair and nondiscriminatory.

---

[51]S. L. Gaertner, J. F. Dovidio, J. Nier, G. Hodson, and M. A. Houlette, "Aversive Racism:  Bias Without Intention," p. 377-393 in *Handbook on Employment Discrimination Research:  Rights and Realities,* edited by R. L. Nelson and L. B. Neilson, Kluwar Academic Press, 2005 (internal citation omitted, quotation on p. 384); G. Hodson, J. F. Dovidio, and S. L. Gaertner, "Processes in Racial Discrimination:  Differential Weighting of Conflicting Information," *Personality and Social Psychology Bulletin,* Vol. 28, 2002, p. 460–471.
[52]E. L. Uhlmann and G. L. Cohen, "Constructed Criteria:  Redefining Merit to Justify Discrimination," *Psychological Science*, Vol. 16, 2005, p. 474-480.

26.  By design, experimental studies like those described above employ methodologies that compare how individuals from different groups (e.g. male versus female, African American versus white) who are otherwise similar are evaluated under identical, experimentally controlled, circumstances (e.g. a hypothetical college admissions or job assignment decision).  This kind of "but for" comparison (of two individuals who are identical "but for" race or sex, which one is treated less favorably) is required to obtain a quantitative measure of the degree of bias.  However, this does not imply that the findings only pertain to contexts in which decision-makers are deciding who among a group of individuals will be evaluated most favorably (as in a promotion or hiring decision in an employment context).  The research is equally applicable to contexts in which a decision maker is making an evaluation of a single individual (such as an applicant for a loan or loan servicing).[53]  Indeed, the kind of "rationalizable prejudice" described by Gaertner and Dovidio, in which the decision maker makes a biased decision while projecting the appearance of fairness, is more likely to occur in a context in which the decision maker is *not* making an explicit comparative assessment of individuals who differ by race or gender.  When making a decision that is adverse towards a single minority applicant, the decision maker does not need to confront or reflect on the fact that he or she might have made a different decision if the applicant was not a minority.

---

[53]With regard to research on stereotyping in lending, see M. Fay and L. Williams, "Sex of Applicant and the Availability of Business 'Start-Up' Finance," *Australian Journal of Management*, Vol. 16, 1991, p. 65-73.

**SUBJECTIVITY AND DISCRETION IN THE PROCESS FOR MAKING**

**DECISIONS ABOUT DIRECT LOANS AND LOAN SERVICING AT FSA**

**CREATES VULNERABILITY TO BIAS**

27.  As noted above, Native Americans are at risk of being stereotyped as naïve,

dependent, and unskilled -- in effect, they can be subject to a stereotype that defines them

as unable and unlikely to succeed at the business aspects of farming.  And, in interacting

in organizational contexts where few Native Americans hold decision-making roles or

positions of authority they are at risk of being defined as an "outgroup."  The research I

described above indicates that stereotyping and outgroup bias are likely to be

consequential when criteria for making decisions are subjective or discretionary.

Although there have been some significant changes over the period from 1981 to the

present in the criteria for making decisions about direct loans and loan servicing and the

processes used to make those decisions, there has been and continues to be considerable

subjectivity and discretion in FSA's practices regarding eligibility and feasibility

decisions for direct loan applications and feasibility decisions for loan processing.

28.  Above I described how those who make decisions about an applicant's

eligibility for a direct loan make numerous "judgment calls," such as what aspects of an

applicant's experience constitutes evidence of appropriate training and experience,

whether the applicant has the personality traits to be a successful farmer, and how likely

it is the applicant will be successful if he or she receives a loan from FSA (or its

predecessor agency).  Absent unambiguous criteria and effective monitoring and

oversight, the exercise of judgment and discretion is likely to be done in a way that rarely

gives the benefit of the doubt to Native Americans and more likely errs in the opposite

direction.  And in the era when county committee members were charged with relying on "personal knowledge" in assessing who would be eligible to receive direct loans from FSA, Native American outsiders are likely to have been disadvantaged by ingroup favoritism (committee members relying on "personal knowledge" to favor those with whom they had personal connections) as well as outgroup bias.  Indeed, if officials in the county office hold the belief that Native American farmers who have encountered financial difficulties are poor prospects for success they may be inclined to discourage Native Americans from even applying to the direct loan program (or they may provide less encouragement to them than they would provide to white farmers with similar financial circumstances).

29.  Above I noted that social psychological research shows that poor performance by an outgroup member is likely to be attributed to personal shortcomings, while poor performance by a member of the ingroup is often attributed to external factors beyond their control.  Eligibility decisions about loan servicing, which require a determination that the economic troubles of borrower are due to factors beyond his or her control are vulnerable to this kind of attribution bias.  The same kind of attribution bias can affect determination of whether a borrower acted in "bad faith," which could be viewed as a character trait common in a minority group that is stereotyped as ill equipped to deal with financial and business affairs.

30.  As described above, the business plan that becomes the basis for the feasibility decision for both direct loans and loan servicing is the outcome of an interactive process between the loan officer and the applicant.  Loan officers who are mindful of the time and energy they have to devote to this task and who are influenced by

the stereotype that Native Americans are bad business risks may decide (rationally, in their view) to provide less technical assistance to Native American applicants than to white applicants who they view as having a greater chance of success.  For the same reason, in exercising judgment and discretion in developing the numbers that go into the business plan, loan officers have little incentive to give the benefit of the doubt to members of a group that they believe is less likely to succeed; what is viewed as appropriate assistance to a white farmer in order to make his or her plan viable may be viewed as an "unrealistic" scenario for a Native American farmer who faces similar difficulties.

31.  Relying on social science research on stereotyping and outgroup bias, I have identified features of the decision making process at FSA and the predecessor agency that are vulnerable to bias.  The 1998 FSA report, *A Qualitative Study of Civil Rights Implications in Farm Loan Program Administration* ("Qualitative Study"), identified nine areas of FSA policy and practice through which "discrimination could occur,"[54] and many of them are the same features that I have identified based on the implications of social science literature on stereotyping and outgroup bias.  (The Qualitative Study also identified twenty-four other factors that could contribute to perceptions of discrimination by those seeking to participate in the Farm Loan Program.)  Because of a long history of a high incidence of discrimination complaints against the USDA's Farm Loan Program, FSA's Director of Civil Rights and Small Business Utilization Staff was charged with conducting a study to determine "the causes of complaints so that FSA can pursue

---

[54]United States Department of Agriculture, Farm Services Agency, Civil Rights and Small Business Utilization Staff, *A Qualitative Study of Civil Rights Implications in Farm Loan Program Administration,* 1997, p. 21 (hereafter cited as "Qualitative Study").

constructive and methodical actions to address the conditions which cause complaints."[55]
The Qualitative Study reports the findings of the team of USDA employees that met three times during 1998.

32.   The first of the nine factors identified as providing the "opportunity to willfully discriminate" was "subjectivity and personal judgment" in such areas as the determination of "family-sized farm," and calculations used for the farm business plan which "could be manipulated to adversely affect the outcome of a request."[56]  As the research I described above shows, it does not require willful manipulation for this kind of subjectivity to lead to adverse outcomes for Native Americans due to stereotyping and outgroup bias.  Stereotyping was identified specifically as a separate mechanism through which discrimination could occur, through such actions as discouraging minority or female applicants "due to their beliefs that people of that minority cannot be successful," again consistent with the scientific research I have summarized above.[57]  Directly related to the issue of discrimination in feasibility determinations in direct loans and loan servicing, the Qualitative Study identified "subjectivity in data usage for loan making" as another potential source of bias.  The report stated:

> FLP regulations permit and in some situations indirectly require subjective interpretations of data.  This feature of FLP may be constructed to permit discriminatory actions by allowing farm loan personnel to make decisions or use regulations in a manner to favor one borrower or harm another in the loan making or loan servicing process.  The team noted that the loan officer could manipulate several items on the FHP to effectuate discriminatory actions.[58]

Again, this is precisely the kind of subjectivity and discretion that scientific research shows is vulnerable to stereotyping and outgroup bias.  And again, that research shows

---

[55]Qualitative Study, p. 4-5, 11-15, quoted at p. 4.
[56]Qualitative Study, p. 22.
[57]Qualitative Study, p. 23, 42.
[58]Qualitative study, p. 24.  Also see p. 40.

that these kind of decision making practices can create outcomes adverse to Native Americans without any deliberate and willful effort by a loan officer to manipulate items on a business plan.

## MONITORING AND OVERSIGHT OF DECISIONS ABOUT DIRECT LOANS AND LOAN SERVICING AT FSA IS INADEQUATE FOR MINIMIZING BIAS

33.  Research studies show that the effects of stereotypes, in-group favoritism and out-group bias on evaluative judgments can be minimized when decision-makers know that they will be held accountable for the process and criteria used to make decisions, for the accuracy of the information upon which the decisions are based, and for the consequences their actions have for the organization's goals in the area of nondiscrimination and equal opportunity.[59]  In short, effective monitoring, oversight, and accountability is essential for bias-free decision making.  In this section I examine whether the monitoring and oversight structures and processes available to the USDA and

---

[59]B. F. Reskin and D. B. McBrier, "Why Not Ascription? Organizations' Employment of Male and Female Managers," *American Sociological Review*, Vol. 65, 2000, p. 210-233; M. Elvira and M. E. Graham, "Not Just a Formality:  Pay System Formalization and Sex-Related Earnings Effects," *Organization Science*, Vol. 13, 2002, p. 601-617; S. T. Fiske, M. Lin, and S. L. Neuberg, "The Continuum Model: Ten Years Later," p. 231-54 in *Dual Process Theories in Social Psychology*, edited by S. Chaiken and Y. Trope, Guilford Press, 1999; T. E. Nelson, M. Acker and M. Manis, "Irrepressible Stereotypes," *Journal of Experimental Social Psychology*, Vol. 32, 1996, p. 13-38; J. L. Eberhardt and S. T. Fiske, "Motivating Individuals to Change:  What Is a Target to Do?" p. 369-415 in *Stereotypes and Stereotyping*, edited by C. N. MacRae, C. Stangor, and M. Hewstone, Guilford Press, 1996; A. M. Konrad and F. Linnehan, "Formalized HRM Structures:  Coordinating Equal Employment Opportunity or Concealing Organizational Practices?" *Academy of Management Journal*, Vol. 38, 1995, p. 787-829; T. F. Pettigrew and J. Martin, "Shaping the Organizational Context for Black American Inclusion," *Journal of Social Issues*, Vol. 43, 1987, p. 41-78; G. R. Salancik and J. Pfeffer, "Uncertainty, Secrecy, and the Choice of Similar Others," *Social Psychology*, Vol. 41, 1978, p. 246-55; C. T. Schreiber, K. F. Price, and A. Morrison, "Workforce Diversity and the Glass Ceiling:  Practices, Barriers, Possibilities," *Human Resource Planning*, Vol. 16, 1993, p. 51-69; P. E. Tetlock, "Accountability:  The Neglected Social Context of Judgment and Choice," p. 297-332 in *Research in Organizational Behavior*, Vol. 7, edited by L. L. Cummings and B. M. Staw, Jai Press, 1985; P. E. Tetlock and J. I. Kim, "Accountability and Judgment Processes in a Personality Prediction Task," *Journal of Personality and Social Psychology*, Vol. 52, 1987, p. 700-709; Bielby, 2000, *op cit*.

FSA (and its predecessor agency) were used in ways that the social science research cited above shows is effective for minimizing bias.

34.   The USDA, FmHA, and FSA have had three kinds of structures and processes in place with potential for effective oversight over farm loan programs.  First, they have (or had) audit systems for reviewing county offices' general compliance with rules and regulations for making direct loans and for providing loan servicing. These systems could be used to assess subjectivity and discretion in the assessment and application of eligibility and feasibility criteria.  Second, they have (or had) civil rights compliance processes that can monitor county offices' policies and practices specifically for their potential discriminatory impact on applicants for direct loans and loan servicing.  Third, they have (or had) the ability to assess disparities by race in the rates of participation of Native Americans and whites (and other race/ethnic groups) in direct loans and loan servicing.

35.   Audits and civil rights compliance reviews have the potential to be effective monitoring mechanisms for two reasons.  First, they can require that the audited agency develop an action plan to remedy deficiencies.  Second, they can subject the agency to continued monitoring in order to assess progress in implementation of action plans.

36.   Statistical studies of disparities in participation rates can be effective for monitoring and oversight by:  (1) detecting disparities when they exist; (2) determining whether patterns of unequal outcomes by race are idiosyncratic and due to localized factors or are systemic in nature; and (3) providing a means for evaluating over time whether policy interventions designed to reduce bias are having their intended effect.

*Audits and Reviews of County Offices' General Compliance with Rules and*
*Regulations*

37.  From the 1970s to the mid-1980s, the USDA's Office of Inspector General

("OIG") did audits of county offices on a five-year cycle (i.e. about 20% of the offices

were audited annually, and each office was audited approximately once every five

years).[60]  These audits covered all aspects of county operations, including but not

focusing exclusively or primarily on civil rights.[61]  The results of the county audits were

reported back to the OIG and to the state office, with that office responsible for

addressing any deficiencies that were identified in the audit report.  The OIG was

responsible for monitoring implementation.[62]  However, the reports were not sent to and

were not monitored by either USDA or FmHA national headquarters,[63] and therefore

they were of limited utility for identifying and correcting any systematic vulnerabilities to

bias that might exist throughout the programs for direct farm loans and loan servicing.  In

fact, the OIG's program for auditing county offices every five years was discontinued in

1985 or 1986 precisely because they were not having any impact.  Theresa Bulla, the

30(b)(6) deponent on this topic testified as follows:

> 17      **Q    The state?  Okay.**
> 18            **When did the regular county audits**
> 19    **that you discussed end?**
> 20      *A    In the mid '80's, '85 to '86.*
> 21      **Q    Do you know why they ended?**
> 22      *A    We didn't have impact with those*
> 23    *audits compared to other audits we were doing.*
> 24    *When you do an audit where you are going to*
> 25    *several locations, you can make recommendations*
>  1   *to the national office to make changes across the*

---

[60]Bulla Topic 12 depo., p. 30-31.
[61]Bulla Topic 12 depo., p. 36-37, 41.
[62]Bulla Topic 12 depo., p. 42-44.
[63]Bulla Topic 12 depo., p. 38, 44-45, 54-56.

> 2   *board.  So, that's why we quit, because there was*
> 3   *no impact in doing these county offices.  We*
> 4   *stopped doing those.*[64]

and she added:

> **22      Q     So, when you say no impact, you mean**
> **23   no national impact?**
> 24      *A     Right.  Right.*
> **25      Q     And why wasn't the state/local impact**
> **0061**
> **1   sufficient?**
> 2      *A     Because you can't make program*
> 3   *changes; when you do a nationwide audit, you can*
> 4   *make program changes.*[65]

38.  Similar in design to the OIG audits were FmHA's Coordinated Assessment

Reviews ("CAR"), done until 1995.[66]  These were reviews of all FmHA programs (not

just farm loans).  Like the OIG audits, civil rights was one component of a larger

"coordinated" review, with a civil rights team manually reviewing withdrawn and

rejected applications to determine if they were "processed correctly."[67]  However, the

main purpose of the CAR review was "to guard against fraud, waste, abuse, and

mismanagement."[68]  CAR reviews were coordinated by an FmHA unit called the

Planning and Analysis Staff.  States were reviewed on a three-year rotating basis.  In a

state being reviewed, CAR teams would visit county offices and do a manual review of a

sampling of files. [69]  The reports for each program area were sent to the relevant state

program administrators, and the state FmHA office was responsible for addressing any

---

[64]Bulla Topic 12 depo., p. 59-60.
[65]Bulla Topic 12 depo., p. 60-61.
[66]Cooksie Topic 3 depo., p. 32-33.
[67]Henry Topic 12 depo., p. 10, 44-45.
[68]Henry Topic 12 depo., p. 9-10.
[69]Cooksie Topic 3 depo., p. 33-35; Henry Topic 12 depo., p. 8-10, 41-44.

weaknesses identified in the reports. [70] As with the OIG, no report was submitted to FmHA or USDA national office.[71] In the 1980s, states conducted "Program Review Assistant" ("PRA") reviews of local offices every two years, and these were reviews of county offices' administrative operations, assessing compliance with agency rules and regulations, similar to the CAR reviews.[72] Like the OIG audits and the CAR reviews, PRA reports were not submitted to the national FmHA office.[73]

39.  Following the reorganization of FmHA and the establishment of FSA, CAR reviews were replaced with National Internal Reviews ("NIR") in 1996.  NIR reviews were originally done in three-year rotations and were changed to two-year cycles in approximately 2000.  Like the CARs, the NIR was the primary management tool for assessing compliance with rules and regulations of the loan making process in the years immediately following the establishment of FSA.[74] Civil rights issues were addressed only incidentally in NIR reviews.  Those reviews had no checklist or protocol for reviewing participation by women and minorities in Farm Loan Programs.[75] Unlike the CARs and PRAs, the NIRs proceeded hierarchically, beginning with a review of files in state offices, followed by a review in the national office of files from the states, and concluding with a team from the national office conducting reviews in the field.[76] As with the review systems that preceded it, the NIR report on county offices was submitted to the state office, which was responsible for implementing any recommended corrective

---

[70]Cooksie Topic 3 depo., p. 39-40, 42-43.
[71]Cooksie Topic 3 depo., p. 43-44.
[72]Henry Topic 12 depo., p. 19-20, 34; Radintz Topic 7 depo., p. 119-120.
[73]Henry Topic 12 depo., p. 37-38.
[74]Cooksie Topic 3 depo., p. 52-53, 57-58, 60.  Unlike the CARs, which covered all aspects of FmHA's operations, NIRs are limited to a review of Farm Loan Programs (Cooksie Topic 3 depo., p. 53).
[75]Cooksie Topic 3 depo., p. 74-75, 77-78.
[76]Cooksie Topic 3 depo., p. 60-61.

action.  And like the review systems that preceded it, the NIR reviews were not used for

making loan-making policy at the national level.[77]

40.  In 2006, the National Internal Review process was replaced with the Farm

Loan Program Risk Assessment process.  This process reconceptualized the oversight

goal from one of compliance with rules and regulations to one of risk management.

Under the new program, risk analyses of county office and state loan portfolios were

conducted, based on approximately forty risk factors.  Risk analyses of loan portfolios are

used to determine which states and county offices are to be subject to on-site reviews,

although each state is required to be reviewed at least once every five years.[78]  There is

one risk factor that pertains to loan processing times for women and minorities ("socially

disadvantaged individuals" or "SDAs" as defined by FSA).[79]  The NIR reviewers "try to

get some sense" of the racial demographics of a county from the U.S. Census of

Agriculture, but there is no quantitative or formal analysis of racial disparities in

participation in Farm Loan Programs.[80]  As with the CAR, PRA, and NIR reviews, the

reports based on the risk assessments and on-site reviews are submitted to the state office,

which is responsible for monitoring corrective action.[81]

41.  From the materials I have reviewed, it is clear that none of the county office

monitoring programs -- the OIG audits, the CARs, the PRAs, the NIRs, and the current

system, the Farm Loan Program Risk Assessment process -- attempts to effectively assess

how the specific criteria used to make eligibility and feasibility decisions for direct loans

and loan servicing are applied in practice, and how subjective judgment and discretion is

---

[77]Cooksie Topic 3 depo., p. 59-60, 63-65.
[78]Cooksie Topic 3 depo., p. 8-11, 13-14, 27-29.
[79]Cooksie Topic 3 depo, p. 18-20.
[80]Cooksie Topic 3 depo, p 21-23.
[81]Cooksie Topic 3 depo., p. 14-16.

exercised in the application of those criteria.  And with the exception of racial disparities
in loan processing times, none of these monitoring programs attempts to systematically
assess racial disparities in participation in direct loans and loan servicing in order to
identify potential discriminatory barriers.  Other oversight programs monitoring
compliance with rules and regulations such as the State Evaluation Reviews of district
and county offices and District Director Oversight Reviews from FmHA era had similar
properties,[82] and they too were of limited utility for minimizing stereotyping and
outgroup bias, for the same reasons.

### Civil Rights Compliance Reviews

42.  Over the period from 1981 to the present there have been various oversight
and monitoring programs focused exclusively on civil rights issues.  Before 1995, in the
FmHA era, the Civil Rights Staff from the agency's national headquarters visited state,
district, and county offices, reviewed loan dockets, case files, and similar information,
and they also reviewed statistical information on county demographics.[83] Similar reviews
were done by Civil Rights Staffs located in state offices.[84]

43.  With the establishment of FSA in 1995, that agency's civil rights staff
became responsible for conducting state management reviews, similar in content and
process to the civil rights compliance reviews of field offices done by FmHA in prior
years.[85] Approximately eight to ten states are reviewed each year.[86] Results of the

---

[82]Henry Topic 12 depo., p. 19-20, 28-31, 36-40.
[83]Henry Topic 12 depo, p 22-23.
[84]Henry Topic 12 depo, p 31, 53-56.
[85]Toles Topic 12 depo., p. 17-20, 85-87; Cooksie Topic 1 depo., p. 102-103.
[86]Toles Topic 12 depo., p. 23-24, 43, 78-79.

reviews are submitted to the state executive director, who prepares an action plan to implement recommendations, which are monitored by FSA's Office of Civil Rights.[87]

44.  For at least part of the time since 1995, FSA has been ill-equipped to undertake civil rights compliance reviews.  Because of severe problems in the handling of civil rights complaints identified in an OIG report, FSA's civil rights staff was placed in receivership from May through November of 1997.[88]  And from approximately 1996 to 1998 or 1999, many of the responsibilities of FSA civil rights office were reassigned to the USDA's Office of Civil Rights.[89]  And while states can be selected for review based in part on the number of complaints, that has not been used as selection factor since 2004.  Instead, the only criterion for selecting states for an FSA civil rights compliance review has been the time elapsed since the previous review.[90]

45.  Throughout the period from 1981 to the present the USDA retained responsibility for departmental civil rights compliance reviews.[91]  These departmental civil rights compliance reviews, conducted by the USDA's Office of Civil Rights Enforcement, are similar to FmHA reviews of county offices and to FSA state management reviews.[92]  States have been selected for review on the basis of the rate of minority participation in loan programs and the level of complaints about those program.[93]  The state agency responsible for the offices being reviewed was held

---

[87]Toles Topic 12 depo., p. 88-93.
[88]Qualitative Study, p. 13-14.
[89]Cooksie Topic 1 depo., p. 104-106.
[90]Toles Topic 12 depo., p. 21-22, 24-25, 30-34, 79-82.
[91]Toles Topic 12 depo., p. 21.
[92]Toles Topic 12 depo., p 85-87; Woodley-Jones Topic 12 depo., p. 22-25.
[93]Woodley-Jones Topic 12 depo., p. 37-39.  This testimony pertains to the period prior to 1995.  Mr. Toles, who testified on departmental compliance reviews since then, was unaware of how states were selected (Toles Topic 12 depo., p. 44-45).

responsible for implementing the recommendations, with monitoring by the USDA's Office of Civil Rights Enforcement.[94]

46.    The USDA's office in charge of civil rights compliance reviews has had serious problems since at least the mid-1990s.  Lloyd E. Wright, who served as Director of the USDA's Office of Civil Rights from March 1997 to May 1997 stated in a declaration that at the time he assumed the position, the Office had not conducted a compliance review in three years.[95]  Rosalind Gray, who assumed the position of Director in July of 1998, stated in a declaration that when she began the Office was "in a state of confusion and disorder."[96]  According to Johnny Toles, who served as director of the compliance division of USDA's Office of Civil Rights for approximately one year in 2000 and 2001 (and is currently director of FSA's Office of Civil Rights), the office was unstaffed when he began and did no compliance reviews during his tenure.[97]  Mr. Toles also testified that he was aware of just one USDA civil rights compliance review conducted since 2001, for the state of Texas, and as of the date of his deposition, April 24, 2008, the report from that review had not yet been finalized.[98]  And a USDA OIG audit report published in 2005 noted that the department's Office of Civil Rights had not conducted a compliance review in over five years, because almost all of the office's resources were allocated to addressing the backlog of civil rights complaints.  In short,

---

[94]Toles Topic 12 depo., p. 46-53, 59-61, 66-68, 70-72; Department Policy for Program Compliance Review, Departmental Regulation 4330-1, U.S. Department of Agriculture, dated June 27, 1986 (Exhibit 3 to Toles Topic 12 depo.); Woodley-Jones Topic 12 depo., p. 30-33.  The testimony of Ms. Woodley-Jones is somewhat ambiguous because Ms. Woodley-Jones was responding to questions about a departmental compliance review of the FmHA national office, not of county offices in a state selected for a compliance review.
[95]Declaration of Lloyd E. Wright, June 4, 2004.
[96]Declaration of Rosalind Gray, April 6, 2002.
[97]Toles Topic 12 depo., p. 14-15, 44.
[98]Toles Topic 12 depo., p. 62-65.  The Texas review was requested by the OIG based on the results of an audit (Toles Topic 12 depo., p. 64).

the evidence I have reviewed indicates that the USDA's Office of Civil Rights

compliance review process was ineffective and practically nonexistent for much if not all

of the period from 1994 to the present.[99]

*Analyses of Participation Rates*

47.  The materials I have reviewed indicate that since 1981 there have been just

two multi-state statistical studies of disparities by race in participation rates in FmHA or

FSA loan programs:  one in 1997 and a follow-up in 2005.[100]  The first, in 1997, was part

of a larger study by the Department's Office of Inspector General of problems with the

USDA's efforts in responding to discrimination complaints.  The OIG staff compiled

statistical information on minority versus nonminority participation in FSA farm loan

programs from offices in eleven states.  A report issued in September 1997, "Minority

Participation in Farm Service Agency's Farm Loan Programs - Phase II" ("Phase II

Report") included statistical comparisons by minority versus nonminority status of

approved applications for direct farm loans, direct loan borrowers, delinquency rates,

loan servicing, and loan processing times.[101]

48.  Eight years later, in November 2005, the Department OIG issued the report

from a follow-up study which included comparable tabulations of statistical disparities by

minority status, based on data compiled from offices in five states.[102]  No other statistical

disparity report was conducted by OIG between 1997 and 2005, there have been none

since, and there are no plans to do a similar kind of statistical analysis in the future

---

[99]U.S. Department of Agriculture Office of Inspector General, Southeast Region, Audit Report:  Minority Participation in Farm Service Agency's Programs, September, 1997, p. ii-iii.
[100]Bulla Topic 12 depo., p. 29-30, 60-61, 68-71.
[101]Bulla Topic 12 depo., p. 48-49, 68.  Selected pages of the Phase II Report are included as Exhibit 3 of Ms. Bulla's deposition.  At my request, counsel for plaintiffs provided me with the full report as well as the full 2005 report cited below.
[102]U.S. Department of Agriculture Office of Inspector General, Southeast Region, Audit Report:  Minority Participation in Farm Service Agency's Programs, November, 2005; Bulla Topic 12 depo., p. 50-51.

because no one at the OIG national office or in the field has suggested it.[103]  In short,

there is no ongoing analysis for analyzing statistical patterns across the U. S. and over

time in disparities between Native Americans and whites or between nonminorities and

minorities in participation in direct loans, loan servicing, delinquency rates, loan

processing times, or related issues.  The two national-level reports that have been done

were produced incidentally as part of larger audit investigations into the USDA's

problems in processing and responding to complaints of discrimination by FSA.

***The Capabilities of FSA, FmHA, and USDA Could Have Been Used to Effectively
Monitor and Minimize Bias Against Native American Farmers***

49.  Based on the research I cite above in paragraphs 22 through 25 and in

paragraph 33, social scientists who study how to control racial bias in organizational

decision making understand that to minimize bias an organization needs to: (1) measure

and monitor patterns of racial disparities; (2) understand the reasons why those disparities

exist; (3) put in place corrective measures; and (4) monitor the impact of corrective

interventions on both decision-making practice and on racial disparities in decision

outcomes in order to make sure the interventions are having the intended effect.

50.  The USDA and FSA have the means to establish meaningful monitoring,

accountability, and oversight over the process used to make decisions about applications

for direct loans and loan servicing consistent with the principles articulated in the

previous paragraph, but it chooses not to use them.  At the department and agency level

the USDA has the capacity to conduct audits of general compliance with rules and

regulations governing decision-making about direct loans and loan servicing, to demand

action plans from the agency in order to remedy deficiencies, and to monitor

---

[103]Bulla Topic 12 depo., p. 71-75.

implementation.  The materials I have reviewed indicate that the USDA and FSA have never used that capacity to analyze potential discrimination due to the biased exercise of judgment and discretion and to remedy vulnerabilities to bias.  To do so requires understanding where subjectivity and discretion can be eliminated or sharply curtailed.  Just as important, it requires acknowledging which elements of the decision-making process require the exercise of professional judgment, and auditing in the field how it is exercised, not just determining whether officials are complying with official rules and regulations.

51.  The USDA and FSA have the capacity to conduct on-going nationwide statistical monitoring of racial disparities in direct loan approvals, servicing, processing time, and foreclosure rates.  However, except for a one-time study and follow-up incidental to a study of the processing discrimination complaints against FSA, it has not used its capacity for such studies that would likely prove indispensable in identifying and remedying vulnerabilities to discrimination.  An effective program would integrate the ongoing monitoring of disparities into FSA's existing risk assessment process.  Indicators of risk to the nondiscriminatory provision of farm loan program services can be incorporated into the systems currently being used to regularly assess the financial risks of loan portfolios at the state and local level.

52.  From a "macro" perspective, ongoing statistical monitoring of civil rights risks can identify where threats to the nondiscriminatory provision of services to minority constituencies are likely to be occurring.  From a "micro" perspective, the results of field-level auditing can be used to obtain a fine-grained understanding of how to improve the exercise of professional judgment in making decisions about loans and loan servicing.

Together, the results of macro-level monitoring of civil rights risks with micro-level monitoring of how professional judgment is exercised in the field can be used to identify deficiencies in the decision-making process, to develop remedies, to establish accountability at the local, regional and headquarters level, and to assess progress in implementing action plans.

**CONCLUSION**

53. In this report I have reviewed materials relating to the criteria and processes used to make decisions about direct loans and loan servicing in order to determine whether they are likely to be vulnerable to bias towards Native Americans. I have determined that there are highly subjective and discretionary aspects to the process and criteria used for decisions about direct loans and loan servicing. I have determined that while the USDA and FSA have the capacity to implement meaningful monitoring, oversight, and accountability, they have chosen not to do so in any sustained, systematic way (and the same was true for FmHA). I have summarized the social science literature that explains the circumstances under which subjective and discretionary decision-making is vulnerable to bias. I have briefly reviewed social science research on stereotypes about Native Americans and have explained how those stereotypes are relevant to decisions about farm credit. In my opinion, social science research on stereotyping and outgroup bias provides a basis for concluding that subjectivity and discretion in the process for making direct loans and loan servicing and lack of effective monitoring and oversight introduces a substantial degree of vulnerability to bias against Native Americans. That research also provides a basis for concluding that this need not

be the case.  The auditing and monitoring capabilities of the USDA and FSA could have been and can be developed in a way that incorporates the identification, understanding, and management of civil rights risks into the increasingly sophisticated systems that the FSA uses to manage financial risks.


William T. Bielby, Ph.D.

Union Pier, MI

February 20, 2009

**EXHIBIT A**

WILLIAM T. BIELBY
TESTIMONY AS AN EXPERT WITNESS SINCE 2001

Marybeth Cremin, et al. v. Merrill Lynch, Pierce, Fenner & Smith Inc.
Docket No:  96 C 3773
Court:  United States District Court, Northern District of Illinois, Eastern Division
Counsel:  Stowell & Friedman, Chicago, IL
Expert Report, Arbitration Testimony

Pamela K. Martens, et al. v. Smith Barney, Inc., et al.
Docket No. 96 Civ. 3779 (AGS)
Court:  United States District Court, Southern District of New York
Counsel:  Stowell & Friedman, Chicago, IL
Expert Reports, Arbitration Testimony

Lucy's Sales, et al. v. County of Contra Costa, et al.
Docket No. C98-02955 PJH (JL)
Court:  United States District Court, Northern District of California
Counsel:  Lawyers' Committee for Civil Rights of the San Francisco Bay Area (Oren Sellstrom)
          Wilson Sonsini Goodrich & Rosati (Lisa Davis, David Berger), Palo Alto
Expert Report, Deposition Testimony, Trial Testimony

Ella Bramwell and Marilyn Hill v. BMG Entertainment, Inc.
Docket No. 00C 7751
Court:  United States District Court, Eastern District of Illinois
Counsel:  Stowell & Friedman (Linda Friedman), Chicago
Expert Report, Deposition Testimony

Eric Bates, et al. v. United Parcel Service
Docket No. C-99 2216 (TEH)
Court: United States District Court, Northern District of California
Counsel:  Schneider & McCormac (Todd Schneider), San Francisco
Declaration, Expert Report, Deposition Testimony

Frank Armenta, et al. v. Osmose Wood Preserving, Inc.
Case No. CV000999
Court:  Superior Court of the State of California, County of San Luis Obispo
Counsel:  James H. Cordes, Santa Barbara, CA
Declaration

Francisco Rodriguez, et al. v. Merrill Lynch & Co.
Docket No. L-5908-98
Court:  Superior Court of New Jersey, Law Division:  Hudson County
Counsel:  Steven Arenson, Arenson, Dittmar & Karbani, New York
Declaration, Expert Report, Deposition Testimony

Carol Gosho, et al. v. U.S. Bancorp Piper Jaffray, Inc.
Docket C 00-01611 PJH
Court: United States District Court, Northern District of California
Counsel:  Meites, Mulder, Burger & Mollica, Chicago
Declaration, Expert Report, Deposition Testimony

Betty Dukes, et al. v. Wal-Mart Stores, Inc.
Docket C-01-2252 MJJ
Court: United States District Court, Northern District of California
Counsel:  The Impact Fund (Jocelyn Larkin, Brad Seligman)
Expert Report, Rebuttal Report, Deposition Testimony

Mary Singleton, et al. v. Regents of the University of California, et al.
Docket 807233-1
Court:  Superior Court of the State of California, County of Alameda
Counsel:  The Sturdavent Law Firm (Mark Johnson), San Francisco
Declarations

Equal Employment Opportunity Commission v. The Herrick Corporation d/b/a/ Stockton Steel
Docket CIV. S-00-0102 FCD DAD
Court:  United States District Court, Eastern District of California
Counsel:  EEOC (Lynn Palma), San Francisco
Expert Report

EEOC & Schieffelin v. Morgan Stanley
Docket 01 CV 8421 (RMB)
Court:  United States District Court, Southern District of New York
Counsel:  Outten & Golden (Adam Klein), New York, EEOC (Michael Ranis)
Expert Report, Deposition Testimony

Stella Mitchell, et al. v. Metropolitan Life Insurance Co.
Docket 01-CIV-2112 (WHP)
Court:  United States District Court, Southern District of New York
Counsel:  Saperstein, Goldstein, Demchak & Ballar (Teresa Demchak), Outten & Golden (Adam Klein)
Expert Report, Deposition Testimony

Roderick Arnold, et al. v. Cargill, Inc.
Docket 01-CV-2086 (DWF/AJB)
Court:  United States District Court, District of Minnesota, Fourth Division
Counsel:  Sprenger & Lang; Cohen, Milstein, Hausfeld & Toll
Expert Report, Deposition Testimony, Declaration

Derrick Satchell, et al. v. FedEx Express.
Docket C 03-2659 SI, C 03-2878 SI
Court: United States District Court, Northern District of California
Counsel:  Lieff, Cabraser, Heimann & Bernstein (James Finberg)
Expert Report, Rebuttal Report, Deposition Testimony

Daryal Nelson, et al. v. Wal-Mart Stores, Inc. and Wal-Mart Transportation LLC
Docket 2:05 CV-00134-WRW
Court:  United States District Court, Eastern District of Arkansas
Counsel:  of Cauley Bowman Carney & Williams (Hank Bates) and Welch and Kitchens (Morgan Welch)
Expert Report, Rebuttal Report Deposition Testimony

Nilda Gutierrez, et al. v. Johnson & Johnson
Docket 01-5302 (WHW)
Court:  United States District Court, District of New Jersey
Counsel:  Mehri & Skalet (Cyrus Mehri)

Expert Rebuttal Report, Deposition Testimony

Equal Employment Opportunity Commission v. Wal-Mart Stores, Inc.
Docket 6:01-CV-339-KKC
Court:  United States District Court, Eastern District of Kentucky
Counsel:  EEOC (Nancy Edmonds), Indianapolis
Expert Report, Rebuttal Report, Deposition Testimony

Duling et al. v. Gristedes Operating Corp et al.
Docket 06 CV 10197
Court:  United States District Court, Southern District of New York
Counsel:  Outten & Golden (Piper Hoffman)
Expert Report, Rebuttal Report, Deposition Testimony

**EXHIBIT B**

January 2009

**CURRICULUM VITAE**

**William T. Bielby**

ADDRESS:

Office    Department of Sociology
College of Liberal Arts and Sciences
1007 W. Harrison Street, MC 312
Chicago, IL 60607

E-Mail    wbielby@uic.edu

CURRENT POSITION:

University of Illinois--Chicago
        Professor, Department of Sociology, 2007-present
        University of California, Santa Barbara
        Professor Emeritus, Department of Sociology, 2005-present

EDUCATION:

B.S.      Electrical Engineering (High Honors), University of Illinois--Urbana, 1970.
M.A.     Social Sciences (Economics), University of Illinois--Urbana, 1972.
Ph.D.    Sociology, University of Wisconsin, 1976.

PREVIOUS POSITIONS:

University of Pennsylvania
        Professor, Department of Sociology, 2005-2007
        Research Associate, Population Studies Center, 2004-2007
        Sociology Department Undergraduate Chair, 2005-2005
Professor, Department of Sociology, University of California,  Santa Barbara, 1983-2005
Professor (Affiliated), Department of Statistics and Applied Probability, UCSB, 1993-2005
Affiliated Faculty, Center for Film, Television, and New Media, UCSB, 2002-2005
Fellow, University of California Washington Center, Washington, DC, Fall 2004
Visiting Distinguished John D. MacArthur Professor of Sociology, Northwestern University
     Spring 2004
American Bar Foundation, Chicago, IL, Visiting Scholar, 2003-2004
Visiting Professor, Graduate School of Management, UCLA, 1985
Chair, Department of Sociology, University of California, Santa Barbara, 1992-1998
Associate Professor, Department of Sociology, University of California,  Santa Barbara, 1981-83
Assistant Professor, Department of Sociology, University of California,  Santa Barbara, 1977-81
Research Associate, Institute for Research on Poverty, University of Wisconsin, 1975-77
Rhythm guitar, bass guitar, The Newports, Harvey, Illinois, 1960-1965, 2006-present

HONORS AND AWARDS:

Reuben Hill Research and Theory Award from the National Council on Family Relations, 1992
Sociological Research Association (by election, 1989)
Kathleen Gregory Klein Award for Excellence in Feminist Studies from the Popular and
American Culture Associations, 1986
Fellow, Center for Advanced Study in the Behavioral Sciences, Stanford, California, 1983-84.
European Group on Organizational Sociology Award, Organizations & Occupations Section,
American Sociological Association, 1981 (with J. N. Baron)
Eta Kappa Nu, Electrical Engineering Honorary Society
Tau Beta Pi, Engineering Honorary Society
Phi Kappa Phi, Scholastic Honorary Society
Riverdale Historical Society (Riverdale, IL), Honorary Member (2002-present)


PROFESSIONAL ACTIVITIES:

Professional Associations:

American Sociological Association
American Economic Association
American Statistical Association
Society of Labor Economists
Society for Human Resource Management
Association for Psychological Science
Society for Industrial and Organizational Psychology

Officer:

Fellow, Center for the Study of Poverty and Inequality, Stanford University, 2006-
President, American Sociological Association, 2002-2003
Council, American Sociological Association, 1998-2001
Committee on Sections, American Sociological Association, 1998-2001 (Vice-Chair, 2000-2001)
Committee on Nominations, American Sociological Association, 1995-97
Council, (1982-84) and Secretary/Treasurer (1984-88), Methods Section of the American
Sociological Association.
Council (1986-88), Organizations and Occupations Section of the American Sociological
Association.


Editorial Board:

American Sociological Review (1994-1996)
Westview Series on Social Inequality (1991-1996)
Sociological Methods and Research (1978-1989, 1994-1998)
American Journal of Sociology (1982-84)
Sociology of Education (1981-85)
Gender & Society (1997-2000)

PROFESSIONAL ACTIVITIES (continued):

Member:

Social Science Research Council Site Selection Committee, First Year Fellowships in the Study of
the Former Soviet Union (1989-1995)
National Institute of Mental Health, Social Science and Population Study Section Review Panel,
(Special Reviewer, 1994)
National Institute of Health, Center for Scientific Review (Special Emphasis Panel Chairperson,
August 1999)
National Institutes of Health, International Studies on Health and Economic Development Review
Committee (November 2000)
Social Science Research Council Committee on the Sociological Study of the USSR (1988-92)
Jessie Bernard Award Selection Committee, American Sociological Association (1990-92)
Social Science Research Council Committee on Occupational Measurement (1980-88)
National Science Foundation, Sociology Review Panel (1985-87)
National Science Foundation, ADVANCE Institutional Transformation Awards Review Panel
(2001)
University of Illinois Foundation (1999-2005, Board of Directors, 2008-2011)
Program Committee, American Sociological Association Annual Meeting, 2001
Board of Directors, Consortium of Social Science Associations (2002-2004)
Amicus Brief Task Force, American Sociological Association (2002-2003)
Sociology Ph.D. Program Assessment Committee, University of California, Irvine, April, 2003
Oversight Committee, Workshop on the Utilization of Women-Owned Small Businesses in
Federal Contracting, National Research Council, National Academy of Sciences, 2004
Sociology Ph.D. Program Assessment Committee (Chair), Texas A & M University, April, 2005


PUBLICATIONS:

2008  William T. Bielby
"Promoting Racial Diversity at Work:  Challenges and Solutions."  Pp. 53-88 in Arthur
P. Brief (ed.), *Diversity at Work*.  New York:  Cambridge University Press.

2007  William T. Bielby and Pamela Coukos
"'Statistical Dueling' with Unconventional Weapons:  What Courts Should Know about
Experts in Employment Discrimination Class Actions*." Emory Law Journal*, Vol. 56.
Reprinted in David Sherwyn and Samuel Estreicher (eds.), *Proceedings of the New York
City 56th Annual Conference on Labor*.  Alphen aan den Rijn, The Netherlands:  Kluwer
Law International 2008.

2005  William T. Bielby
"Applying Social Research on Stereotyping and Cognitive Bias to Employment
Discrimination Litigation:  The Case of Allegations of Systematic Gender Bias at Wal-
Mart Stores."  In Robert L. Nelson and Laura Beth Nielsen (eds.), *Handbook on
Employment Discrimination Research:  Rights and Realities*.  Norwell, MA:  Kluwer
Academic Press 2005.

2005  Arleen Leibowitz, William T. Bielby, Jonathan S. Leonard, Patricia A. Roos, J. H. (Rip)
Verkerke, and John E. Rolph
*Analyzing Information on Women-Owned Small Business in Federal Contracting*.
(Report of Steering Committee for the Workshop on Women-Owned Small Business in
Federal Contracting.)  Washington, D.C.:  National Academy Press.

2004  William T. Bielby
"Rock in a Hard Place:  Grass-Roots Cultural Production in the Post-Elvis Era."
*American Sociological Review*, Vol. 69, No. 1:  1-13.  Reprinted in *The Practical Skeptic: Readings in Sociology*, edited by Lisa J. McIntyre; McGraw-Hill, forthcoming, 2007.

2004  William T. Bielby
"Social Science Accounts of the Maternal Wall: Applications in Litigation Contexts."
*Thomas Jefferson Law Review*, Vol. 26:  15-26, Fall 2003.

2004  Denise D. Bielby and William T. Bielby
"Audience Aesthetics and Popular Culture."  Pp. 295-317 in Roger Friedland and John Mohr (eds.), *Matters of Culture:  Cultural Sociology in Practice*.  Cambridge, England: Cambridge University Press.

2003  William T. Bielby
"Can I Get A Witness?  Challenges of Using Expert Testimony on Cognitive Bias in Employment Discrimination Litigation."  *Employee Rights and Employment Policy Journal*, Vol. 7, No. 2:  377-400, Symposium Issue on "Litigating the Glass Ceiling and the Maternal Wall: Using Stereotyping and Cognitive Bias Evidence to Prove Gender Discrimination."

2003  Denise D. Bielby and William T. Bielby.
"Beyond Contexts: Taking Cultural Objects Seriously in Media, Popular Culture, and the Arts."  *Sociological Perspectives*, Vol. 46, No. 4:  429-433.

2003  Denise D. Bielby and William T. Bielby
Co-editors of  Special Issue on Media, Popular Culture, and the Arts, *Sociological Perspectives,* Vol. 46, No. 4.

2003  William T. Bielby and Denise D. Bielby
"Controlling Primetime:  Organizational Concentration and Network Television Primtime Programming Strategies."  *Journal of Broadcasting and Electronic Media*, forthcoming, Vol. 47, No. 4:  573-596.

2003  William T. Bielby
"ASA Submits Amicus Brief in U.S. Affirmative Action Supreme Court Case."
*Footnotes:  Newsletter of the American Sociological Association*, Vol. 31, No. 3, March, 2003.

2002  Denise D. Bielby and William T. Bielby
"Hollywood Dreams, Hard Realities:  Writing for Film and Television."  *Contexts*, Vol. 1:  21-27, Fall/Winter 2002.

2002  William T. Bielby and Denise D. Bielby
"Telling Stories about Gender and Effort:  Social Science Narratives About Who Works Hard for the Money."  Pp. 193-217 in Mauro F. Guillen, Randal Collins, Paula England, and Marshall Meyer (eds.), *The New Economic Sociology: Developments in an Emerging Field*.  New York:  Russell Sage Foundation.

2001  Denise D. Bielby and William T. Bielby
"Audience Segmentation and Age Stratification Among Television Writers."  *Journal of Broadcasting and Electronic Media*, Vol. 45, No. 3:  391-412, Summer, 2001.

2000  William T. Bielby
         "Minimizing Workplace Gender and Racial Bias." *Contemporary Sociology*, Vol. 29,
         No. 1:  120-129, January, 2000.

1999  William T. Bielby
         "Framing Sociology in Court:  Affirmative Action Discourse and Expert Testimony on
         Employment Discrimination." *Research on Social Stratification and Mobility*, Vol. 17:
         265-283, 1999.

1999  Denise D. Bielby, C. Lee Harrington, and William T. Bielby
         "Whose Stories Are They?  Fans' Engagement with Soap Opera Narratives in Three Sites
         of Fan Activity." *Journal of Broadcasting and Electronic Media*, Vol. 42, No. 2:  35-51,
         Spring, 1999.  Reprinted in Toby Miller (ed.), *Television:  Critical Concepts in Media
         and Cultural Studies*, New York:  Routledge, 2002

1999  William T. Bielby and Denise D. Bielby
         "Organizational Mediation of Project-Based Careers:  Talent Agencies and the Careers of
         Screenwriters." *American Sociological Review*, Vol. 64, No. 1:  64-85, February, 1999.

1998  Bielby, William T. and Denise D. Bielby.
         *The 1998 Hollywood Writers' Report:  Telling ALL Our Stories*.  Los Angeles, CA:
         Writers Guild of America, West, 53 p.
         (http://www.wga.org/manuals/Report/index2.html)

1997  Matt L. Huffman, Steven C. Velasco, and William T. Bielby
         "Where Sex Composition Matters Most:  Comparing the Effect of Job Versus
         Occupational Sex Composition on Earnings." *Sociological Focus*, Vol. 29, No. 3:  189-
         207, August, 1997.

1996  Bielby, Denise D. and William T. Bielby
         "Women and Men in Film:  Gender Inequality among Writers in Culture Industries."
         *Gender & Society*, Vol. 10, No. 3:  248-270, June, 1996.  Reprinted in Paula Dubeck and
         Dana Dunn (eds.), *Workplace/Women's Place*, Belmont, CA.  Roxbury, 2002.

1994  Bielby, William T. and Denise D. Bielby
         "'All Hits are Flukes:'  Institutionalized Decision-Making and the Rhetoric of Network
         Prime-Time Program Development." *American Journal of Sociology*, Vol. 99, No. 5:
         1287-1313, March, 1994.  Reprinted in Toby Miller (ed.), *Television:  Critical Concepts*,
         New York and London, Routledge, 2002.

1994  Bielby, William T. and Denise D. Bielby
         "The Production of Mass Culture." *Footnotes*, Vol. 22, No. 4, April, 1994.  Washington,
         DC:  American Sociological Association.

1993  Bielby, Denise D. and William T. Bielby
         "The Hollywood 'Graylist'?  Audience Demographics and Age Stratification Among
         Television Writers." *Current Research on Occupations and Professions,* Vol. 8:  11-172.

1993  Bielby, William T.
         "Aging in the Television Industry." Pp. 34-37, 74-76 in *Age Has A Future:  Maturity
         and the Media*.  Conference Proceedings published by the American Association of
         Retired Persons, Washington, DC.

1993  Bielby, William T. and Denise D. Bielby.
      *The 1993 Hollywood Writers' Report:  A Survey of the Employment of Writers in the
      Film, Broadcast, and Cable Industries  for the Period 1987-1991*.  West Hollywood, CA:
      Writers Guild of America, West, 52 p.

1992  Bielby, William T. and Denise D. Bielby
      "Cumulative Disadvantage in an Unstructured Labor Market:  Gender Differences in the
      Careers of Television Writers"  *Work and Occupations*, Vol. 19, No. 4:  366-386,
      November, 1992.  Reprinted in Jerry A. Jacobs (ed.), *Sex Segregation at Work*, Newbury
      Park, CA, Sage, 1994.

1992  Bielby, William T. and Denise D. Bielby
      "I Will Follow Him:  Family Ties, Gender-Role Beliefs, and Reluctance to Relocate for a
      Better Job,"  *American Journal of Sociology*, Vol. 97, No. 5:  1241-1267, March, 1992
      (Winner of the 1992 Reuben Hill Research and Theory Award from the National Council
      on Family Relations).

1992  Bielby, William T.  "The Structure and Process of Sex Segregation."  Pp. 97-112 in Richard
      Cornwall and Phanindra Wunnava (eds*.), New Approaches to Economic and Social
      Analyses of Discrimination*.  New York:  Praeger. Reprinted in David B. Grusky (ed.),
      *Social Stratification: Class, Race, and Gender in Sociological Perspective*, Second
      Edition, Boulder, CO:  Westview Press, 2001.

1991  Bielby, William T. and Ross N. Matsueda
      "Statistical Power in Nonrecursive Linear Models," in Peter V. Marsden (ed.),
      *Sociological Methodology,* Vol. 21:  167-197.

1991  Bielby, William T.
      "Sex Differences in Careers:  Is Science a Special Case?"  Pp. 171-187 in H. Zuckerman,
      J. R. Cole, and J. T. Bruer (eds.), *The Outer Circle:  Women in the Scientific Community*.
      New York:  Norton.  Reprinted (German translation) in Beate Krais (ed.),
      *Wissenschaftskultur und Geschlechterordnung*, Frankfurt:  Campus Verlag.

1989  Bielby, William T. and Denise D. Bielby
      "Family Ties:  Balancing Commitments to Work and Family in Dual Earner
      Households," *American Sociological Review*, Vol. 54, No. 5:  776-789, October, 1989.

1989  Bielby, W .T. and Bielby, D .D.
      *The 1989 Hollywood Writers' Report:  Unequal Access, Unequal Pay*.  West Hollywood,
      CA:  Writers Guild of America, West, 112 p.

1988  Bielby, Denise D. and William T. Bielby
      "She Works Hard for the Money:  Household Responsibilities and the Allocation of
      Work Effort," *American Journal of Sociology*, Vol. 93, No. 5:  1031-1059, March, 1988
      (Winner of the 1986 Kathleen Gregory Klein Award for Excellence in Feminist Studies
      from the Popular and American Culture Associations).

1988  Bielby, Denise D. and William T. Bielby
      "Women's and Men's Commitment to Paid Work and Family:  Theories, Models, and
      Hypotheses."  Pp. 249-253 in B. Gutek, L. Larwood, and A. Stromberg (eds*.), Women
      and Work, Volume III*.  Newbury Park, CA:  Sage.

1988  Bielby, Denise D. and William T. Bielby
      "Sex Differences in the Allocation of Work Effort Among Professionals and Managers."

Pp. 45-67 in R. Schwartz, (ed.), *Women at Work*.  Los Angeles:  UCLA Institute for Social Science Research.

1988  Treiman, Donald J., William T. Bielby, and Man-tsun Cheng
        "Evaluating a Multiple-Imputation Method for Recalibrating 1970 U.S. Detailed Industry Codes to the 1980 Standard."  *Sociological Methodology*. Vol. 18: 309-345.

1988  Bielby, Denise D., William C. Brastow, and William T. Bielby
        "Goal Incongruence, Interdependence, and Decision-Making in a 'High-Tech' Firm," *Research in the Sociology of Work*, Vol. 4:  153-178.  Revised version published in Russian in V. Yadov (ed.), *Social Organization of Labor:  Aspects of the Problem.* Moscow:  Soviet Sociological Association, 1989.

1987  Bielby, William T.
        "Modern Prejudice and Institutional Barriers to Equal Employment Opportunities for Minorities," *Journal of Social Issues*, Vol. 43, No. 1:  79-84, Spring, 1987.

1987  Bielby, William T. and Denise D. Bielby
        *The 1987 Hollywood Writers' Report:  A Survey of Ethnic, Gender and Age Employment Factors*.  West Hollywood, CA:  Writers Guild of America, West.

1987  Bielby, William T. and James N. Baron
        "Undoing Discrimination:  Comparable Worth and Job Integration."  Pp. 211-229 in Christine Bose and Glenna Spitze (eds.), *Ingredients for Women's Employment Policy*. Albany:  State University of New York Press.

1986  Baron, James N. and William T. Bielby
        "The Proliferation of Job Titles in Organizations," *Administrative Science Quarterly*, Vol. 31, No. 4:  561-586, December, 1986.

1986  Baron, James N., Alison Davis-Blake, and William T. Bielby
        "The Structure of Opportunity:  How Promotion Ladders Vary Within and Among Organizations," *Administrative Science Quarterly*, Vol. 31, No. 2:  248-273, June 1986. Reprinted in Peter Capelli (ed.), *Training and Development, a volume in The International Library of Management*, Aldershot, Hampshire, England, Dartmouth Publishing, 1994.

1986  Bielby, William T.
        "Arbitrary Metrics in Multiple Indicator Models of Latent Variables*," Sociological Methods and Research*, Vol. 15, No. 1:  3-23, November, 1986.

1986  Bielby, William T.
        "Arbitrary Normalizations (comments on Sobel, Arminger and Henry*), Sociological Methods and Research*, Vol. 15, No. 1:  62-63, November, 1986.

1986  Bielby, William T. and James N. Baron
        "Sex Segregation Within Occupations," *American Economic Review*, Vol. 76, No. 2:  43-47, May, 1986.

1986  Matsueda, Ross N. and William T. Bielby
        "Statistical Power in Covariance Structure Models," *Sociological Methodology* Vol. 16: 120-158.

1986 Bielby, William T. and James N. Baron
"Men and Women at Work: Sex Segregation and Statistical Discrimination*," American Journal of Sociology*, Vol. 91, No. 4: 759-799, January, 1986.  Reprinted in David B. Grusky (ed.), *Social Stratification:  Class, Race, and Gender in Sociological Perspective*, Boulder, CO:  Westview Press, 1994.  Reprinted in Marianne A. Ferber (ed.), *Women in the Labor Market* (in the series *International Library of Critical Writings in Economics*, Mark Blaug, series editor), Cheltenham, UK:  Edward Elgar Publishing, 1998.

1985 Baron, James N. and William T. Bielby
"Organizational Barriers to Gender Equality: Sex Segregation of Jobs and Opportunities." Pp. 233-251 in A. S. Rossi (ed.), *Gender and the Life Course*. New York: Aldine, 1985.

1984 Bielby, William T. and James N. Baron
"A Woman's Place is With Other Women:  Sex Segregation Within Organizations."  Pp. 27-55 in B. Reskin (ed.), *Sex Segregation in the Workplace:  Trends, Explanations, Remedies*. Washington, D.C.:  National Academy Press, 1984.

1984 Baron, James N. and William T. Bielby
"The Organization of Work in a Segmented Economy*," American Sociological Review*, Vol. 49, No. 4:  454-473, August, 1984.

1984 Bielby, Denise D. and William T. Bielby
"Work Commitment, Sex Role Attitudes, and Women's Employment*," American Sociological Review*, Vol. 49, No. 2:  234-247, April, 1984.

1983 Bielby, William T. and James N. Baron
"Organizations, Technology, and Worker Attachment to the Firm."  *Research in Social Stratification and Mobility*, Vol. 2:  77-113.

1983 Wilson, Thomas P. and William T. Bielby
"Recursive Models for Categorical Data," *Social Science Research*, Vol. 12, No. 2: 109-130, June, 1983.

1982 Baron, James N. and William T. Bielby
"Workers and Machines:  Dimensions and Determinants of Technical Relations in the Workplace," *American Sociological Review*, Vol. 47, No. 2: 175-188, April, 1982.

1981 Bielby, William T.
"Neighborhood Effects:  A LISREL Model for Clustered Samples*," Sociological Methods and Research*, Vol. 10, No. 1:  82-111, August, 1981.

1981 Bielby, William T.
"Models of Status Attainment."  *Research in Social Stratification and Mobility*, Vol. 1: 3-26.

1981 Bielby, William T. and Arne L. Kalleberg
"The Structure of Occupational Inequality," *Quality and Quantity*, Vol. 15, No. 2: 125-150, April, 1981.

1981 Friedland, Roger O. and William T. Bielby
"The Power of Business in the City." Pp. 131-151 in T. N. Clark and L. C. Ferguson (eds*.), Urban Policy Analysis*.  Beverly Hills:  Sage Publications, 1981.

1981 Hawley, Clifford B. and William T. Bielby
"Research Uses of Longitudinal Survey Data on Women," Pp. 364-386 in R. F. Boruch, P. M. Wortman, and D. S. Cordray (eds.), *Reanalyzing Program Evaluations Policies and Practices for Secondary Analysis of Social and Educational Programs*.  San Francisco:  Jossey-Bass, 1981.

1980 Baron, James N. and William T. Bielby
"Bringing the Firms Back In:  Stratification, Segmentation, and the Organization of Work," *American Sociological Review*, Vol. 45, No. 5:  737-765, October, 1980 (Winner of the European Group on Organizational Sociology Award, American Sociological Association, 1981).  Reprinted in David B. Grusky (ed.), *Social Stratification:  Class, Race, and Gender in Sociological Perspective*.  Boulder, CO, Westview Press, 1992.

1980 Sanders, Jimy M. and William T. Bielby
"Revising 'The American Soldier Revisited:' Comment on Butler and Wilson," *Social Science Quarterly*, Vol. 60, No. 2:  333-336, September, 1980.

1979 Allen, Richard C. and William T. Bielby
"Blacks' Attitudes and Behaviors Toward Television," *Communications Research*, Vol. 6, No. 4:  437-462, October, 1979.

1979 Allen, Richard C. and William T. Bielby
"Blacks' Relationship with the Print Media," *Journalism Quarterly*, Vol. 56, No. 3:  488-496, Autumn, 1979.

1977 Bielby, William T. and Robert M. Hauser
"Response Errors in Earnings Functions for Non-black Males," *Sociological Methods and Research*, Vol. 6, No. 2:  241-280, November, 1977. The issue has been reprinted as *Survey Design and Analysis:  Current Issues*, D. F. Alwin (ed.), Beverly Hills, CA:  Sage Publications, 1978.  Article reprinted in *Linear Models in Social Research*, P. V. Marsden (ed.), Beverly Hills, CA:  Sage Publications, 1981.

1977 Bielby, William T. and Robert M. Hauser
"Structural Equations Models," *Annual Review of Sociology*, Vol. 3:  137-161, 1977.

1977 Bielby, William T., Robert M. Hauser, and David L. Featherman
"Response Errors of Black and Non-black Males in Models of the Intergenerational Transmission of Socioeconomic Status," *American Journal of Sociology*, Vol. 82, No. 6:  1242-1288, May, 1977.

1977 Bielby, William T., Robert M. Hauser, and David L. Featherman
"Response Errors of Non-black Males in Models of the Stratification Process," in D. J. Aigner and A. S. Goldberger (eds.), *Latent Variables in Socioeconomic Models*.  Amsterdam: North-Holland, 1977, revised and expanded *in Journal of the American Statistical Association*, Vol. 72, No. 360:  723-735, December, 1977.

1977 Bielby, William T. and James R. Kluegel
"Simultaneous Statistical Inference and Statistical Power in Survey Research Applications of the General Linear Model," *Sociological Methodology:* Vol. 8:  283-312.

1974 Bielby, William T. and James R. Kluegel
"Non-random Exogenous Variables in Path Analysis:  A Comment," *American Sociological Review*, Vol. 39, No. 6:  888-891, December, 1974.

BOOK REVIEWS AND REVIEW ESSAYS:

2001   *Creative Industries:  Contracts Between Art and Commerce* by Richard E. Caves.
Reviewed in *American Journal of Sociology*, Vol. 16, No. 6:  1830-1832.

1999   *Organizations in America:  Analyzing Their Structures and Human Resource Practices* by
Arne L. Kalleberg, David Knoke, Peter V. Marsden, and Joe L. Spaeth.  Reviewed in
*Administrative Science Quarterly*, Vol. 44, No. 4:  842-846, December 1999.

1999   *The Use of Social Science Data in Supreme Court Decisions* by Rosemary J. Erickson and
Rita J. Simon.  Reviewed in *Contemporary Sociology*, Vol. 28, No. 2:  222-223, March,
1999.

1998   "Firm Commitments."  Review Essay on *The Time Bind:  When Work Becomes Home and
Home Becomes Work* by Arlie Russell Hochschild.  Contribution to Review Symposium
in *Contemporary Sociology* Vol. 27, No. 1:  32-34, January, 1998.

1998   *Social Differentiation and Social Inequality:  Essays in Honor of John Pock*, edited by
James N. Baron, David B. Grusky, and Donald J. Treiman.  Reviewed in *Contemporary
Sociology*, Vol. 27, No. 2:  152-153, March, 1998.

1992   "Organizations, Stratification, and *The American Occupational Structure*."  Review essay in
*Contemporary Sociology* as part of a 25 year retrospective on Blau and Duncan's *The
American Occupational Structure*, Vol. 21, No. 5:  647-650, September, 1992.

1992   *Revolving Doors:  Sex Segregation and Women's Careers* by Jerry A. Jacobs, *and Doing
Comparable Worth:  Gender, Class, and Pay Equity* by Joan Acker.  Reviewed *in Social
Forces*, Vol. 70, No. 4:  1165-1168, June, 1992.

1988   *The Process of Occupational Sex-Typing:  The Feminization of Clerical Labor in Great
Britain* by Samuel Cohen, and *Gender at Work:  The Dynamics of Job Segregation* by
Sex during World War II by Ruth Milkman.  Reviewed in *Social Forces*, Vol. 67, No. 2:
551-553, December, 1988.

1986   "Contractual Arrangements." Review of *Households, Employment, and Gender:  A Social,
Economic, and Demographic View* by Paula England and George Farkas.  Reviewed in
*Science*, Vol. 232, No. 4753:  1021-1022, May, 1986.

1984   "Imperatives of the Organization:  Stinchcombe's Techno-Marxism."  Review essay on
*Economic Sociology* by A. S. Stinchcombe. *American Journal of Sociology*, Vol. 90, No.
1:  192-196, July, 1984.

1980   "More Inequality:  Christopher Jencks on the Paths to Success."  Review essay *on Who Gets
Ahead?* by Christopher Jencks, et al. in *Contemporary Sociology*, Vol. 9, No. 1:  754-
758, November 1980.

1980   *Mathematical Tools for Applied Multivariate Analysis* by P. E. Green.  Reviewed in
*Contemporary Sociology*,  Vol. 9, No. 1:  105-106, January 1980.

1979   *Inequality in American Communities* by R. F. Curtis and E. F. Jackson; and *Classes in the
United States:  Workers Against Capitalists* by C. Loren.  Reviewed in *Social Forces*,
Vol. 57, No. 3:  982-985, March, 1979.

1977 *Women and the Workplace:  The Implications of Occupational Segregation*.  Edited by
Martha Blaxall and Barbara Reagan.  Reviewed in *Social Forces*, Vol. 56, No. 1:  287-
289, September, 1977.


TECHNICAL REPORTS:

1995 Bielby, William T. and Denise D. Bielby
"Agency Representation and Writers' Employment in Television and Film." Report
prepared for the Writers Guild of America, West, West Hollywood, CA, February 1995.

1987 Bielby, William T. and Denise D. Bielby
"Employment Opportunities for Television Writers:  Continuity and Change from 1960
to the Present."  Report prepared for the Writers Guild of America, West Hollywood,
CA, October 1987.

1983 Bielby, William T.
"Measuring Attributes of Jobs in the Panel Study of Income Dynamics." Report prepared
for the National Advisory Board on the Panel Study of Income Dynamics, January, 1983.

1983 Nam, Charles B. (Subcommittee Chair), William T. Bielby, Clifford Clogg, Stephen
Fienberg, William H. Form, Robert M. Hauser, David L. Kaplan, Ann R. Miller, Mary G.
Powers, Donald Rubin, and Donald J. Treiman.
"Alternative Methods For Effecting the Comparability of Occupational Measurement
Over Time." Report to the SSRC Advisory and Planning Committee on Social Indicators
and the U.S. Bureau of the Census.  Subcommittee on Comparability of Occupational
Measurement, Social Science Research Council.

1980 Bielby, William T. and Richard A. Berk
"Sources of Error in Survey Data Used in Criminal Justice Evaluation."  Final Report
submitted to National Institute of Law Enforcement and Criminal Justice.

1979 Bielby, William T.
"Evaluating Measures of Neighborhood Quality in the Annual Housing Survey."  *Annual*
Housing *Survey Studies No. 2*.  U.S. Department of Housing and Urban Development.
Washington, D.C.:  U.S.  Government Printing Office, 1979, 33 p.

1979 Bielby, William T., Clifford B. Hawley and David Bills
*Research Uses of the National Longitudinal Surveys*.  Research and Development
Monograph No. 62, U.S. Department of Labor.  Washington, D.C.:  U.S. Government
Printing Office, 1979, 143p.


RECENT INVITED LECTURES AND ACTIVITIES (2005-present)

2008 "Discrimination Processes at Work."  Organizer and Panelist, Thematic Session at the
Annual Meeting of American Sociological Association, Boston, MA, August 1,
2008

2008 "Judicial Research on Discrimination at Work."  Panelist, Discrimination at Work
Seminar, Radcliff Institute for Advanced Study, Harvard University, April 26,
2008.

2008  "Stereotyping, Intent, Discretion & Institutionalized Practices:  Social Science and the
        Growth in Class Action Employment Litigation."  Department of Sociology,
        University of Arizona, March 31, 2008.

2008  "Race at the Top:  How Companies Shape the Inclusion of African Americans on
        Their Boards in Response to Institutional Pressures" (with Clayton Rose).
        Conference on "The Iron Cage Revisited: Institutional Isomorphism and
        Collective Rationality in Organizational Fields," Department of Sociology,
        University of Arizona, March 1, 2008.

2007  "'Statistical Dueling' with Unconventional Weapons:  Anticipating the Disaggregation
        Defense in Discrimination Class Actions."  The Impact Fund, Oakland, CA,
        February 16, 2007 (with Pamela Coukos).

2007  "Perspectives from the Trenches:  Employers, Employees, and Expert Witnesses."
        Panelist, Institute for Law and the Workplace Member Conference on New
        Frontiers in Employment Litigation, Chicago-Kent College of Law, November 9,
        2007.

2006  "The Lasting Effectiveness of Consent Decrees on Employers' Policies and Practices,"
        Participant and advisor for meeting organized by the Institute for Women's Policy
        Research and the WAGE Project, Boston, MA, November 29, 2006.

2006  "'Statistical Dueling' with Unconventional Weapons: What Courts Should Know
        About Experts in Employment Discrimination Class Actions."  Center for the
        Study of Law & Society, School of Law, Boalt Hall, University of California,
        Berkeley (co-sponsored by the Haas School of Business and the Department of
        Sociology), November 14, 2006 (with Pamela Coukos)

2006  "Managerial Discretion, Cognitive Stereotypes, and Workplace Discrimination:
        Should Organizations be Legally Liable for 'Unconscious' Bias?"  Department of
        Sociology, University of Illinois--Chicago, October 26, 2006.

2006  Interview, "From the Plaintiffs' Expert."  Annual Conference of the American
        Employment Law  Council, Naples, FL, October, 20, 2006 (interviewed by Neal
        Mullen of Paul, Hastings, Janofsky & Walker, LLP).

2006  Panelist, "When Do You Need and Expert."  National Employment Lawyers
        Association Workshop, Beyond Stereotypes:  Discovering & Proving Hidden
        Bias in Employment Cases.  Washington, DC, October 14, 2006.

2006  "The Law, Equal Opportunity, and Organizational Sociology:  Understanding and
        Addressing Workplace Discrimination in an Era of "Subtle" Bias --
        or -- 'Bringing the Firms Back In.'"  Harvard Inequality & Social Policy Seminar,
        Kennedy School of Government, Harvard University, October 2, 2006.

2004-06  "Managerial Discretion, 'Subtle' Bias, and the Politics of Expertise:  Litigating
        Statistical Proof of Employment Discrimination."  Columbia University Sociology
        Colloquium, March 22, 2006; Harvard-MIT Economic Sociology Seminar, MIT
        Sloan School of Management, October 27, 2005; Colloquium Series, Department
        of Sociology, University of Illinois, January 30, 2004; Economic Sociology
        Workshop, Graduate School of Business, University of Chicago, February 3,
        2004; Department of Sociology, Northwestern University, February 5, 2004,

Department of Sociology, University of Wisconsin--Madison, March 2, 2004,
Public Policy Seminar, George Washington University, October 20, 2004.
Population Studies Center, University of Pennsylvania, February 14, 2005.

2005  Panelist, "Best Practices:  Strategies for Retention and Promotion."  Promoting
Diversity:  Tough Questions and Proposed Solutions Conference, Sponsored by
the Bar Association of San Francisco, California Minority Counsel Program, and
Minority Corporate Counsel Association, San Francisco, October 28, 2005.

2005  "Cognitive Bias, Organizational Context, and Intent:  Lessons from Applying Social
Science Expertise in Dukes et al. v. Wal-Mart."  Equal Justice Society Conference
on Rethinking the Intent Doctrine, Chicago, IL, September 9, 2005.

2005  "Managerial Discretion, 'Subtle' Workplace Bias and the Courts."  The Ruth and John
Useem Plenary Address, 2005 Annual Meeting of the North Central Sociological
Association, Pittsburgh, PA, April 9, 2005.


RESEARCH GRANTS:

2004-05      "Doctoral Dissertation Research: Dividing the Field: Credentials, Organizational Dynamics
and Sex Segregation in U.S. Higher Education, 1970-2000."  National Science
Foundation Dissertation Improvement Grant (Craig Rawlings, Ph.D. Candidate, UC
Santa Barbara).

2002-03      "'Serial Employment': Professional, Managerial, and Technical Workers in the New
Economy."  University of California Institute for Labor and Employment (with Lisa
Torres).

1995-98      "Environments, Organizations, and Jobs:  The Causes and Consequences of Workplace
Gender Segregation."  National Science Foundation, Sociology Division and Human
Capital Initiative.

1995-96      "MOST Program:  Minority Opportunity Through School Transformation."  American
Sociological Association, Ford Foundation, and the Borchard Foundation (Co-
Investigator, with Kum-Kum Bhavnani).

1989-93      "From Market to Hierarchy:  Industrial Change and the Employment Relation in Television
Production."  National Science Foundation, Sociology Division.  (Principal
Investigator.  Denise D. Bielby, Co-Investigator.)

1985-87      "Men's and Women's Commitment to Work and Family." National Science Foundation,
Sociology Division.  (Principal Investigator.  Denise D. Bielby, Co-Investigator.)

1987         "Research Conference on Occupational Sex Segregation and Comparable Worth."  American
Sociological Association, Problems of the Discipline Program (with Toby Parcel,
James Baron, Paula England, Jerry Jacobs, Barbara Reskin, and Patricia Roos).

1980-83      "Jobs, Firms, and Industries:  Economic `Dualism' and the Organization of Work." National
Science Foundation, Divisions of Sociology and Applied Research.  (Principal
Investigator. James N. Baron, Co-Investigator.)

1978-80      "Sources of Error in Survey Data Used in Criminal Justice Evaluation." National Institute of
             Law Enforcement and Criminal Justice.  (Principal Investigator.  Richard A. Berk,
             Co-Investigator.)

1978         "Neighborhood and Household Components of Variation in Respondents' Reports of
             Neighborhood Quality." U. S. Department of Housing and Urban Development.
             (Principal Investigator.)

1977         "Research Uses of the National Longitudinal Survey." U. S. Department of Labor.
             (Principal Investigator.)


RESEARCH AND TEACHING INTERESTS:

            Quantitative Methods              Organizations
            Media & Popular Culture          Labor Markets & Discrimination
            Social Stratification            Gender & Race


REFERENCES:        available upon request

**EXHIBIT C**

**EXHIBIT C**

**RECORD MATERIALS REVIEWED IN PREPARATION OF THIS REPORT**

"Minority Participation in Farm Service Agency's Farm Loan Programs," USDA report published September 1997

U.S. Department of Agriculture Office of Inspector General, Southeast Region, Audit Report: "Minority Participation in Farm Service Agency's Programs," November 2005

Declaration of Rosalind Gray

Declaration of Lloyd E. Wright

United States Department of Agriculture, Farm Services Agency, Civil Rights and Small Business Utilization Staff, *A Qualitative Study of Civil Rights Implications in Farm Loan Program Administration,* 1997, p. 21 (hereafter cited as "Qualitative Study")

Civil Rights at the United States Department of Agriculture, "A Report of the Civil Rights Action Team," February 1997

Transcript- Deposition of Theresa Bulla (Topic 12), dated 11/05/2007 (with exhibits # 1-6)

Transcript- Deposition of Carolyn B. Cooksie (Topic 1), dated 01/05/2006 (with exhibits # 1-11)

Transcript- Deposition of Carolyn B. Cooksie (Topic 2), dated 02/28/2006 (with exhibits # 1-10)

Transcript- Deposition of Carolyn B. Cooksie (Topic 13), dated 07/24/2006 (with exhibits # 1-8)

Transcript- Deposition of Carolyn B. Cooksie (Topic 3), dated 12/18/2007 (with exhibits # 1-17)

Transcript- Deposition of Katherine Gugulis (Topic 5), dated 02/16/2006 (with exhibits # 1-3)

Transcript- Deposition of Sherry Hinton Henry (Topic 12), dated 03/04/2008 (with exhibits # 1-11)

Transcript- Deposition of Walter Michael Hill (Topic 4), dated 03/21/2006 (with exhibits # 1-23)

Transcript- Deposition of Walter Michael Hill, dated 09/24/2008 (with exhibits # 1-12)

Transcript- Deposition of Josie Woodley Jones (Topic 12), dated 09/15/2008 (with exhibits # 1-4)

Transcript- Deposition of Kenneth L. Nagel (Topic 14), dated 05/03/2006 (with exhibits # 1-11)

Transcript- Deposition of Kenneth L. Nagel (Topic 8), dated 06/30/2006 (no exhibits)

Transcript- Deposition of Kenneth L. Nagel (Topic 13), dated 10/26/2006 (with exhibits # 1-10)

Transcript- Deposition of Kenneth L. Nagel (Amended Topic 9), dated 09/27/2007 (with exhibits # 1-12)

Transcript- Deposition of James F. Radintz (Topic 8), dated 01/26/2006 (with exhibits # 1-36)

Transcript- Deposition of James F. Radintz (Topic 6), dated 03/08/2006 (with exhibits # 1-15)

Transcript- Deposition of James F. Radintz (Topic 7), dated 04/20/2006 (with exhibits # 1-6)

Transcript- Deposition of James F. Radintz (Topics 11A, 11C, 11F), dated 05/17/2006 (with exhibits # 1-12)

Transcript- Deposition of James F. Radintz (Amended Topic 16), dated 11/07/2006 (with exhibits # 1-8)

Transcript- Deposition of James D. Rowe (Topics 11A, 11B), dated 02/02/2006 (with exhibits # 1-3)

Transcript- Deposition of James D. Rowe (Topic 6), dated 03/08/2006 (with exhibits # 1-4)

Transcript- Deposition of James D. Rowe (Topic 7), dated 04/20/2006 (with exhibits # 1-2)

Transcript- Deposition of Johnny R. Toles (Topic 5), dated 02/16/2006 (with exhibits # 1-2)

Transcript- Deposition of Johnny R. Toles (Topic 13), dated 10/26/2006 (with exhibits # 1-6)

Transcript- Deposition of Johnny R. Toles (Topic 12), dated 04/24/2008 (with exhibits # 1-13)

Transcript- Deposition of Gladys Gary Vaughan (Topic 4), dated 03/21/2006 (with exhibit # 1)