**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| MARILYN KEEPSEAGLE, et al., | ) |
|  | ) |
|  | ) |
| Plaintiffs, | ) |
|  | ) Civil Action No. 1:99CV03119 |
| v. | ) (EGS) |
|  | ) |
| TOM VILSACK, Secretary, United States | ) |
| Department of Agriculture, | ) Judge: Emmet G. Sullivan |
|  | ) Magistrate Judge: Alan Kay |
|  | ) |
| Defendant. | ) |
|  | ) |

**MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT, AND AN ORDER
CERTIFYING SETTLEMENT CLASS AND APPROVING CERTAIN PROVISIONS IN
SETTLEMENT AGREEMENT**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................................. iii

INTRODUCTION .................................................................................................................... 1

BACKGROUND ...................................................................................................................... 3

    A.      The Litigation. ........................................................................................................ 3

    B.      The Settlement Agreement. .................................................................................... 5

          1.      Monetary awards for class members who prevail in non-judicial claims process. ......................................................................... 7

               a.      Track A ................................................................................ 7

               b.      Track B ................................................................................ 9

          2.      Debt Relief .......................................................................................... 10

               a.      The USDA will extinguish up to $80 million of successful claimants' outstanding federal farm loan debt. ................................................................................... 10

               b.      Until debt relief is provided, the USDA will establish a moratorium on adverse loan actions. ........................................ 11

          3.      Programmatic Relief ........................................................................... 12

          4.      Notice provisions ................................................................................ 14

                a.      Attorneys' Fees and Class Representative Service Awards ............................................................................... 15

                b.      Plaintiffs' Proposed Administrators ................................... 16

                c.      Process for Opting Out or Objecting to the Settlement .......... 17

ARGUMENT .......................................................................................................................... 17

I.      Preliminary Approval Is Appropriate Because the Settlement Agreement is Fair, Reasonable, and Adequate. ................................................................................... 17

    A.      The Proposed Settlement Terms Are Fair, Reasonable, and Adequate. ........ 19

    B.      The Proposed Settlement Is the Product of Extensive Arm's-Length Negotiations by Informed, Experienced Counsel ............................................ 24

      C.       An Appropriate Point for Settlement Has Been Reached. ...............................25

II.     The Settlement Class Should Be Certified. ....................................................................27

      A.       The Proposed Class Meets the Requirements of Rule 23(a). ...........................28

      B.       The Proposed Class Meets the Requirements of Rule 23(b)(3). ......................28

            1.      Common Questions Predominate Over Questions Affecting
                  Only Individual Members. ......................................................................29

            2.      A Class Action Is Superior to Individual Adjudication. ......................30

III.    The Proposed Notice Is Fair and Satisfies Due Process. ..............................................31

CONCLUSION .......................................................................................................................33

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Amchem Products v. Windsor,*
    521 U.S. 591 (1997)..........................................................................................................27, 28

*Barnes v. District of Columbia,*
    242 F.R.D. 113 (D.D.C. 2007)....................................................................................................30

*Equal Rights Ctr. v. Wash. Metro. Area Transit Auth.,*
    573 F. Supp. 2d 205 (D.D.C. 2008) ......................................................................................24, 25

*In re General Motors Corp. Pick-up Truck Fuel Tank Prods. Liab. Litig.,*
    55 F.3d 768 (3d Cir. 1995)..........................................................................................................21

*In re Lorazepam,*
    2003 U.S. Dist. LEXIS 12344 ...............................................................................................20, 24

*In re National Student Marketing Litigation,*
    68 F.R.D. 151 (D.D.C. 1974).......................................................................................................25

*In re Shell Oil Refinery,*
    155 F.R.D. 552 (E.D. La. 1993)..................................................................................................18

*In re Traffic Executive Ass'n,*
    627 F.2d 631 (2d Cir. 1980).........................................................................................................18

*In re Veneman,*
    309 F.3d 789 (D.C. Cir. 2002) ......................................................................................................4

*In re Vitamins Antitrust Litig.,*
    2001 U.S. Dist. LEXIS 25071 (D.D.C. 2001) .................................................18, 20, 27, 29

*In re Vitamins Antitrust Litig.,*
    209 F.R.D. 251 (D.D.C. 2002)................................................................................................29, 30

*Keepseagle v. Johanns,*
    236 F.R.D. 1 (D.D.C. 2006)...........................................................................................................4

*Keepseagle v. Veneman,*
    2001 U.S. Dist. LEXIS 25220 (D.D.C. Dec. 12, 2001)......................................................3, 4

*Keepseagle v. Vilsack,*
    No. 1:99CV03119 ("the Action")...............................................................................1, 28, 31

*Ocher v. SCA Realty I,*
    945 F. Supp. 298 (D.D.C. 1996) .................................................................................................26

*Petruzzi's, Inc. v. Darling-Delaware Co.*,
  983 F. Supp. 595 (M.D. Pa. 1996) .........................................................................................21

*Pigford v. Glickman*,
  185 F.R.D. 82 (D.D.C. 1999) ..............................................................................................20

*Pigford v. Vilsack*,
  No. 97-1978 (PLF) (D.D.C.)..................................................................................................7

*Swedish Hosp. Corp. v. Shalala*,
  1 F.3d 1261 (D.C. Cir. 1993) ...............................................................................................21

## STATUTES

7 U.S.C. § 2279...........................................................................................................................8

Equal Credit Opportunity Act, 15 U.S.C. §§ 1691-1691f .............................................................3

## OTHER AUTHORITIES

Census of Agriculture, Table 55, *available at* http://www.agcensus.usda.gov/Publications
  /2007/Full_Report/Volume_1,_ ...........................................................................................6

Federal Judicial Center, Manual For Complex Litigation (Fourth), § 13.14, at 173 & §
  21.632, at 320-21 (2004)..........................................................................................17, 18, 26

Federal Rule of Civil Procedure 23 ....................................................................... passim

Order Denying Writ of Mandamus, No. 04-5031 (D.C. Cir. Mar. 3, 2004)...................................4

## INTRODUCTION

On October 19, 2010, after nearly eleven years of litigation, Plaintiffs Marilyn Keepseagle, Luther Crasco, Gene Cadotte, Porter Holder, Keith Mandan, and Claryca Mandan, individually and on behalf of all others similarly situated ("Plaintiffs"), and Defendant Tom Vilsack, the Secretary of the U.S. Department of Agriculture ("the Secretary" or "USDA"), entered into a Settlement Agreement ("Settlement" or "Settlement Agreement") to resolve *Keepseagle v. Vilsack*, No. 1:99CV03119 ("the Action"), a nationwide class action lawsuit that alleges systemic racial discrimination in the USDA's Farm Loan Program during the period from 1981 through 1999. Plaintiffs submit this Memorandum of Law in support of their Motion for Preliminary Approval of the Settlement. The Settlement Agreement is attached as Exhibit 1 to this Motion.

The Settlement Agreement offers far-reaching and unprecedented programmatic and financial relief for Native American farmers and ranchers—America's first farmers and ranchers. The Settlement will fairly compensate thousands of Native American farmers and ranchers for the economic harm they claim is the result of discrimination in the delivery of farm loan services by the USDA. Equally important, the Settlement provides Native Americans relief from farm loan debt which will assist them in remaining active and productive farmers and ranchers, and provides for historic reforms to the farm loan program procedures and operations to improve their responsiveness to the needs and culture of Native Americans.

The Settlement Agreement has several major components, each of which will benefit Native American farmers and ranchers in significant ways. First, the Settlement establishes a cash fund of $680 million from which damages will be paid to eligible class members. The Settlement also establishes a claims process administered by neutrals with extensive experience handling these types of claims, and provides that the cost of such administration will be paid by

the government up to a limit of $20 million.  Second, the Settlement provides that the USDA will extinguish outstanding farm loan debt held by eligible class members up to a total amount of $80 million.  Combining the cash fund and debt relief, the government will provide monetary relief to the class in an amount of up to $760 million.  Third, and most important, the Settlement Agreement establishes a host of new programmatic changes and initiatives that should dramatically improve the way the USDA provides farm loan services to Native Americans.  The programmatic changes, described below, will help ensure that Native Americans receive equal access to credit opportunities from the USDA, as well as enhanced services and technical assistance that address the unique needs of the Native American community.

The Settlement is the result of arm's-length negotiations spanning ten months.  Prior to reaching the Settlement, the parties exchanged over two million pages of documents, examined more than 100 witnesses in deposition, retained and examined multiple expert witnesses, and briefed numerous legal and factual issues in this hard-fought litigation.  As a result of this extensive discovery, the parties were able to assess the strengths and weaknesses of their positions to negotiate a Settlement based on their educated assessment of the case.  The terms of the Settlement are fair, reasonable and adequate within the meaning of Federal Rule of Civil Procedure 23(e).  They represent a resolution of this litigation that should dramatically enhance the quality of farm loan services delivered to Native American farmers and ranchers and pave the way for a new partnership between the Native American community and the USDA.  Accordingly, Plaintiffs request that the Court grant preliminary approval of the Settlement Agreement and its attachments, and enter the proposed Order certifying a class that includes pursuit of the damage claims for settlement purposes only, and directing the issuance of attached notice to the class.

# BACKGROUND

## A.    The Litigation.

On November 24, 1999, Plaintiffs filed suit against the USDA under, *inter alia*, the Equal

Credit Opportunity Act, 15 U.S.C. §§ 1691-1691f, alleging that the USDA discriminated against

Native Americans in its Farm Loan Program, causing them substantial economic losses.   As

reflected in the most recent amended complaint, Plaintiffs alleged discrimination under both

disparate treatment and disparate impact theories of liability.   Eighth Amended Complaint ¶¶

134-36, Dkt. No. 457.   In particular, Plaintiffs alleged that the USDA has discriminated against

Native American farmers by failing to provide them equal credit opportunities under its Farm

Loan Program.   This discrimination allegedly took the form of denials of farm loans and loan

servicing, unjustified delays in approval of loans, the provision of loans that were smaller than

what had been applied for or contained more onerous conditions than loans made to similarly

situated white farmers, and a widespread failure to provide Native Americans the technical and

other forms of assistance available to white farmers that the USDA itself has recognized are

necessary for farmers to prepare Farm Loan Program applications.

On September 28, 2001, this Court issued an order, subsequently memorialized in a

December 12, 2001 opinion and order, certifying a class under Federal Rule of Civil Procedure

23 for purposes of declaratory and injunctive relief and defining the class as:

> All Native American farmers and ranchers, who (1) farmed or ranched between
> January 1, 1981 and November 24, 1999; (2) applied to the USDA for
> participation in a farm program during that period; and (3) filed a discrimination
> complaint with the USDA either individually or through a representative during
> the time period.

*Keepseagle v. Veneman*, 2001 U.S. Dist. LEXIS 25220, *19 (D.D.C. Dec. 12, 2001).   At that

time, the Court deferred until the completion of discovery the question of whether it would

certify Plaintiffs claims for economic damages under Rule 23(b)(2), or in the alternative certify the damages claims as part of as a "hybrid" class under Rule 23(b)(2) and (b)(3). *Id.* at *46.

The USDA has vigorously contested this case at every stage of the litigation. After unsuccessfully opposing class certification, the USDA sought interlocutory review of this Court's class certification decision. In October 2002, after briefing and oral argument, the D.C. Circuit denied the USDA's Rule 23(f) petition for review. *In re Veneman*, 309 F.3d 789 (D.C. Cir. 2002). The USDA then petitioned for a writ of mandamus and sought to stay all proceedings in this Action. Again, the D.C. Circuit denied the USDA's request. Order Denying Writ of Mandamus, No. 04-5031 (D.C. Cir. Mar. 3, 2004). In November 2005, this Court denied Plaintiffs' request to certify their claim for monetary damages, without prejudice to Plaintiffs' renewing their motion after further discovery. *Keepseagle v. Johanns*, 236 F.R.D. 1, 1-2 (D.D.C. 2006).

Between 2004 and 2009, the parties engaged in significant discovery in the Action. This discovery included the exchange and review of more than two million pages of hard copy and electronic documents, more than 40 depositions of Plaintiffs' non-expert witnesses, more than 50 depositions of the Secretary's non-expert and 30(b)(6) witnesses, the exchange of numerous reports from several experts on both sides, and eight expert depositions. As of November 2009, discovery in the case was essentially complete.

On August 18, 2009, Plaintiffs filed a motion asking the Court to issue an order governing the means by which Plaintiffs could establish class membership in the Action. Dkt. 529. Plaintiffs' motion argued that these alternative means of establishing class membership were justified because the USDA had failed to create and maintain records of civil rights complaints and failed to implement a proper litigation hold in the Action. The Secretary opposed

the motion, arguing that the USDA had maintained adequate records and had taken sufficient actions with regard to the litigation hold.  The Secretary further asserted that the relief sought by Plaintiffs was not supported by the facts in the Action.  Dkt. 541.  Plaintiffs' motion is still pending.

On December 4, 2009, Plaintiffs filed a motion asking the Court to decide the class certification issue it had previously deferred.  Plaintiffs requested the Court to certify a class to assert claims for damages under Rule 23(b)(3).  Dkt. 551.  That same day, the Court granted the parties' joint request to stay proceedings in the Action for 60 days in order to allow the parties to explore settlement opportunities.  The stay was extended several times as the parties attempted to resolve the case.  On October 13, 2010, as the parties continued to make progress in settling the case, the stay was again extended to October 19, 2010.

### B.      The Settlement Agreement.

The parties began settlement negotiations after they had largely concluded extensive merits discovery and substantial briefing and motion practice on a variety of issues in the Action.  After lengthy negotiations that spanned ten months and that included myriad meetings, telephone conferences and other communications between the parties, the parties reached a Settlement Agreement on the morning of October 19, 2010.  Later that day, the parties presented the executed Settlement Agreement to the Court.

The Settlement Agreement, which is attached as Exhibit 1**,** provides far-reaching and unprecedented benefits to past, current, and future Native American farmers and ranchers.  In this Memorandum, Plaintiffs summarize the most significant benefits of the Settlement.

First, class members will be awarded $680 million in damages to compensate them for

the discrimination they suffered since 1981.[1]  This $680 million in monetary relief represents 88% of the $776 million that Plaintiffs' expert Patrick O'Brien, a 27-year veteran of the USDA's Economic Research Service, calculated as the maximum amount of quantifiable net economic losses that Native Americans suffered from 1981 through 2007.  *See* Motion for Class Certification, Dkt No. 551-4 (Dec. 4, 2009), at 6.  The USDA will also pay for the administrative costs associated with implementing the settlement, up to a total amount of $20 million.

Second, the USDA will provide up to an additional $80 million to extinguish the farm loan debt of class members who obtain damages under either Track A or Track B, as described below.  In order to avoid prejudicing class members by the amount of time this process will consume, the USDA has agreed to suspend from the date of preliminary approval through the conclusion of the claims process all efforts to accelerate, foreclose, use administrative offsets, or refer offsets to the U.S. Treasury on any FSA Farm Loan Program loan, and will not dispose of any foreclosed real property formerly owned by any claimant.

Third, the USDA has agreed to make numerous programmatic changes to improve the delivery of farm loan programs to Native Americans and to help ensure that they are treated equally in the future.  These changes will provide critically important benefits to what the United States Census has counted to be over 61,000 Native Americans currently engaged in farming and ranching,[2] as well as to future generations of Native American farmers and ranchers.

---

[1] The plaintiffs will seek an award of attorneys' fees and costs as a percentage of the common fund created by the monetary relief provided to the class.  While the monetary relief provided to the class includes $680 million payable as damages and up to $80 million in debt relief, totaling up to $760 million, the plaintiffs will seek the award of attorneys' fees payable only from the $680 million damage fund.

[2] *See* Census of Agriculture, Table 55, *available at* http://www.agcensus.usda.gov/Publications /2007/Full_Report/Volume_1,_ Chapter_1_US/st99_1_055_055.pdf.

### 1. Monetary awards for class members who prevail in non-judicial claims process.

To distribute the $680 million in damages, the Settlement Agreement establishes a two-track non-judicial claims process for any class member who files a claim within 180 days from the Effective Date of the Settlement.[3]  The claims process is similar to the process established in the African-American farmers' settlement with the USDA, *Pigford v. Vilsack*, No. 97-1978 (PLF) (D.D.C.).

The claims process, which will be non-adversarial, will be administered by a Claims Administrator with substantial experience administering these kinds of claims.  Among other duties, the Claims Administrator will receive and process claims forms, inform claimants if any information is missing, perform some calculations concerning the amount of money being paid to each successful claimant, and make payments to successful claimants.  Each individual claim will be evaluated by a third-party adjudicator (a "Neutral") familiar with the USDA farm loan process, who will determine whether the claimant has met the relevant standard of proof to establish his or her claim, and who will calculate the award amount for successful claimants.  Class Counsel will provide assistance, free of charge, to individuals seeking to file claims under the non-judicial claims process, including helping individuals fill out the claims forms and answering questions about eligibility for relief.

### a. Track A

Track A is a claims process where the Neutral evaluates each Track A claim to determine

---

[3] "Effective Date" is the date upon which the Court's order providing final approval of the Agreement under Federal Rule of Civil Procedure 23(e) becomes non-appealable, or, in the event of any appeals, upon the date of final resolution of said appeals.

whether the individual has established by substantial evidence[4]:  (1) that the claimant is a Native American who farmed or ranched, or attempted to farm or ranch, between January 1, 1981 and November 24, 1999; (2) that the claimant owned or leased, or attempted to buy or lease, or had grazing rights on or authorization to use, farm or ranch land; (3) that the claimant applied, or attempted to apply, for loan(s) between January 1, 1981 and November 24, 1999; (4) that the loan(s) for which the claimant applied was denied, provided late, approved for a lesser amount than what was requested, or encumbered by restrictive conditions, or the USDA failed to provide an appropriate loan service(s); (5) that the claimant suffered economic damage as a result of the USDA's treatment; and (6) that the claimant filed a discrimination complaint between January 1, 1981 and November 24, 1999 either directly with the USDA or through a representative who informed the claimant that the complaint had been or would be passed on to the USDA.[5]

Meritorious Track A claimants are eligible to receive an award of up to $50,000.[6]   In addition, the Settlement provides for an additional payment to offset the tax consequences of the damage awards in the amount of 25% of the cash award, which will be paid directly by the Claims Administrator to the Internal Revenue Service ("IRS").  Furthermore, each class member

---

[4] "Substantial evidence" is such evidence that a reasonable person might accept as adequate to support a conclusion after taking into account other evidence in the record that fairly detracts from that conclusion.  Substantial evidence is a lower standard of proof than a preponderance of the evidence.

[5] As a result of the interplay between the statute of limitations under the Equal Credit Opportunity Act and the statute of limitations set forth in 7 U.S.C. § 2279, a claimant will not prevail if the *only* incident of discrimination occurred between January 1, 1997 and November 23, 1997, or if the *only* complaint filed was one filed between July 1, 1997 and November 23, 1997.  These limitations are explained in the Notice and Claim form.

[6] The presumptive award will be $50,000, although that amount could be reduced based on the total number of successful claimants.  Should the total damages awarded to the successful claims exceed the amount of Settlement Funds available for Track A awards, each award will be reduced on a pro rata basis.

who receives a Track A award and who has outstanding federal farm program debt with the USDA will be entitled to have some or all of that debt extinguished, along with a debt relief tax award paid directly to the IRS, as described below.

### b.    Track B

Track B is a claims process where the Neutral will make an individualized determination whether the claimant has established by a preponderance of the evidence the following:  (1) that the claimant is a Native American who farmed or ranched, or attempted to farm or ranch, between January 1, 1981 and November 24, 1999; (2) that the claimant owned or leased, or attempted to own or lease, or had grazing rights on, farm or ranch land; (3) that the claimant applied for a loan(s) between January 1, 1981 and November 24, 1999; (4) that the loan(s) for which the claimant applied was denied, provided late, approved for a lesser amount than what was requested, or encumbered by restrictive conditions, or the USDA failed to provide an appropriate loan service(s); (5) that the treatment of the claimant's loan or loan servicing application(s) by the USDA was less favorable than that accorded to a specifically identified similarly situated white farmer(s); (6) that the claimant suffered economic damage as a result of the USDA's treatment; and (7) that the claimant filed a discrimination complaint between January 1, 1981 and November 24, 1999 with the USDA or through a representative who informed the claimant that the complaint had been or would be passed on to the USDA.[7] Meritorious Track B claims are entitled to receive their *actual damages*, up to $250,000, as determined by the adjudicator.[8]  In addition, successful Track B claimants are entitled to the

---

[7] The same exceptions apply as described in n.5, *supra*.

[8] There is a cap of $50 million on the *total* of all Track B awards, and if the amount awarded to meritorious Track B claimants exceeds this sum, then the Track B awards will be reduced proportionally to fit within this cap.

same debt relief and debt relief tax payment as meritorious Track A claimants.  However, unlike successful Track A claimants, successful Track B claimants will not be provided with an additional payment to offset the taxes that may be due on the damages awarded to them.

2. **Debt Relief**

a. **The USDA will extinguish up to $80 million of successful claimants' outstanding federal farm loan debt.**

All claimants who prevail under either Track A or Track B will be entitled to debt relief under the Settlement.  There is a cap of $80 million for all debt relief awards.  If the sum of all successful claimants' outstanding farm loan debt is less than $80 million, then each prevailing claimant will receive complete debt relief.  In other words, the USDA will forgive and extinguish *all* of their outstanding federal farm loan debt (including interest and penalties).  If the sum exceeds $80 million, then the debt relief each claimant with outstanding USDA Farm Loan Program debt will receive will depend on whether the claimant first received a USDA farm loan before or after November 24, 1999.[9]  Accordingly, if the sum of all successful claimants' outstanding farm loan debt is more than $80 million, the Claims Administrator will determine which claimants first obtained a farm loan from the USDA on or prior to November 24, 1999, and which claimants first obtained a loan after November 24, 1999.  Ninety percent of the $80 million debt relief award cap, or $72 million, will then be used to allocate debt relief on a pro rata basis among the group of claimants who received a farm loan from the USDA prior to November 24, 1999—referred to in the Settlement Agreement as the "Pre-1999 Group."  Ten percent of the $80 million debt relief award cap, or $8 million, will then be used to allocate debt relief to the "Post-1999 Group."  This allocation of debt relief funds between these two groups

---

[9] Expert testimony in this Action demonstrated that over 90% of the economic losses attributable to the denial of loan servicing were incurred prior to 2000.

roughly reflects the parties' best estimate of the time periods within which the outstanding debt held by Native Americans arose.

Further, all claimants who receive debt relief will also receive a debt relief tax award, equal to 25% of the principal of the prevailing claimant's farm loan debt.  The tax award for debt relief will be made by the Claims Administrator directly to the IRS on behalf of the claimant. The debt relief tax award payments will be paid from the $680 million Settlement Fund.

If the $80 million allocated for debt relief does not extinguish *all* outstanding federal farm loan debt owed by successful claimants, the USDA will offer loan servicing to every successful claimant who is delinquent in the re-payment of a USDA farm loan.  The loan servicing options available to successful claimants who continue to carry USDA debt include a reduction in the amount of outstanding federal loan debt, a reduction in the interest rate on such debt, or several other loan servicing options.

The parties will agree to appropriate terms to govern the use of any confidential information provided by the USDA in the course of the settlement process.

### b.       Until debt relief is provided, the USDA will establish a moratorium on adverse loan actions.

Until the USDA can provide debt relief to successful claimants, the Settlement requires that the USDA establish a moratorium on adverse loan actions against Native American farmers and ranchers.  From the time of Preliminary Approval of the Settlement through the end of the claims process, the USDA will provide to Native Americans important and much-needed protection against seizure of real property, referrals to the Treasury Department for administrative offsets of other farm program payments, actions to accelerate farm loan accounts, and actions to foreclose on real property.  For all Native American borrowers in the USDA's database and all individuals who file claims pursuant to the Settlement Agreement, the USDA

will cease such seizures, offsets, accelerations, and foreclosures upon preliminary approval of the Settlement, and for all claimants under the Settlement, this moratorium will remain in effect until 30 calendar days after the Preliminary Accounting Date which occurs after all claim determinations are issued and payments are made to claimants, or until the claim is denied, whichever is earlier.

### 3.     Programmatic Relief

In addition to providing damages and debt relief, the Settlement Agreement provides critical and unprecedented programmatic relief for class members and other Native American farmers and ranchers throughout the country.  The primary purpose of this relief is to keep as many Native Americans as possible on their land and engaged in farming and ranching, and to nurture the next generation of Native American farmers and ranchers.  For current and future Native American farmers and ranchers, these programmatic changes will have a profound, positive and permanent impact on their lives—far greater than even the substantial monetary benefits of this Settlement.

First, the Settlement establishes a new Federal Advisory Committee called the Council for Native American Farming and Ranching.  The 15-member Council will consist of 11 Native American leaders and advocates and four senior USDA officials.  The Council will focus on issues related to the participation of Native American farmers and ranchers in USDA farm loan programs, and will provide guidance to help eliminate barriers to greater participation in these programs.  It will serve as a unique forum within which leaders of the USDA and the Native American community can meet regularly to address problems in the delivery of farm loan services and develop strategies for enhancing the delivery of these services to Native Americans for years to come.

Second, the Settlement provides for the appointment of an Ombudsperson at the USDA

to address the concerns of *all* socially disadvantaged farmers, including Native American farmers and ranchers. The Ombudsperson will report the concerns of minority farmers to the new Council on a regular basis.

Third, the Settlement requires the USDA to undertake a number of new and unprecedented initiatives that should dramatically improve the delivery of farm loan services to Native Americans. For the first time ever, subject to the availability of funding, the USDA will establish farm loan sub-offices located on Indian Reservations at Tribal Headquarters. These sub-offices will provide, *inter alia*, technical assistance and outreach to Native Americans. The managers of these sub-offices will be required to demonstrate an understanding of the culture of the tribes where the offices are located. In addition, the USDA will offer instruction to Native Americans at 10 to 15 regional venues on financial, business and marketing planning skills, basic and advanced business management skills training, and instruction on leasing requirements. Finally, the USDA will create and distribute a customer's guide to assist applicants for farm loans and loan servicing to navigate the complex process for securing these benefits.

Fourth, the USDA will undertake a comprehensive review of its regulations, handbooks, instructions, and administrative notices, in consultation with Class Counsel, and will make changes necessary to ensure these rules are responsive to unique features of Native American culture.

Fifth, the Settlement requires the USDA regularly to collect and report data comparing loans awarded and sought by Native Americans to the Council, the Ombudsperson, and Class Counsel, permitting detection of any disparities that may arise and formulation of measures to address them. The data will be collected by county in the 15 states with the highest concentration of Native American farmers and ranchers, and by state elsewhere. The Council,

Class Counsel, or the Ombudsperson may ask the USDA Inspector General to examine any loan disparities that they believe warrant such attention.

Sixth, the USDA will take unprecedented action to make credit available to Native Americans who otherwise, because of past financial difficulties, would likely encounter difficulty obtaining credit from either the USDA or commercial banks.  These measures include a commitment that prior debt settlements with the USDA that would have been eligible for debt relief under this Agreement will not adversely affect the debtor's ability to obtain new credit from the USDA.  Similarly, the debt relief provided through this Settlement will not adversely affect the debtor's ability to obtain credit from the USDA in the future.  These provisions will ensure that debt relief that class members have received, either in the past or through this Settlement, will not affect their ability to secure credit in the future.

Subject to the Court's approval, the Court will retain supervision over certain provisions of the programmatic relief, as described in Section XIII of the Settlement Agreement.

### 4.    Notice provisions

Under the Settlement Agreement, notice will be provided to Native Americans through a wide range of media viewed in Indian country and generally by farmers and ranchers throughout the country.  The details of the extensive plan for providing notice to potential class members is set forth in the Notice Plan, attached as Ex. 2 to this Memorandum.  Working with a firm with considerable experience in providing notice to absent members in class actions, and especially notice to Native Americans, Plaintiffs have created a "long" and "short" notice form.  They will provide potential class members a summary of the Settlement Agreement terms, as well as information about the options available to potential class members and the consequences of each option.  *See* Ex. 1, Tabs I & J.  The long form notice, claims forms, and other materials will be mailed to class members identified by Class Counsel, Native American farmers and ranchers

identified through the USDA's databases, and any other individual identified as a potential class member through other sources.  In addition, the Notice Administrator (discussed in more detail below, *infra* __) will publish the short-form notice in a variety of media outlets, including trade publications, newspapers, internet sites, and radio broadcasts that market to Native American communities or to farmers and ranchers throughout the country.  The short form notice will also be distributed as a flyer to over 1,000 Native American and farmer and rancher community organizations (such as tribal colleges, tribal governments, state and county farm bureaus, and agricultural extension programs) that provide services and support to Native American farmers and ranchers.  Class Counsel and the Notice Administrator have also set up a web site, www.IndianFarmClass.com, from which class members may obtain information, the notice forms, claims forms, relevant court documents, and other important information, and Class Counsel will provide and staff a toll-free number that individuals may call for information or help with the claims process.  With the Court's permission, Class Counsel will also post notice on the Court's website.

   a.      **Attorneys' Fees and Class Representative Service Awards**

The Settlement Agreement also provides that Class Counsel may request an award of attorneys' fees and costs as a portion of the common fund created by the Settlement for the benefit of the class, in an amount between 4% and 8% of the monetary relief totaling $760 million.  The details of the request for an award of attorneys' fees and costs and the rationale for such an award will be the subject of separate motion practice.  While Class Counsel will provide assistance to class members in preparing their claim forms at no cost to them, the Settlement permits class members to retain individual counsel other than Class Counsel, and sets caps on the amounts that may be paid in fees to such individually retained attorneys.  These fees may not

exceed 2% of the damages received by a Track A claimant and 8% of the damages received by a Track B claimant.

The Settlement also provides that Plaintiffs may seek class awards for the service to the class provided by the class representatives.  Plaintiffs propose amounts for these awards ranging from $75,000 to $200,000.  The rationale for these awards will be the subject of a separate memorandum filed with the Court.  The Settlement permits the government an opportunity to comment on these awards.  Both the Fee Award and the class representative service awards will be paid out of the $680 million Settlement Fund.

### b.       Plaintiffs' Proposed Administrators

As part of the Settlement Agreement, Plaintiffs have proposed the appointment of three separate administrators each of whom is responsible for the execution of specific provisions of the Settlement.  *First*, to coordinate and administer the notice provisions, Plaintiffs propose using Kinsella Media, LLC ("Kinsella").  Kinsella is a nationally recognized advertising and legal notification consulting firm specializing in the design and implementation of class action and bankruptcy notification programs to reach unidentified putative class members, and has developed and directed some of the largest and most complex national notification programs. *Second*, Plaintiffs propose using Epiq Systems ("Epiq") as the Claims Administrator.  Epiq is a leader in complex claims administration, has worked in an administrator capacity on some of the largest class actions cases, and has developed advanced and innovative case management systems to carry out its administrator functions.  Epiq serves as the claims administrator in the *Pigford* cases.  *Third*, to serve as the neutral responsible for evaluating claims submitted pursuant to the Settlement Agreement, Plaintiffs propose JAMS.  JAMS is the largest private alternative dispute resolution provider in the world, specializing in mediating complex, multi-party cases. JAMS served as a neutral in the *Pigford* litigation.  Each of Plaintiffs' proposed administrators is

uniquely qualified to carry out its respective responsibilities as set forth in the Settlement Agreement.

### c.      Process for Opting Out or Objecting to the Settlement

The Settlement Agreement also provides a simple process for individuals to opt out of the Settlement, and/or to express objections to any aspect of the Settlement.  As explained in the notice form, an individual need only send a letter to accomplish either.  The letter must contain the individual's name, address, telephone number, signature, and then either an explanation of his or her objections or a statement in his or her own handwriting explaining that he or she wishes to be excluded from the Settlement.  Letters must be sent to a post office box listed in the notice and maintained by the Notice Administrator, and must be postmarked by a date certain, which the Plaintiffs propose be set for February 9, 2011.

### ARGUMENT

This Court should grant preliminary approval of the Settlement Agreement.  It is not only fair, reasonable, and adequate, but it is also an extraordinary result for Native American farmers and ranchers, who have been waiting decades for justice.   The Court should likewise conditionally certify the class for settlement purposes, and approve the class notice plan.

### I.      Preliminary Approval Is Appropriate Because the Settlement Agreement is Fair, Reasonable, and Adequate.

Under Rule 23(e) of the Federal Rules of Civil Procedure, a court may approve a proposed class action settlement if the court determines that the settlement is "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  As described by the Manual for Complex Litigation, judicial approval of a proposed class settlement is a two-part process.  Federal Judicial Center, Manual For Complex Litigation (Fourth), § 13.14, at 173 & § 21.632, at 320-21 (2004).  First, "the judge reviews the proposal preliminarily to determine whether it is sufficient to warrant

public notice and a hearing." *Id*. If the court finds the settlement is sufficient—that is, it is within the range of reasonable outcomes of the litigation—it should schedule a formal fairness hearing and direct notice to the class. *Id*. at § 21.633, at 321-22. Second, once notice has been disseminated to the class and class members are afforded an opportunity to comment on or object to the settlement, the court must make the final determination as to whether the settlement is fair, reasonable, and adequate to the class as a whole. *Id*., at § 21.634-635, at 322-23.

Plaintiffs ask the Court to conduct the initial review of the settlement and find that it is within the range of fair outcomes of this litigation sufficient to justify issuance of notice and scheduling a fairness hearing. Preliminary approval of a settlement is not a decision about the merits of the settlement or the case itself. Rather, the Court's role at this juncture is limited to determining whether the settlement agreement is sufficient to justify public notice and a hearing, at which time the class members and others may present arguments and evidence for or against the proposed agreement. *Id*. at § 21.632, at 320-21. Accordingly, in considering whether to grant preliminary approval, the Court is not required to probe extensively into the merits of the settlement or to make a final determination on the adequacy of the settlement. Both of these inquiries are reserved for the final stage of the class settlement approval process. *Id*. Because preliminary approval is a provisional step that merely begins the settlement approval process, any doubts are resolved in favor of preliminary approval. *See In re Traffic Executive Ass'n*, 627 F.2d 631, 634 (2d Cir. 1980) (preliminary approval "is at most a determination that there is what might be termed 'probable cause' to submit the proposal to class members and hold a full-scale hearing as to its fairness").

This Court has explained that preliminary approval should be granted "if the preliminary evaluation of the proposed settlement does not disclose grounds to doubt its fairness or other

obvious deficiencies, such as unduly preferential treatment of class representatives or of segments of the class, or excessive compensation for attorneys, and appears to fall within the range of possible approval." *In re Vitamins Antitrust Litig*., 2001 U.S. Dist. LEXIS 25071, at *30 (D.D.C. 2001) (internal citation and quotation marks omitted); *see also In re Shell Oil Refinery*, 155 F.R.D. 552, 555 (E.D. La. 1993) (finding that, at the preliminary approval stage, the Court's only task is to determine whether "the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preliminary preferential treatment to class representatives or segments of the class, and falls within the range of possible [judicial] approval").

As explained below, the settlement of this action, memorialized in the attached Settlement Agreement, is the product of extensive arm's-length negotiations between experienced attorneys over a period of more than ten months.  In addition, this Settlement was only reached after the substantial completion of discovery in the case and extensive briefing, and falls well within the "range of possible approval."  It is, therefore, more than "sufficient to warrant public notice and a hearing."  Accordingly, preliminary approval should be granted.

**A.    The Proposed Settlement Terms Are Fair, Reasonable, and Adequate.**

The Settlement Agreement is well within the range of reasonable outcomes of this litigation.  The class representatives have done exactly what they set out to do—obtain significant monetary and programmatic relief to redress the discrimination that class members claim to have endured since 1981.  More important, the programmatic changes provided by this Settlement offer the promise that the USDA will make significant changes to its Farm Loan Program in order to enhance their responsiveness to the Native American community and its culture and to protect against a recurrence of the circumstances that gave rise to this litigation.

Under the terms of the Settlement Agreement, class members are entitled to substantial relief, including monetary payments and tax relief from a $680 million Settlement Fund, as well as debt relief of up to $80 million, as compensation for the USDA's discriminatory operation of its farm loan program.  The Settlement also provides that the government will pay up to $20 million to ensure effective implementation of the Settlement.  Moreover, the USDA has agreed to make significant programmatic changes to improve the delivery of farm loan programs to Native Americans in the future.  Given the substantial benefits afforded to class members, there are no "obvious deficiencies"—or really any deficiencies at all—in the Settlement Agreement that would justify denying preliminary approval.  *See In re Vitamins Antitrust Litig.*, 2001 U.S. Dist. LEXIS 25071, at *30.

The Settlement Agreement provides immediate and certain relief to members of the class, benefits the class members might not receive if they proceed to trial.  Notwithstanding the strength of the evidence the Plaintiffs elicited during discovery in this action, litigation of this action through trial would inevitably present risks of loss and would delay considerably the receipt of the relief provided by the terms of this Agreement.  *See In re Lorazepam*, 2003 U.S. Dist. LEXIS 12344, at *13 (noting, in decision approving a settlement agreement, that "[f]urther litigation also entails substantial risks; given the Defendants' denial of liability, monetary recovery certainly cannot be assumed").  And even if Plaintiffs did prevail at trial, costly and time-consuming appeals could follow, thereby further delaying potential relief.  The eleven-year litigation history of this case demonstrates that the USDA has vigorously contested this case at every turn, and unless the case is settled at this juncture, it is likely the USDA would continue to defend the case for years to come.  By contrast, the Settlement provides for prompt recovery of nearly all the monetary relief the Plaintiffs could obtain through trial and programmatic changes

beyond those measures the Court would be empowered to award as a matter of law.  *See Pigford v. Glickman*, 185 F.R.D. 82, 104-105 (D.D.C. 1999) (approving a class action settlement in part on the grounds that, unlike litigation, "the settlement negotiated by the parties provides for relatively prompt recovery").

In addition, under the Settlement the USDA will pay a substantial amount to implement the terms of the Agreement.  Subject to this Court's approval, upon execution of the Settlement Agreement, the government will immediately provide $5 million to a designated fund to be used to notify putative class members of the Settlement Agreement, as well as to begin implementation of the claims process.  Thereafter, Class Counsel may seek additional payments, in $5 million increments up to a maximum of $20 million, to pay for the costs associated with implementing the Settlement Agreement, including administering the claims process.

The Settlement Agreement also provides important and extensive programmatic relief.  It creates a Council for Native American Farming and Ranching, establishes a USDA Ombudsperson position to address issues related to Native American farmers and ranchers, requires the USDA to provide enhanced services to Native American farmers and ranchers, and requires the USDA to collect and evaluate data on a regular basis to enable comparisons between the volume of loans and loan servicing sought and received by Native American farmers and ranchers.  These programmatic changes will provide unprecedented benefit to Native American farmers and ranchers.

Furthermore, the Settlement Agreement provides for the payment to Class Counsel—a team of attorneys who have been litigating this case for over ten years—reasonable attorneys' fees and costs.  The parties have agreed that Class Counsel may request payment in an amount between 4% and 8% of the $760 million compensation fund.  As will be shown in a fee petition

to be filed prior to final approval, the fees Class Counsel are permitted to seek are well within the range that courts have found reasonable.  "No general rule exists for determining the appropriate percentage.  Fee awards have ranged from fifteen to forty-five percent of the settlement fund." *See Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1272 (D.C. Cir. 1993) (approving 20% fee); *see also Petruzzi's, Inc. v. Darling-Delaware Co.*, 983 F. Supp. 595*,* 603 (M.D. Pa. 1996); *In re General Motors Corp. Pick-up Truck Fuel Tank Prods. Liab. Litig*., 55 F.3d 768, 822 (3d Cir. 1995) (fee awards range from 19% to 45%)*.*  Here, Class Counsel is seeking a fee amount on the lower end of the range of what is typically sought as a percentage of a settlement fund.  Given the length of this litigation, the significant efforts expended by counsel, and the favorable results they obtained for their clients in securing both monetary and equitable relief, the Settlement Agreement permits proper compensation to Class Counsel.  Of course, the precise fee award must be approved by the Court after presentation of a complete fee petition.

The Settlement Agreement also reasonably limits the amount of attorneys' fees that counsel retained individually by members of the class may seek when representing Track A and Track B claimants.  The Settlement Agreement provides that individual counsel for Track A claimants may seek no more than 2% of a Track A claimant's final award, while individual counsel for Track B claimants may seek no more than 8% of a Track B claimant's final award.

The Settlement Agreement does not grant preferential treatment to the Class Representatives or any segment of the Settlement Class.  The Agreement lists only nine individuals as proposed Class Representatives, and provides that Class Counsel may seek Court approval for awards to these Class Representatives that range from $75,000 to $200,000, varying by the amount and nature of the service each person provided throughout the litigation.  All nine of the class representatives have been (or were) directly involved in these proceedings for years.

They served as named plaintiffs in a discrimination lawsuit against the United States, subjecting themselves to the risks of retaliation inherent in taking what to many may be viewed as an unpopular position.  They repeatedly spent time with class members around the country and participated in countless telephone conversations in which they answered questions from class members and addressed comments and concerns by class members concerning the litigation. They likewise spent years working closely with Class Counsel to develop evidence, to respond to discovery, to prepare for and submit to depositions, and more.  Each contributed hundreds—if not thousands—of hours working on this case.  And thousands of class members stand to benefit tremendously from the efforts of these Class Representatives.  If approved, the Settlement proposes that six of the Class Representatives will receive a service award of $100,000 for their contributions; one will receive an award of $200,000 in recognition of the additional assistance she provided both to class members around the country and to Class Counsel; and the estates of two individuals who passed away during their service as class representatives will receive $75,000.  Other than these nine individuals, the Settlement does not single out any other class members for higher payments.

To carry out various provisions of the Settlement Agreement in a fair, reasonable, and effective manner, Plaintiffs propose retaining three separate administrators, each of which is uniquely qualified to execute its delegated responsibilities.  *First*, to coordinate and execute efforts to provide notice to putative class members, Plaintiffs propose contracting with Kinsella Media, LLC, a national leader in providing legal notification in class action lawsuits.  Kinsella will implement a coordinated nationwide notice program designed to reach as many class members as possible.  *Second*, to serve as Claims Administrator, Plaintiffs propose using Epiq Systems, which has served as the Claims Administrator in *Pigford*.  Epiq is a leader in claims

administration for class action lawsuits—including government settlements—and has a wealth of experience managing complex cases and claims processes, and has a demonstrated ability to manage the claims process effectively and efficiently.  Epiq will receive, process, and track all claims submissions.  *Third*, Plaintiffs propose JAMS to serve as the neutral adjudicator for Track A and Track B claims.  JAMS has extensive experience in mediating and arbitrating complex claims and its experience serving as the neutral in the *Pigford* litigation renders JAMS a reasonable and logical choice to serve as the neutral under this Settlement Agreement.  JAMS will provide neutral decision makers to adjudicate Track A and Track B claims.

The Settlement Agreement also provides a reasonable process by which individuals may opt out of the Settlement or object to some or all of the Settlement terms.  To opt out, an individual need only send to an address provided in the notice a short letter containing the individual's name, address, telephone number, statement in the individual's own handwriting saying that he or she wants to be excluded from the Class, and a signature.  To comment on or express disagreement with any aspect of the Settlement, an individual may send to an address provided in the notice a letter containing his or her name, address, telephone number, the case name and number, a brief explanation of the reasons for any objections, and a signature.  The notice forms also state that individuals have a right to attend the Fairness Hearing and provide information about doing so.

**B.      The Proposed Settlement Is the Product of Extensive Arm's-Length Negotiations by Informed, Experienced Counsel.**

This Court has explained that "[t]he opinion of experienced counsel 'should be afforded substantial consideration by a court in evaluating the reasonableness of a proposed settlement.'" *Equal Rights Ctr. v. Wash. Metro. Area Transit Auth.*, 573 F. Supp. 2d 205, 212-213 (D.D.C. 2008) (quoting *In re Lorazepam & Clorazepate Antitrust Litig.*, 2003 U.S. Dist. LEXIS 12344,

*19 (D.D.C. June 16, 2003)).   It has further explained that "[a] presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery."   *In re Lorazepam*, 2003 U.S. Dist. LEXIS 12344, at *7 (internal citation and quotation marks omitted).

That presumption should attach here.  Every aspect of the proceedings, from discovery and motion practice through completion of the settlement negotiations, has been vigorously contested.   The proposed Settlement is the product of serious, contested, arm's-length negotiations that took place over more than ten months, between experienced counsel for the Plaintiffs and the USDA.  Moreover, the Class Representatives actively participated in all stages of the settlement negotiations and even attended several negotiating meetings between the parties.   The Class Representatives also were extensively consulted in the formulation and negotiation of the programmatic relief.

Counsel representing the parties to the Settlement Agreement are able attorneys with extensive experience in class action litigation, and include counsel with decades of experience with complex, federal litigation, civil rights litigation and farm law, all legal disciplines that contributed to the successful prosecution and settlement of this action.  Moreover, the settlement negotiations here occurred after nearly all merits discovery had concluded, ensuring that the parties benefited from a fully developed record and that their respective litigation positions had been the subject of careful scrutiny, exposing the strengths and weaknesses of each side's case.

### C.      An Appropriate Point for Settlement Has Been Reached.

In evaluating a proposed settlement, courts consider "the stage of the proceedings when settlement has been offered and degree of completed discovery."   *In re National Student Marketing Litigation*, 68 F.R.D. 151, 155 (D.D.C. 1974).   "[C]ourts have a duty to ensure that the settlement does not 'come too early to be suspicious nor too late to be a waste of

resources,' and that it is at 'a desirable point in the litigation to reach an agreement without further delay, expense, and litigation.'" *Equal Rights Ctr.*, 573 F. Supp. 2d at 212-213 (quoting *In re Vitamins Antitrust Litig.*, 305 F. Supp. 2d 100, 105 (D.D.C. 2004)).

The Settlement Agreement here, reached nearly 11 years after this Action was initiated, comes at an appropriate point for settlement. The Settlement is the product of an extensive analysis of the legal and factual issues presented in this case. Prior to beginning settlement negotiations, the parties had engaged in five years of discovery. This discovery included the exchange and review of over two million of pages of hard copy and electronic documents, more than 40 depositions of Plaintiffs' non-expert witnesses, more than 50 depositions of the Secretary's non-expert and 30(b)(6) witnesses, the exchange of numerous reports from experts on both sides, and eight expert depositions. As of November 2009, discovery in the case was essentially completed. As a result, Class Counsel were able to evaluate the merits of the case and assist their clients in balancing the benefits of settlement against the risks of continuing with litigation, permitting fully informed judgments by both parties. *See Ocher v. SCA Realty I*, 945 F. Supp. 298, 305 (D.D.C. 1996) (finding that, when evaluating a proposed settlement, it is significant that "counsel had an adequate appreciation of the merits of the case before negotiating," which typically happens after "discovery has been made"). As a result, the Agreement comes at an appropriate point in the litigation process for a settlement.

For all of the foregoing reasons, the Settlement Agreement is clearly "sufficient to warrant public notice and a hearing," and thus should be preliminarily approved. *See* Manual on Complex Litigation, § 13.14 at 173. Accordingly, Plaintiffs respectfully request the Court to approve the Settlement Agreement—including the proposed individual counsel fee caps, the proposed administrators, and the proposed implementation funds—and to authorize the Secretary

to disburse to Class Counsel the implementation funds necessary to carry out the terms of the

Settlement Agreement.  Plaintiffs also move this Court to approve as Class Counsel the attorneys

proposed in the Settlement Agreement, and to approve as Class Representatives the individual

class members proposed in the Settlement Agreement.  Plaintiffs further ask the Court to order

that objections to the Settlement Agreement and all opt-outs submitted by February 9, 2011,

and to set a date of February 21, 2011, for a Fairness Hearing, at which time the Court shall

determine whether to approve the Settlement Agreement pursuant to Rule 23(e), Fed. R. Civ. P.

## II.     The Settlement Class Should Be Certified.

As part of this settlement, the parties jointly ask the Court to allow the plaintiffs' claims

for damages to be certified pursuant to Rule 23(b)(3), Fed. R. Civ. P., along with the pre-existing

certification of the Plaintiffs' claims for declaratory and injunctive relief pursuant to Rule

23(b)(2).

In *Amchem Products v. Windsor*, 521 U.S. 591 (1997), the Supreme Court acknowledged

that cases may be certified for settlement purposes only.  The Court explained that the "dominant

concern" on which a court should focus when deciding whether to certify a class in those

circumstances is "whether a proposed class has sufficient unity so that absent members can fairly

be bound by decisions of class representatives."  *Id*. at 621.  The Court further held that, when

"[c]onfronted with a request for settlement-only class certification, a district court need not

inquire whether the case, if tried, would present intractable management problems" as typically

required under Rule 23(b)(3), "for the proposal is that there be no trial.  But other specifications

of the rule . . . demand undiluted . . . attention in the settlement context."  *Id*. at 620.  And this

Court has explained that "[a] settlement class should be certified where the four requirements of

Fed. R. Civ. P. 23(a)–numerosity, commonality, typicality, and adequacy–are satisfied, as well as

one of the three subsections of Fed. R. Civ. P. 23(b)." *In re Vitamins Antitrust Litig.*, 2001 U.S.

Dist. LEXIS 25071, *19 (D.D.C. July 25, 2001).

In the Settlement Agreement, the parties agreed to allow the class, previously defined and

certified by the Court, to pursue damage claims pursuant to Rule 23(b)(3), Fed. R. Civ. P.  That

class has been defined to include:

> All persons who are Native American farmers and ranchers who (1) farmed or
> ranched or attempted to farm or ranch between January 1, 1981 and November
> 24, 1999; (2) applied to the USDA for participation in a farm loan program during
> that period; and (3) filed a discrimination complaint with the USDA either
> individually or through a representative with regard to alleged discrimination that
> occurred during the same time period.

As defined, this class meets the conditions set forth in Rule 23(a) and Rule 23(b)(3).

### A.      The Proposed Class Meets the Requirements of Rule 23(a).

The proposed Settlement Class is essentially identical to the class that this Court certified

in 2001 for the purpose of pursuing injunctive and declaratory relief.  *See Keepseagle*, 2001 U.S.

Dist. LEXIS at *19.  As this Court has already found in its December 12, 2001 Opinion and

Order, this class satisfies the four requirements of Rule 23(a) – that is, the class is large enough

to meet the numerosity requirement; common questions of law and fact exist, thus meeting the

commonality requirement; Plaintiffs' claims arise out of the same alleged events and conduct,

thus meeting the typicality requirement; and the class representatives are able to fairly and

adequately protect the interest of the class and to actively prosecute the interests of the class

through competent counsel, thus meeting the fair and adequate representation requirement.

*Keepseagle*, 2001 U.S. Dist. LEXIS at *24-*33.

### B.      The Proposed Class Meets the Requirements of Rule 23(b)(3).

The proposed class also satisfies the requirements of Rule 23(b)(3).  That Rule requires

that "the questions of law or fact common to class members predominate over any questions

affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."   Fed. R. Civ. P. 23(b)(3).   Both criteria are met in this case.

### 1.    Common Questions Predominate Over Questions Affecting Only Individual Members.

The predominance requirement in Rule 23(b)(3) focuses "on the legal or factual questions that qualify each class member's case as a genuine controversy, questions that preexist any settlement."   *Amchem Prods*., 521 U.S. at 623.   "There is no definitive test for determining whether common issues predominate, however, in general, predominance is met when there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class members' individual position." *In re Vitamins Antitrust Litig*., 209 F.R.D. 251, 262 (D.D.C. 2002) (internal quotation marks omitted).

The extensive discovery conducted in this case confirmed that common questions of fact and law predominate over any questions affecting individual members, and likewise predominate with respect to the Plaintiffs' claims for damages.   First, members of the class challenge a common set of practices they allege to be discriminatory:   the highly discretionary and undisciplined process by which loan and loan servicing decisions were made by the USDA, the lack of oversight over officials who made loan decisions on the basis of stereotypes of Native Americans, and other forms of bias often encountered at USDA county offices.   This exposure to a common set of unlawful practices is the basis on which liability to the class would be demonstrated.   As a result, this set of issues of fact and law common to the class necessarily predominates over the circumstances of individual class members.   *See In re Vitamins Antitrust Litig.*, 2001 U.S. Dist. LEXIS 25071, at *28 ("In determining whether common questions of law

or fact predominate, liability issues are the primary focus.").

Second, the method for computing and allocating the relief provided in the Settlement Agreement is common to all members of the class. The Settlement Agreement relies on a straightforward two-track non-judicial claims process for the resolution of all claims. This structure reflects the similarity among class members of the nature and extent of harm that will provide the basis for awards of economic damages. *See* pages 5-10, *supra*. Moreover, Track B provides an option for class members who wish to seek an award of damages more closely tailored to the individual harm they suffered.

### 2.      A Class Action Is Superior to Individual Adjudication.

"The superiority requirement of Rule 23(b) is met when a court determines that a class action is superior to other available means of adjudication." *In re Vitamins Antitrust Litig*., 209 F.R.D. at 270. This Action meets this second requirement of Rule 23(b)(3). The use of a class action here promotes judicial economy. The Settlement Agreement would alleviate the need for multiple, individual adjudications of class members' damages claims, which would require thousands of hearings and consume enormous resources and time. Moreover, individual adjudications would depend largely upon recollections of loan decisions made decades earlier without the benefit of loan applications or records of the decisions, as the USDA failed to retain most of those materials. Therefore, the use of the claims processing system provided in the Settlement Agreement to compensate class members is decidedly more reliable than efforts to reconstruct individual loan decisions. Moreover, settlement on a class basis is superior to individual litigation and adjudication because the Settlement provides the class with prompt compensation for their damages. By contrast, absent a Settlement, compensation resulting from litigation is highly uncertain, ultimately may not be received following lengthy trial and appellate proceedings, and may be held up for years to come while the appellate process proceeds.

Accordingly, because in this case "a class action would promote judicial efficiency and uniformity of decisions as to persons similarly situated," the use of a class action is superior to other available means of adjudication.  *Id*.; *see also Barnes v. District of Columbia*, 242 F.R.D. 113, 123-124 (D.D.C. 2007) ("In cases such as this, involving many extremely similar claims against the same defendant, class certification promises greater efficiency and consistency than serial litigation of nearly identical individual cases.").  The Settlement Class should therefore be certified for settlement purposes.

## III.    The Proposed Notice Is Fair and Satisfies Due Process.

For any class certified under Rule 23(b)(3), "the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B).  The Rule requires that any such notice "must clearly and concisely state in plain, easily understood language" the following items:  (1) the nature of the action, (2) the definition of the class certified, (3) the class claims, issues, or defenses, (4) that a class member may enter an appearance through counsel if the member so desires, (5) that the court will exclude from the class any members who request exclusion, stating when and how members may elect to be excluded, and (6) the binding effect of a class judgment on class members under Rule 23(c)(3).  Fed. R. Civ. P. 23(c)(2)(B).

The proposed forms of notice and the notice plan are consistent with due process and meet the requirements of Rule 23.  The Long-Form Notice describes the nature of the case, defines the class and the class claims, and walks individuals through a series of questions that explain in plain language the terms of the Settlement Agreement.  It informs individuals that they have the option to present a claim for relief under the Settlement (and how to do so), to affirmatively opt out of the class (and how to do so), or to do nothing, and it explains the different consequences of each action.   And it identifies Class Counsel and explains that

individuals have a right to seek counsel of their own to assist with the claims process.  The notice also explains that Class Counsel intend to seek up to 8% of the Compensation Fund as attorneys' fees in this case.  And the notice also informs potential class members about the Court's fairness hearing, and explains that potential class members have a right to provide comments about or express disagreement with the Settlement—including the requested attorneys' fees—at the hearing.

The plan for notice in this case satisfies Rule 23(e)(1)'s command to "direct notice in a reasonable manner to all class members who would be bound by the proposal."  As detailed in Plaintiffs' Notice Program, attached as Exhibit 2, direct notice consisting of the Long Form Notice will be sent via first-class mail to all known Native American USDA loan recipients, all known Class Members in the case, all Class Members who request a copy through the toll-free information line, email address, or the P.O. Box detailed in the Media Notices, and all individuals identified on other available lists of potential Class Members.  *Id*. at 7.  In addition to direct notice, the Short Form Notice will be disseminated by Native American media as well as mainstream media, in a variety of ways, including print advertisements in tribal, local, and national Native American publications, internet banner ads on Native American-focused web sites, radio placement in Native American markets, and newspaper placement.  *Id.* at 7-8.  A request to participate in the notice plan will also be sent to over 1,100 entities affiliated with the agricultural sector and/or the Native American community.  And Class Counsel will conduct meetings around the country in areas with high concentrations of Class Members to answer questions about the Settlement.  There will also be a dedicated informational website that will provide constant and updated information about and assistance with the claims process.  All individuals who receive mailed Notice will be sent a Claim Package after the Court's final

approval of the Settlement Agreement, as will all individuals who request a Claim Package as a result of the publication notice.

For these reasons, the attached Notice Plan should be approved.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their Motion for Preliminary Approval of the Consent Decree, and enter the proposed Order Conditionally Certifying the Settlement Class and Preliminarily Approving the Settlement, which is attached as Exhibit 3 to the Motion.

October 22, 2010

Respectfully submitted,

By:  /s/ Paul M. Smith

Joseph M. Sellers, Bar No. 318410
Christine E. Webber, Bar No. 439368
Peter Romer-Friedman, Bar No. 993376
COHEN MILSTEIN SELLERS &
   TOLL PLLC
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

David J. Frantz, Bar No. 202853
CONLON, FRANTZ & PHELAN
1818 N Street, N.W.
Suite 400
Washington, DC 20036-2477
Telephone: (202) 331-7050
Facsimile: (202) 331-9306

Paul M. Smith, Bar No. 358870
Katherine A. Fallow, Bar No. 462002
Jessica Ring Amunson, Bar No. 497223
Carrie F. Apfel, Bar No. 974342
JENNER & BLOCK LLP
1099 New York Ave., N.W.
Suite 900
Washington, DC 20001-4412
Telephone: (202) 639-6000
Facsimile: (202) 639-6066

Anurag Varma, Bar No. 471615
PATTON BOGGS LLP
2550 M Street, N.W.
Washington, DC 20037
Telephone: (202) 457-6000
Facsimile: (202) 457-6315

Phillip L. Fraas
STINSON MORRISON HECKER
1150 18th St. NW, Suite 800
Washington, DC 20036
Telephone: (202) 785-9100
Facsimile: (202) 785-9163

Sarah Vogel
SARAH VOGEL LAW PARTNERS
222 N. 4th St.
Bismarck, ND 58501
Telephone: (701) 221-2911
Facsimile: (701) 221-5842

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 22nd day of October, 2009, the foregoing was served via the

Court's ECF system, which will cause an electronic copy to be sent to all counsel of record in the

case.

Respectfully submitted,

*/s/ Paul M. Smith*_____
Paul M. Smith, Bar No. 358870
JENNER & BLOCK LLP
1099 New York Ave., N.W.
Suite 900
Washington, DC 20001-4412
Telephone: (202) 639-6000
Facsimile: (202) 639-6066