IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MARILYN KEEPSEAGLE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:99CV03119 |
| | ) | (EGS) |
| | ) | |
| TOM VILSACK, Secretary, United States | ) | |
| Department of Agriculture, | ) | Judge: Emmet G. Sullivan |
| | ) | Magistrate Judge: Alan Kay |
| Defendant. | ) | |
| | ) | |

## JOINT MEMORANDUM IN FURTHER SUPPORT OF PROPOSED SETTLEMENT AGREEMENT

Pursuant to the Court's Order issued October 22, 2010, the parties hereby hereby supply this memorandum in further support of the Settlement Agreement which was filed on October 19, 2010[i1] Although the parties are unclear as to the specific problems the Court is referring to in its October 22, 2010 minute order, the parties hereby address problems that arose in the administration of the settlement in *Pigford v. Vilsack*, Civil Action No. 97-1978 (PLF) (D.D.C.) (*"Pigford I"*), which may be relevant to the proposed settlement in *Keepseagle v. Vilsack* ("Keepseagle settlement") and the manner in which the proposed settlement in this case is designed to avoid these problems. To the extent this joint memorandum does not address the specific concerns contemplated by the Court in its October 22 minute order, the parties are prepared to address those specific concerns upon further clarification from the Court.

---

[1] The Court's Order directed the parties to supplement the Motion for Preliminary Approval filed on October 22, 2010. The parties note that although this Supplement is a joint filing in accordance with the Court's direction, the Motion for Preliminary Approval was filed by, and on behalf of, Plaintiffs. Defendants intend to file a response to that motion, should one appear appropriate, prior to the hearing on the Preliminary Approval motion set for October 29, 2010.

1

5128403

The parties negotiating the Keepseagle settlement of this action benefited from a decade of experience in the administration of the settlement in the *Pigford I* case, permitting them to model some features of the *Keepseagle* settlement on strengths of the earlier agreement and proceeding along a different path in other areas where the *Pigford I* agreement encountered problems in its administration   The settlement in the *Pigford I* case and the settlement of this action both provide for the award of damages to class members who demonstrate they were subject to conduct that could qualify as discrimination, with the evidentiary requirements varying with the amount of damages that may be recovered.  Both settlements also provide for debt relief to eligible class members, although the process for awarding such relief is considerably simpler in the *Keepseagle* settlement.  Both agreements provide for relief from taxes that would be due on damages under Track A and debt relief awarded to eligible members of the class under both Track A and Track B  However, in part due to the parties' efforts to avoid the problems with the administration of the settlement in *Pigford I*, the proposed settlement differs in many significant respects from the Consent Decree in that case.  Specifically, issues in *Pigford I* associated with the notice to class members and delays in the adjudication and processing of claims based upon the adversarial nature of the claims process have been accounted for in the context of this settlement.

In describing problems arising out of the Pigford I Consent Decree which may be relevant to the settlement in this matter, the parties will be guided largely by the concerns raised with and addressed by the *Pigford I* Court.

## I.  Concerns Related to Sufficiency of Award Amounts

In *Pigford I*, some class members raised concerns as to the adequacy of the Track A award. The *Pigford I* Consent Decree and the *Keepseagle* settlement separated class member claims into two tracks: Track A with a fixed liquidated damages award of $50,000 and Track B which is based on a

5128403

claimant's actual damages and which can be greater than $50,000[2]. In both cases, claimants electing to proceed under Track A may prevail upon satisfying a substantial evidence burden of proof, an evidentiary standard more modest than the preponderance of the evidence standard used in Track B and in traditional civil litigation. This objection to the amount of damages in *Pigford I* was addressed by the Court in that case:

> "As our court of appeals has said, in considering a proposed class action settlement, the Court must first compare the likely recovery that plaintiffs would have realized if they had gone to trial with the terms of the settlement." 185 F.R.D. 110 (citing Thomas v. Albright, 139 F.3d 227, 231 (D.C. Cir. 1998)). As this Court noted when approving the Consent Decree in 1999, "most of the members of the class had little in the way of documentation or proof of their claims and likely would have recovered nothing if they were required to prove their cases by the traditional preponderance of the evidence standard." *Pigford v. Glickman*, 185 F.R.D. at 103. Nothing has changed."

*Pigford v. Veneman*, 355 F.Supp.2d 148, 159-60 (D.D.C. 2005)[3].

Here, the parties had the benefit of plenary discovery before entering into their settlement. In the context of that discovery, the parties each retained economic experts who analyzed loans and constructed and applied different economic models to estimate the amounts of economic harm that the plaintiffs could claim were they to have prevailed at trial. The plaintiffs' expert, Mr. Patrick

---

[2]  Unlike the Pigford I Consent Decree, the proposed settlement provides a cap on overall damages paid to the class. Accordingly, here, Track B claims to individual claimants are capped at $250,000 and the total of all Track B claims are capped at $50 million, and both Track A and Track B awards are subject to a pro rata reduction based on the availability of funds in the overall settlement payment. Settlement Agreement IX.F.2.

[3] The cited decision deals with additional concerns related to Pigford I, which do not apply in the context of this Settlement Agreement.

O'Brien, a farm economist formerly employed by the USDA, estimated the measurable economic harm to which the plaintiffs could recover collectively if they prevailed entirely on liability as being as high as $ 776 million. Unlike the parties to the *Pigford I* settlement who reached a settlement before conducting discovery and before benefitting from the economic analyses formulated in this action, the parties to this action were able to assess in considerable detail the estimated economic losses that could be awarded at trial. The payment of $ 680 million into a fund from which damage payments will be made under the agreement proposed in this case represents 88% of the economic recovery the plaintiffs could have received after prevailing at trial according to the last expert report provided to Defendants by Plaintiffs.[4]   As such, there should be no doubt about the sufficiency of the economic relief awardable to the plaintiff class in this action.

## II. Concerns Related to Delays in Receipt of Awards

Another issue raised by some *Pigford I* class members was that the payments were unduly delayed. The delay was caused in substantial part by the Petitions for Monitor Review ("PMR"). *Pigford*, 355 F.Supp.2d at 160. The PMR process was designed as a safeguard to errors in the adversarial process and allowed claimants and the government to challenge the decisions reached by Neutrals who adjudicated claims in the context of adversarial proceedings in that case.[5]   As an initial matter, the *Keepseagle* settlement does not contemplate an adversarial process in which the government will be contesting claims.[6] Additionally, under the *Keepseagle* settlement all decisions by

---

[4] Defendants had their own expert who provided a different analysis of the facts, and who came to different conclusions. The exact contours of those conclusions, as well as the manner in which even Plaintiffs' expert might change his conclusions were this case to proceed to trial, are not instructive with regard to whether class members in this case can expect to obtain a reasonable and fair recovery. The point that is relevant is that the parties have agreed to a total class payment that is less than – but only slightly less than – the total recovery for economic damages which Plaintiffs' expert has opined they should receive at trial, plus additional debt relief and programmatic relief.

[5] Many of the petitions in the PMR process complained about the decisions of Track A and Track B neutrals in Pigford. Plaintiffs are recommending the same entity, JAMS, for adjudicating Track A decisions, because it has had an opportunity to educate itself from basic errors in the Pigford I Track A process.

[6] This distinction makes sense because in *Pigford I* the government paid claims out of the Judgment Fund with no limit on the amount ultimately payable, whereas in this case the parties' agreement contemplates a payment from the

4

5128403

the adjudicators who will be deciding claims will be final.  Proposed Settlement Agreement IX.1.9.

For these reasons, the Keepseagle settlement does not contemplate a PMR process.  By removing

the PMR process, the proposed settlement will avoid this source of delay in making Track A and

Track B determinations and, subsequently, distributing Track A and Track B damages awards.  In

addition, under the proposed settlement, payments of claims will not be made until all claims are

adjudicated in order to allow for the possibility that awards must be reduced *pro rata* in the event that

the number of successful claims is larger than expected. And there is no right to appeal the

adjudicator's final determination in this proposed settlement.  In *Pigford I*, claims were paid out as

they were adjudicated and claimants had the right to appeal from the adjudicator's decisions, which

led to thousands of appeals that the proposed settlement will not permit.

### III. Concerns Related to *Pigford I* Injunctive Relief

Another concern raised before the *Pigford I* Court was that the Consent Decree lacked

injunctive relief to prevent potential future discrimination against class members.  To address these

concerns, the proposed Settlement Agreement has created an extensive array of programmatic relief[7]

to address the issues related to the potential for ongoing discrimination which were described by

some claimants in *Pigford I*.  *See Pigford*, 355 F.Supp.2d at 164.

Under the proposed settlement here, the USDA has agreed to take steps to establish a

Council for Native American Farming and Ranching ("Council"), comprised of Native American

leaders and senior officials of the Farm Service Agency and USDA.  Settlement Agreement XII. A.1.

The Council's purpose is to discuss issues related to the participation of Native American farmers

---

Judgment Fund of a specific amount to cover Track A and Track B claims (as well as certain miscellaneous payments such as attorneys' fees) with no additional monetary liability on the government's part other than debt relief, which is also capped.

[7] Under the terms of this agreement the Programmatic Relief will last for a term of five years. Settlement Agreement XII.G.  USDA may decide outside of this proposed Settlement Agreement to continue providing elements of Programmatic Relief after this five-year period.

5128403

and ranchers in USDA farm loan programs and to transmit recommendations concerning any changes to FSA regulations or internal guidance or other measures that would eliminate barriers to program participation for Native American farmers and ranchers. Settlement Agreement XII.A.2. In addition to the creation of the Council, the USDA has agreed to establish a USDA Ombudsperson position to address issues relating to Native American farmers and ranchers, as well as to other socially disadvantaged farmers or ranchers. Settlement Agreement XII.B.1.  Likewise, the USDA has agreed to regularly collect and evaluate data that will permit a comparison between the volume of loans sought by Native Americans and the volume of loans awarded to Native Americans Settlement Agreement XII.C.1.  The USDA has also agreed to undertake a series of actions designed to enhance services for Native American Farmers and Ranchers, such as releasing a plain language customer's guide on how to apply for farm loans and farm loan servicing. Settlement Agreement XII.C.1-4.

In total, the parties believe that these programmatic relief provisions are historic and unprecedented and will serve to avoid the concerns related to future discrimination which were raised in the context of the *Pigford I* Consent Decree.

### IV. Objection that Notice of the Settlement Was Inadequate

The Notice Plan in *Keepseagle* differs substantially from that used in *Pigford I*.  As a bottom line comparison, the *Pigford* notice proposal would have cost between $678 and $841 thousand, but the final approved plan only cost $380,000.  In contrast, the *Keepseagle* notice plan contemplates spending over $2 million on various paid media. Ex. 1, Declaration of Christine E. Webber. [8]  The difference in cost represents a significant difference in the total number of times publication notice would appear, and thus the number of opportunities class members will have to learn of the settlement.

---

[8] The parties note that the plan for notice in this case described here is that proposed by a contractor to be retained by Plaintiffs.

5128403

The *Pigford* proposal called for publication notice to appear *once* in national publications (Jet, Ebony, TV Guide) and selected general interest newspapers, and television ads were broadcast over a two-week period on CNN, BET, and American Urban Radio. *Pigford v.* Glickman, 185 F.R.D. 82, 91 (D.D.C. 1999). Agricultural press was sent a press release, but there were no paid ads. *Id.* at ¶14. However, on average "the print and television notice campaign 'reached 87 percent of African-American farm operators, managers or others in farm-related industries, [for] an average frequency of 2.4 times.'" *Id.* In contrast, the plan for *Keepseagle* involves multiple publications in media targeted to Native Americans, farmers and ranchers, and general interest publications. Thus, among 75 Native American publications, there will be three separate appearances for daily or weekly publications, two separate publications for bi-weekly publications, in addition to one publication in the monthly publications. Kinsella Plan at 20. Among 45 publications targeted towards farmers and ranchers, notice would appear once or twice, depending on their publication schedule. Kinsella Plan at 28. In addition, notice will appear in the American Profile weekly newspaper supplement (similar to Parade magazine, but targeted towards more rural areas). On average, 22.8% of Native Americans read these newspapers which include the American Profile supplement. Kinsella Plan at 31.

The *Pigford* Notice Plan included a hosted website, but no advertising on internet-based publications. The *Keepseagle* plan incorporates internet advertising on over a dozen identified sites. Kinsella Plan at 23-26. In addition, the *Keepseagle* plan includes advertising on radio programs targeted towards Native Americans (Kinsella Plan at 21-22); farmers (Kinsella Plan at 29); and the general public in geographic areas with higher concentrations of Native American farmers (Kinsella Plan at 32). Radio spots will be broadcast multiple times over a two week period.

5128403

The *Pigford* plan made reference to outreach to community organizations, but did not identify the number of such organizations.  Pigford Proposal at 7.  The *Keepseagle* plan incorporates mailing notice with outreach information to *over one thousand* organizations, including tribal governments.  Kinsella Plan at 37-38.  This is particularly important as most Native Americans are members of a tribe, and interact with their tribal governments on a regular basis, and the tribal governments are likely to be highly motivated to share this information with their members.

## V.  Concerns Related to Adequacy of Assistance Provided by Class Counsel

In *Pigford I*, the Court commended Class Counsel on their handling of the case stating, "Class Counsel ably litigated the case throughout its early stages, and they negotiated and entered into a fair settlement for the class as a whole." *Pigford*, 355 F.Supp.2d 165.  However, the complainants objected to the implementation process after the entry of the Consent Decree.  *Pigford v. Glickman*, 127 F.Supp.2d 35, 38-39, (D.D.C. 2001)[9].  For example, one issue that created tension between Class Counsel and Claimants was the PMR process.  As described above, *Pigford I* provided for a process for appeal of adverse decisions by either party. This led to a breakdown in the filing of appeals for claimants by Class Counsel, due largely to the sheer volume of appeals – more than 5,000.  This issue is not a concern here because unlike *Pigford I*, the claims process in the Keepseagle settlement is not adversarial, and the claims neutrals' decisions are designed to be final with no right to appeal by either party.  Moreover, Class Counsel, for their part, believes they have learned from the mistakes of the past and further believes that they are adequately equipped to administer the Keepseagle settlement.  Class Counsel is comprised of able class action litigators as well as some attorneys with more than one decade of experience in handling *Pigford I* issues (including current and former members of the Class Counsel team in that action).  Furthermore, as indicated in the

---

[9] This decision deals with additional concerns related to *Pigford I*, which do not apply in the context of this Settlement Agreement.

5128403

proposed settlement, Class Counsel envisions utilizing a Claims Administration company and Track A and Track B Neutrals with combined class action and *Pigford I* experience. Settlement Agreement II.D; II.OO; II.AAA.

### VI. Concerns About Determinations Made by Track A and Track B Neutrals

A central feature of both the *Pigford I* Consent Decree and the proposed settlement here is that they provide a process for evaluating claims of discrimination.  Neither agreement, however, promises particular outcomes for any specific individual.  *See Pigford*, 355 F.Supp.2d at 164.  These processes require third party neutrals to evaluate the sufficiency of the discrimination claims.  The Track A process in both cases requires a class member to describe his or her claim of discrimination with some degree of specificity.  Some claims will be denied because they do not meet the burdens of proof set forth in the settlement.  Such negative outcomes were more likely in *Pigford I* due to the adversarial nature of the process in *Pigford I*.  In contrast, the process in this case will not be adversarial -- a fundamental difference between *Pigford I* and the *Keepseagle* settlement.  USDA will not be opposing the award of individual Track A and Track B claims, but, in part because the parties have already agreed to an overall cap on the amount of money to be provided to the class under the agreement, the government will be leaving the determination of whether or not a claimant qualifies to the sound judgment of the neutral based upon the evidence presented by the claimant. Notwithstanding the non-adversarial nature of the claims process in the proposed Settlement Agreement, there are significant protections to ensure damages and debt relief are awarded only to class members with meritorious claims.  Settlement Agreement IX.B.5; IX.E.  These protections, some of which were included in *Pigford I*, include the requirement that claims be submitted under oath, that detailed requirements exist that must be satisfied in order for class members to become eligible for monetary relief and the provision allowing USDA, the Department of Justice and any

9

5128403

other enforcement agency with jurisdiction to audit the claims made to protect against fraudulent claims. Settlement Agreement XI. Further, in a provision that makes particular sense in this case, the agreement here strikes a careful balance between allowing all eligible claimants the opportunity to obtain relief in connection with their claims and the need to allow only those claimants who can establish that they are, or have historically held themselves out to be, Native Americans. Settlement Agreement II.BB.

Notably, during *Pigford I*, some claimants alleged that a large number of Track A claims were being denied and that adjudicators had a tendency to resolve factual disputes against class members. *Pigford*, 127 F.Supp.2d at 38. In *Pigford*, an alleged lack of neutrality by JAMS was never substantiated. *Id.*

A fundamental understanding by the neutrals of the details of the operation of federal farm loan programs and the manner in which unfair treatment could occur will be critical to a successful implementation of this Settlement Agreement. For this reason, Class Counsel is proposing to use the same entity, JAMS, which made over 22,000 Track A determinations in *Pigford*.

## VII.  Objections to the Requirement that All Claimants Identify a Similarly Situated White Farmer

In *Pigford I*, concerns were raised about the requirement under both the Track A and Track B claims process that class members identify a "similarly-situated white farmer" who received better treatment from USDA than the class member did. *Pigford*, 127 F.Supp.2d at 38-39. The 'similarly situated white farmer' is not a requirement under Track A in the proposed settlement, thereby eliminating the potential for problems of this nature on the Track A process. However, because of the  possibility of a significantly higher damages award, and consistent with the accompanying heightened standards for proving a Track B claim, a 'similarly situated white farmer' is required

5128403

under Track B of this Agreement.  Settlement Agreement IX.D.1.e.  The addition of this component is consistent with the objective of requiring a Track B claimant to meet the standards of claim of discrimination under prevailing law.   For this reason, among others, Track B Claimants are encouraged to consult Counsel for assistance in completing their Track B Claim.  Claim Form, Settlement Agreement, Exhibit C.

## VIII.   Conclusion

As described above, Class Counsel has drawn on its experience in *Pigford I* to anticipate potential issues that could arise in the *Keepseagle* settlement and Claims Process.   To that end, where possible, the Parties have made adjustments to the terms and the Settlement Agreement and the claims process to address these issues.  The Parties believe that these changes will be sufficient to prevent similar concerns from arising during this Claims process.

Respectfully submitted,

For the Plaintiffs:

_____/s/_____
Joseph M. Sellers, Bar No. 318410
Christine E. Webber, Bar No. 439368
Peter Romer-Friedman, Bar No. 993376
COHEN MILSTEIN SELLERS &
TOLL PLLC
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

David J. Frantz, Bar No. 202853
CONLON, FRANTZ & PHELAN
1818 N Street, N.W.
Suite 400

Paul M. Smith, Bar No. 358870
Katherine A. Fallow, Bar No. 462002
Jessica Ring Amunson, Bar No. 497223
Carrie F. Apfel, Bar No. 974342
JENNER & BLOCK LLP
1099 New York Ave., N.W.
Suite 900
Washington, DC 20001-4412
Telephone: (202) 639-6000
Facsimile: (202) 639-6066

Anurag Varma, Bar No. 471615
PATTON BOGGS LLP
2550 M Street, N.W.
Washington, DC 20037

11

Washington, DC 20036-2477
Telephone: (202) 331-7050
Facsimile: (202) 331-9306

Telephone: (202) 457-6000
Facsimile: (202) 457-6315

Phillip L. Fraas
STINSON MORRISON HECKER
1150 18th St. NW, Suite 800
Washington, DC 20036
Telephone: (202) 785-9100
Facsimile: (202) 785-9163

Sarah Vogel
SARAH VOGEL LAW PARTNERS
222 N. 4th St.
Bismarck, ND 58501
Telephone:  (701)221-2911
Facsimile:  (701) 221-5842

*Attorneys for Plaintiffs*

Dated:  October 25, 2010

For the Secretary:

TONY WEST
Assistant Attorney General

RONALD C. MACHEN JR.
United States Attorney
Civil Division, Room E4216
555 Fourth Street NW
Washington, DC  20530
Telephone:  (202) 514-7170

_____/s/_____
Joshua E. Gardner
Federal Programs Branch
Civil Division
20 Massachusetts Avenue NW, Room 6146
Washington, DC  20001
Telephone:  (202) 514-1944

Dated:  October 25, 2010

_____

5128403