Administrators of the Keepseagle Lawsuit

Judge Emmet G. Sullivan

Attorney Cohen Milstein

Magistrate Judge Alan Kay

Dear Sirs:

In August of 2012 a small percentage of Native American Farmers received a settlement from Keepseagle v Vilsack lawsuit as the Native American Farmers that received the awarded monies in the Southwest Region of Oklahoma were/are very appreciative.

Upon further inquiry regarding the residual of monies that was leftover after the initial distribution of the monies which is in the amount of $380 million dollars, We, the Native American farmers from the Southwest Region of Oklahoma would like to request that the leftover monies be utilized in a different and more productive way.

We do understand the Cy Press system and why it was created and inserted in the settlement but we, the Native American Farmers believe that allocating the residual monies in the proposed foundation and multiple agencies would not be a beneficial solution for us. We, the Native American Farmers would like to see the leftover monies be distributed to the Native American Farmers where it could be financially beneficial.

The Native American Farmers understand that according to the settlement agreement a Cy Press system would be established to administer the left over monies in accordance with the court's decision. It is our understanding that the presiding Judge (Sullivan) did not foresee the lack of participation nor did anyone else including (class counsel) which in turn because of this left a large sum of monies in the settlement.

In keeping with the settlement according to (Section X) in the Keepseagle v Vilsack settlement agreement which states in part for the class counsel "to provide information to class members plaintiffs regarding Keepseagle monies." The Keepseagle plaintiffs are under the impression or understanding that the Cy Pres funds for the foundation would be beneficial for the plaintiffs in the future. The plaintiffs were not informed nor were they polled to render their input regarding what should be done or how to allocate the leftover monies so that it would have financial positive impact for the Native American farmers in their surrounding communities and businesses now in the present time.

It is to our understanding that before the Cy Pres s system could allocate monies to different agencies the plaintiffs have a right to input their concerns in how it could help us now. The Native American farmer's plaintiffs did not know of this proposed new foundations that would handle all of the leftover monies from the Keepseagle lawsuit until it appeared from a Washington D.C. article which stated "That all Keepseagle representatives and plaintiffs knew of this and agreed upon this newly proposed foundation that will help the Native American Farmers". We, the Native American plaintiffs also found out about the proposed foundation via our local "Anadarko, OK Daily News "and the "Native American Times" newspapers.

This to us appears to be another discriminatory attitude toward the Native American Farmers as it implicates that we are not capable of making decisions or being informed of the decision regarding the residual monies of the funds from the settlement. We believe that various agencies will have part of the Cy Pres funds as it was decided for us on how to utilize this great amount of leftover monies from the settlement. It appears to the plaintiffs that the administrators have their agenda on how to disperse it to their benefits as this foundation will have to have administrator in the years to come to administer these Cy Pres funds to different agencies that will also benefit. As for the Native American Farmers it seems the administrators have set the mentality as likened to us as "Throw a dog a bone" attitude.

Some designated entities or agencies are already sending out what appear to be internet thank you notes for being considered recipients for this proposed Cy Pres foundation fund as it has not been ascertained who will be eligible or rules on how this proposed foundation will be dispersing these funds.

We would like to voice our opinion and suggest where these monies could be more useful for all the Native American farmers plaintiffs involved. It would seem that even in the settlement agreement that the $380 million leftover monies could be beneficial if it were to be distributed again to the Native American farmer's plaintiffs. These monies would help to enhance their farms and ranches ventures and relieve their financial burdens.

As due to the recent droughts of recent years in Southwest Oklahoma the Native American farmers were hit hard and incurred a financial loss to a great degree, this is where the Keepseagle monies will lessen hardship that were brought on by these droughts. With a re-dispersment of the residual monies it would help lift the financial burdens to a higher degree and give the Native American farmers some added relief. Also, this will still leave millions of dollars for the Cy Pres funds to start proposed foundation for future farmers and agencies that can help the Native American farmers.

It appears that the Cy Pres funds for this proposed foundation need to evaluate its' agenda and include the Native American farmers opinions and concerns after all this was a lawsuit and only victims of this lawsuit should benefit from it not other agencies.

Included in this letter are copies of the two media sources in which the media gave us information of the Cy Pres proposed foundation that is to be formed from the leftover monies of the Keepseagle v Vilsack lawsuit. Also include is a signature page of concerned Native American farmers plaintiffs in the Southwest Oklahoma region.

Respectfully,

Concerned "Keepseagle Native American plaintiffs",

(See attachment for signature page of Keepseagle plaintiffs)

Attachment - copies of news articles

KEEPSEAGLE PLANTIFF SIGNATURE PAGE

We, the following Native American Farmers of Southwest Oklahoma do hereby ratify and concur that
according to the Keepseagle v Vilsack settlement agreement that the clause for a Cy Pres Fund that was
included should be re-evaluated and modified on how much the Cy Pres Fund is allowed and how much
left-over monies from the Keepseagle settlement is recommended to be given to such a foundation and
to reconsider a distribution payment to the Keepseagle plaintiffs to help them economically and
financially stabilize the Native American Farmers to improve their farms and ranches in their area that
was almost devastated by the 2010-2012 drought that many Native American Farmers endured and
faced.

| Name | Address | Phone |
|------|---------|-------|
| 1. Leslie Meeks | Rt 2 Box 14 Anadarko OKla | (405) 638-0739 |
| 2. Timothy Ware | 411 W. Petunia Rd Anadarko ok | 933-3963 |
| 3. Terry Ware | Po Box 821 Anadarko, OK. 73005 | 405-933-6082 |
| 4. Allen Zach Saville | Rt3 Box 240, Anadarko, OK 73005 | 405-247-9130 838-898 |
| 5. Marica Saville | Rt3 Box 240 B Anadarko, OK, 73005 | |
| 6. Matthew Meeks | P.O. Box 1763 Anadarko, Ok. | 405-933-2310 405-933-2534 |
| 7. Nanci McKenzie | P.O. Box 653 # Cobb OK 73038 | |
| 8. Raquel Meeks | Rt 4 Box 145 Anadarko, ok | 405-374-6445 |
| 9. Melvin Meeks | Rt4 Box 144 Anadarko | |
| 10. Valen Kenlin | 219 Redbud Circle Anadarko, OK 73005 | |
| 11. Wesley Jessepe | P.O. Box 22 Anadarko, OK 73005 | |
| 12. Raquel Wedes | 312 E Oklahoma Ave, Anadarko OK 73005 | |

KEEPSEAGLE PLANTIFF SIGNATURE PAGE

We, the following Native American Farmers of Southwest Oklahoma do hereby ratify and concur that according to the Keepseagle v Vilsack settlement agreement that the clause for a Cy Pres Fund that was included should be re-evaluated and modified on how much the Cy Pres Fund is allowed and how much left-over monies from the Keepseagle settlement is recommended to be given to such a foundation and to reconsider a distribution payment to the Keepseagle plaintiffs to help them economically and financially stabilize the Native American Farmers to improve their farms and ranches in their area that was almost devastated by the 2010-2012 drought that many Native American Farmers endured and faced.

| Name | Address | Phone |
|------|---------|-------|
| 13. _Mary Prentis_ | 202 Blackhawk Ter, Anadarko, OK 73005 | |
| 14. _Bonny Quoton_ | PO Box 455 Lawton, OK 73505 | |
| 15. _Sandra Littlechief_ | Anadarko, OK 73005 | |
| 16. _Sant Ryan_ | Norman, OK 73071 | |
| 17. _Melissa Wild Cat_ | PO Box 13 Anadarko, OK 73005 | |
| 18. _Sandra Morgan_ | PO Box 584 Hobart, OK 73038 | |
| 19. _Edward Stephenson_ | 118 West Rd Anadarko, OK 73005 | |
| 20. _Benny Rivera_ | PO Box 230 Carnegie, OK 73015 | |
| 21. _Keith Tillman_ | Elgin, OK 73030 | |
| 22. _RPL_ | 205 W. TEXAS Anadarko, OK 405.779.8707 | |
| 23. _Marvin James_ | 807 S.W. 2nd St Anadarko OK LA | |
| 24. _Donna Prentiss_ | 23098 CR 1376, Anadarko OK 73005 | |
| 25. _Thomas M Johnson_ | 917 SW 24th Ave - Apt 243, Norman OK 73069 | |

Keepseagle Plaintiff Signature Page

We the following Native American Farmers of Southwest Oklahoma do hereby ratify and concur that according to the Keepseagle v Vilsack settlement agreement that the clause for a Cy Pres Fund that was included should be re-evaluated and modified on how much the Cy Pres Fund is allowed and how much left-over monies from the Keepseagle settlement is recommended to be given to such a foundation and to reconsider a distribution payment to the keepseagle plaintiffs to help them economically and financially stabilize the native American Farmers to improve their farms and ranches in their areas that was almost devastated by the 2010-2012 drought that many Native American Farmers endured and faced.

| Name | Address | Contact Number |
|------|---------|----------------|
| 26. Amy Tselee | 408 East Colorado, Anadarko OK 73005 | |
| 27. Prulli Horse | 311 Elmwood Terrace - Anadarko, OK 73005 | |
| 28. Andy Horn | 311 Elmwood Terrace Anadarko OK 73005 | |
| 29. | | |
| 30. | | |
| 31. | | |
| 32. | | |
| 33. | | |
| 34. | | |
| 35. | | |
| 36. | | |
| 37. | | |

## What Can a Court Do with Leftover Class Action Funds? Almost Anything!

Kevin M. Forde
The Judges' Journal, vol. 35, no. 3 (Summer 1996)

© 1996 American Bar Association. Reproduced by permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or downloaded or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

At the conclusion of class action cases it is common to have funds that, for a number of reasons, cannot be distributed to the class members technically entitled to their funds. In some instances, members of the class simply cannot be located. In other instances, eligible class members fail to submit claims as required by the judgment order or settlement. And, on occasion, the court may order that no disbursement be made to certain class members because the amount of recovery due is so small that the cost of disbursement, notice, and administration may exceed the value of the claim.

In some cases, the undistributed funds may be substantial. For example, in *West Virginia v. Chas. Pfizer & Co.,* 314 F. Supp. 710 (S.D.N.Y. 1970), *aff'd,* 440 F.2d 1079 (2d Cir.), *cert. denied,* 404 U.S. 871 (1971), $32 million remained undistributed ("unclaimed") from a $100 million settlement. And, in *Van Gemert v. Boeing,* 739 F.2d 730 (2d Cir. 1984), more than $2.5 million remained in the fund after all claims were satisfied.

If, in fashioning a decree or negotiating a settlement, the parties do not consider and anticipate this predicament, the responsibility falls on the court to resolve any ensuing dispute or to otherwise direct the distribution of these funds. The scope of a court's discretion in disposing of nondistributable funds has been tested in recent cases. In ordering distribution, courts rely on their general equity power or on the *cy pres* doctrine.

The *cy pres* doctrine originated in the common law as a method of fairly distributing a trust fund, the original purpose of which failed in some respect. The term *cy pres* derived from the Norman French term "*cy pres comme possible,*" which means "as near as possible."[1] Under the *cy pres* doctrine, once a trust fund's original purpose fails, the fund is to be

*Note* This electronic document was created from a different page layout system than that used to produce *The Judges' Journal* Pagination is different, although the contents are identical; do not cite to this version if using page citations.

Forde, What Can a Court Do with Leftover Class Action Funds? Almost Anything!
The Judges' Journal, vol. 35, no. 3 (Summer 1996)

distributed to the "next best" use. This remedy now extends to other areas, including the situation where funds remain after distribution in a class action.[2] The *cy pres* approach in the class action situation puts the unclaimed portion of the fund to its "next best" compensation use, usually by giving it to a third party or agency to use for court-designated purposes.[3] It should be emphasized that courts have claimed broad discretion in determining how to satisfy the "next best" use criteria.

Exercising this broad discretion, some courts have applied *cy pres* to order a future price reduction on sales of the defendant's product applicable until the total reduction equals an amount equivalent to the unclaimed funds.[4] Other courts and commentators have rejected this approach for reasons including the possibility that the defendant may gain a competitive edge from the lowered price. Further, this method of distributing the excess requires the injured class members in product class actions to make future purchases to collect their refund.[5]

The prospect of excess or undistributed funds raises the possibility that these funds should "escheat" to the state or federal government as unclaimed property. Even if not required, escheat to the state is a method of disposition within the discretion of the court. For example, a California state escheat statute allows a court to escheat unclaimed funds to the government, yet specifically provides that, "nothing in this section shall be construed to change the authority of a court or administrative agency to order equitable remedies."[6] Similarly, a New York court opined the class action concept has its origin in equity . . . and the courts still retain traditional equity power over the fund which is created until it is disbursed. . . . Although the application of abandoned property statutes to unclaimed class action funds is not required, we cannot say it was an abuse of discretion to dispose of the unclaimed funds in accordance with the scheme created by the Abandoned Property Law.[7]

On the other hand, numerous federal and state courts have distributed such funds to educational institutions or charities, apparently without regard to state or federal escheat statutes. In addition, some courts and commentators have concluded that escheat laws are inapplicable in analogous situations. For example, in *Van Gemert v. Boeing* Co.,[8] the Second Circuit found that "a court of equity may dispose of funds fairly—without being compelled to utilize [the federal statutes]."[9] The court explained:

> We hold that [28 U.S.C.] § 2041 [the federal statute providing for the deposit of unclaimed funds in the U.S. Treasury] does not limit the discretion of the district

Forde, What Can a Court Do with Leftover Class Action Funds? Almost Anything!
The Judges' Journal, vol. 35, no. 3 (Summer 1996)

court to control the unclaimed portion of a class action judgment fund. Whether the money has been paid into court or whether an alternative method of administering payment is used, the money held is subject to the court's order. . . . The statute referred to does not control when a court fashions a plan for distributing unclaimed funds.[10]

The *Van Gemert* court also rejected the argument that the monies should escheat to the state:

The critical determining factor here, however, is that trial courts are given broad discretionary powers in shaping equitable decrees. "[E]quitable remedies are a special blend of what is necessary, what is fair, and what is workable." Lemon v. Kurtzman, 411 U.S. 192, 200 (1973) (footnotes omitted). Appellate review is narrow. *Id.* We believe that this principle should apply to equitable decrees involving the distribution of any unclaimed class action fund.[11]

Finally, several cases reject government escheat as controlling the nondistributed funds. After referring to a state statute providing for residue to be treated as unclaimed property, which would eventually escheat to the state's general fund, the court noted that in a class action context, "to compel this method [general escheat] would be to cripple the compensatory function for the private class action."[12] The court also noted, "that [the] statute was not intended to limit the equitable discretion of the courts in managing private consumer class actions."[13]

For these reasons, the disposition of undistributed funds should not be limited by escheat laws or other state abandoned property statutes.[14]

One possibility is to order the payment of undistributed funds to the already paid class members, as a supplemental payment. This approach has some obvious inequities and has been rejected by courts where it has been directly challenged.[15]

A further disposition of funds to already paid class members produces a windfall to them, particularly where the case resulted in a judgment, rather than a settlement, because each of the class members who had submitted a proper claim would have already been fully compensated. Further, there is no compelling reason to distribute the unclaimed or otherwise undistributed monies to this group.

Another *cy pres* method of distributing the excess funds involves the establishment of a form of trust fund to which disposition is provided according to the terms of the settlement agreement or, in case of judicial resolution, by application and suggestion to the court by interested persons or parties. This method allows the court to create a flexible, equitable remedy. As one leading commentator has pointed out:

Forde, What Can a Court Do with Leftover Class Action Funds? Almost Anything!
The Judges' Journal, vol. 35, no. 3 (Summer 1996)

While the use of *cy pres* distribution remains controversial and unsettled in an adjudicated class action context, courts are not in disagreement that *cy pres* distributions are proper in connection with a class settlement, subject to court approval of the particular application of the funds. Thus, even in circuits that have ruled that *cy pres* or fluid class recovery distributions are not valid in contested adjudications, these distributions have obtained a stamp of approval as part of a class settlement.[16]

The Supreme Court of California in *State v. Levi Strauss & Co.,* 715 P.2d 564 (Cal. 1986), discussed the *cy pres* doctrine as a means to distribute litigation benefits to a class. As to residual funds, the court suggested that the best method of distribution would be to establish a consumer trust fund "which would engage in consumer protection projects, including research and litigation."[17] This method would put the funds to their "next best" use by providing indirect benefits to silent class members while promoting the statute under which the suit was brought. The court did recognize, however, that establishing and administering such a trust fund would be costly and that some courts avoided these costs by distributing residual money to established private organizations.[18]

Many courts have approved of this type of distribution of unclaimed funds. In *Nelson v. Greater Gadsen Housing Authority,* 802 F.2d 405, 409 (11th Cir. 1986), the Eleventh Circuit expressly approved the use of fluid recovery to distribute unclaimed class action funds. The California Supreme Court also supports this approach.[19]

The saga of the *Folding Carton* litigation[20] is an example of how the views of judges may differ as to the appropriate use of residual funds, and ultimately, the breadth of the discretion afforded courts when determining what the "next best" use of such monies might be. In the *Folding Carton* case, approximately $6 million was unclaimed following the distribution of more than $200 million in settlement funds to class members. The district court originally directed that a portion of the fund be used to establish an "Antitrust Development and Research Foundation."[21] The Seventh Circuit disagreed with the disposition, describing the proposal as "carrying coals to Newcastle," because, in the view of that court, there were already sufficient institutions conducting studies of the antitrust laws. Consequently, the court found that creation of such a foundation was "a miscarriage of justice and an abuse of discretion."[22] The Seventh Circuit directed, instead, that the remainder of the reserve fund "escheat" to the United States, under federal law (28 U.S.C. § 2041). (*See* discussion of *Van Gemert v. Boeing Co., supra.*)

Forde, What Can a Court Do with Leftover Class Action Funds? Almost Anything!
The Judges' Journal, vol 35, no. 3 (Summer 1996)

Most of the parties to that appeal, and the district judges who were found to have abused their discretion, sought Supreme Court review. Before those petitions were acted upon, the parties entered into a settlement agreement under which half of the remaining funds would be distributed to all previously paid class members, and the other half would be paid to two or more Chicago-area law schools to fund research projects involving enforcement of the antitrust laws or management of complex litigation, or to assist needy students. The government [the ultimate potential beneficiary of the appeal court's escheat ruling] initially took no position on this proposed settlement. The district court approved the settlement when it was presented, but insisted on further notice to the government. The government did not respond and the settlement was approved. When the government later attempted to intervene in the case to block the proposed distribution, the district court denied the government's untimely petition. The government appealed and, thus, the Seventh Circuit had a second opportunity to address the appropriate use of the undistributed funds. The appeal was heard by a different panel of judges.

In its opinion, the second panel of the Court of Appeals agreed with the district court that the government's petition to intervene was untimely and inferentially overruled the previous panel's holding that the money "escheat" to the federal government. The court further stated, however, that the prohibition in its earlier opinion "against using the funds for antitrust purposes remains and shall not be circumvented by the parties or the district court."[23] The lower court was directed to collect the monies from the law schools to which they had been disbursed and to "consider entirely different and appropriate uses under the *cy pres* doctrine."[24] Significantly, this panel of the Seventh Circuit suggested that the money be given to the Federal Judicial Center Foundation, a use that would have no direct benefit to the class and no direct bearing on the enforcement of the antitrust laws, the subject of the underlying litigation.[25] The result reached by the Seventh Circuit suggests a policy of giving the trial court almost unlimited discretion in directing the use of the funds. The case was remanded to the district court.

In response to the Seventh Circuit's invitation, eleven public interest and charitable organizations, including the Federal Judicial Center Foundation, filed applications with the district court. In general, these applications were straightforward requests for grants. After a review of the proposals, the district court, Judge Ann Claire Williams, entered an order directing that the entire balance of the fund, approximately two and one-

Forde, What Can a Court Do with Leftover Class Action Funds? Almost Anything!
The Judges' Journal, vol. 35, no. 3 (Summer 1996)

third million dollars, be paid to the National Association for Public Interest Law to be used to finance "a national fellowship program" to give young lawyers the opportunity to work at public interest organizations and provide legal services to the poor.[26] Judge Williams' decision was promptly affirmed by the Seventh Circuit, without published opinion.[27]

The second *Folding Carton* opinion of the Seventh Circuit Court of Appeals appears to stand for the proposition that in an antitrust class action the *cy pres* doctrine allows for practically any charitable, educational, or legally-related purpose—except the creation of an antitrust foundation barred by its earlier opinion.[28]

The following list of other reported and unreported cases is consistent with this approach. Some of these cases rely on the *cy pres* doctrine and some on the court's general equity power; others are silent as to their authority and simply order the distribution:

• *Coordinating Committee of Mechanical Specialty Contractors Ass'n v. Duncan,* Nos. 76 L 12896, 77 CH 6497 (Cir. Ct. Cook County Aug. 1, 1985) (funds distributed to four Chicago area law schools and the Lawyers Trust Fund of Illinois for legal services to the poor).

• *Lindy Bros. Builders v. American Radiator & Standard Sanitary Corp.,* CA No. 71774 (E.D. Pa. Feb. 28, 1978) (approximately $25,000 given to two law schools to establish loan funds for needy students at those institutions).

• *Illinois v. J.W. Petersen Coal & Oil Co.,* No. 71 C 2548 (N.D. Ill. Mar. 15, 1976) (one-half of the residue funds distributed to the Chicago Bar Foundation and one-half distributed to the Chicago Lawyers Committee for Civil Rights).

• *Liebman v. J.W. Petersen Coal & Oil Co.,* 63 F.R.D. 684 (N.D. Ill. 1974) (unclaimed funds given to the Legal Assistance Foundation and the Lawyers' Committee for Civil Rights Under Law).

• *Boothe v. Recrion,* No. 74 C 1547 (N.D. Ill. 1974) (monies given to the Roger Baldwin Foundation and the Lawyers' Committee for Civil Rights Under Law).

• *Benaron v. Sears Roebuck & Co.,* No. 75 C 4026 (N.D. Ill. 1975) (funds dispersed to the Roger Baldwin Foundation and Lawyers' Committee for Civil Rights Under Law).

• *Seiden v. Nicholson,* No. 74 C 3117 (N.D. Ill. 1974) (funds given to the Chicago Bar Foundation).

• *In re Three Mile Island Litigation,* 557 F. Supp. 96 (M.D. Pa. 1982), later proceeding, 596 F. Supp. 1274 (1985) (payment made to a newly

Case 1:99-cv-03119-EGS   Document 657   Filed 10/07/13   Page 12 of 15

Remaining Keepseagle Funds Could Create a Foundation to Benefit ALL Native American Farmers and Ranchers

Intertribal Agriculture Council

# Remaining Keepseagle Funds Could Create a Foundation to Benefit ALL Indian Ranchers and Farmers



The Keepseagle v. Vilsack class action made history in 2010 when Indian farmers and ranchers were awarded $680 million in damages and $80 million in debt relief for decades of harsh discrimination by the USDA's Farm Loan Program. There is an opportunity to make history again – this time by using unclaimed settlement funds to create the largest endowed foundation in United States history dedicated to assisting current and future generations of farmers and ranchers throughout Indian Country.

Keepseagle class representatives unanimously agreed that consolidating the funds in a large, well-managed foundation would have a far more profound and greater long-term impact than dispersing the funds all at once to multiple organizations. The first step in creating such an opportunity is to change the provision of the settlement agreement relating to the unclaimed funds. This is why class counsel asked the court to consider the merits of the single foundation concept and how best to create and implement such a plan.

Under the terms of the Settlement Agreement for the Keepseagle Lawsuit as currently written, the Intertribal Agriculture Council could arguably make the strongest case for a portion of the Cy Pres funds for it's own purposes. The Intertribal Agriculture Council is the longest standing national organization specifically serving Indian Agricultural interests, representing Tribes and Tribal producers. The membership of the IAC, by its very charter consists of each and every Federally Recognized Tribe and Alaskan Native Village.

Self-serving interests aside, the Board of Directors and Membership of the Intertribal Agriculture Council were unanimous in their support of a solution that would benefit the next 7 generations of farmers and ranchers. A newly created foundation would receive the Cy Pres fund from the Keepseagle Settlement as an initial endowment. The Fund could

generate $30 million in annual interest revenue

Funding to enable Indian Country itself to formulate solutions to problems it faces in any arena; should be cause for thanks and celebration. The IAC greatly appreciates the hard work of George and Marilyn Keepseagle, Porter Holder, the late Basil Alkire, Claryca Mandan, Keith Mandan, John Fredericks Jr , the late Luke Crasco; the unnamed plaintiffs, and last but not least, all former and current members of Class Counsel.

An important provision of the foundation proposal is that it would be managed and controlled by leaders from Indian Country. The foundation board would be comprised of those who are familiar with the farming and ranching needs of our communities. With the Court's approval, this board – rather than class counsel or any other non-Native entity – would approve recipients of foundation funds.

The benefits that this foundation ultimately can achieve within our farming and ranching communities are boundless. Consider what it would mean to have funds available year after year to provide, among other things, agricultural scholarships for our promising young people; endow educational programs that build our capacity to grow and sustain livestock and crops; provide financial and technical assistance to Native farmers and ranchers now and in the future; grow our rural-based community college agri-business system; and, finally, to ensure that Native peoples will be able to remain on the land we all hold sacred.

We urge all who believe as we do that "the land does not belong to us; it is only borrowed from our children" to support this legacy foundation so that this unexpected inheritance will pay forward for countless generations to come.

Thank you!
-*Intertribal Agriculture Council*

For more information contact:
Donita A. Fischer
Public Relations Director
Intertribal Agriculture Council
605-964-8320
donita@IndianAgLink.com
www.IndianAgLink.com

forward to a friend



SPECIAL SECTION: INDIAN EDUCATION PGS 5-9

...PENDENT & NATIVE OWNED   – A FREE WEEKLY PUBLICATION –   WWW.NATIVETIMES.COM

# NATIVE TIMES

SEPTEMBER 13, 2013

...ME 19 • ISSUE 34

## ...llions left in American Indian farmers settlement

...LARE JALONICK
...d Press

...INGTON  (AP)
... unusual twist for
...ton these days:
...oney left over from
...illion settlement the
...overnment awarded

American Indian farmers in 2010 after decades of discrimination.

A three-year claims process is complete, and more than half the settlement money is still available. The plaintiffs want to use the unexpected $380 million windfall to form a foundation that could be the largest Indian country has ever seen.

Joseph Sellers, the lead lawyer for the American Indian plaintiffs, said the amount of money left over was a big surprise to those involved. It turned out that many potential recipients had died, lost any evidence of discrimination or felt too distrustful of the government to even apply, he said. Lawyers expected around 10,000 people to file claims and the remainder to be in the hundreds of thousands of dollars, but less than 4,000 people sought part of the settlement.

The settlement agreement calls for any left over money to be distributed to American Indian farmer organizations, but none of those groups was set up to handle so much money.

So the plaintiffs decided the best way to handle the funds was to set up a new foundation, led by Indian leaders, to help American Indian farmers and

See MILLIONS on Page 4







# THE Anadarko Daily News

Caddo County's daily newspaper ... informing the community since 1901

Copyright 2013, Anadarko Publishing Co., All Rights Reserved

50 cents single copy price

Saturday, August 31, 2013

Volume 113    Number 15    10 Pages



*A rare twist for Washington*

## Millions remain in Indian farmer settlement account

WASHINGTON (AP) — It's an unusual twist for Washington these days: There's money left over from a $680 million settlement the federal government awarded American Indian farmers in 2010 after decades of discrimination.

A three-year claims process is complete, and more than half the settlement money is still available. The plaintiffs want to use the unexpected $380 million windfall to form a foundation that could be the largest Indian country has ever seen.

Joseph Sellers, the lead lawyer for the American Indian plaintiffs, said the amount of money left over was a big surprise to those involved. It turned out that many potential recipients had died, lost any

for any left over money to be distributed to American Indian farmer organizations, but none of those groups was set up to handle so much money.

So the plaintiffs decided the best way to handle the funds was to set up a new foundation, led by Indian leaders, to help American Indian farmers and ranchers.

"We believe it would be the largest philanthropic organization devoted to native Americans in the history of this country," Sellers said.

The plaintiffs notified the federal court of their desire to form the new organization Friday. The court will then have to approve it.

Sellers said the idea is that a larger fund could make annual grants to all of the smaller organi-

against American Indians and other minorities in rural farm loan offices.

At the time, President Barack Obama said the settlement "helps strengthen the nation to nation relationship and underscores the federal government's commitment to treat all citizens fairly."

## Van Dyck calls grand jury in Rogers County

CLAREMORE (AP) — A Caddo-Grady County District Judge ordered the grand jury process to proceed Thursday in Rogers County to investigate the county commissioners, the district attorney and three of her assistants

## France is ready, but scant support for US against Syria

TTENDING THE STATE Convention with a copy of *The Anadarko Daily News* are the members of the indiako Chapter of Beta Sigma Phi Holly Savage, Lois Matlock, Marilynn Morrison, Earlyn Daugherty, sity Coel, Eva Williams and Carline Gibson.