**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MARILYN KEEPSEAGLE, et al., | ) |
| | ) |
| | ) |
| Plaintiffs, | ) |
| | ) Civil Action No. 1:99CV03119 |
| v. | ) (EGS) |
| | ) |
| TOM VILSACK, Secretary, United States | ) |
| Department of Agriculture, | ) Judge: Emmet G. Sullivan |
| | ) Magistrate Judge: Alan Kay |
| | ) |
| Defendant. | ) |
| | ) |

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF THEIR UNOPPOSED MOTION**
**TO MODIFY THE SETTLEMENT AGREEMENT CY PRES PROVISIONS**

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................. 1

FACTUAL AND PROCEDURAL BACKGROUND.................................................................. 3

I.     The Proposed Addendum to the Settlement Agreement...................................................... 4

II.    Distribution of the Initial $38 Million of Cy Pres Funds.................................................... 5

III.   Creation and Operation of the Trust to Distribute the Balance of the $380 Million
of Cy Pres Funds............................................................................................................. 6

ARGUMENT ..................................................................................................................... 9

I.     The Proposed Addendum Will Make the Cy Pres Distribution More Effective,
Accountable, Transparent and Beneficial Than Under the Current Agreement................. 9

II.    The Court May Approve the Proposed Amendment Pursuant to Section XXII of
the Settlement Agreement............................................................................................... 11

III.   The Court May Modify the Agreement Under Rule 60(b)(5) ......................................... 12

IV.   The Court May Approve the Proposed Amendment Without
Requiring Supplemental Notice..................................................................................... 18

V.    The Plaintiffs Have Fully Informed Class Members And The Broader Native
American Community About The Proposed Modification Of The Cy Pres
Provisions...................................................................................................................... 23

CONCLUSION.................................................................................................................. 25

1922789.4

# TABLE OF AUTHORITIES

Page

CASES

*In re Baby Products Antitrust Litig.*,
 708 F.3d 163 (3d Cir. 2013)................................................................19

*In re Black Farmers Discrim. Litig.*,
 No. 08-0511 (PLF), 2014 U.S. Dist. LEXIS 29062 (D.D.C. Mar. 5, 2014)....................12, 13

*Democratic Cent. Comm. of D.C. v. Washington Metro. Area Transit Comm'n*,
 84 F.3d 451 (D.C. Cir. 1996).........................................................3, 17, 18

*Diamond Chem. Co. v. Akzo Nobel Chems. B.V.*,
 No. 01-2118 (CKK), 2007 U.S. Dist. LEXIS 49406 (D.D.C. July 10, 2007) ....................3, 17

*In re Diet Drugs*,
 MDL No. 1203, 2010 U.S. Dist. LEXIS 66879 (E.D. Pa. 2010)...........................................19

*In re Diet Drugs Prods. Liab. Litig.*,
 226 F.R.D. 498 (E.D. Pa. 2005)........................................................19

*In re Folding Carton Antitrust Litig.*,
 1991 U.S. Dist. LEXIS 2553 (N.D. Ill. Mar. 5, 1991)............................................17

*Halderman v. Pennhurst State Sch. & Hosp.*,
 901 F.2d 311 (3rd Cir. 1990) ........................................................13

*In re Integra Realty Res., Inc.*,
 262 F.3d 1089 (10th Cir. 2001) ........................................................19

*Jones v. Gusman*,
 296 F.R.D. 416 (E.D. La. 2013)........................................................19

*Perkins v. American Nat'l Ins. Co.*,
 No. 3:05-cv-100 (CDL), 2012 U.S. Dist. LEXIS 95039 (M.D. Ga. July 10, 2012)............3, 17

*Pigford v. Veneman*,
 292 F.3d 918 (D.C. Cir. 2002)........................................................15

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*,
 962 F. Supp. 450 (D.N.J. 1997) ........................................................19

*Rufo v. Inmates of Suffolk County Jail*,
 502 U.S. 367 (1992)................................................................ *passim*

# TABLE OF AUTHORITIES

<u>Page</u>

*United States v. W. Elec. Co.*,
   46 F.3d 1198 (D.C. Cir. 1995) ........................................................................................14, 15

*Washington Hosp. v. White*,
   889 F.2d 1294 (3d Cir. 1989) .............................................................................................13

*Williams v. Vukovich*,
   720 F.2d 909 (6th Cir. 1983) .............................................................................................13

**FEDERAL RULES**

Fed. R. Civ. P. 23(e) ...............................................................................................................18

Fed. R. Civ. P. 60(b) .................................................................................................12, 13, 14, 15

## INTRODUCTION

Plaintiffs respectfully submit the following Memorandum in Support of Plaintiffs' Unopposed Motion to Modify the Settlement Agreement Cy Pres Provisions, pursuant to Section XXII of the Settlement Agreement in this action. *See* Dkt. No. 576 (Nov. 1, 2010) ("Settlement Agreement"); Aug. 1, 2012 Minute Order (approving Plaintiffs' Unopposed Motion to Modify Settlement Agreement); Plaintiffs' Unopposed Motion to Modify Settlement Agreement, Dkt. No. 621 (July 31, 2012).

After lengthy and constructive negotiations, the parties have reached an agreement on an Addendum to the Settlement Agreement that would serve to modify the cy pres provisions of the Settlement Agreement. The Proposed Addendum, attached hereto as Exhibit A, does not change any of the substantive terms of the Settlement Agreement and does not modify any of the rights of the thousands of Class Members who have already submitted their claims and received the relief authorized by the Settlement Agreement. Instead the proposed amendment will help to ensure that the $380 million of unclaimed settlement funds that remain available for a cy pres distribution under the Settlement Agreement will be distributed in an effective and accountable way.

Rather than distribute the entire cy pres fund now in equal shares to non-profit organizations that assisted Native American farmers and ranchers in the past, as the Settlement currently provides, the Proposed Addendum calls for the creation of a trust that will be endowed by most of the unclaimed settlement funds and that will be directed to distribute the funds over a period not to exceed 20 years to non-profit organizations that have served or will serve Native American farmers and ranchers. Individuals with substantial knowledge of the needs of Native American farmers and ranchers (hereafter referred to as "community leaders") rather than Class Counsel, will oversee the Trust and select recipients of the cy pres distributions in accordance

1

with well-defined parameters, and will ensure that the distributed funds are expended for the agreed-upon purposes.  In addition, under the Proposed Addendum, Class Counsel would recommend to the Court for its approval a faster distribution of $38 million of the unclaimed settlement funds – approximately 10% of the total available cy pres funds – to non-profit groups that have served Native farmers or ranchers prior to November 1, 2010.

The Trust the parties propose to create would operate exclusively for the benefit of Native American farmers and ranchers and would be governed by a Board of Trustees comprised of community leaders with knowledge of agriculture, grant making, investment management and other fields relevant to making grant decisions and managing the Trust.[1]

Although the Plaintiffs proposed to the USDA that the unclaimed settlement funds be distributed to successful claimants or be used to fund a second claims process, the USDA declined to agree to using the funds in those ways.  As the Settlement Agreement requires the agreement of all the parties to modify the Settlement Agreement, those uses of the funds were foreclosed.  *See* Transcript of the Status Conference Before the Hon. Judge Emmet G. Sullivan, United States District Judge at 31-33, Dkt. No. 675 (Nov. 18, 2013) (USDA's counsel stating the government's opposition to distributing cy pres funds to *Keepseagle* claimants and stating that the claimants "were fully compensated for their claims"); Settlement Agreement § XXII.

The current proposal to use the unclaimed funds to endow a Trust, however, will serve the same community of Native American farmers and ranchers that brought this action and will ensure that the cy pres funds are used to serve their agricultural interests and needs.  Moreover,

---

[1] Under the terms of the Addendum, Class Counsel would recommend candidates for the Board of Trustees, which must be approved and appointed by the Court.  The names of approximately 100 individuals have been submitted as Trustee candidates.  Class Counsel are currently vetting the candidates and expect to submit their recommendations to the Court on or before September 30, 2014.

2

in this Circuit the parties' proposal for how to distribute the unclaimed settlement funds constitutes a permissible use of cy pres funds. *See Democratic Cent. Comm. of D.C. v. Washington Metro. Area Transit Comm'n*, 84 F.3d 451, 456 (D.C. Cir. 1996) (approving the distribution of unclaimed settlement funds to non-profit organizations directly and to endow a trust that will, in turn, distribute the funds in the future to other non-profit organizations).[2]

In the following sections of this Memorandum, Plaintiffs discuss the Proposed Addendum, explain why this proposed modified process for disbursing the unclaimed settlement funds will serve the same interests as those served by this action, will entrust the disbursement decisions to community leaders with knowledge of American Indian agricultural needs, and will ensure that the funds are used for permissible purposes. In addition, Plaintiffs address the Court's authority to approve the Proposed Addendum. Finally, Plaintiffs address the issue of whether formal supplemental notice is required in order for the Court to approve the Proposed Addendum, explain that such notice is not necessary, and describe the significant outreach Plaintiffs have undertaken to inform Class Members and the Native American community about the proposed changes to the cy pres terms.

## FACTUAL AND PROCEDURAL BACKGROUND

As the Court is familiar with the factual and procedural background of the Settlement Agreement in the instant action and its cy pres provisions, Plaintiffs refer the Court to the filings that discuss the unexpectedly large amount of unclaimed settlement funds and the claims process that left these funds undisbursed. Plaintiffs' Status Report, Dkt. No. 646 at 4-9 (Aug. 30, 2013).

---

[2] The practice of endowing a trust or foundation to distribute cy pres funds has been followed by courts in this and other Circuits. *See, e.g.*, *Diamond Chem. Co. v. Akzo Nobel Chems. B.V.*, No. 01-2118 (CKK), 2007 U.S. Dist. LEXIS 49406, at *6-7, *15 (D.D.C. July 10, 2007); *Perkins v. American Nat'l Ins. Co.*, No. 3:05-cv-100 (CDL), 2012 U.S. Dist. LEXIS 95039, at *4, *15-16 (M.D. Ga. July 10, 2012).

3

Herein, Plaintiffs describe the Proposed Addendum regarding the cy pres provisions that the parties have agreed upon and for which they seek the Court's approval.

## I.     THE PROPOSED ADDENDUM TO THE SETTLEMENT AGREEMENT

The proposed modifications to the cy pres terms of the Settlement Agreement are set forth in an Addendum.  See Exhibit A.  The proposed amendment is styled as an addendum to the Settlement Agreement, as opposed to an amendment that replaces particular language of the original Settlement Agreement, in order to make it easier for the Court, Class Members, and other interested individuals to understand what the parties are specifically proposing regarding the distribution of the cy pres funds.[3]  Attached hereto as Exhibit B is the Trust Agreement that, upon approval by the Court and submission to a state for incorporation, would establish a Trust to distribute approximately 90 percent of the cy pres funds pursuant to the terms of the Proposed Addendum and the Trust Agreement ("Trust").

Under the Proposed Addendum, instead of the current requirement that distribution of the unclaimed settlement funds be made immediately in equal shares to each of the cy pres beneficiaries, the parties have agreed that approximately 90% of the funds would go to the Trust to be distributed over no more than 20 years, at the direction of an independent Board of Trustees.  However, the parties have agreed that $38 million, approximately 10% of the cy pres funds, would be distributed to eligible non-profit organizations by a more expedited process than the Trust would permit.  The $38 million would be distributed to eligible non-profit groups after approval by the Court upon the recommendation by class counsel within 180 days of the Court's

---

[3] In addition, the use of a separate Addendum avoids creating confusion given the number of provisions in the Settlement Agreement that refer to events happening a set number of days after the Court approves "this Agreement."  If the parties incorporated their new cy pres language into the text of the Agreement and presented it for Court approval in that fashion, they would have to make additional amendments to avoid confusion.

4

approval of this process.[4]

## II.  DISTRIBUTION OF THE INITIAL $38 MILLION OF CY PRES FUNDS

To determine which non-profit organizations Class Counsel will recommend to receive the initial $38 million of cy pres funds, Class Counsel and Plaintiffs intend to undertake a multi-step process that will be fair to potential cy pres beneficiaries and ensure that Class Counsel's recommendations are well-informed and based on a careful analysis about which projects will be most beneficial to Native American farmers and ranchers.

First, Class Counsel will publicize the existence of the $38 million fund and the opportunity for non-profit organizations to submit applications to receive funds.[5]  The publicity will include e-mailing all parties that have previously expressed interest, posting a notice and a copy of the grant application on the case website, www.indianfarmclass.com, e-mailing an announcement of the fund to all federally and state recognized tribes, tribal colleges, and to a list of relevant non-profit groups.  A deadline for submitting grant applications will be established, which is expected to be December 31, 2014 unless the Court approves the Proposed Addendum

---

[4] The Proposed Addendum defines "Initial Cy Pres Beneficiary" as any non-profit organization that (i) has provided agricultural, business assistance, or advocacy services to Native American farmers between 1981 and November 1, 2010, (ii) is either a tax-exempt organization described in Section 501(c)(3) of the Code; educational organization described in Section 170(b)(1)(A)(ii) of the Code; an instrumentality of a state or federally recognized tribe, including a non-profit  organization chartered under the tribal law of a state or federally recognized tribe, that furnishes assistance designed to further Native American farming or ranching activities, provided, however, that the use of any grant funds by such grant recipient shall be restricted exclusively to charitable and educational purposes described in Section 170(c)(2)(B) of the Code; and (iii) is proposed by Class Counsel and approved by the Court. Proposed Amendment § II.A.

[5] With respect to the initial distribution of $38 million, only groups that had provided services to Native American farmers and ranchers before the Settlement Agreement was executed on November 1, 2010 may receive cy pres funds—a temporal limitation that is the same as under the current Settlement Agreement.  *See* Settlement Agreement § II.I.  This provision is designed to ensure that only groups with an established track record will receive funds during this initial round of funding.

5

after October 31, 2014.  Once applications are submitted, an advisory committee composed of

five members who have a deep commitment to and knowledge of the Native American farming

and ranching community and professional grant making practices in Indian Country[6] will review

the grant applications and make recommendations to Class Counsel on which applications to

fund and in what amounts.  Class Counsel will review the recommendations of the advisory

committee and then submit those recommendations or modified recommendations to the Court

for its approval.

## III.   CREATION AND OPERATION OF THE TRUST TO DISTRIBUTE THE BALANCE OF THE $380 MILLION OF CY PRES FUNDS

Under the Proposed Addendum, the balance of the cy pres funds, approximately $342

million, would be transferred to the Trust, which would be established pursuant to the Trust

Agreement, attached as Exhibit B ("Trust Agreement").

The mission of the Trust would be "to make grants to Eligible Grant Recipients . . . to

fund the provision of business assistance, agricultural education, technical support, and advocacy

services to Native American farmers and ranchers to support and promote their continued

engagement in agriculture."  Trust Agreement § 7, Ex. B.

In general, the same types of organizations will be eligible to receive cy pres funds under

the Proposed Addendum as under the existing Settlement Agreement – non-profit organizations

that provide agricultural, business assistance, or advocacy services to Native American farmers

---

[6] The Advisory Committee will be composed of the following individuals who are serving in their individual capacities, but whose relevant professional affiliations are noted: (1) Claryca Mandan, *Keepseagle* class representative (2) Porter Holder, *Keepseagle* class representative and Vice Chair of the Council for Native American Farming and Ranching, which was established as a result of the *Keepseagle* Settlement; (3) Mark Wadsworth, Chair of the Council for Native American Farming and Ranching; (4) Carly Hare, Executive Director of Native Americans in Philanthropy; and (5) Gary Cunningham, former Vice President at Northwest Area Fund, current Executive Director of the Metropolitan Economic Development Association.

and ranchers.   The Proposed Addendum, however, would expand the types of organizations eligible to receive distributions from the Trust to include educational institutions and new organizations that serve Native farming and ranching but may not have existed when the Settlement Agreement was originally executed.  Addendum § II.B; Trust Agreement § 8. *See* Trust Agreement § 8(a)(2).  The provision of legal services, except for litigation, may also be supported by funds disbursed by the Trust.  *Id.* §§ 7, 9(e).  In addition, certain instrumentalities of tribal governments would be eligible to receive distributions from the Trust so long as provision is made to ensure the funds are used for charitable and educational purposes in support of Native American farmers and ranchers.  *Id.* § 8(a)(4); Addendum § II.B.

The proposed amendment retains the same constraints on the purposes for which the unclaimed settlement funds may be used that currently exist in the Settlement Agreement – to provide business assistance, agricultural education, technical support, and advocacy services to Native American farmers and ranchers, including those seeking to become farmers and ranchers. *See* Addendum § II.B.

The Trust would intend to qualify for recognition as a 501(c)(3) tax-exempt organization under the Internal Revenue Code, would be administered in order to exempt earnings from the invested funds from federal taxation, and would be operated exclusively for charitable and educational purposes.  Trust Agreement § 5(a).  The Trust would terminate no later than 20 years and six months after this Court approves the Proposed Addendum to the Settlement Agreement and the approval becomes effective.  Addendum § II.B; Trust Agreement § 10.  The situs of the Trust would be North Dakota, and the Trust would be governed by the laws of North Dakota.

Trust Agreement § 14. [7]  Under the Trust Agreement, the Trust could not lobby, engage in political activity, make grants to support litigation, or engage in self-dealing.  *Id.* § 9.

The Trust initially would be governed by 13 Trustees who would operate the Trust in a professional manner and represent the varied interests of the Native American farming and ranching community throughout the United States.  Under the Trust Agreement, at least two-thirds of the Trustees would "have substantial knowledge of agricultural issues, the needs of Native American farmers or ranchers, or other substantive knowledge relevant to accomplishing the Trust's Mission."  *Id*. § 13(f)(1).  At least one Trustee would "have professional financial and investment experience.  *Id.* § 13(f)(2).  And at least one Trustee would "have professional grantmaking experience."  *Id.* § 13(f)(3).

The Trustees would hold staggered terms; after the first set of Trustees, who would have terms of two, three or four years to create the staggered terms, each subsequent term would be three years.  *Id.* § 13(c).  The Trust Agreement provides that no Trustee may serve more than two consecutive terms or serve more than three terms overall.  And any Trustee could be removed for cause by a vote of the majority of the Trustees.  *Id.* § 13(e).  The Trust Agreement limits the compensation of the Trustees to prevent the Trust from spending excessive amounts of its resources on administration.  Initially, Trustees would be compensated in amounts not to exceed $10,000 per year for performing their ordinary duties, with adjustments allowed for inflation over time.  *See id.* § 13(h)(1).  Like other Trusts, this Trust would be required to hold annual meetings, be empowered to form advisory committees, and be authorized to employ staff in order to carry out the work of the Trust, evaluate and fund grant proposals, hold grant recipients

---

[7] Class Representative Claryca Mandan and a substantial number of other Class Members are residents of North Dakota, providing that state with a substantial nexus to the Trust.  While other states have Class Members, North Dakota has a well-developed body of trust law that makes it a suitable choice to effectuate the purposes of the Trust.

accountable for the manner in which they expend the funds they receive, and analyze the needs

of the Native American community for various types of programs.  *Id.* § 8, 12, 13.

<u>**ARGUMENT**</u>

**I.      THE PROPOSED ADDENDUM WILL MAKE THE CY PRES DISTRIBUTION
MORE EFFECTIVE, ACCOUNTABLE, TRANSPARENT AND BENEFICIAL
THAN UNDER THE CURRENT AGREEMENT**

Use of a Trust governed by community leaders and authorized to distribute the cy pres

funds over an extended time period better serves the interests of the Class than the current terms

of the Settlement Agreement that provide that the funds be disbursed in equal amounts and

within a brief time period to recipients selected by Class Counsel.  *See* Plaintiffs' Status Report,

Dkt. No. 646 at 4-9 (Aug. 30, 2013).

First, the Proposed Addendum would transfer decision-making authority over distribution

of 90% of the remaining funds from Class Counsel to a Board of Trustees with expertise in

agriculture and the specific needs of Native American farmers and ranchers.  The proposed

Board of Trustees will have far greater expertise, permitting better decision-making about how

the funds can be used most effectively.  Because the Board will include Native leaders, it should

command greater trust and confidence from the community it seeks to serve.

Second, Plaintiffs anticipate that the creation of the Trust, which can employ professional

staff, would permit a thorough needs assessment to identify areas that warrant funding.

Moreover, such staff provides for accountability and transparency to ensure that the Trust has as

beneficial an impact as possible and that granted funds are used as intended.  Non-profit

organizations that seek funds from the Trust would be required to submit detailed grant

proposals, and the Trust's staff and Trustees would analyze those proposals and determine which

applications should be funded.  There would also be regular reporting by the grant recipients and

oversight by the Trust's staff to ensure that grantees use the funds as promised and also to assess

the impact of the funds and programs.  This type of analysis would permit the Trust to identify

which programs are most effective, and thus inform future decisions about grants.  Over time,

these procedures would help to ensure that the cy pres funds are appropriately used for the

specific purposes set forth in the Settlement Agreement, and that the funds disbursed and spent

by national, regional, and local organizations are consistent with the capacity of the relevant

organizations to deliver quality services and assistance to Native American farmers and ranchers.

Third, the Trust is authorized to disburse the funds over an extended period of time, if the

Trustees elect to do so, permitting the funds to serve the needs contemplated by the Settlement

Agreement.  The Trustees would decide how quickly to spend down the principal, consistent

with the goal of putting cy pres money to use in a timely fashion, which would affect the amount

of interest that could be generated each year.  Nonetheless, it is reasonable to expect that, for

most of its existence, the funds would generate interest well in excess of the cost of running the

Trust, providing additional resources for distribution.  Consequently, the Trust would create the

opportunity to distribute a greater amount of overall funds to non-profits that serve Native

American farmers and ranchers than the amount of the initial endowment.

Fourth, the Trust would be permitted to disburse funds to eligible non-profits that

currently exist and those that do not yet exist, stimulating development of organizations to serve

Native farmers and ranchers in areas that may currently be underserved.  Today there are

numerous places in Indian Country where not a single non-profit organization provides

assistance to Native American farmers and ranchers.  The Trust would have the resources and the

staff to provide seed funding to new non-profits and help them grow into viable organizations

that help Native American farmers and ranchers even after the Trust has completed its work.

Finally, the Proposed Addendum would avoid pitfalls inherent in the original cy pres

provision, such as the rigid regime currently in place that would require distribution in equal amounts to each organization.  Instead, the Trust would permit disbursement of funds to organizations in amounts that serve the actual and varied needs of each program.

The Proposed Addendum serves the same goal as the *Keepseagle* litigation:  to overcome the effects of longstanding discrimination by assisting Native farmers and ranchers to become more successful in agriculture.  Whereas many Native American farmers and ranchers currently receive little or no assistance with their businesses, the resources that they would receive from the Trust over a multi-year period could dramatically change that dynamic and ensure that Native American farmers and ranchers have a significant and sustained connection to national, regional, and local non-profit groups that deliver critically needed services, education, advocacy, and assistance.  New farmers and ranchers, who face a range of challenges in obtaining land, capital, equipment, and the knowledge needed to embark upon a career in farming or ranching, may also benefit from the Trust.

## II.  THE COURT MAY APPROVE THE PROPOSED AMENDMENT PURSUANT TO SECTION XXII OF THE SETTLEMENT AGREEMENT

The modifications to the Settlement Agreement that the parties propose may be approved by the Court pursuant to Section XXII of the Agreement.  Under that section, "[t]his Settlement Agreement may be modified only with the written agreement of the Parties and with the approval of the District Court, upon such notice to the Class, if any, as the District Court may require." Settlement Agreement § XXII.

The parties previously agreed to a modification of the Settlement Agreement, which the Court approved, pursuant to this provision of the Agreement.  In July 2012, Plaintiffs proposed, with USDA's consent, that the Settlement Agreement be amended to allow the earlier distribution of Track A awards and to permit the Track B neutral additional time to complete its

evaluation of a small number of Track B claims.[8]  *See* Dkt. No. 621 at 1.  The Court approved

the amendment in an August 1, 2012 Minute Order.  As in July 2012, here the Parties have

reached a written agreement on a proposed amendment, which is the only prerequisite to seek the

Court's approval of the amendment.[9]  While the Court *may* approve the Addendum based on the

parties' agreement alone, Rule 60(b)(5) affords an additional basis on which to permit the

proposed amendment.

## III.    THE COURT MAY MODIFY THE AGREEMENT UNDER RULE 60(B)(5)

In addition to the Court's authority to modify the Settlement Agreement under Section

XXII, the Court may modify the Settlement Agreement pursuant to Rule 60(b)(5) of the Federal

Rules of Civil Procedure.  *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 384-85 (1992);

*In re Black Farmers Discrim. Litig.*, 2014 U.S. Dist. LEXIS 29062, at *7 (describing Rule

60(b)(5) as an alternative way of modifying a settlement agreement that had a provision

expressly requiring the parties' approval for any modification); Fed. R. Civ. P. 60(b)(5).

Rule 60(b)(5) provides that "[o]n motion and just terms, the court may relieve a party or

its legal representatives from a final judgment" when "applying it prospectively is no longer

equitable[.]"  Fed. R. Civ. P. 60(b)(5).  Courts apply the principles of Rule 60(b)(5) to consent

decrees as well as to settlement agreements that have been entered as part of a final judgment in

---

[8] This amendment was made under exigent circumstances where a severe drought created a pressing need for making funds available as soon as possible and the Track A determinations had been completed, but the Neutral needed time to complete the Track B determinations.

[9] Consistent with this Court's prior modification of the *Keeepseagle* Settlement Agreement, in a recent opinion U.S. District Judge Friedman indicated that the same language in the second black farmers' settlement agreement providing that the agreement "may be modified only with the written agreement of the Parties and with the approval of the Court" means that this provision can be invoked to modify the settlement agreement independent of the relief available pursuant to Rule 60(b) of the Federal Rules of Civil Procedure.  *See In re Black Farmers Discrim. Litig.*, No. 08-0511 (PLF), 2014 U.S. Dist. LEXIS 29062, at *7 (D.D.C. Mar. 5, 2014).

a federal court. *See, e.g.*, *In re Black Farmers Discrim. Litig.*, 2014 U.S. Dist. LEXIS 29062, at

*8-10 (applying Rule 60(b)(5) to a settlement agreement, and inserting the term "settlement

agreement" when quoting prior cases that applied Rule 60(b)(5) to consent decrees).[10]

In *Rufo*, the Supreme Court held that a consent decree or settlement agreement may be

modified pursuant to Rule 60(b)(5) under several circumstances: (1) "when changed factual

circumstances make compliance with the decree substantially more onerous"; (2) "when a decree

proves to be unworkable because of unforeseen obstacles"; or (3) "when enforcement of the

decree without modification would be detrimental to the public interest[.]" *Rufo*, 502 U.S. at

384-85.

With respect to the "unforeseen obstacles" standard, the *Rufo* Court rejected any

expectation that the facts must be *both* unforeseen and unforeseeable to modify a decree under

Rule 60(b)(5), rejected any requirement that a party needs to show a grievous wrong to justify

relief, and made clear that a party may be entitled to relief if the relevant circumstances were not

anticipated. *Id*. at 386.[11]  Furthermore, the *Rufo* Court held that once a party has shown that

changed factual circumstances warrant relief, the "district court should determine whether the

proposed modification is suitably tailored to the changed circumstance." *Id*. at 391.  In other

words, modification of a decree should be "tailored to resolve the problems created by the

---

[10] *See also Halderman v. Pennhurst State Sch. & Hosp.*, 901 F.2d 311, 318 & n.9 (3rd
Cir. 1990) (noting that a settlement "is the functional equivalent, and has the same effect as, a
consent order or consent decree") (following *Washington Hosp. v. White*, 889 F.2d 1294, 1299 &
n. 9 (3d Cir. 1989) ("[a] court must be able to protect the integrity of a stipulation of dismissal
that is functionally the equivalent to a consent order or consent decree when it has retained
jurisdiction"); *Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir. 1983) ("A consent decree is
essentially a settlement agreement subject to continuing judicial policing.").

[11] Even if it is "clear" that a party seeking relief actually anticipated the changing
conditions, it still may obtain relief under Rule 60(b)(5) if "it agreed to the decree in good faith,
made a reasonable effort to comply with the decree, and should be relieved of the undertaking
under Rule 60(b)." *Rufo*, 502 U.S. at 385.

change in circumstances." *Id.* The "'less stringent . . . standard'" that *Rufo* adopted for providing relief under Rule 60(b)(5) was "intended to meet the 'need for flexibility in administering consent decrees.'" *United States v. W. Elec. Co.*, 46 F.3d 1198, 1203 (D.C. Cir. 1995) (quoting *Rufo*, 502 U.S. at 380).

Under the instant circumstances, it is appropriate to modify the Settlement Agreement cy pres provisions based on "unforeseen obstacles" that make those provisions of the Settlement Agreement "unworkable," especially the requirements that all cy pres beneficiaries receive equal shares of the cy pres funds and that there be a single distribution of all of cy pres funds. *Rufo*, 502 U.S. at 384.

First, the parties did not foresee that the claims filed by Native American farmers and ranchers would leave $380 million in unclaimed funds that are subject to a *cy pres* distribution. When the parties entered into the Settlement Agreement in October 2010, Plaintiffs expected that sufficient Class Members would file claims such that all or nearly all of the settlement funds would be distributed to Class Members.

The Plaintiffs' expectations were based on numerous factors, including the federal government's estimates of the number of Native Americans engaged in farming and ranching and the number of claims filed in the *Pigford* litigation under a similar claims process. Given that the most recent Census of Agriculture reports that there are more than 61,000 Native American farm or ranch operations in the United States and that an even higher number of Native Americans farmed or ranched since 1981, the parties expected that a larger number of Native American farmers or ranchers would file claims, leaving little or no funds remaining to be distributed pursuant to the cy pres provision. *See* U.S. Census of Agriculture, Table 55, Selected Farm Characteristics by Race (2007). Indeed, the Settlement Agreement contemplated that the

14

claims filed might have sought funds in excess of the available funds and, in such event,

provided that claimants who succeeded in their claims would have received a pro rata share of

damages awardable for their Track A or Track B claims. Settlement Agreement § IX.F.[12]

While the parties certainly anticipated that at least several million dollars might be

available after all claims were paid, that about half of the funds paid in settlement of this action

would remain unclaimed and be available for a cy pres distribution was not "reasonably

anticipated" by the parties. *W. Elec. Co.*, 46 F.3d at 1205 (stating that "[t]he focus of Rule

60(b)(5) is not on what was possible, but on what the parties and the court reasonably

anticipated"). Indeed, the rigid regime for the distribution of the unclaimed settlement funds

currently in the Agreement, requiring the funds to be distributed in equal amounts to approved

recipients, reflects the expectation that small amounts would be distributed to organizations

without regard to their overall size or the needs of their programs, rather than the large size of the

funds that actually remain unclaimed. *See* Settlement Agreement § IX.F.7.

Furthermore, courts routinely modify consent decrees or settlement agreements in light of

significant changes in the number of expected beneficiaries or participants that impact the

feasibility of implementing the decree. *See Rufo*, 502 U.S. at 385 (remanding for lower court to

consider whether the parties anticipated an increase in the prison population that made a

provision of the consent decree requiring single-cell occupancy unworkable); *Pigford v.*

*Veneman*, 292 F.3d 918, 925 (D.C. Cir. 2002) (suggesting that a significant difference in the

number of class members who file claims in a settlement could justify relief under Rule 60(b)(5),

but declining to reach the issue as it had not been raised below, and also noting that there

---

[12] Plaintiffs have previously discussed the reasons why they believe that the actual number of timely claims – fewer than 4,500  – was far smaller than the parties anticipated.  Dkt. No. 646 at 5 n.3.

actually was only a small difference in the number of class members who filed claims).

Second, the unforeseen circumstance of having $380 million available for a cy pres distribution renders several aspects of the existing cy pres provisions unworkable. *Rufo*, 502 U.S. at 384.

After carefully researching and examining the modest number of non-profit organizations that *currently* qualify as cy pres beneficiaries under the existing Settlement Agreement, Plaintiffs and Class Counsel have discerned that those organizations do not, as a whole, provide services to all Native American farmers and ranchers.  Thus, limiting distribution to existing organizations would necessarily mean some portions of the Native farming and ranching community would not be well served.  Moreover, a distribution in equal shares would result in national, regional, and local organizations receiving the same amount of cy pres funds, despite vast differences among those organizations in the geographic scope of their programs, the number of Native American farmers and ranchers they serve, and their capacity to manage and spend the funds, among other significant differences.

A one-time distribution would limit the impact to addressing existing needs, and provide no resources to address future and currently unforeseen needs.  Moreover, distribution under the existing cy pres provision rather than through a Trust would provide no mechanism for oversight nor ensure that the organizations receiving the funds use them as intended.  Accordingly, implementing the existing cy pres provisions, including the provision that the funds be distributed in equal shares and at the same time to existing non-profit organizations, would significantly diminish the effectiveness and accountability of the cy pres distribution.  *See supra* at 9-11.

Third, Plaintiffs have proposed modifications that are "suitably tailored to the changed

16

circumstance." *Rufo*, 502 U.S. at 391.  The modifications described above, *supra* at 4-9, would permit creation of a Trust that would serve the Native American farming and ranching community, professionally manage the substantial amount of unclaimed funds, and ensure that the funds can be disbursed to meet the varied needs in Indian Country.  Having an immediate $38 million cy pres distribution and the endowment of a Trust that operates for up to 20 years will be far more effective, accountable, and beneficial for Native American farmers and ranchers than the current approach of distributing equal shares of $380 million to the limited number of non-profit organizations that currently qualify as cy pres beneficiaries.  *See supra* at 1-3, 9-11.

Furthermore, the proposal to create a Trust that would distribute the cy pres funds over a period of time comports with the jurisprudence of this and other circuits permitting cy pres funds to be distributed to non-profit organizations through an endowed "trust fund."  *Democratic Cent. Comm.*, 84 F.3d at 456 (stating that one of the several options for a cy pres distribution is the "establishment of a '[] trust fund'" under which "the court appoints a board of trustees and deposits the funds with them," and the "trustees then create an organization through which it finances projects beneficial to the injured [plaintiffs] and those similarly situated.").[13]  And using a trust to distribute most of the cy pres funds is not a major change in the *type* of cy pres distribution, as the D.C. Circuit regards as comparable the distribution of cy pres funds to non-

---

[13] *Diamond Chem. Co.*, 2007 U.S. Dist. LEXIS 49406, at *6-7, *15 (applying *Democratic Central Committee* to establish an endowment fund for the creation of a Center for Competition Law with leftover funds from antitrust settlement); *Perkins*, 2012 U.S. Dist. LEXIS 95039, at *4, *15-16 (ordering that a portion of remaining funds from class action be distributed to a foundation to "establish a fund for the charitable purpose of administering grants to national, regional and/or local organizations that would use the grants to educate and/or advocate for consumers who, due to their limited educational background and/or modest financial resources, are particularly susceptible to being victimized in consumer transactions"); *In re Folding Carton Antitrust Litig.*, 1991 U.S. Dist. LEXIS 2553, at *2-8 (N.D. Ill. Mar. 5, 1991) (distributing unclaimed antitrust class settlement funds to National Association for Public Interest Law for fellowships unrelated to antitrust law).

profits organizations directly, as the Agreement currently provides, and through a trust, which the proposed amendment would permit.   *See id.*

Finally, the proposed modification of the Settlement Agreement will not cause prejudice warranting denial of the modification.  Because the existing Settlement Agreement does not provide that unclaimed funds be returned to the USDA, changing the procedures of the cy pres distribution under the Settlement Agreement does not unduly impact USDA's interests or rights. In fact, UDSA has consented to the Proposed Addendum, after collaborating with Plaintiffs and Class Counsel to design an Addendum to the Settlement Agreement, a Trust Agreement, and a Trust that will maximize the benefits of the cy pres funds to the entire class (whether successful claimants or not).  Nor would the Proposed Addendum cause prejudice to non-profit organizations interested in receiving cy pres grants.  Because the amounts of funds that would be distributed by the proposed trust will be no less, and because of investment interest earned, may be greater than the funds currently available for distribution, these organizations will have the same or greater opportunities to receive cy pres funds.  Thus, these organizations and the people whom they serve would benefit from the Proposed Addendum.

## IV.    THE COURT MAY APPROVE THE PROPOSED AMENDMENT WITHOUT REQUIRING SUPPLEMENTAL NOTICE

Although the Settlement Agreement gives the Court discretion to order supplemental notice in the case of an amendment proposed by the parties, the Settlement Agreement does not prescribe the circumstances when supplemental notice should be given.  In the absence of a legal standard prescribed by the Settlement Agreement, the general legal principles governing the need for notice under Rule 23(e) of the Federal Rules of Civil Procedure should guide the Court here. Application of those principles here leads to the conclusion that supplemental notice is not necessary and should not be required.

18

It is widely recognized that supplemental notice "is only required where the amendment to the settlement agreement would have a material adverse effect on the rights of class members." *In re Diet Drugs*, MDL No. 1203, 2010 U.S. Dist. LEXIS 66879, at *17 (E.D. Pa. 2010) (citing *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, n.10 (D.N.J. 1997), *aff'd* 148 F.3d 283 (3d Cir. 1998)).

Thus, courts routinely decline to issue supplemental notice when a modification to a settlement agreement is not material, would not adversely affect the rights of class members, or would actually *expand* the rights of class members. *See, e.g.*, *Jones v. Gusman*, 296 F.R.D. 416, 467 (E.D. La. 2013) (holding no supplemental notice was required as the "minor modifications" to agreement "did not impair the class members' rights even indirectly, and the modifications certainly did not constitute a material change with respect to the class members") (citing *In re Baby Products Antitrust Litig.*, 708 F.3d 163, 175 n.10, 182 (3d Cir. 2013) (holding that supplemental notice is not required to inform class members of the specific cy pres recipients selected by the parties, when the original notice identified the possibility of a cy pres award), and *In re Integra Realty Res., Inc.*, 262 F.3d 1089, 1111 (10th Cir. 2001) (holding no additional notice needed where amendment "merely expanded the rights of class members")); *In re Diet Drugs*, 2010 U.S. Dist. LEXIS 66879, at *17-18  (no supplemental notice required where modification "provides many additional benefits").

Courts consider a modification to materially and adversely affect the rights of class members – and thus require supplemental notice – when the modification would reduce the payments some class members would receive or take away other important rights, such as the right to opt-out. *See, e.g.*, *In re Diet Drugs Prods. Liab. Litig.*, 226 F.R.D. 498, 501, 518 (E.D. Pa. 2005) (ordering supplemental notice where amendment "makes material changes to the

19

Settlement Agreement in that it reduces payment amounts to certain eligible class members and extinguishes certain opt-out rights").

Here, the proposed amendment falls squarely on the side of not requiring supplemental notice.  The proposed amendment will not adversely affect the rights of any Class Members in *any* way, let alone in a material way, as a modification to the procedures for distributing the cy pres funds will not affect the rights of Class Members to receive the payments permitted by the Settlement Agreement.

Under the Settlement Agreement, each Class Member who did not opt out had the opportunity to receive up to $50,000 (plus an additional 25% or $12,500 to pay income taxes) under Track A or up to $250,000 under Track B, and, if they succeeded in either track, to have all of their eligible Farm Service Agency debt forgiven.  The Settlement Agreement was clear, however, that each successful claimant under Track A would be limited to an award of no more than $50,000 plus 25% tax relief and each successful claimant under Track B would be limited to an award of $250,000 without tax relief.  *See* Settlement Agreement § IX.F.3.  Likewise, the Settlement Agreement was clear that any unclaimed funds would be distributed as cy pres awards to non-profit organizations that serve Native American farmers and ranchers, regardless of the amount of unclaimed funds that remained after the monetary relief was distributed to successful claimants.  Settlement Agreement § IX.F.7.

Like the Settlement Agreement, the detailed notice that was mailed to potential Class Members and the summary publication notice that was disseminated throughout the country made clear that there were specific limits on the amount of monetary relief that successful claimants could receive and that *all* unclaimed funds would be distributed to one or more non-profit organizations.  For example, Question 10 of the Notice described how much each person

1922789.4

could receive under Track A and Track B, stating that Track A claimants "may get a payment up to $50,000 for your discrimination claim" and "will also be eligible to get an additional 25% of the amount which will be paid directly to the IRS," and stating that Track B claimants "may get a payment up to $250,000 for your discrimination claim."  Detailed Notice at 7, attached as Ex. C.[14]  The Detailed Notice was also clear that the unclaimed funds would be distributed to eligible non-profit organizations, as the answer to Question 8 in the Notice stated that "If any money remains in the Settlement Fund after all payments to class members and expenses have been paid, then it will be donated to one or more organizations that have provided agricultural, business assistance, or advocacy services to Native Americans."  *Id.* at 6.  The one-page Publication Notice also stated the same information about caps on monetary relief and that any unclaimed funds would be "donated to one or more organizations that help Native American farmers and ranchers."  Publication Notice, attached as Ex. D.

None of the rights of Class Members to receive monetary relief and debt relief under Track A and Track B will be compromised or reduced by a single penny by the proposed creation of a trust to distribute the unclaimed funds.  To date, each Class Member had an opportunity to file a timely Track A or Track B claim, and all successful claimants have already received the monetary relief to which he or she is entitled under the Settlement Agreement.  As such, an amendment that changes the procedures and timing for distributing the cy pres funds does not have an legally cognizable impact on the rights of Class Members that have already

---

[14] Before and after final approval, Class Counsel and the Settlement Administrator reiterated the limits on monetary relief to Class Members and other individuals who made inquiries or attended hundreds of public meetings held by Class Counsel.  Moreover, when Class Members submitted claim forms under Track A and Track B, they acknowledged on the form that they "finally release USDA from any and all claims and causes of action that have been or could have been asserted against the Secretary by the proposed Class and the Class Members in the Case arising out of the conduct alleged therein."  Keepseagle Claim Form at 3.

21

been exercised and fully satisfied under the Settlement Agreement.  Simply put, because the

Class Members have received all relief that the Settlement Agreement provided them, the

proposed amendment cannot adversely affect their rights as a matter of law.  To the extent that

Class Members may consider the distribution of the cy pres funds to be a right of individual

Class Members under the Settlement Agreement, none of those rights will be impaired in any

way.  The proposed amendment will only change the procedures and timing for distributing the

cy pres funds.

While the plaintiffs and class counsel recognize that some class members would prefer

that the unclaimed funds be distributed as additional damages to those claimants who succeeded

in their original claims or to fund a second claims process, neither option was originally provided

in the Settlement Agreement and the USDA has declined to agree to use the funds for either

purpose.  As such, the changes to the cy pres provision proposed do not affect the individual

rights of any class member to receive relief that was not already permitted and provided by the

Settlement Agreement the terms of which they were previously provided extensive notice.

In sum, although the amount of cy pres funds available for distribution is higher than the

Parties expected, the Settlement Agreement, notice and other communications to Class Members

have been unequivocal that any unclaimed funds would be distributed to eligible non-profit

organizations, not to individual class members.  Before final approval was entered, Class

Members received "reasonable and adequate notice" about the Settlement pursuant to the Court-

approved notice plan, which provided specific information about the amount of monetary relief

that Class Members could receive and about the cy pres provisions.  Order on Plaintiffs' Motion

for Final Approval of Settlement, Dkt. No. 606 at 2 (Apr. 28, 2011).  None of the rights of Class

Members will be adversely affected by the Proposed Addendum.  Accordingly, it is not

necessary to require the parties to provide Class Members with formal, supplemental notice of the Proposed Addendum that merely affects the procedures and timing for the distribution of the cy pres funds that are available under the current version of the Settlement Agreement that this Court approved in April 2011.

## V.    THE PLAINTIFFS HAVE FULLY INFORMED CLASS MEMBERS AND THE BROADER NATIVE AMERICAN COMMUNITY ABOUT THE PROPOSED MODIFICATION OF THE CY PRES PROVISIONS

Although supplemental notice is not required, Plaintiffs nevertheless have provided extensive notice of the proposed changes to the Settlement Agreement to the Class and have undertaken a major campaign to educate Class Members and other members of the Native American community about the changes to the cy pres provisions that Plaintiffs are proposing, to consider the views of all stakeholders regarding the disposition of the cy pres funds, to solicit candidates to serve as Trustees of the proposed Trust, and to inquire about the needs that the Trust distributions would best serve.

Toward that end, Plaintiffs and Class Counsel undertook the following steps to provide notice of the proposed changes to the Settlement Agreement.  On July 7, 2014, Plaintiffs posted on the *Keepseagle v. Vilsack* case web site, IndianFarmClass.com, a description of the proposed changes to the Settlement Agreement set forth herein, posted a copy of Plaintiffs' Status Report to the Court on August 30, 2013 in which they explained why the proposed Trust is preferable to the existing procedure provided by the Agreement, and announced a series of meetings to solicit the views of Native farmers and ranchers.

Moreover, on July 23, 2014, Plaintiffs directed the Claims Administrator to mail all *Keepseagle* claimants (successful and unsuccessful) a notice that summarized the changes to the cy pres provisions that the Plaintiffs are proposing and invited those individuals to attend any of eight in-person informational meetings planned throughout the country or any of three

conference calls.  The web site and the written notice to the claimants also provided an e-mail address, physical address, and a phone number of Class Counsel for any individuals to submit their comments in writing or by telephone.  In addition, a notice about the public meetings was distributed to all tribal governments (both federally recognized and state recognized) and a large number of non-profit organizations serving the Native American community, tribal colleges, and Native media outlets.

The in-person informational meetings took place between July 30 and August 26, 2014 in Tulsa, OK, Albuquerque, NM, Phoenix, AZ, Rapid City, SD, Bismarck, ND, Spokane, WA, Billings, MT, and Raleigh, NC, and the conference calls occurred on August 6, 16, and 20, 2014. Each of these meetings spanned an entire day, while each call lasted three hours, and included presentations, questions and answers, and remarks by Class Members and members of the public. Class Counsel attended each of these meetings to make presentations, address the issues raised by all stakeholders, and consider any remarks, and Class Representatives attended six of the eight in-person meetings.  All of these meetings were well attended, with hundreds of individuals attending meetings in most cases, confirming that Class Members and other members of the public had been well informed about the meetings and the instant proposed amendment.

Finally, Plaintiffs and Class Counsel have frequently interacted and communicated with national, regional, and local Native American organizations about the proposed changes to the cy pres provisions of the Settlement Agreement.

The comments of Class Members and Native American leaders have informed Class Counsel and Plaintiffs as they finalized the Trust Agreement and the Proposed Addendum, and had a meaningful impact on the way that the Trust has been designed.

24

1922789.4

While many Class Members had thoughtful suggestions about how best to structure the Trust and distribute the cy pres funds to non-profit organizations, most Class Members who spoke at these meetings expressed their preference that some or all of the cy pres funds be distributed directly to Class Members who filed claims.  There was variation among those who pressed that the cy pres funds be distributed directly Class Members, as some urged that the funds be distributed directly to the successful claimants, others asked that the funds be distributed to claimants who had not been successful, and still others spoke in favor of creating a second claims process for Class Members who never filed claims during the original claims process.

Attached hereto as Exhibit E is a report that summarizes all of the comments from the meetings, as well as comments received by phone, email and regular mail.  The comments are grouped by theme or recommendation.  *See* Keepseagle Listening Sessions, Summary Report, Prepared for Keepseagle Class Counsel by Indigenous Food & Agriculture Initiative, University of Arkansas School of Law (September 2014), Ex. E.  The Report shows that more than 200 individuals recommended that prevailing claimants receive additional monetary relief, nearly 350 individuals highlighted particular needs of Native American farmers and ranchers, and over 100 individuals made recommendations about how the Trust should be operated.  *Id.* at 4.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Unopposed Motion to Modify the Settlement Agreement Cy Pres Provisions should be granted.  Plaintiffs have attached a proposed order that would approve the proposed modification in the form of the Proposed Addendum, including the Trust Agreement that is attached to the Addendum.

1922789.4

September 24, 2014                    Respectfully submitted,


By /s/ Joseph M. Sellers
Joseph M. Sellers, Bar No. 318410        Paul M. Smith, Bar No. 358870
Christine E. Webber, Bar No. 439368      Jessica Ring Amunson, Bar No. 497223
Peter Romer-Friedman, Bar No. 993376     Carrie F. Apfel, Bar No.
COHEN MILSTEIN SELLERS &                  JENNER & BLOCK LLP
   TOLL PLLC                              1099 New York Ave., N.W.
1100 New York Avenue, N.W.                Suite 900
Suite 500, West Tower                     Washington, DC 20001-4412
Washington, DC 20005                      Telephone: (202) 639-6000
Telephone: (202) 408-4600                 Facsimile: (202) 639-6066
Facsimile: (202) 408-4699


David J. Frantz, Bar No. 202853          Phillip L. Fraas
CONLON, FRANTZ & PHELAN                   STINSON LEONARD STREET
1818 N Street, N.W.                       1775 Penn. Ave. NW
Suite 400                                 Suite 800
Washington, DC 20036-2477                 Washington, DC 20006
Telephone: (202) 331-7050                 Telephone: (202) 785-9100
Facsimile: (202) 331-9306                 Facsimile: (202) 572-9946


Sarah Vogel
SARAH VOGEL LAW OFFICE
1203 North 2nd St.
Bismarck, ND 58501
Telephone: (701) 355-6521
Facsimile:  (701) 425-0155


*Attorneys for Plaintiffs*

1922789.4