**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

```
_____
                                    )
MARILYN KEEPSEAGLE, et al.,         )
                                    )
              Plaintiffs,           )
                                    )
       v.                           ) Civil Action No. 99-3119 (EGS)
                                    )
TOM VILSACK, Secretary, U.S.        )
Department of Agriculture,          )
                                    )
              Defendant.            )
_____ )
```

<u>**MEMORANDUM OPINION**</u>

Pending before the Court are two motions to intervene in this case. Both groups of putative intervenors seek to participate in proceedings regarding the Court's consideration of a pending motion to modify the *cy pres* provisions of the 2011 agreement that resulted in the settlement of this class action ("the Agreement"). First, the Choctaw Nation of Oklahoma and its affiliated Jones Academy Foundation ("the Choctaw Movants") seek to intervene on the basis of their concern that the proposed modification will adversely affect their opportunity to receive *cy pres* funds. Second, a group of class members who successfully obtained compensation under the Agreement (calling themselves "the Great Plains Claimants") seek intervention due to their concern that Class Counsel has failed to request a modification that would provide for additional payments to them.

Both motions raise questions regarding the requirements for intervening in post-judgment proceedings involving *cy pres* distributions. In this case, the Agreement created a *cy pres* fund to distribute any leftover funds. That portion of the Agreement was not objected to, and no appeal was filed from the Court's approval of it. So this is not a case where parties seek to intervene to address whether *cy pres* is appropriate in the first instance. The narrow issue before the Court is modification: Should the *cy pres* provisions of the Agreement be modified and, if so, how? It is on this issue that the putative intervenors seek to be heard as parties.

The Choctaw Movants desire to maintain the *status quo*. They oppose the proposed changes to the procedures for distributing *cy pres* funds. In doing so, they assert that they have a legal right to the *cy pres* funds, despite being neither members of the class nor otherwise connected to the Agreement. The Choctaw Movants lack standing, however. For one, it is highly speculative that the proposed modification would harm, rather than help, their ability to compete for a portion of the *cy pres* funds. In any event, the Choctaw Movants lack legal rights under the Agreement, which in no way expressed or implied an intent to benefit them or a class to which they belong.

The Great Plains Claimants desire to propose an entirely different modification. They would remove the *cy pres* provisions

2

altogether and distribute the leftover funds to class members who have already completed the claims process and received monetary awards. The Great Plains Claimants, however, do not have a legally protected interest in those funds. By failing to object to the *cy pres* provisions or otherwise appeal the approval of the Agreement, and then participating in the claims process, they settled their legal claims. Accordingly, the Court cannot find that they retain a legal interest giving them standing to intervene.

Upon consideration of the motions to intervene, the responses and replies thereto, the applicable law, and the entire record, the Court **DENIES** the motions.[1]

I.   **Background**

   A.   **The Parties Reach a Settlement Agreement.**

Following over a decade of litigation, the parties to this class action reached a Settlement Agreement. *See* Agreement, ECF No. 621-2.[2] The Agreement created a Compensation Fund ("the

---

[1] The Court emphasizes that this Opinion does *not* resolve the pending motion to modify the Agreement. Before any decision on that request will be reached, the Court must determine whether to direct notice of that motion to the class and hold a fairness hearing (or other hearing at which class members may be heard). The Court has directed the parties to submit briefs on this issue, Minute Order of October 20, 2014, and welcomes participation by *amici curiae* whose perspectives may differ from those of the parties.

[2] The Agreement was modified in 2012 to alter provisions related to the distribution of Track A and B awards, an issue that does

Fund") of $680,000,000 "for the benefit of the Class." *Id.* ¶ VII.F (p. 7). The Fund was to be used in part to cover the attorney-fee award and individual awards to those who served as class representatives. *See id.* Primarily, however, the Fund would "pay Final Track A Liquidated Awards, Final Track A Liquidated Tax Awards, Final Track B Awards, and Debt Relief Tax Awards, to, or on behalf of, Class Members pursuant to the Non-Judicial Claims Process." *Id.*

The Agreement described how leftover funds, if any, would be disbursed: "In the event there is a balance remaining . . . the Claims Administrator shall direct any leftover funds to the Cy Pres Fund." Agreement ¶ IX.F.9 (p. 37). "Class Counsel may then designate Cy Pres Beneficiaries to receive equal shares of the Cy Pres Fund." *Id.* These designations "shall be for the benefit of Native American farmers and ranchers." *Id.* The Agreement made eligibility as a recipient contingent upon being "recommend[ed] by Class Counsel and approv[ed] by the Court." *Id.* Potential recipients were also only "non-profit organization[s], other than a law firm, legal services entity, or educational institution, that has provided agricultural, business

---

not affect the issues currently pending before the Court. *See* Mot. to Amend, ECF No. 621 at 1; Redline Changes to Agreement, ECF No. 621-3. For clarity, the Court refers throughout this Opinion to the version of the Agreement as modified in 2012.

assistance, or advocacy services to Native American farmers between 1981 and [November 1, 2010]." *Id.* ¶ II.I (pp. 6–7).

The Class received notice of all relevant provisions of the Agreement. The Claim Form provided to potential claimants contained a section that required the claimant to acknowledge that "[y]ou . . . forever and finally release USDA from any and all claims and causes of action that have been or could have been asserted against the Secretary by the proposed Class and the Class Members in the Case arising out of the conduct alleged therein." Ex. C to Agreement, ECF No. 576-1 at 63. The Agreement, moreover, provided that the Class "agrees to the dismissal of the Case with prejudice." *Id.* ¶ VI.A (p. 15).[3] The Claim Form also notified Track A claimants that they would be "eligible for . . . [a] cash award up to $50,000." Ex. C to Agreement, ECF No. 576-1 at 63. The Notice that was sent to the Class similarly described the $50,000 maximum under Track A and the fact that participation would result in a resolution of the individual's legal claim, and stated that "[i]f any money

---

[3] *See also id.* ¶ X (pp. 51–52) (acknowledging that the Class is "forever barred and precluded from prosecuting[] any and all claims, causes of action, or requests for injunctive and/or monetary relief, including, but not limited to, damages, tax payments, debt relief, costs, attorney's fees, expenses, and/or interest, whether presently known or unknown, that have been or could have been asserted in the Case by reason of, with respect to, in connection with, or which arise out of, any matters alleged in the Case that the Class Releasors, or any of them, have against the Government Releasees, or any of them").

remains in the Settlement Fund after all payments to class members and expenses have been paid, then it will be donated to one or more organizations that have provided agricultural, business assistance, or advocacy services to Native Americans." *See* Ex. I to Agreement, ECF No. 576-1 at 87, 88, 92.

### B.   The Court Approves the Agreement.

The parties first indicated to the Court that they had reached a settlement on October 19, 2010. *See* Notice of Settlement, ECF No. 570. On October 22, 2010, they moved for preliminary approval of the Agreement. *See* Mot. for Preliminary Approval, ECF No. 571. On November 1, 2010, the Court preliminarily approved the Agreement. *See* Order, ECF No. 577. The Court also approved the parties' proposed notice to the Class, directed that any objections to the Agreement be postmarked by no later than February 28, 2011, and scheduled a fairness hearing for April 28, 2011. *See id.* at 3.

On March 18, 2011, Class Counsel filed copies of thirty-five letters raising objections to the Agreement. *See* Notice, ECF No. 585. Class Counsel filed their motion seeking final approval of the Agreement, which also responded to those objections, on April 1, 2011. *See* Mot. for Final Approval, ECF No. 589. Only two written objections related to *cy pres*. *See id.* at 62-63. One objector requested that his organizations be granted *cy pres* funds. *See* Kent Objection, ECF No. 585-2 at 7-8. Class Counsel

noted that this request was premature. *See* Mot. for Final
Approval, ECF No. 589 at 62. Another objector indicated his
preference that excess funds be used for outreach purposes and
not be limited to groups that already existed in 1981. *See*
Givens Objection, ECF No. 585-4 at 19-20. Class Counsel noted
that this desire was entirely consistent with the existing *cy
pres* provisions. *See* Mot. for Final Approval, ECF No. 589 at 62-
63.

The Court held a fairness hearing on April 28, 2011. *See*
Minute Entry of April 28, 2011. The issue of *cy pres* was not
raised by any objector. *See generally* Transcript of April 28,
2011 Fairness Hearing, ECF No. 609. After hearing from all who
attended the fairness hearing, the Court found that the
Agreement was fair and reasonable and approved it pursuant to
Federal Rule of Civil Procedure 23(e). *See* Order, ECF No. 606.
No appeal was filed from the Court's approval of the Agreement.

**C.    Class Counsel Seeks to Modify the Agreement.**

On August 30, 2013 Class Counsel filed a status report,
notifying the Court that nearly all distributions from the Fund
had been made and approximately $380,000,000 remained leftover.
*See* Status Report, ECF No. 646 at 3. Class Counsel asserted that
this "render[ed] some of the conditions for *cy pres* distribution
impractical." *Id.* at 5. Class Counsel also outlined a potential
modification of the Agreement, which would have involved the

endowment of a new foundation "which could fund non-profit organizations serving the needs of Native American farmers and ranchers." *Id.* at 8. The Department of Agriculture opposed this proposal. *See* Response to Status Report, ECF No. 649.

The filing of the August 30, 2013 status report prompted the Choctaw Movants and the Great Plains Claimants to move to intervene. *See* Mot. to Intervene, ECF No. 647; Mot. to Intervene, ECF No. 654. These motions, however, sought to intervene in proceedings that did not yet exist. No one had proposed any modification to the Court and the hypothetical proposal outlined by Class Counsel was opposed by the defendant. Accordingly, the Court allowed the parties additional time to come to an agreement on whether and how to modify the Agreement.

On September 24, 2014, Class Counsel filed an unopposed motion to modify the Agreement. *See* Mot. to Modify, ECF No. 709. The modification proposes that 10% of the Cy Pres Fund be distributed immediately to non-profit organizations "proposed by Class Counsel and approved by the Court" that must also meet the following criteria:

> (1)  they must have "provided business assistance, agricultural education, technical support, or advocacy services to Native American farmers or ranchers between 1981 and November 1, 2010 to support and promote their continued engagement in agriculture"; and
>
> (2)  they must be "either a tax-exempt organization described in Section 501(c)(3) of the Internal

> Revenue Code . . . educational organization described in Section 170(b)(1)(A)(ii) of the Code; or an instrumentality of a state or federally recognized tribe, including a non-profit organization chartered under the tribal law of a state or federally recognized tribe, that furnishes assistance designed to further Native American farming or ranching activities."

Proposed Addendum to Agreement, ECF No. 709-2 ¶ II.A.

The modification utilizes the remainder of the Cy Pres Fund to create a trust "for the purpose of distributing the *cy pres* funds" which "shall seek recognition as a non-profit organization under § 501(c)(3)." *Id.* ¶ II.B. The trust would be required "to distribute the funds over a period not to exceed 20 years" and would be charged with disbursing the funds to "not-for-profit organizations that have served or will serve Native American farmers and ranchers." Mot. to Modify, ECF No. 709-1 at 1. The Trust would be authorized to make grants subject to the following restrictions:

(i) "grants must be to a tax-exempt organization described in Section 501(c)(3) of the Code; educational organization described in Section 170(b)(1)(A)(ii) of the Code; or an instrumentality of a state or federally recognized tribe, including a non-profit organization chartered under the tribal law of a state or federally recognized tribe, that furnishes assistance designed to further Native American farming or ranching activities"; and

(ii) "the organization must use the funds to provide business assistance, agricultural education, technical support, and advocacy services to Native American farmers and ranchers, including those seeking to become farmers or ranchers, to support

>       and   promote   their   continued   engagement   in
>       agriculture."

Proposed Addendum to Agreement, ECF No. 709-2 ¶ II.B.

Shortly before the motion to modify the Agreement was filed, the Great Plains Claimants filed a renewed motion to intervene. *See* Second Great Plains Mot. to Intervene, ECF No. 705. On September 18, 2014, the Court denied without prejudice the earlier motions to intervene of the Great Plains Claimants and the Choctaw Movants and set a schedule for the briefing of renewed motions to intervene. *See* Minute Order of September 18, 2014. The Choctaw Movants filed a renewed motion to intervene on October 1, 2014. *See* Second Choctaw Mot. to Intervene, ECF No. 714. Class Counsel and the defendant oppose both motions, which are now ripe for the Court's consideration.

## II.  Applicable Law

### A.    Intervention as of Right

Requests to intervene as of right are governed by Federal Rule of Civil Procedure 24(a). Rule 24(a)(2) requires the Court to permit intervention by any party who "claims an interest relating to the property or transaction that is subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(2). Accordingly,

a putative intervenor's entitlement to intervention as of right depends upon four factors: "'(1) the timeliness of the motion; (2) whether the applicant claims an interest relating to the property or transaction which is the subject of the action; (3) whether the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest; and (4) whether the applicant's interest is adequately represented by the existing parties.'" *New Hampshire v. Holder*, 293 F.R.D. 1, 3–4 (D.D.C. 2013) (quoting *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 731 (D.C. Cir. 2003)).

**B.   Permissive Intervention**

Requests for permissive intervention are governed by Federal Rule of Civil Procedure 24(b), which "states in relevant part that '[o]n timely motion, the court may permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact.'" *Holder*, 293 F.R.D. at 4 (quoting Fed. R. Civ. P. 24(b)) (alterations in original). "When exercising its discretion, the district court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." *EEOC v. Nat'l Children's Ctr., Inc.*, 146 F.3d 1042, 1045 (D.C. Cir. 1998) (quotation marks omitted).

**III. The Choctaw Movants' Request to Intervene**

The Choctaw Movants seek to intervene "for the limited purpose of opposing Plaintiffs' motion to modify the *cy pres* provisions of the Settlement Agreement." Mem. in Supp. of Mot. to Intervene, ECF No. 713 at 1. Because they lack standing under Article III and seek to raise the legal rights of others in violation of the doctrine of prudential standing, the Choctaw Movants are not entitled to intervene.

**A.   The Choctaw Movants May Not Intervene as of Right.**

The Choctaw Movants assert that they qualify for intervention as of right because they are potential beneficiaries under the existing *cy pres* provisions and thus have an interest in opposing any modification in order to "preserv[e] their current opportunity to receive a full share of those funds." *Id.* at 9. Class Counsel asserts that "the injury about which [the Choctaw Movants] express[] concern—*i.e.*, that a modification to the Settlement Agreement will affect the amount of money that [they] may receive, or the timing of such awards, as a potential *cy pres* beneficiary . . . is speculative." Pls.' Opp. to Mot. to Intervene, ECF No. 717 at 3-4. Accordingly, Class Counsel challenges the Choctaw Movants' standing under Article III, as well as their establishment of an interest in the litigation under Federal Rule of Civil Procedure 24(a). The government

challenges the Choctaw Movants' standing under Article III and
the doctrine of prudential standing.

The Court begins with Article III standing, "a prerequisite to
a federal court's exercise of jurisdiction." *Nat'l Ass'n of
Clean Water Agencies v. EPA*, 734 F.3d 1115, 1160 (D.C. Cir.
2013) (quotation marks omitted). "Prudential standing, like
Article III standing, is a threshold, jurisdictional concept,"
so the Court considers it as well. *Deutsche Bank Nat'l Trust Co.
v. FDIC*, 717 F.3d 189, 194 n.4 (D.C. Cir. 2013). Because the
Choctaw Movants lack standing, the Court need not—and, indeed,
ought not—address Rule 24(a). *Id.*

1.    *The Choctaw Movants Lack Article III Standing.*

"[A] movant seeking to intervene as of right must . . .
demonstrate Article III standing." *In re Endangered Species Act
Section 4 Deadline Litig.*, 704 F.3d 972, 976 (D.C. Cir. 2013).
Accordingly, the Choctaw Movants "'must establish that (1)
[they] suffered an injury-in-fact; (2) there is a causal
connection between the injury and the conduct complained of; and
(3) the injury will likely be redressed by a favorable
decision.'" *Associated Builders & Contractors, Inc. v. Shiu*, No.
13-1806, 2014 WL 1100779, at *4 (D.D.C. Mar. 21, 2014) (quoting
*In re Polar Bear Endangered Species Act Listing,* 627 F. Supp. 2d
16, 24 (D.D.C. 2009)). Their injury-in-fact must be "concrete,
particularized, and actual or imminent." *Clapper v. Amnesty*

*Int'l*, 133 S. Ct. 1138, 1147 (2013) (quotation marks omitted).
The requirement that an injury be imminent "cannot be stretched
beyond its purpose, which is to ensure that the alleged injury
is not too speculative for Article III purposes—that the injury
is *certainly* impending." *Id.* (quotation marks omitted).

The Choctaw Movants claim that "[a]s intended third-party
beneficiaries of the Agreement, members of this group of Cy Pres
Beneficiaries have standing to enforce its terms." Mem. in Supp.
of Mot. to Intervene, ECF No. 713 at 10. In essence, they
believe that the *possibility* that they currently qualify for and
could be selected to receive a *cy pres* distribution, and the
*possibility* that under the proposed modification they would
receive a lesser distribution, a distribution later in time, or
no distribution, creates a concrete injury-in-fact. The Court
disagrees because any injury will arise only if a multitude of
speculative events occur.

It is well-established that an injury-in-fact may be
demonstrated by the existence of an economic interest, so long
as that interest "faces an imminent, threatened invasion—i.e.,
one that is not conjectural or speculative." *Deutsche Bank*, 717
F.3d at 193. The same is true for putative intervenors. For
example, where a lawsuit seeking to place Mongolian wildlife on
an endangered-species list could have "barr[ed] American hunters
from bringing their trophies home," the Mongolian government had

standing to intervene based on the direct negative impact that would result from reducing the number of hunters going to Mongolia and paying hunting fees to the government. *Fund for Animals*, 322 F.3d at 733.

The Choctaw Movants have no existing involvement with the Cy Pres Fund. They have not received a *cy pres* distribution, been approved to receive one, or had their eligibility assessed. Accordingly, modification of the *cy pres* provision would not affect them in the direct ways described in the cases they cite. *See id.* (lawsuit could reduce the number of hunters continuing to pay fees to the putative intervenor); *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 295 F.3d 1111, 1113, 1116 (10th Cir. 2002) (lawsuit could affect existing projects on which putative intervenor had contracts); *Natural Resources Defense Council, Inc. v. U.S. Nuclear Regulatory Comm'n*, 578 F.2d 1341, 1344 (10th Cir. 1978) (lawsuit could affect standards applicable to putative intervenor's request for renewal of its uranium-processing license).

Indeed, the Choctaw Movants are no different from any other organization: They could, upon satisfaction of four criteria, receive a *cy pres* distribution of an indeterminate amount. They would need to: (1) be a "non-profit organization, other than a law firm, legal services entity, or educational institution," Agreement ¶ II.I (p. 6); (2) have "provided agricultural,

business assistance, or advocacy services to Native American
farmers between 1981 and [November 1, 2010]," *id.*; (3) be
"recommend[ed] by Class Counsel," *id.* ¶ IX.F.9 (p. 38); and (4)
be "approv[ed] by the Court." *Id.*

The government and Class Counsel question whether the Choctaw
Movants may ever satisfy the first two requirements. As to the
first, the parties assert that the Jones Academy Foundation is
likely an educational institution and that the Choctaw Nation is
not a "non-profit organization." *See* Pls.' Opp., ECF No. 717 at
8-9; Gov't's Opp., ECF No. 718 at 5-7. The Choctaw Movants
counter that the Jones Academy Foundation is separate from the
Jones Academy, and thus is not an educational institution, and
that tribes are included within the term "non-profit
organization." Reply, ECF No. 722 at 3-5. The plaintiffs also
assert that the Choctaw Movants put forth no evidence
demonstrating that they "provided agricultural, business
assistance, or advocacy services to Native American farmers
between 1981 and [November 1, 2010]." Pls.' Opp., ECF No. 717 at
9.

The Choctaw Movants correctly note that the Court must accept
as true their factual allegations regarding the basis for
intervention. *See* Charles Alan Wright & Arthur R. Miller,
*Federal Practice and Procedure* § 1914 (4th ed. 2014).
Accordingly, their allegation that they provided qualifying

assistance to Native American farmers during the relevant time
period is accepted as true. *See* Mem. in Supp. of Mot. to
Intervene, ECF No. 713 at 3. Similarly, the Court must accept
the allegation that the Jones Academy Foundation is a separate
entity that grants scholarships, rather than a fundraising arm
of the Jones Academy. *See id.* at 4. Accordingly, the Jones
Academy Foundation meets the first two eligibility criteria.

The Choctaw Nation, however, cannot establish that it is
eligible because the Agreement does not include tribal
governments as potential recipients of *cy pres* distributions.
The Agreement defines potential *cy pres* recipients as "non-
profit organization[s], other than a law firm, legal services
entity, or educational institution." Agreement ¶ II.I (p. 6).
The Agreement does not define "non-profit organization," but the
Choctaw Nation is not a 501(c)(3) organization. As the Choctaw
Movants admit, it is a government entity: "The Choctaw Nation
possesses the attributes of a classic non-profit organization
*notwithstanding that it is also a governmental sovereign*."
Reply, ECF No. 722 at 5 (emphasis added). The Court finds it
difficult to believe that the parties used the term "non-profit
organization" intending to include tribal governments without
saying as much. Such a reading is especially difficult where the
subject matter of the Agreement relates to Native Americans, and
the provision at issue sought to identify a class of entities

17

that could be eligible for grants to benefit Native American farmers and ranchers. If the Agreement was intended to include tribes, it would have said so.

The term "non-profit organization," moreover, is often used in a way that excludes tribes, recognizing that they are distinct entities.[4] The Choctaw Nation argues that this usage is inconsistent, relying on a footnote in *Seminole Tribe v. Butterworth*, 658 F.2d 310, 314 n.7 (5th Cir. Unit B 1981), which indicated that the fact that a tribe's profits from gambling

---

[4] *See, e.g.*, *Blue Lake Rancheria v. United States*, 653 F.3d 1112, 1118–19 (9th Cir. 2011) (citing a House Conference Report regarding an amendment to the Federal Unemployment Tax Act, which noted that "[g]enerally, Indian tribes are not eligible for the reimbursement treatment allowable to nonprofit organizations"); *Mason ex rel. Heiser v. Morrisette*, 403 F.3d 28, 31 (1st Cir. 2005) (referring to regulations, promulgated by the Department of Housing and Urban Development and the Environmental Protection Agency pursuant to 42 U.S.C. § 4852d, which defined the term "lessee" to include "any entity that enters into an agreement to lease, rent, or sublease . . . including . . . Indian tribes, and nonprofit organizations"); *Am. Jewish Congress v. Corp. for Nat'l & Cmty. Serv.*, 323 F. Supp. 2d 44, 47 (D.D.C. 2004) (noting that an AmeriCorps program "is administered through grantees such as state and local governments, Indian tribes, and non-profit organizations"), *rev'd on other grounds*, 399 F.3d 351 (D.C. Cir. 2005); *SEC v. Bear, Stearns & Co.*, No. 03 Civ 2937, 2004 WL 885844, at *6 (S.D.N.Y. Mar. 25, 2004) (grant-making entity created by settlement of litigation made "[t]he following persons and entities . . . eligible to apply for . . . grants: Non-profit organizations and educational institutions; State agencies, federal and local government units, and Indian tribes"); *Atlantic, Cape May & Parts of Burlington, Ocean & Cumberland Cntys. Bldg. Trades Council v. City of N. Wildwood*, No. 77-2609, 1979 WL 2018, at *6 (D.N.J. May 18, 1979) (reciting statutory definition of "a grantee" under a particular statute, which included "any state or political subdivision thereof, indian tribe, or private or public non-profit organization").

activities would "be invested for the betterment of the Indian community" meant that the tribe "may not qualify as a charitable organization within the letter of the statute [at issue], [but] could be said to fall within the spirit of its permissive intent." That is the point, however. Even though tribal governments operate for purposes that are similar to those of charitable organizations, they are distinct entities.[5]

Regardless of whether the Choctaw Movants satisfy those criteria, it is clear that they do not satisfy the third—that they be "recommend[ed] by Class Counsel." Agreement ¶ IX.F.9 (p. 38). The Agreement provides no standard for Class Counsel's decision, so the Choctaw Movants could obtain a *cy pres* distribution only if Class Counsel were to exercise its discretion to recommend them. This is problematic for standing, as the Supreme Court is "reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment." *Clapper*, 133 S. Ct. at 1150. It is

---

[5] The Choctaw Nation briefly mentions that the Government Accountability Office has indicated that federal agencies recently awarded grants to twenty-four non-federally-recognized tribes because they were "organized as nonprofit organizations and so were 'eligible to receive federal funding from any program authorized to fund nonprofits.'" Reply, ECF No. 722 at 4 n.4 (quoting Government Accountability Office, *Federal Funding for Non-Federally Recognized Tribes* 11 (April 2012), *available at* http://www.gao.gov/products/GAO-12-348). Unlike the tribes described in the report, however, the Choctaw Nation is federally recognized. *See* Mem. in Supp. of Mot. to Intervene, ECF No. 713 at 1.

thus hypothetical at best to assert that the Agreement will result in *any* award to the Choctaw Movants.

Even if the Choctaw Movants were to receive an award under the Agreement, the amount of that award is highly speculative. The Agreement provides for distribution in equal shares of the $380 million Cy Pres Fund. While it is conceivable that a small number of qualifying organizations would be recommended by Class Counsel, resulting in a large distribution to the Choctaw Movants, it is equally conceivable that the opportunity to obtain an immediate share of a large Cy Pres Fund would draw applications from an array of eligible organizations, resulting in a lower award. These twin uncertainties—whether the Choctaw Movants would receive an award at all and, if so, how large an award they would receive—render it highly speculative to assert that the proposed modification would harm them.

This uncertainty is compounded by uncertainty regarding the effect of the modification. Under the proposed modification, eligibility to receive a distribution of the initial 10% is contingent upon the discretion of Class Counsel to make recommendations, but the modification makes clear that tribes and educational institutions may qualify. *See supra* at 8-9. The modification therefore increases the likelihood that the Choctaw Movants qualify at the initial phase. The modification similarly broadens the eligibility criteria for the distribution of the

remaining 90% of the Cy Pres Fund, while also removing the discretionary role of Class Counsel. *See supra* at 9-10.

Similarly, it is far from clear that the timing and amount of awards that the Choctaw Movants could receive under the modification would differ negatively. The smaller amount of money and laxer eligibility criteria applicable to the initial 10% distribution may make it likelier that Class Counsel would propose smaller distributions to many organizations, but the modification—unlike the existing Agreement—permits Class Counsel to scale awards to an organization's ability. Therefore, it is just as likely that the Choctaw Movants would obtain a larger amount due to their ability to provide a scaled proposal. *See* Mem. in Supp. of Mot. to Intervene, ECF No. 713 at 3 n.1. Distributions from the trust could similarly be scaled in a manner that could benefit the Choctaw Movants. Accordingly, the modification may well result in a greater award for the Choctaw Movants.

In view of the highly speculative nature of their claim, the Choctaw Movants argue that their true injury is not the loss of the funds, but the lost opportunity to compete for those funds. *See* Mem. in Supp. of Mot. to Intervene, ECF No. 713 at 10-11. To be sure, "[l]oss of an opportunity to compete for a benefit may be an injury in fact if it is not merely 'illusory.'" *N.J. Television Corp. v. FCC*, 393 F.3d 219, 221 (D.C. Cir. 2004). In

light of the Choctaw Nation's failure to qualify as a "non-profit organization" under the Agreement, however, any opportunity to compete using the joint proposal on which the Choctaw Movants rely is illusory. In any event, the Choctaw Movants lose no opportunity to compete under the modification.

The D.C. Circuit has recognized standing based on a lost opportunity to compete when a putative applicant is foreclosed from applying for the benefit due to a legal change. For example, in *CC Distributors, Inc. v. United States*, 883 F.2d 146, 148 (D.C. Cir. 1989), a group of former contractors for the Department of Defense challenged the Department's decision not to renew certain contracts and to bring the program "in-house." The Court recognized an injury-in-fact arising out of "the loss of a statutorily conferred opportunity to compete for a contract." *Id.* at 150. Similarly, in *West Virginia Ass'n of Community Health Centers v. Heckler*, 734 F.2d 1570, 1572–73, 1576 (D.C. Cir. 1984), the Court found standing for a group of health centers that received funding from the Department of Health and Human Services to challenge a decision to reduce funding for their state. The Court held that "once appellants demonstrated that they would qualify to receive these funds, they need not shoulder the additional burden of demonstrating that they are certain to receive funding." *Id.* at 1576.

The Choctaw Movants find themselves in a very different situation. Under the modification, they retain every ability to compete for the same *cy pres* funds. Unlike the situations where the D.C. Circuit has found standing based on a lost opportunity to compete, the competitive opportunity would neither disappear entirely, *CC Distributors, Inc.*, 883 F.2d at 148, nor be reduced by shrinking the pot of available funds. *W. Va. Ass'n of Cmty. Health Ctrs. v. Heckler*, 734 F.2d at 1576. Indeed, as the above discussion demonstrates, it is highly speculative to say that the procedures under the modification harm rather than help the Choctaw Movants' ability to compete. *See supra* at 15–21. Accordingly, even if the competitive-injury doctrine recognizes injuries caused by adverse changes to procedures governing a competition, the Choctaw Movants would not qualify because the procedural changes are just as likely to improve their competitive prospects. Accordingly, the Choctaw Movants do not face a "concrete, particularized, and actual or imminent" injury. *Clapper*, 133 S. Ct. at 1147 (quotation marks omitted).

   2.   *The Choctaw Movants Lack Prudential Standing.*

Even if the Choctaw Movants suffered a lost opportunity to compete, their claims suffer from a more fundamental flaw: They seek to assert a legal right to compete under the existing procedures for *cy pres* distribution that were created by a settlement (which has nothing to do with them), to be

distributed for the benefit of a class (of which they are not a
part), to remedy claims of discrimination (which they did not
suffer). The funds have nothing to do with the Choctaw Movants,
yet they assert a legal right to obtain them (or, at least, to
compete for them). In doing so, they assert rights under the
Agreement that do not belong to them.

By raising rights that are not theirs, the Choctaw Movants run
afoul of the doctrine of prudential standing, which requires
that a party seeking to intervene in proceedings regarding the
interpretation of a contract must show that it is an intended
beneficiary of that contract; otherwise, "the basic point
remains that the contract does not protect *their* rights."
*Deutsche Bank*, 717 F.3d at 194 (emphasis in original). The
Choctaw Movants assert that they do not actually seek to be
heard on the interpretation of the Agreement, Reply, ECF No. 722
at 6 n.5, but this contention is belied by their proposed brief
in opposition to the request for modification, which raises
disputes regarding the interpretation of various provisions of
the Agreement. *See* Proposed Opp. to Mot. to Modify, ECF No. 713-
2 at 3-4.

The Supreme Court has held that "a consent decree is not
enforceable directly or in collateral proceedings by those who
are not parties to it even though they were intended to be
benefited by it." *Blue Chip Stamps v. Manor Drug Stores*, 421

U.S. 723, 750 (1975). The D.C. Circuit has read this to "prohibit only *incidental* third party beneficiaries from suing to enforce a consent decree." *Beckett v. Air Line Pilots Ass'n*, 995 F.2d 280, 288 (D.C. Cir. 1993) (alteration omitted; emphasis in original). "The test is not . . . only whether the contracting parties intended to confer a benefit directly on the third parties, but also whether the parties intended the third party to be able to sue to protect that benefit." *SEC v. Prudential Sec.*, 136 F.3d 153, 159 (D.C. Cir. 1998); *see also Doe v. District of Columbia*, 958 F. Supp. 2d 178, 203 (D.D.C. 2013); *Ekwem v. Fenty*, 666 F. Supp. 2d 71, 81 (D.D.C. 2009).

"To prove intended beneficiary status, the third party must show that the contract reflects the express or implied intention of the parties to the contract to benefit the third party." *GECCMC 2005-C1 Plummer St. Office v. JP Morgan Chase Bank*, 671 F.3d 1027, 1033 (9th Cir. 2012) (quotation marks omitted). The contract, however, "need not name a beneficiary specifically or individually" and may instead specify a particular class of beneficiaries. *Id.* "A party has a cause of action as a third-party beneficiary to a contract if the contracting parties express an intent primarily and directly to benefit that third party (or a class . . . to which that third party belongs)." *Vencor Hosps. v. Blue Cross Blue Shield of R.I.*, 169 F.3d 677, 680 (11th Cir. 1999). In *Vencor*, for example, the Eleventh

Circuit recognized that a hospital was an intended third-party beneficiary of an insurance contract that stated that "[b]enefit payments may be paid to the doctor, hospital or to you directly at our discretion." *Id.* Although the contract did not grant the hospital an absolute right to payment, the purpose of the contract was to cover the costs of a medical service the hospital had provided.

The Choctaw Movants argue that the Agreement was similarly intended to create a trust of which they are intended beneficiaries. They assert that "[t]he Settlement Agreement defined a group of Cy Pres Beneficiaries among whom all of the leftover settlement funds were to be distributed in equal shares." Mem. in Supp. of Mot. to Intervene, ECF No. 713 at 10. Accordingly, they claim, even though they "ultimately may or may not be . . . selected," they remain beneficiaries of the trust. Reply, ECF No. 722 at 10. The class to which they belong, however, was never the intended target of the Agreement.

It is important to remember that the funds at issue in this case are *cy pres* funds. Although the *cy pres* doctrine provides for the distribution of unclaimed settlement funds to non-parties, the purpose is to put the funds to their "'next best use which is *for indirect class benefit*.'" *Powell v. Ga.-Pacific Corp.*, 843 F. Supp. 491, 497 (W.D. Ark. 1994) (quoting Newberg on Class Actions § 11:20 (3d ed. 1992) (emphasis added). "The

object of applying the funds to the 'next best' class is to parallel the intended use of the funds as nearly as possible *by maximizing the number of plaintiffs compensated*." *Democratic Cent. Comm. v. Wash. Metro. Area Transit Comm'n*, 84 F.3d 451, 455 (D.C. Cir. 1996) (emphasis added). Accordingly, the point of *cy pres* is to benefit the class as closely as possible, using third-parties only as vehicles for providing that benefit to the class when direct distribution is infeasible. This is nothing like *Vencor*, where the contract was intended to provide payment for services rendered by the third party.

The Agreement confirms that its purpose was geared toward the Class. It settled claims of individuals who allegedly suffered discrimination at the hands of the Department of Agriculture. In doing so, it created a Fund "for the benefit of the class," provided a process for the distribution of that Fund to class members, and created a Cy Pres Fund in the event that the full amount of funds set aside to pay those claims was not exhausted. The Cy Pres Fund was specifically intended "for the benefit of Native American farmers and ranchers." Agreement ¶ IX.F.9 (p. 33). The *cy pres* distribution criteria further this purpose by guiding Class Counsel to organizations that could use the money to benefit the class. *Id.* ¶ II.I (p. 3). Nothing in the Agreement contradicts this statement or hints that it was

actually intended to provide a legally enforceable benefit to unrelated organizations.

The cases relied on by the Choctaw Movants, by contrast, all permitted individuals who were direct beneficiaries of a trust to sue to enforce the terms of that trust. *See Beckett*, 995 F.2d at 281 (consent decree that obligated employer to make pension-related payments into a trust fund to be administered by the airline pilots' union could be enforced by former pilots who claimed that the union failed to grant them required payments because the consent decree created a trust for the benefit of all pilots); *Price v. Akaka*, 928 F.2d 824, 825 (9th Cir. 1990) (Native Hawaiian seeking to enforce terms of trust holding public lands "for the betterment of the conditions of native Hawaiians"). Those cases did not involve third parties seeking funds held for someone else's benefit.

Finally, the Choctaw Movants rely on the Agreement's use of the term "beneficiary" to describe the organizations that may receive a *cy pres* distribution, but the use of that word does not trump the purposes of the *cy pres* doctrine and the Agreement's expressed intent to benefit class members. The mere fact that those selected to be vehicles for distributing the funds to the class's benefit may themselves "benefit" from that selection does not make them intended beneficiaries with legally enforceable rights. Because the Choctaw Movants lack such

28

rights, they lack prudential standing to intervene to enforce their preferred interpretation of the Agreement.

**B.    The Choctaw Movants May Not Intervene Permissively.**

The Choctaw Movants' lack of standing also dooms their request for permissive intervention. The D.C. Circuit previously indicated that it remained an open question whether standing is required of a party seeking permissive intervention. *See, e.g.*, *Endangered Species Act Litig.*, 704 F.3d at 980. The Circuit recently settled that question, however. In *Deutsche Bank National Trust Co. v. FDIC*, the D.C. Circuit rejected the argument that a party seeking to intervene as of right as a defendant need not demonstrate standing, noting that "[i]t is therefore circuit law that intervenors must demonstrate Article III standing." 717 F.3d at 193. Judge Silberman (who authored the unanimous opinion) wrote separately to emphasize:

> If we were authorized to dispense with the standing requirement for a defendant-intervenor, then any organization or individual with only a philosophic identification with a defendant—or a concern with a possible unfavorable precedent—could attempt to intervene and influence the course of litigation. To be sure, parties seeking intervention as of right would still need to meet the specific standards articulated in Rule 24(a), but district courts have discretion to grant *permissive* intervention under Rule 24(b), which requires only that a party have a claim or defense that shares with the main action a common question of law or fact. Opening participation to parties without standing would be quite troublesome in direct review in the court of appeals, but intolerable at the district court level, where individual parties have substantial power to direct the flow of

litigation and affect settlement negotiation. Our rule requiring all intervenors to demonstrate Article III standing prudently guards against this possibility.

*Id.* at 195–96 (quotations marks and citations omitted).

Accordingly, the Choctaw Movants' lack of standing renders them ineligible for permissive intervention.[6]

## IV. The Great Plains Claimants' Request for Intervention

The Great Plains Claimants seek to intervene "to ensure that their interests are adequately represented in the context of any amendments to the Settlement Agreement." Mot. to Intervene, ECF No. 705-1 at 1. They assert that they would like Class Counsel to seek to modify the Agreement to provide for additional payments to successful claimants, but that Class Counsel has failed to do so and has failed to keep them apprised of relevant case developments. *See id.* at 3–5. Because they lack Article III standing, the Great Plains Claimants are not entitled to intervene.

### A.    The Great Plains Claimants May Not Intervene as of Right.

As discussed above, putative intervenors "must . . . demonstrate Article III standing," *Endangered Species Act Litig.*, 704 F.3d at 976, by "'establish[ing] that (1) [they] suffered an injury-in-fact; (2) there is a causal connection

---

[6] The Choctaw Movants also did not dispute the government's argument that permissive intervenors must demonstrate standing, thereby conceding the argument. *See, e.g.*, *Inst. for Pol'y Studies v. U.S. Cent. Intelligence Agency*, 246 F.R.D. 380, 386 n.5 (D.D.C. 2007).

between the injury and the conduct complained of; and (3) the injury will likely be redressed by a favorable decision.'" *Associated Builders & Contractors*, 2014 WL 1100779, at *4 (quoting *Polar Bear Listing,* 627 F. Supp. 2d at 24.

The Great Plains Claimants assert that "[a]s successful *Keepseagle* class members, the Great Plains Claimants are direct beneficiaries of the Settlement Agreement" and therefore "have legally protected interests in the distribution of the Cy Pres Fund." Mot. to Intervene, ECF No. 705-1 at 16–17. It is undisputed that none of the Great Plains Claimants objected to the *cy pres* provisions of the Agreement, and that no one appealed the Court's approval of the Agreement.[7] It is also undisputed that the Great Plains Claimants participated in the Agreement's procedures for filing a claim under Track A. That process included an affirmative choice to proceed under Track A, knowing that the maximum possible cash award was $50,000. *See*

---

[7] For this reason, the Court cannot accept assertions that the Great Plains Claimants "never agreed to participate in a settlement which provides that a majority of the funds would not go to class members" and that "[h]ad the original Settlement Agreement contained such provisions, many would have objected and/or opted out." Reply, ECF No. 723 at 8; *see also id.* at 14 (citing Knight Declaration, ECF No. 723-1 ¶¶ 13–14; Petersen Declaration, ECF No. 723-2 ¶¶ 13–14). The Great Plains Claimants—like Class Counsel and the government—may not have anticipated that so few claimants would come forward and therefore may not have expected the Cy Pres Fund to be as large as it is. All of the provisions creating this result, however, were part of the proposed Agreement, of which the Great Plains Claimants received notice and to which they did not object.

Ex. C to Agreement, ECF No. 576-1 at 63. They also acknowledged
that they were "forever and finally releas[ing] USDA from any
and all claims and causes of action that have been or could have
been asserted . . . in the Case arising out of the conduct
alleged therein." *Id.* The notice initially provided to the Class
reiterated these points and also made clear that all unclaimed
funds would be "donated to one or more organizations that have
provided agricultural, business assistance, or advocacy services
to Native Americans." *See* Ex. I to Agreement, ECF No. 576-1 at
87, 88, 92. Accordingly, the Great Plains Claimants, with
notice, have intentionally satisfied their legal claims.

It is well-established that this extinguishes a legal claim.
"An agreement between the parties dismissing all claims is the
equivalent of a decision on the merits and thus claims settled
by agreement are barred by *res judicata*." *Chandler v. Bernanke*,
531 F. Supp. 2d 193, 197 (D.D.C. 2008). Indeed, as the Great
Plains Claimants appeared to acknowledge, Reply, ECF No. 723 at
7, the Agreement binds class members who did not opt out. Once
the Agreement was approved and no appeal was filed, the claims
of class members who did not opt out were extinguished, in
accordance with the Agreement's terms. *See* Agreement ¶¶ VI.A (p.
15), X (pp. 51-52).

This conclusion is entirely consistent with the weight of
precedent regarding unclaimed settlement funds. "In approaching

the question of the appropriate distribution of such funds,
various courts have determined that 'neither the class members
nor the settling defendants have any legal right to unclaimed or
excess funds.'" *Diamond Chem. Co. v. Akzo Nobel Chems. B.V.*, 517
F. Supp. 2d 212, 217 (D.D.C. 2007) (quoting *Powell*, 843 F. Supp.
at 495, *aff'd*, 119 F.3d 703, 706 (8th Cir. 1997) ("neither party
has a legal right to the unclaimed funds")); *see also Wilson v.
Southwest Airlines*, 880 F.2d 807, 811 (5th Cir. 1989) ("We agree
with the district court that . . . none of the parties in this
case has a legal right to the balance of the fund."); *In re
Folding Carton Antitrust Litig.*, 744 F.2d 1252, 1254 (7th Cir.
1984) ("we agree that neither the plaintiff class nor the
settling defendants have any right to the reserve fund"); *In re
Motorsports Merchandise Antitrust Litig.*, 160 F. Supp. 2d 1392,
1393 (N.D. Ga. 2001) ("Neither the class members nor the
settling defendants have any legal right to unclaimed or excess
funds.") (alteration and quotation marks omitted). Once a
settlement agreement is final, "all class members who presented
their claims received the full payment due them, and those who
did not present claims have waived their legal right to do so.
Thus, the class has no further legal rights in the fund."
*Wilson*, 880 F.2d at 811–12.

Professor Rubenstein echoes this position in the most recent
edition of Newberg on Class Actions. Although there is some

33

dispute over the property status of unclaimed funds, "most courts start from the proposition that neither the plaintiff class nor the settling defendants have any right to the unclaimed or excess funds." Newberg on Class Actions § 12:28 (5th ed. 2014) (quotation marks omitted). The argument that unclaimed settlement funds are property of the class is problematic, he posits:

> The premise that the recovery fund is the property of the plaintiff class is not quite right because the settlement fund does not truly belong to the class as a whole, but rather to the class members individually. When a class member does not claim her share of the fund, it is not at all obvious that her share therefore belongs to the other class members. If, for example, the government distributed a tax refund to a group of taxpayers but some did not cash their checks, no one would seriously propose that the unclaimed funds are the property of, and should be distributed *pro rata* to, those other citizens who received tax refunds. . . . Additionally, an individual's presence as a class member in a class action hardly expands her property rights to include the property of the other class members. Even if it is the case that the claiming class members have received less than the full value of their claims by the settlement, that fact does not magically make the nonclaimaints' property theirs.

*Id.* § 12:30.

The Great Plains Claimants have received the full value of their claims pursuant to the Agreement and thereby fully satisfied those legal claims. The fact that their claims, if ultimately successful at trial, could have resulted in higher

34

damages awards changes nothing. As the Court emphasized during
the April 28, 2011 fairness hearing:

> There are risks in litigation as we all know. This
> case could have gone to trial, presumably, and the
> Plaintiffs not recovered anything. Class certification
> was not a foregone conclusion, and you're aware, I'm
> sure, of other cases in this court, not before this
> judge, wherein class certification issues were not as
> successful as the class members would have liked. . .
> . So there were no guarantees that this case went
> forward at all.

Transcript of April 28, 2011 Fairness Hearing, ECF No. 609 at
24:9–18. Settlements, by definition, are compromises in which
plaintiffs accept less than their full claim of damages in
exchange for avoiding the risks of further proceedings and
trial. The Great Plains Claimants accepted that trade off,
consented to an Agreement that provided for a maximum award of
$50,000, and recovered that amount. They cannot now claim a
property right in funds that were intended to pay the claims of
other class members who did not claim their award.

The Court is not persuaded by their arguments to the contrary,
which rely on two distinguishable cases:

First, they correctly note the Fifth Circuit's recent
statement that "settlement-fund proceeds . . . belong solely to
the class members." *Klier v. Elf Atochem N. Am.*, 658 F.3d 468,
474 (5th Cir. 2011). That case, however, "[wa]s not a case where
the settlement agreement itself provide[d] that residual funds
shall be distributed via *cy pres*," and the Fifth Circuit noted

that "the relevant provisions" of the Agreement "shape the property interest created by the Agreement." *Id.* at 476, 478. The decision, moreover, related to the use of *cy pres* even though the excess funds could have been used to pay claims that were due to another subclass under the Agreement. *Id.* at 478. Here, any property interest that was shaped or created by the Agreement was limited by the Agreement's provisions making the Track A maximum $50,000, and providing for a *cy pres* distribution of leftover funds from the outset.[8]

Second, the Great Plains Claimants rely on the Third Circuit's recent decision in *In re Baby Products Antitrust Litigation*, 708 F.3d 163 (3d Cir. 2013). That decision addressed a claim by a class member (who objected to the settlement agreement during a fairness hearing and filed an appeal) that "the settlement notice was inadequate because it did not identify the *cy pres* recipients who will receive excess settlement funds." *Id.* at 180. The Court held that the notice (which was issued before the

---

[8] *Devlin v. Scardelletti*, 536 U.S. 1 (2002), on which the Choctaw Movants rely for the proposition that members of a class have interests in a settlement sufficient to support Article III standing, is even more distinct. That case addressed the claim of a class member who objected to a proposed settlement at a fairness hearing, and sought to appeal the district court's approval of the settlement. *See id.* at 4–6. The Supreme Court held "that this issue does not implicate the jurisdiction of the courts under Article III of the Constitution" because "[a]s a member of the retiree class, petitioner has an interest in the settlement." *Id.* at 6. The Great Plains Claimants, by contrast, never objected or appealed and they have already had their legal claims fully resolved.

identity of the *cy pres* recipient was known) was sufficient, and
noted without deciding that "to the extent putative class
members have a property interest in the unclaimed funds and
object to the *cy pres* recipients selected, they may typically
intervene in the lawsuit for purposes of appealing an eventual
order directing a *cy pres* distribution." *Id.* at 181. To the
extent that tentative statement may be read to grant property
rights in leftover funds to class members who participate
successfully in a settlement agreement's claims process, receive
the maximum award permitted by the settlement agreement, and who
neither object to nor appeal from the entry of that settlement
agreement, the Court disagrees. *See supra* at 32–35.

Because the Great Plains Claimants retain no legal claim to
the fund, their desire that the Agreement be modified to provide
for additional payments to previously successful class members,
while understandable, is not a legal interest that faces
imminent invasion. Accordingly, they lack standing.[9]

---

[9] The Court also agrees with the government's contention that any
injury the Great Plains Claimants may suffer by virtue of not
receiving additional payments beyond those received to satisfy
their claims is not causally linked to an action of the
defendant in this case; rather, it is a product of their assent
to and participation in the Agreement. *See B'hood of Locomotive
Engs. & Trainmen v. Surface Transp. Bd.*, 457 F.3d 24, 28 (D.C.
Cir. 2006).

**B.   The Great Plains Claimants May Not Intervene Permissively.**

As discussed in Part III.B, *supra*, the same standing requirements applicable to intervention as of right apply to permissive intervention. Like the Choctaw Movants, moreover, the Great Plains Claimants have not attempted to argue otherwise. *See supra* at 30 n.6 (noting that the Choctaw Movants conceded that standing was required for permissive intervention by failing to oppose the government's argument). Accordingly, their lack of standing precludes them from obtaining permissive intervention.

**C.   The Great Plains Claimants May File an *Amicus Curiae* Brief.**

The Great Plains Claimants request, in the alternative, that the Court grant them leave to participate in the settlement-modification proceedings as *amici curiae*. *See* Mot. to Intervene, ECF No. 705-1 at 21. Neither party objects to this request. Moreover, the Great Plains Claimants rightly note that this Court has broad discretion to permit participation of *amici* especially where, as here, the proposed *amici* may provide a unique perspective on issues pending before the Court. *See id.* Accordingly, the Great Plains Claimants may enter their appearance as *amici curiae*.

## V.    Conclusion

For the foregoing reasons, the motions to intervene filed by the Choctaw Nation of Oklahoma and the Jones Academy Foundation, and by the Great Plains Claimants are **DENIED**. The request of the Great Plains Claimants to participate in the pending settlement-modification proceedings as *amici curiae* is **GRANTED**. An appropriate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

**Signed:   Emmet G. Sullivan
United States District Judge
November 7, 2014**