Judge Emmett G. Sullivan                    Nov 25th 2014

United States District Court for the
District of Columbia
333 Constitution Blvd. NW
Washington D.C.   20001

Reference: Keeps Eagle Settlement Cause No. 1:99CV03119

Dear Judge Sullivan,
    My wife Marilyn and I feel that we must reply to the class counsel's response to our letters to the court. We feel that their response is a direct attack on our personal integrity. That class council is attempting to assassinate our character, needs to be addressed. We are not greedy, money hungry, rural hicks as portrayed in their response. Rather, we are honest, hard working tribal elders who are striving to help our people, and all native people who are party to this law suit. Our opposition to the foundation, and our request for a second round of pay outs, is based on need, not greed.
    First off, we would like to explain to the court that we are not ungrateful for the outcome of the law suit, or the services provided to us by class council up to the point where they ceased listening to us and started this foundation proposal. The funds which we received, were used to pay off our debts and to stop foreclosure on our ranch. This was the whole purpose of the law suit from the outset. The discrimination we received from the USDA put us in a very dire position. We have no argument that we, as well as other class members did receive relief from debts, and foreclosures. Our argument is centered on the fact that the class counsel is trying to take the cy pres funds and throw them away on this foundation proposal that will not benefit any Keeps Eagle class member.
    Secondly, I will agree that I initially agreed to support the foundation proposal, when Joe Sellers and Sarah Vogel first proposed it to us in late October of 2013. We only agreed, because class counsel told us that there were no other alternatives, except returning the cy pres funds to the USDA. We of course did not want to see this happen. However, the current foundation proposal is far different than that which was explained to us in 2013.
Thirdly, in Docket 649, the USDA expresses their opposition to the foundation, because it violates the Cy Pres doctrine. The USDA very clearly states the purpose and scope of what cy pres means, and how it should be applied. Cy Pres means, "as near as possible" to compensate class members.

They further state that the Cy Pres funds must qualify as the next best distribution to giving the money directly to class members. The USDA talks about the need for immediate relief for class members now, not 20 years from now. It also points out that these funds are designed to benefit class members, not some random group in the future. These thoughts express our reasons we also oppose the foundation.

Fourth, class counsel was asked time and time again at the listening sessions to provide class members with an accounting of the funds, i.e. accrued interest, and the investments being utilized by the cy pres funds so we could gain an understanding of how much money is in the cy pres fund. The requests of the class members were ignored. The court may have been informed of these funds, but class members were denied this information.

Lastly, we would point out to the court that Ms. Vogel contacted us about meeting with us on Nov 5th, 2013. We did not contact her. It was very apparent when she came here, that her purpose was to shut us up about our opposition to the foundation. She contacted us a few days after we expressed our opposition to the foundation proposal to Joe Sellers. We are including a 7 page letter that Ms. Vogel sent to us about a month after she came here to our home. We view her meeting with us, and this letter, as an attempt by class counsel to intimidate and bully us into silence. The court can read it and decide for itself. Class counsel was trying to silence us by making us feel guilty and greedy. They have also repeatedly tried to put words into our mouths. We received a call from Anu Varma trying to silence us. Christine Webber also called, but we did not speak to her, but we knew what she wanted. Also to silence and intimidate us.

We feel that the class counsel's attempts to intimidate us into silence border on elder abuse. We are fighting for these funds for the 3600 class claimants. We are attempting to get these funds into the hands of those who were injured by and suffered through the injustice dealt to us by the USDA. This law suit was started due to the horrible racism and discrimination we native ranchers and farmers suffered through. Many such natives lost their hopes, dreams, and aspirations for a better life because of this discrimination.

Marilyn and I believe that neither our class counsel, nor the USDA attorneys fully understand how badly so many native families were injured by this discrimination. If they do comprehend this disaster, they are seemingly unsympathetic to it. At the listening sessions, many people testified about the devastation of their lives and lively hood brought on by this government sanctioned bigotry.

      We are not greedy, nor are we ungrateful, dishonest liars, as portrayed by class counsel. We are simple Tribal elders trying to do what's best for our Native people. We are not highly educated people. Our education consists of basic high school classes. We have no training in law, philosophy, nor do we have experience with jurisprudence. We cannot compete with these attorneys and their law degrees. We are speaking from our logic and our hearts.

      We are looking only for justice for the wrongs perpetrated on us by the government.

Our hopes and dreams are that the court can see it's way clear to make a just decision in this matter of such great importance to our people. We pray that the Creator gives you the wisdom to decide what is best for our Native people.

Sincerely Yours,

*[signatures: George Keeps Eagle, Marilyn Keeps Eagle]*

George and Marilyn Keeps Eagle
P.O. Box 509
Fort Yates, North Dakota 58538

Sarah Vogel
1203 North 2nd St.
Bismarck, ND 58501
P: 701-355-6521
F: 701-425-0155
sarahvogellaw@gmail.com
www.sarahvogellaw.com



**Sarah Vogel**

December 4, 2013

Dear George and Marilyn,

First, let me start by thanking you for your letter of September 30, 2013 and apologizing for not writing you back sooner. As you know, my sister passed away shortly after you wrote and I was unable to focus for a while. In addition, I hoped that the conference call that we lined up between the lead plaintiffs and class counsel shortly after you sent your letter, and the evening I spent visiting with you at your house on November 5, 2013 may have answered your questions and resolved some of your concerns. However, I recently talked with David Garelick and he told me that he spoke to you on Friday, November 15 and that you were still very unhappy. So, I decided to put in written form the points I expressed when I met with you at your kitchen table. In addition, at the end of this letter, I will add some perspective on where we stand with regard to the use of the leftover funds (the "cy pres" funds) based on the status hearing held in Washington, DC on Monday, November 18, 2013.

In your letter to me, at page 2, you state that you "emphatically" deny that you are better off because of the lawsuit. As I told you when I met with you, I respectfully disagree with this bleak view of the benefits you have received as a result of the lawsuit. I will explain.

The most important benefit you received was the forgiveness of $440,836.47 of USDA debt because you had a successful Track A claim. Your land, your house, your outbuildings, your machinery, your land, and your cattle had been pledged as collateral for this debt. As a result of the lawsuit, your home, your land, your buildings, your machinery and farm equipment and cattle are free and clear of USDA liens. Further, because the Settlement Agreement required USDA to pay one-quarter of the value of the debt forgiven to the IRS you also received $110,902.32 paid to the IRS by USDA for application to 2012 taxes due as a result of the debt forgiveness. (If your overall tax obligation for 2012 was lower than 25%, the remainder could be refunded to you.)

1

1827445.1

Second, in about June 2011, each of you received $100,000 for your services as Lead Plaintiffs to the case, for a total of a $200,000 cash payment.[1]

Third, in September 2012, because you had a successful Track A claim, you received $50,000 in cash, and $12,500 for tax relief. This was paid to you on or about September 10, 2012.

In total, you received $250,000 in cash and $449,836.47 in debt relief and $123,402.32 in prepaid taxes, for a grand total of benefits of $823,238.79. This is quite a substantial sum. Even if the tax payments are not counted as a benefit, your direct monetary benefit is almost $700,000 ($699,836.47) as a result of the lawsuit. And, during the course of the lawsuit, you didn't have to pay any out of pocket expenses or legal fees for these benefits from your personal funds. Finally, while the lawsuit was ongoing, we were able to block USDA efforts to collect on your outstanding loans. As you know, there were people who lost their land to USDA foreclosure prior to the lawsuit, and while the lawsuit awarded them money damages, it was not possible to get their land back. Thus, protecting the land during the lawsuit, as well as clearing it of debt at the end of the lawsuit, was a substantial benefit.

The $250,000 in cash paid to you in 2010 and 2011 was yours to use as you saw fit. It could have been used in any number of ways, to repurchase the land you'd sold to the Standing Rock Sioux Tribe, for retirement and travel, for home improvements, for new vehicles or equipment, or to pay down non-USDA debt. The way that you spent it was your choice. If it has been used for purposes you intended, you had the benefit of that use and the claim, made in your letter to me and written in late 2013, that you are not better off is overly pessimistic.

When I visited with you recently, it seemed that you wish you had filed a Track B claim. I would like to revisit the circumstances under which you decided to file a Track A, rather than a Track B claim. At the time, you were delinquent with FmHA (FSA) and the debt burden was overwhelming. The anticipated cash flow from annual cattle sales was not enough to service the USDA debt and other private debt and pay for the normal operations of the ranch; it certainly wasn't enough to retire the debt so that you could own your land free and clear and pass it to your son and grandchildren. In fact, because of the amount of built-up debt, it appeared to us that the Keepseagle ranch would not be able to survive without debt relief and would face foreclosure if debt forgiveness did not occur. As you know, the Settlement Agreement provided that any successful claimant (whether Track A or Track B) would have their debt forgiven.

---

[1] As you will recall, George served as a lead plaintiff up to the date of his deposition, and when George was too ill to complete his deposition, he withdrew as lead plaintiff, Marilyn then stepped in as a lead plaintiff. We are very grateful for your services as lead plaintiffs. While you had to pay taxes on this $200,000, the after-tax net would still be approximately $140,000.

2

Before making the decision on whether to go with Track A or B, we discussed the respective burdens of proof needed to prove a Track B claim (very difficult) and the burden to prove a Track A claim (much easier).

Further, we discussed the fact that a Track B cash award might be considerably less than $250,000 because an award of $250,000 was not automatic and any Track B claim needed admissible evidence for proof of damages. For example, if you filed for Track B and could prove only $100,000 in damages, then $100,000 was all you would receive. In your case, David Garelick and I discussed the Track A and Track B choice with you. I personally didn't think Track B was a good option for you because I believed there would be serious difficulty in proving damages that would result in a large Track B award. First, the amount might be less than $250,000 and there would be taxes (Track B awards were not eligible for tax relief payments to the IRS) and costs that would need to be paid from an award (e.g. the fees for appraisers or ag economists). As you know, during some years between 1981 and 1999 all ranchers (white and Native American) lost money and the profit margins in many other years were very low. Based on the facts known to us, the major economic harm suffered by you was that you had been compelled by USDA to sell land to the Standing Rock Sioux Tribe in order to reduce your debt rather than using deferral, re-amortization or other debt restructuring tools that were available to USDA at the time. (This sale occurred *before* the lawsuit was brought in 1999.) While we knew that the land had appreciated since the sale, we did not believe the appreciation was sufficient to warrant abandoning a "safe" $50,000 Track A award. Further, we had a problem proving lost profits from crop or hay sales because you still farmed the same land (the Tribe rented it back to you) and you did not sell the crops grown on that land before or after the land was transferred to the Tribe, but rather used this land to produce feed consumed on the ranch. The additional cost of rent paid to the Tribe was a factor, of course, but rental expense was partially offset by the lowered interest payments to USDA as a result of reduction of USDA debt by sale proceeds. When all these factors were considered as well as the very high burden of proof required and the risks of not having *any* debt relief if the Track B claim were unsuccessful, it was my firm opinion that Track A was the better option for you. David Garelick agreed with me. You also agreed.

I continue to believe that going with Track A was the right choice for you. The standards for a Track B were very high. Almost all of the people who filed Track B claims were rejected: only 14 Track B claims nationwide were approved. Had you been among the **85% of the Track B claims that were rejected, you would have been immeasurably worse** off than you are today because you would still be saddled with almost a half million in debt and facing the full range of USDA collection efforts.

The lawsuit set out to redress discrimination suffered by you and a class of similarly situated farmers and ranchers with regard to extension of farm and ranch credit by FmHA (now FSA) during the period of 1981 to 1999. With regard to its goals, the case was extraordinarily successful. We paid $182,714,647 in claims, $59,260,840.32 in debt was forgiven, and $ 55,534,642.11 in tax payments were made so that the value of the claim awards and the debt forgiveness would not be reduced by claims from the IRS. Further, we

3

negotiated significant reforms to USDA procedures to reduce the likelihood that discrimination against Native Americans will occur in the future.

Your letter speaks of several problems that still bother you. For example, you mention that white farmers receive better access to bank services than do Native Americans, that Standing Rock Sioux Tribe ranchers such as yourselves suffered significant losses caused by the Oahe Dam, that Native Americans are treated as "incompetent" and other long-standing problems that face you and many other Native American ranchers. These are valid concerns, but they were and are outside the scope of this lawsuit. The lawsuit could not solve all problems facing ranchers in Indian Country, and it is unrealistic to expect those types of problems to be resolved by this case. From the beginning, our lawsuit only dealt with credit discrimination by one federal agency – USDA.

We are sorry that you lost family land before the lawsuit started. We didn't have the power under the ECOA to compel the Standing Rock Sioux Tribe to transfer the land back to you as part of the settlement. The Tribe was not a party to the lawsuit and can't be forced to sell it back to you or to give it back to you. It is also the case, however, that the lawsuit doesn't stop you from negotiating with the Tribe to recover the land in the future.

You mentioned that you were threatened and nearly lost everything to USDA. We know that to be the case, and agree that these were exceptionally difficult years. However, during these difficult and stressful times you – as lead plaintiffs – received additional free representation from class counsel. During the period between filing the lawsuit in November 1999 and October 2010 when it settled, we represented you through a number of crisis and difficulties. The year after the lawsuit was settled, there was a moratorium on collection action that protected your ranch from collection action and collection threats. But for the lawsuit and the personal legal assistance that members of the class counsel team provided to you during the course of the lawsuit, I think that keeping the ranch intact would have been exceptionally difficult. Fortunately, we were in a position to be of assistance and though it was very difficult for you, you survived and the Keepseagle ranch is still intact and still operating, and will hopefully be managed by you and your son Wade for many years to come.

In sum, you saved your ranch by participating in the lawsuit. You are better off because of the lawsuit. And, as a result of your willingness to be lead plaintiffs together with the other lead plaintiffs named on the case, you also helped **3600** other successful claimants win awards and many of them also received debt forgiveness. Finally, you played a significant role in securing significant programmatic reforms to USDA's operation in Indian Country. You should be very proud of these accomplishments

I'd like now to turn to the left-over money -- the $380,000,000 that remains after all claims are paid. There is some confusion about this money and what it may be used for. This confusion is understandable because the discussion has focused on an alternative method of distribution (a new foundation) that has not been approved by the Department of Justice or the Court. The confusion was exacerbated by inaccurate stories in Indian Country Today

4

that implied that the Department of Justice favored further payments to successful claimants. I think these stories led to some of your concern that was expressed in the letter to me.

While we are still working very hard to resolve the impasse between us and the Department of Justice, there are several important principles and positions of parties to remember.

First, when we negotiated the settlement, USDA was adamant that payments for claimants be set at $50,000 per Track A claim, so that the awards per claim would be the same as in the Black farmer case, as well as in the claims processes they were contemplating for Hispanic and women farmers.

Second, while no one expected more than a few million, if anything, to be left over after the claims process, the settlement did address what to do if there were any funds left over, and directed that the funds (called cy pres funds) would be distributed to *non-profit organizations*, selected by class counsel, that provided services to Native American farmers and ranchers between 1981 and 2010 in equal shares. The Settlement Agreement does not say that further payments to successful claimants are to be the first priority of that fund, as your letter states at page 1. There is *nothing* in the settlement agreement that would allow successful claimants to get payments from the cy pres funds. Unless there is an amendment, this is how the money must be spent.

Third, the Settlement Agreement cannot be modified just by us. We need the Department of Justice (as lawyers for USDA) to consent to any amendment.

Fourth, while class counsel support an amendment to the Settlement Agreement to allow additional payments to successful claimants (we have said this in talks with DOJ, in briefs we filed and shared with you, and in open court), the Department has been *unwavering in its opposition* to further awards to successful class members. Most recently, the Department unequivocally told Judge Sullivan on Monday, November 18, 2013 that they oppose such a payment. Moreover, when the issue was raised, Judge Sullivan asked if that would not be an unfair windfall to the claimants, since he believed the claims had been fairly valued at $50,000 per person. We simply don't see the government changing its position.

Fifth, negotiation (however slow) is preferable to filing an adversary motion. For example, if we were to file a formal motion to the Court asking that the cy pres funds be paid to successful claimants, it might trigger a motion from the Department of Justice demanding the recapture of the money to the Treasury. Loss of $380,00,000 would be a real blow to Native American farmers and ranchers for generations to come. *Last Monday, in response to a question from Judge Sullivan on whether they intended to seek return of the money, the spokesman for the Department of Justice said that the Department "hadn't ruled out the possibility", if the agreement were altered by the Court in a manner not to their liking.* Judge Sullivan also mentioned that Chief Justice Roberts had recently signaled his dislike of cy pres awards. Any action that would induce an appeal carries profound risk that Native

5

1827445.1

American farmers and ranchers will lose the cy pres funds for their use, now and for generations to come. It is a risk we want to avoid.

X  Sixth, after consultation with lead plaintiffs (including you) and other Native American leaders and organizations, we have proposed amendments to the Settlement Agreement whereby the cy pres funds would be administered by a new stand-alone foundation that would be led by qualified Native American leaders that would invest the cy pres principal so that money would be generated every year for the long term, and that would select appropriate non-profits to receive grants intended to benefit Native American farmers and ranchers. Before we ever raised this with the Department of Justice or anyone else, we reviewed the idea with you and other lead plaintiffs and received your consent to proceed on this course. We have periodically updated you about progress or lack of progress. We have repeatedly stated that our lead plaintiffs supported this approach because you, Claryca, Porter, and others *told us that you supported it.* You are of course free to change your mind about that support, but it is unhelpful to our case and impairs our credibility to tell others (as you told David Garelick) that if we had said that you supported the foundation concept that we put words into your mouth. Perhaps we could fashion a statement that more completely addresses your preference that the cy pres funds be distributed to class members. For example, "Although they would prefer distribution of the funds to successful claimants, George and Marilyn Keepseagle recognize that approach is opposed by the Department of Justice and accordingly they are fully supportive of the creation of a new foundation."

It may seem that we are spending more energy on persuading DOJ to agree to the foundation idea than the proposal of a further plan of distribution to successful claimants. The reason for that is the DOJ has completely ruled out a further distribution to successful claimants, and that would be a major change in the Settlement Agreement that we do not believe we could ever obtain through filing motions with the court. It depends solely on DOJ consent which they have made clear they will not give. However, the change between distributing the cy pres funds to non-profit organizations directly and immediately, to the foundation idea in which the cy pres funds are given to non-profit organizations by the foundation over time, is not such a major change. It provides a better mechanism for distribution, but ultimately follows the same purpose as that set forth in the Settlement Agreement. Thus, it is within the court's power to approve such a change over the government's objections. More significantly, it is an approach that DOJ has been interested in discussing with us, even though they have not embraced it publicly yet. They have indicated that they are open to distributing the funds over a period of years, which will provide a steady flow of funding to organizations in Indian Country that serve Native American farmers and ranchers. They also understand why we, as class counsel who know a lot more about law than we do about farming and ranching, believe that decisions about which non-profit groups deserve a share of the funds should be made by people with great expertise in farming and ranching and the needs of Native American farmers and ranchers, people who have the confidence of the Native American community, and can be entrusted with such authority.

6

1827445.1

As it stands now, the Court has set another status conference for late January. He has expressed the hope that the parties will reach an agreement by then.

As we move forward to this crucial period of negotiation, your lawyers (Joe, Christine, Peter, David, Anu, Phil and Paul, and myself) very much hope that you two will be fully supportive of the work that we have done and are doing. We need to work together and not disagree and there is little point in lamenting choices that were made years ago. We stand at the cusp of a significant turning point in this case regarding the use of $380,000,000 in cy pres funds, and we have an unprecedented ability to benefit Native American farmers and ranchers across the country and for generations to come. We value your input and hope you can be as fully supportive of this effort in the future, as you have been in the past.

My very best wishes,

*Sarah*

Sarah Vogel