*Let this be filed*
*EGS*
*1/22/15*

January 12, 2015


District Judge Emmet G. Sullivan
333 Constitution Avenue N.W.
Washington  D.C.  20001

Dear Judge Sullivan:

Attached is my claimant copy to Keepseagle vs. Vilsack.  Also, I am sending a copy of the letter that was sent to Congressman Mike McIntyre.  I also contacted Keith H. Weatherly, State Executive Director and Representative Richard Hudson to help me look at my paperwork to show what happened to my loan and how I was discriminated.  I have also enclosed my denial letter.  The only thing I want is someone to help me with all the trouble USDA has caused me.

Thanks for your time and I hope to see you at the next hearing for Mrs. Mary Keepseagle.

Sincerely,

Ozmer Lee Oxendine  Jr.
1917 Old Baker Road
Maxton  NC  28364
(910)  674-5480

Keepseagle Claims Administrator
PO Box 3560
Portland, OR 97208-3560

  271801446839

Claimant's Tracking Number: 14582

0000000000070
OZMER L OXENDINE JR
1917 OLD BAKER RD
MAXTON NC 28364

August 24, 2012

**Keepseagle v. Vilsack Settlement**
Civil Action No. 1:99-cv-03119 (DDC) (EGS)

# "TRACK A" CLAIM DETERMINATION FORM

## PART I.  CLAIMANT INFORMATION

Claimant:
OZMER L OXENDINE JR
1917 OLD BAKER RD
MAXTON NC 28364

Claimant's SSN/TIN: XXX-XX-5604
Claimant's Date of Birth: 08/03/1963
Claimant's Phone Number: (910) 521-0566

## PART II. SUMMARY OF CLAIM DETERMINATION

Several months ago, you submitted a Track A claim to the Non-Judicial Claims Process under the Settlement Agreement in *Keepseagle v. Vilsack*, No. 1:99-cv-03119 (D.D.C.). Since that time, a Neutral has determined that your claim is **DENIED**.

Your claim is DENIED because:

- You failed to prove that you complained of discrimination to the USDA or to a representative who complained to the USDA on your behalf regarding USDA's treatment of you in response to your application.

_Linda DeBene_
Linda DeBene

**THIS DECISION IS FINAL.  IT IS NOT REVIEWABLE BY THE CLAIMS ADMINISTRATOR, THE TRACK A NEUTRAL, THE TRACK B NEUTRAL, THE DISTRICT COURT, OR ANY OTHER PARTY OR BODY, JUDICIAL OR OTHERWISE.**

**QUESTIONS:**  If you have any questions, you may contact the Claims Administrator at 1-888-233-5506.

**NOTE:**  Please note that only Track A determination letters have been distributed at this time.  Track B claimants will receive their notifications in a few months.



00072823

## Keepseagle v Vilsack Settlement Online Claim Form

# [CLAIMANT COPY]

## CLAIMANT INFORMATION

| | |
|---|---|
| NAME: | OZMER LEE OXENDINE JR |
| ADDRESS: | 1917 OLD BAKER RD, MAXTON NC 28364 |
| BUSINESS NAME: | SSN: 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 |
| PHONE: | (910) 521-0566 |
| DATE OF BIRTH: | 08/03/1963 |
| ALTERNATE PHONE: | (910) 674-5480 |
| EMAIL ADDRESS: | |

## CO-CLAIMANT INFORMATION

NAME:
PHONE:                              SSN:
RELATION TO                          DATE OF BIRTH:
CLAIMANT:                            EMAIL ADDRESS:

## CLAIMANT'S COUNSEL INFORMATION

NAME:
ADDRESS:
BUSINESS NAME:
PHONE:
EMAIL ADDRESS:

## SUBMITTER'S INFORMATION

NAME:
ADDRESS:
RELATION TO
CLAIMANT:                            SSN / TAX ID:
PHONE:                               DATE OF BIRTH:
ALTERNATE PHONE:                     EMAIL ADDRESS:

## FOR DECEASED CLAIMANTS

Are you the legal representative of the claimant's estate?

Do you have a death certificate for the claimant?

## FOR CLAIMANTS UNABLE TO SUBMIT A CLAIM DUE TO MENTAL OR PHYSICAL LIMITATION

Are you the claimant's legal representative?

## CLAIMANT ACKNOWLEDGEMENTS


00072823

### Keepseagle v Vilsack Settlement Online Claim Form

# [CLAIMANT COPY]

1. You acknowledge that you will be bound by the Neutral's ruling on your claim, and that the Neutral's determination will be the final determination on your claims. You forever and finally waive the right to seek review of this determination in any court or before any tribunal and forever and finally release USDA from any and all claims and causes of action that have been or could have been asserted against the Secretary by the proposed Class and the Class Members in the Case arising out of the conduct alleged therein.

> Acknowledged

2. Some of the relief for successful claims may include payments made directly to USDA/FSA to reduce outstanding debt or payments made directly to the IRS to reduce tax liability. Notwithstanding this payment, you acknowledge you are responsible for compliance with all applicable federal, state, and local tax requirements that arise as a result of any payment you receive on your claim. This includes payment of taxes for any cash payments, debt payments, or tax payments you may be awarded.

> Acknowledged

3. I did not file a claim in connection with the Black Farmers Settlement, Pigford v. Vilsack, No. 97-1978 (PLF) (D.D.C.), and will not file a claim in connection with any of the following cases: • Pigford II, In re Black Farmers Discrimination Litigation, No. 08-0511 (MC) (D.D.C.); • Women Farmers Settlement, Love v. Vilsack, No. 07-2502 (RBW) (D.D.C.); or • Hispanic Farmers Settlement, Garcia v. Vilsack, No. 00-2445 (RBW) (D.D.C.).

> Acknowledged

4. Your failure to complete this Claim Form and/or provide any necessary documentation will result in denial of your claim.

> Acknowledged

---

## ELECTION OF TRACK A OR TRACK B

| Selected Track: | Track A |
| --- | --- |

## CLAIM INFORMATION FOR TRACK A & TRACK B

QUESTION 1: Are you an enrolled member of a state or federally-recognized tribe?
> Yes
> I AM A MEMBER OF THE LUMBEE TRIBE, MY ENROLLMENT NUMBER IS #141065. ATTACHED, PLEASE FIND A COPY OF MY MEMBERSHIP CARD.

QUESTION 2: Did you farm or ranch, or attempt to farm or ranch, between January 1, 1981 and November 24, 1999?
> Yes
> I GREW CORN, SOYBEANS, AND WHEAT ON 600 ACRES FROM 1986 TO THE PRESENT DATE ON SHARECROPPED LAND. FROM 1987 TO 1991 I ALSO RAISED AND SOLD HOGS, ABOUT 100 PER YEAR. I RAISED THE HOGS ON 30 ACRES I OWN JOINTLY WITH MY MOTHER.

QUESTION 3: Did you own or lease, attempt to own or lease, have grazing rights on, or authorization to use farm or ranch land?
> Yes
> I GREW CORN, SOYBEANS, AND WHEAT ON 600 ACRES FROM 1986 TO THE PRESENT DATE ON SHARECROPPED LAND IN ROBESON COUNTY LOCATED OFF OF HWY 710 SOUTH, UNION SCHOOL ROAD, US 74 AND CABINET SHOP ROAD. FROM 1987 TO 1991 I RAISED AND SOLD HOGS, ABOUT 100 PER YEAR. I RAISED THE HOGS ON 30 ACRES I OWN JOINTLY WITH MY MOTHER. THE LAND I OWN IS LOCATED AT 1917 OLD BAKER ROAD IIN MAXTON, NC



00072823          **Keepseagle v Vilsack Settlement Online Claim Form**

# [CLAIMANT COPY]

QUESTION 4: Did you apply for loan(s) or loan servicing at a USDA office between January 1, 1981 and November 24, 1999?

> Yes

QUESTION 5: Were you denied an opportunity to submit application(s) for loan(s) or loan servicing, or discouraged from applying between January 1, 1981 and November 24, 1999?

> Yes

QUESTION 6: Was the only instance of being denied an opportunity to submit an application or being discouraged from applying between January 1, 1997 and November 23, 1997?

> No

Identify the type(s) of loan(s) or loan servicing you sought.

> Emergency Loan          Loan Servicing

IN NOVEMBER 1998 I WAS GRANTED AN EMERGENCY LOAN AFTER A DROUGHT. WHEN I WENT TO THE USDA OFFICE TO MAKE MY FIRST LOAN PAYMENT I WAS TOLD BY USDA EMPLOYEES THAT THE OFFICE I NEEDED TO MAKE A PAYMENT IN WAS CLOSED DOWN AND THAT SOMEONE WOULD CONTACT ME TO MAKE ARRANGEMENTS FOR MY LOAN PAYMENTS. ABOUT SIX MONTHS LATER I RECEIVED A FORECLOSURE LETTER FROM THE USDA SAYING MY LOAN WAS HEADED FOR DEFAULT BECAUSE I MISSED MY PAYMENT. I WENT TO THE USDA OFFICE TO FOLLOW UP AND I SPOKE WITH A MAN NAMED MICHAEL BROWN WHO TOLD ME THAT MY ORIGINAL LOAN PAPERS WERE MISPLACED. I TOLD MR BROWN THAT I COULD NOT REPAY THE EMERGENCY LOAN BECAUSE I DID NOT HAVE OPERATING FUNDS. MR. BROWN REVIEWED MY CASE AND HAD MY LOAN PAYMENTS RESCHEDULED. ALSO, MR. BROWN STARTED AN OPERATING LOAN APPLICATION FOR ME SO I COULD KEEP MY FARM RUNNING. WHEN I RETURNED TO THE USDA OFFICE TO COMPLETE MY LOAN APPLICATION I WAS INFORMED THAT MR. BROWN HAD BEEN TRANSFERRED TO A DIFFERENT USDA OFFICE AND I HAD TO FILE A NEW APPLICATION. BEFORE MY LOAN APPLICATION WAS REVIEWED MY CREDITORS HAD FILED FOR A JUDGEMENT AGAINST ME FOR UNPAID BILLS. I WAS REFERRED TO ANOTHER LOAN OFFICER WHO SUBMITTED MY APPLICATION BUT IT WAS DENIED. IN 2004 I WAS REFERRED TO K. DEAN SASSER WHO SUBMITTED ANOTHER LOAN APPLICATION WHICH WAS DENIED. AFTER THIS DENIAL I REQUESTED A MEETING WITH KEITH WEATHERLY (STATE EXECUTIVE DIRECTOR, FSA). I WANTED TO ASK MR. WEATHERLY WHY I WAS BEING DENIED AN OPERATING LOAN AFTER I HAD SUFFERED DAMAGE TO MY CREDIT BECAUSE OF A USDA ERROR. MR WEATHERLY REVIEWED MY CASE WHILE MR. SASSER AND I WERE PRESENT . MR. WEATHERLY SUPPORTED MY LOAN DENIAL, SAYING THAT THE ONLY PROBLEM HE SAW WAS MY BAD CREDIT. HE DID NOT REVIEW OR CONSIDER MY EMERGENCY LOAN OR THE FACT THAT THE USDA HAD MADE ERRORS THAT DAMAGED MY CREDIT. MR. WEATHERLY FOLLOWED UP THE MEETING WITH A LETTER CONFIRMING MY DENIAL. AFTER THIS I CALLED U.S. CONGRESSMAN MIKE MC INTYRE TO ASK FOR HELP WITH MY USDA LOAN APPLICATIONS AND I WAS REFERRED BY MR. MCINTYRE'S SECRETARY TO BILLY BARKER (CONGRESSMAN MCINTYRE'S ASSISTANT). BILLY BARKER PRESENTED MY CASE TO THE USDA FOR REVIEW AND HE RECEIVED A LETTER OF REPLY ON JUNE 14, 2005 THAT DID NOT MENTION MY EMERGENCY LOAN (AS IT RELATES TO PAPERWORK BEING MISPLACED AND DAMAGE TO MY CREDIT.) THE LETTER ONLY MENTIONS THAT I WAS UNQUALIFIED FOR AN OPERATING LOAN BECAUSE MY "CASH FLOW" WAS TOO LOW AND THERE WERE JUDGEMENTS AGAINST ME FOR UNPAID BILLS. I LATER RECEIVED A LETTER FROM CONGRESSMAN MCINTYRE'S OFFICE WITH A COPY OF THE LETTER HE RECEIVED FROM THE USDA REGARDING MY CASE. AFTER THAT I VISITED K. DEAN SASSER IN HIS WHITEVILLE OFFICE AND I TOLD HIM THAT I THOUGHT I WAS BEING DISCRIMINATED AGAINST BY THE USDA BECAUSE I AM NATIVE AMERICAN. I ALSO ASKED HIM WHAT I SHOULD DO ABOUT MY LOAN SITUATION TO



00072823

## Keepseagle v Vilsack Settlement Online Claim Form

# [CLAIMANT COPY]

PROTECT MY CREDIT FROM FURTHER DAMAGE. MR. SASSER TOLD ME TO CONTACT THE NATIONAL TRIBAL DEVELOPMENT ASSOCIATION. I CONTACTED THEIR OFFICE BUT THEY COULD NOT HELP ME AS THEY ARE GRANT WRITERS AND NOT LENDERS.

QUESTION 7: Were the loan(s) or loan servicing you applied for denied, provided late, approved for a lesser amount than requested, encumbered by restrictive conditions, or did USDA fail to provide appropriate loan services, such as assistance with completing forms or restructuring of payments?

Yes

QUESTION 8: Was the only instance of conduct described in the previous Question between January 1, 1997 and November 23, 1997?

No

IN NOVEMBER 1998 I WAS GRANTED AN EMERGENCY LOAN AFTER A DROUGHT. WHEN I WENT TO THE USDA OFFICE TO MAKE MY FIRST LOAN PAYMENT I WAS TOLD BY USDA EMPLOYEES THAT THE OFFICE I NEEDED TO MAKE A PAYMENT IN WAS CLOSED DOWN AND THAT SOMEONE WOULD CONTACT ME TO MAKE ARRANGEMENTS FOR MY LOAN PAYMENTS. ABOUT SIX MONTHS LATER I RECEIVED A FORECLOSURE LETTER FROM THE USDA SAYING MY LOAN WAS HEADED FOR DEFAULT BECAUSE I MISSED MY PAYMENT. I WENT TO THE USDA OFFICE TO FOLLOW UP AND I SPOKE WITH A MAN NAMED MICHAEL BROWN WHO TOLD ME THAT MY ORIGINAL LOAN PAPERS WERE MISPLACED. I TOLD MR BROWN THAT I COULD NOT REPAY THE EMERGENCY LOAN BECAUSE I DID NOT HAVE OPERATING FUNDS. MR. BROWN REVIEWED MY CASE AND HAD MY LOAN PAYMENTS RESCHEDULED. ALSO, MR. BROWN STARTED AN OPERATING LOAN APPLICATION FOR ME SO I COULD KEEP MY FARM RUNNING. WHEN I RETURNED TO THE USDA OFFICE TO COMPLETE MY LOAN APPLICATION I WAS INFORMED THAT MR. BROWN HAD BEEN TRANSFERRED TO A DIFFERENT USDA OFFICE AND I HAD TO FILE A NEW APPLICATION. BEFORE MY LOAN APPLICATION WAS REVIEWED MY CREDITORS HAD FILED FOR A JUDGEMENT AGAINST ME FOR UNPAID BILLS. I WAS REFERRED TO ANOTHER LOAN OFFICER WHO SUBMITTED MY APPLICATION BUT IT WAS DENIED. IN 2004 I WAS REFERRED TO K. DEAN SASSER WHO SUBMITTED ANOTHER LOAN APPLICATION WHICH WAS DENIED. AFTER THIS DENIAL I REQUESTED A MEETING WITH KEITH WEATHERLY (STATE EXECUTIVE DIRECTOR, FSA). I WANTED TO ASK MR. WEATHERLY WHY I WAS BEING DENIED AN OPERATING LOAN AFTER I HAD SUFFERED DAMAGE TO MY CREDIT BECAUSE OF A USDA ERROR. MR WEATHERLY REVIEWED MY CASE WHILE MR. SASSER AND I WERE PRESENT. MR. WEATHERLY SUPPORTED MY LOAN DENIAL, SAYING THAT THE ONLY PROBLEM HE SAW WAS MY BAD CREDIT. HE DID NOT REVIEW OR CONSIDER MY EMERGENCY LOAN OR THE FACT THAT THE USDA HAD MADE ERRORS THAT DAMAGED MY CREDIT. MR. WEATHERLY FOLLOWED UP THE MEETING WITH A LETTER CONFIRMING MY DENIAL. AFTER THIS I CALLED U.S. CONGRESSMAN MIKE MCINTYRE TO ASK FOR HELP WITH MY USDA LOAN APPLICATIONS AND I WAS REFERRED BY MR. MCINTYRE'S SECRETARY TO BILLY BARKER (CONGRESSMAN MCINTYRE'S ASSISTANT). BILLY BARKER PRESENTED MY CASE TO THE USDA FOR REVIEW AND HE RECEIVED A LETTER OF REPLY ON JUNE 14, 2005 THAT DID NOT MENTION MY EMERGENCY LOAN (AS IT RELATES TO PAPERWORK BEING MISPLACED AND DAMAGE TO MY CREDIT.) THE LETTER ONLY MENTIONS THAT I WAS UNQUALIFIED FOR AN OPERATING LOAN BECAUSE MY "CASH FLOW" WAS TOO LOW AND THERE WERE JUDGEMENTS AGAINST ME FOR UNPAID BILLS. I LATER RECEIVED A LETTER FROM CONGRESSMAN MCINTYRE'S OFFICE WITH A COPY OF THE LETTER HE RECEIVED FROM THE USDA REGARDING MY CASE. AFTER THAT I VISITED K. DEAN SASSER IN HIS WHITEVILLE OFFICE AND I TOLD HIM THAT I THOUGHT I WAS BEING DISCRIMINATED AGAINST BY THE USDA BECAUSE I AM NATIVE AMERICAN. I ALSO ASKED HIM WHAT I SHOULD DO ABOUT MY LOAN SITUATION TO PROTECT MY CREDIT FROM FURTHER DAMAGE. MR. SASSER TOLD ME TO CONTACT THE NATIONAL



00072823          **Keepseagle v Vilsack Settlement Online Claim Form**

# [CLAIMANT COPY]

TRIBAL DEVELOPMENT ASSOCIATION. I CONTACTED THEIR OFFICE BUT THEY COULD NOT HELP ME AS THEY ARE GRANT WRITERS AND NOT LENDERS.

QUESTION 9: Did USDA's treatment of you lead to financial harm?
Yes
MY CREDIT WAS DAMAGED DUE TO A USDA LOGISTICAL ERROR. ALSO, I WAS UNABLE TO APPLY FOR LOANS AS A RESULT OF DAMAGE TO MY CREDIT. MY CREDIT WOULD HAVE BEEN IN GOOD STANDING IF THE USDA HAD NOT LOST MY PAPERWORK. AND, ALTHOUGH I STILL FARM MY FARM IS MUCH SMALLER (75 ACRES), BECAUSE I CAN'T AFFORD TO RENT AS MUCH LAND AS I COULD BEFORE MY CREDIT WAS DAMAGED.

QUESTION 10: During the period January 1, 1981 through June 30, 1997 or November 24, 1997 through November 24, 1999, did you file a discrimination complaint with USDA either individually or through a representative with regard to alleged discrimination?
Yes
I CALLED U.S. CONGRESSMAN MIKE MCINTYRE TO ASK FOR HELP WITH MY USDA LOAN APPLICATIONS AND I WAS REFERRED BY MR. MCINTYRE'S SECRETARY TO BILLY BARKER (CONGRESSMAN MCINTYRE'S ASSISTANT). BILLY BARKER PRESENTED MY CASE TO THE USDA FOR REVIEW AND HE RECEIVED A LETTER OF REPLY ON JUNE 14, 2005 THAT DID NOT MENTION MY EMERGENCY LOAN (AS IT RELATES TO PAPERWORK BEING MISPLACED AND DAMAGE TO MY CREDIT.) THE LETTER ONLY MENTIONS THAT I WAS UNQUALIFIED FOR AN OPERATING LOAN BECAUSE MY "CASH FLOW" WAS TOO LOW AND THERE WERE JUDGEMENTS AGAINST ME FOR UNPAID BILLS. I LATER RECEIVED A LETTER FROM CONGRESSMAN MCINTYRE'S OFFICE WITH A COPY OF THE LETTER HE RECEIVED FROM THE USDA REGARDING MY CASE. AFTER THAT I VISITED K. DEAN SASSER (USDA LOAN OFFICER) IN HIS WHITEVILLE OFFICE AND I TOLD HIM THAT I THOUGHT I WAS BEING DISCRIMINATED AGAINST BY THE USDA BECAUSE I AM NATIVE AMERICAN. I ALSO ASKED HIM WHAT I SHOULD DO ABOUT MY LOAN SITUATION TO PROTECT MY CREDIT FROM FURTHER DAMAGE. MR. SASSER TOLD ME TO CONTACT THE NATIONAL TRIBAL DEVELOPMENT ASSOCIATION. I CONTACTED THEIR OFFICE BUT THEY COULD NOT HELP ME AS THEY ARE GRANT WRITERS AND NOT LENDERS.

QUESTION 11: Do you have any outstanding debt, interest or penalties associated with any of the following USDA/FSA farm loan programs: operating loans, farm ownership loans, emergency loans, debts restructured under Part 1951-S or other farm loan program servicing options?
Yes

| USDA or FSA Account Number | Loan Program | Loan Number | Year Loan Obtained | USDA or FSA County Office Where Loan Obtained | Outstanding Balance on Loan |
|---|---|---|---|---|---|
| | 43 | 4 | 2000 | ROBESON | 6585.4200 |
| | 43 | 5 | 2000 | ROBESON | 33321.4400 |
| | 44 | 6 | 2000 | ROBESON | 18059.9400 |

**TRACK B ONLY**

QUESTION 12: Was the USDA's treatment of you less favorable than that of a similarly situated white farmer(s)?



00072823

**Keepseagle v Vilsack Settlement Online Claim Form**

# [CLAIMANT COPY]

N/A (Track A selected)


00072823

Keepseagle v Vilsack Settlement Online Claim Form

# [CLAIMANT COPY]

## CLAIMANT DECLARATION

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the answers and statements made in this Claim Form are true and correct and all enclosures are true and correct copies; and:

1. The number provided in Part 1: Claimant & Counsel Information is the correct Social Security Number or Taxpayer Identification Number for this claimant; and
2. The claimant is NOT subject to backup withholding because: (a) the claimant is exempt from backup withholding, or (b) the claimant has not been notified by the Internal Revenue Service (IRS) that the claimant is subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified the claimant that he or she is no longer subject to backup withholding; and
3. The claimant is a U.S. citizen or other U.S. person.

Note: You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return.

The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding.

_____          _____
Signature of Claimant or Submitter                              Date Signed

**Submit this form by December 27, 2011 to:**
Keepseagle Claims Administrator
PO Box 3560
Portland, OR 97208-3560

MIKE McINTYRE
7TH DISTRICT, NORTH CAROLINA

COMMITTEE ON AGRICULTURE

RANKING MEMBER
SUBCOMMITTEE ON SPECIALTY CROPS

SUBCOMMITTEE ON CONSERVATION,
CREDIT, AND RURAL DEVELOPMENT

COMMITTEE ON ARMED SERVICES

SUBCOMMITTEE ON TACTICAL AIR AND LAND FORCES

SUBCOMMITTEE ON TERRORISM,
UNCONVENTIONAL THREATS AND CAPABILITIES

U.S. HELSINKI COMMISSIONER
ORGANIZATION FOR SECURITY AND
COOPERATION IN EUROPE

Congress of the United States
House of Representatives
Washington, DC 20515–3307

WEB PAGE:
www.house.gov/mcintyre

SENIOR WHIP

CO-CHAIRMAN
SPECIAL OPERATIONS FORCES CAUCUS

CO-CHAIRMAN
TASK FORCE ON FATHERHOOD

CO-CHAIRMAN
COALITION TASK FORCE ON
BUSINESS AND TECHNOLOGY

STEERING COMMITTEE
RURAL HEALTH CARE COALITION

BOARD MEMBER
UNITED STATES NAVAL ACADEMY

June 17, 2005

Ozmer Lee Oxendine
1917 Old Baker Road
Maxton , NC 28364

Dear Mr.Oxendine:

Enclosed is a letter of response from Mr. Keith Weatherly, State Executive Director with
the United States Department of Agriculture (USDA) in Raleigh North Carolina
concerning your issues with the Farm Service Agency (FSA) regarding your application
for an annual operating loan

The letter from the USDA/FSA Department of Agriculture is self-explanatory. I truly
regret that a favorable reply was not possible. However, I trust the information is helpful.
Thank you for contacting my office for assistance.

Sincerely,

Mike McIntyre
Member of Congress

MM:bb

Enclousre

2437 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515–3307
(202) 225–2731
FAX: (202) 225–5773

301 GREEN STREET, ROOM 218
FAYETTEVILLE, NC 28301–6088
(910) 323–0260
FAX: (910) 323–0069

701 NORTH ELM STREET
LUMBERTON, NC 28358–4895
(910) 671–6223
FAX: (910) 739–6085

201 NORTH FRONT STREET, SUITE 410
WILMINGTON, NC 28401–3957
(910) 815–4959
FAX: (910) 815–4543

PRINTED ON RECYCLED PAPER



| United States | Farm | 4407 Bland Road, Suite 175 |
|---|---|---|
| Department of | Service | Raleigh, North Carolina 27609 |
| Agriculture | Agency | Tel: 919/875-4800 |
| | | Fax: 919/875-4825 |

June 14, 2005

The Honorable Mike McIntyre
United States House of Representatives
301 Green Street, Suite 218
Fayetteville, NC  28301-5088

Attn:  Mr. Billy Barker

Dear Congressman McIntyre:

This letter is in response to your recent inquiry on behalf of your constituent, Mr. Ozmer Lee Oxendine, 1917 Old Baker Rd., Maxton, NC  28366.

Mr. Oxendine, a currently indebted FSA borrower with both operating and emergency loans, recently applied for an annual operating loan for 2005.  We were unable to develop a feasible plan of operation for Mr. Oxendine's request for an $8000.00 operating loan due to a significant amount of judgment debts that are all due and payable, in addition to a lack of cash flow to pay normal operating expenses and current term debt payments.

Mr. Oxendine presented a plan of operation for 2005 that projected expenses for seed, fertilizer, and chemicals at a level significantly below his historical average, based on the borrower's tax returns for the last five years.  Based on Mr. Oxendine's projections for 2005 of $7920.00 for these items, he failed by $3269.00 to provide sufficient income to pay operating expenses, family living and current debt payments.  His historical average of $31,365 for these inputs would have resulted in an even greater deficit.  We reviewed Mr. Oxendine's plan in this manner to make every attempt to look at his current financial situation in a "light most favorable."  If we had been able to develop a feasible plan for this crop year, Mr. Oxendine would have been required to get a nondisturbance agreement from all judgment holders to allow the loan to be made.  Mr. Oxendine's credit quality would have also been a problem, since he shows several accounts that have been converted to collection only and a significant number of payments 90 or more days past due.  Currently Mr. Oxendine has a negative net worth and our ability to adequately secure a loan would also have been a problem.

In 2004, Mr. Oxendine was rejected for an annual operating loan for basically the same reasons as described above.  In that case, Mr. Oxendine presented a cash flow that was infeasible, and then revised the projections and it was still infeasible.  He had the same judgments on record, but we did not obtain a credit report at that time, since it would not have overridden the other factors in our decision.

Honorable Mike McIntyre
Ref:  Lee Oxendine
June 14, 2005
Page 2

Thank you for sharing Mr. Oxendine's letter with me.  Please let me know whenever I might be
of assistance to you and your constituents in the future.

Sincerely,

Keith H. Weatherly
State Executive Director

cc:  Warren Hepler, DD

K. Dean Sasser, FLM
Columbus County

# Office of U.S. Representative Richard Hudson



## Privacy Authorization Release Form

### Authorization in Accordance with the 1974 Privacy Act

Due to the provisions of the Privacy Act of 1974 (Title 5, Section 552A of the United States Code)
permission in writing is required before making an inquiry on your behalf. Completing and signing this
form authorizes U.S. Representative Richard Hudson to make inquiries to the appropriate officials on your behalf. In
accordance with the provisions of the Privacy Act, I hereby authorize U.S. Representative or his representative to receive information
on my behalf and discuss my records with the agency involved.

Name: *Ozmer Lee Oxendine Jr*   Date of Birth: *8-3-63*

Address: *1917 Old Baker Rd*

City: *Maxton*   State: *NC*   Zip: *28364*
*cell*

Home Phone: (*910*) *521-0566*   Other Phone: (*910*) *674-5480*

Email: _____

Social Security Number *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*   Case/Account/Inquiry Number _____
*(Please provide the appropriate identification number pertaining to the assistance with which you are seeking our help.)*

Have you contacted any other elected official regarding this case?
(Yes)/No (circle one) If so, who *Mr. Mike McIntyre*

Please describe the specific information you are requesting or the exact nature of the problem you are experiencing. Send
copies of relevant information.  **Please do not send originals.** Use extra paper if necessary.

*This Brief Story of my loans*
*The story start with ms. Mary Elialty Jones*
*who lost my loan paper, P.S we are coming*
*to Washington. DC, 10-22-14 to Hear Case of, Remaining Keeps eagle*
*Funds case*

Which federal agency does this involve? *FSA*
*call me for*
*more Inf*

SIGNATURE: *Ozm Lee Oxdin Jr*   Date: *10-1-14*

Please return the completed form to:   U.S. Representative Richard Hudson/Casework
1015 Fayetteville Rd.
Rockingham, NC 28379
Phone: 910-997-2070
Fax: 704-782-1004

RICHARD HUDSON
8TH DISTRICT, NORTH CAROLINA

COMMITTEE ON HOMELAND SECURITY
CHAIRMAN, TRANSPORTATION SECURITY SUBCOMMITTEE

COMMITTEE ON AGRICULTURE

COMMITTEE ON EDUCATION
AND THE WORKFORCE

STEERING COMMITTEE

ASSISTANT WHIP

429 CANNON HOUSE OFFICE BUILDING
WASHINGTON, DC 20515
(202) 225-3715

325 MCGILL AVE., STE. 500
CONCORD, NORTH CAROLINA 28027
(704) 786-1612

1015 FAYETTEVILLE RD.
ROCKINGHAM, NORTH CAROLINA 28379
(910) 997-2070

**Congress of the United States**
**House of Representatives**

September 24, 2014

Ozmer Oxendine
1917 Old Baker Rd.
Maxton, NC 28364

Dear Mr. Oxendine,

Thank you for contacting the Office of Congressman Hudson regarding your issue with USDA.

We will be happy to do all we can to assist you. Before we can proceed, you will need to complete and return the enclosed Privacy Authorization Release Form. This authorization form will permit our office to follow up on your case with the appropriate officials.

After we receive your completed Privacy Authorization Release Form, we will contact the agency. We will then contact you once a response is received. If you have any questions, please feel free to contact me at (910) 997-2070. Thank you again for contacting the Office of Congressman Richard Hudson. We look forward to assisting you.

Sincerely,

William C. Maples
Constituent Relations Manager

enclosure

RICHARD HUDSON
8TH DISTRICT, NORTH CAROLINA

COMMITTEE ON HOMELAND SECURITY
CHAIRMAN, TRANSPORTATION SECURITY SUBCOMMITTEE

COMMITTEE ON AGRICULTURE

COMMITTEE ON EDUCATION
AND THE WORKFORCE

STEERING COMMITTEE

ASSISTANT WHIP

429 CANNON HOUSE OFFICE BUILDING
WASHINGTON, DC 20515
(202) 225-3715

325 MCGILL AVE., STE. 500
CONCORD, NORTH CAROLINA 28027
(704) 786-1612

1015 FAYETTEVILLE RD.
ROCKINGHAM, NORTH CAROLINA 28379
(910) 997-2070

# Congress of the United States
## House of Representatives

September 24, 2014

Ozmer Oxendine
1917 Old Baker Rd.
Maxton, NC 28364

Dear Mr. Oxendine,

Thank you for contacting the Office of Congressman Hudson regarding your issue with USDA.

We will be happy to do all we can to assist you. Before we can proceed, you will need to complete and return the enclosed Privacy Authorization Release Form. This authorization form will permit our office to follow up on your case with the appropriate officials.

After we receive your completed Privacy Authorization Release Form, we will contact the agency. We will then contact you once a response is received. If you have any questions, please feel free to contact me at (910) 997-2070. Thank you again for contacting the Office of Congressman Richard Hudson. We look forward to assisting you.

Sincerely,

William C. Maples
Constituent Relations Manager

enclosure

Judge Emmet G. Sullivan, and,
Magistrate judge Allan Kay
United States District Court
District of Columbia

Washington D.C.        20001

Jan 20th 2015

Dear Judge Sullivan,

We are pleased to provide your honor with a status update regarding our search for legal
counsel as directed by the court.

We have narrowed our search down to two law firms, both based in Washington DC.
The contact by one of these law firms was initiated by Mr. Sellers. We are thankful for his
assistance in this regard. The other firm, we found on our own. We have been in contact
with both firms, and are at the present time negotiating with them for representation.

We anticipate retaining one of these firms with in 10 to 14 days. We will immediately
notify the court of our choice of legal representation.

We wish to thank the court for it's patience in this matter. Such legal representation is a
very important matter, and we feel that we must choose wisely. Our decision will not only
affect our lives, but may well affect the other plaintiffs in this case.

George and Marilyn Keeps Eagle
P.O. Box 509
Ft. Yates, North Dakota

          58538

CC:     Mr. Joe Sellers

        Cohen, Milstein, Sellers, and Toll, LLC

        1100 New York Ave. NW Suite 500



COHEN MILSTEIN

Joseph M. Sellers
(202) 408-4600

August 29, 2014

Tex G. Hall
Chairman, Great Plains Tribal Chairman's
Association
Chairman, Mandan, Hidatsa & Arikara Nations
(Three Affiliated Tribes)
HC3 Box 2
New Town, North Dakota  58763-9402

Re:   *Keepseagle v. Vilsack settlement*

Dear Chairman Hall:

I am writing to provide you with a report on the status of the *cy pres* funds from the *Keepseagle* settlement.  As you know, we scheduled a series of meetings with the broader Native community to report on the status of the settlement funds, to solicit recommendations on how to use these *cy pres* funds within the limits set by the Settlement Agreement and on recommendations of persons who should serve as members of the Board of Trustees who will oversee distribution of these funds.   During these meetings, we found some people fundamentally misunderstood how these *cy pres* funds could be used and we provided the facts that correct this misunderstanding.  We wanted to provide this information to you as well in order that you can share this with members of the Great Plains Tribal Chairman's Association.

***Some people believe the cy pres funds would be distributed to claimants who succeeded in the original claims process if the existing Settlement Agreement were not changed.***  This is a very common misconception.  In fact, the original settlement agreement dictated that after each successful claimant was paid the full amount of his or her claim ($50,000 plus $12,500 to the IRS for Track A claimants and up to $250,000 for Track B claimants), any remaining funds would be distributed to non-profit organizations.  Before the settlement was approved by the Court, members of the class were informed about the claims process pursuant to Tracks A and B and that any settlement funds that remained unclaimed after the claims process concluded would be given to non-profit organizations.  The notice providing this information was distributed widely throughout Indian Country in 2010 and 2011.  No one objected to this process for distributing unclaimed settlement funds by giving the funds to non-profit groups that have served

Cohen Milstein Sellers & Toll PLLC   1100 New York Ave. NW   Suite 500, West Tower   Washington, DC  20005
t 202.408.4600   f 202.408.4699   www.cohenmilstein.com

1914652.1



Tex G Hall
August 29, 2014
Page 3

*Some people believe that USDA would agree to distribute the unclaimed settlement funds to the claimants who succeeded on their original claims if asked by class counsel or that the Court can order USDA to agree to this change.* First, class counsel has repeatedly asked the DOJ, on behalf of USDA, to agree that the unclaimed settlement funds may be distributed to individual class members, either to those class members who succeeded in their original claims or those class members whose claims were denied or even to class members who never filed claims but wish to do so now. Repeatedly, USDA/DOJ has rejected this use of the unclaimed settlement funds. As the terms of the Settlement Agreement were the result of a negotiation and agreement with USDA, changes in the use of the unclaimed settlement funds would require its agreement, which it has refused to provide. I have enclosed with this letter a copy of a status report the USDA and the plaintiffs filed with the Court in which we each set forth our views about distributing unclaimed settlement funds to class members who succeeded in their original claims. Second, the Court has made clear in other rulings in this case that it lacks the authority to order changes to these terms of the Settlement Agreement without the USDA's agreement. Third, at a status conference in this case held in November, 2013, when we informed the Court that we supported distributing the remaining funds to claimants who had prevailed on their claims, the Court expressed concern that it would constitute an improper "windfall" because those class members already received the full payment that the Settlement Agreement permitted them to have.

*Some people believe that because the parties are discussing revisions to some terms of the Settlement Agreement, that the terms could be changed to distributed the unclaimed settlement funds to claimants who succeeded in their original claims.* The only changes that can be made to the Settlement Agreement are those to which the USDA agrees and the Court approves. While the USDA has been willing to explore some changes to terms governing ways in which unclaimed settlement funds may be used, it has consistently refused to allow these funds to be disbursed to class members who succeeded on their original claims or otherwise to distribute these funds as damages to other class members. The USDA, however, has been willing to discuss changes to the Settlement Agreement to expand the non-profit groups eligible to receive grants of *cy pres* funds, to include tribal colleges and tribal organizations with programs dedicated exclusively to serving farming and ranching. The USDA also seems willing to agree to Class Counsel's request that decisions about how to distribute most of the unclaimed settlement funds be made by a Board of Trustees drawn from the community rather than by class counsel. Finally, USDA seems willing to allow the Board of Trustees to distribute the funds over a period of time, if it elects to do so, as long as the entire fund is distributed within 20 years.

*Some people are confused about the main distribution of the funds through a Trust and distribution of a small, initial fund upon the recommendation of Class Counsel.* As presently written, the Settlement Agreement requires that all unclaimed settlement funds be disbursed to non-profit groups selected by class counsel and approved by the Court. Class Counsel have proposed that most of the unclaimed settlement funds be transferred to a trust, overseen by a Board of Trustees drawn from the community who can distribute the funds over a period of time. As part of the revisions to the Settlement Agreement to which the plaintiffs and

Tex G Hall
August 29, 2014
Page 5

*Some people think that the Trust is being created to benefit class counsel and that class counsel will control which non-profits receive the funds.* Left unchanged, the Settlement Agreement as it is currently written provides that all unclaimed settlement funds be disbursed to non-profits selected by class counsel and approved by the Court. The changes to the Settlement Agreement under consideration would reduce considerably the influence of class counsel in the selection of the non-profit groups receiving unclaimed settlement funds. Those changes would provide for appointment of a Board of Trustees drawn from the community and on which none of class counsel expect to serve. Nearly all of the unclaimed settlement funds would be distributed by this Trust. Only 10% of the settlement funds would be distributed to non-profit groups selected by class counsel and approved by the Court and, even there, Class Counsel has appointed a five-member advisory committee comprised of Native ranchers and others familiar with Native needs.

*Some people are concerned that funds disbursed to non-profit organizations will be used to pay overhead of these groups rather than benefit the Native community.* We expect that, as the Trust Agreement being drafted provides, standard precautions will be put in place by the Trustees to protect against a disproportionate amount of funds being used by any non-profit group receiving funds to fund their overhead. Standard rules and guidelines exist to govern the amount of funds that ordinarily may be used to fund the overhead of grant recipients, which we expect the Board of Trustees to use in evaluating which non-profit groups to fund and in monitoring the use of those funds.

*Some people have suggested that the cy pres money be given to a non-profit organization that in turns gives a grant to every prevailing claimant in the lawsuit.* While we do not expect any restrictions to exist that would bar non-profit groups receiving grants to disburse funds to individual farmers and ranchers, there are limits imposed by law on such grants. Any funds distributed to individuals by non-profits may not be used as if they were damages awarded under the original claims process. The legal requirements on non-profit organizations require (a) that its grants be available to a broadly defined population, such as Native American farmers and ranchers, rather than a set list of named beneficiaries, such as class members who prevailed on their claims; (b) that recipients of grants demonstrate financial need; and (c) that the grant be used for a permissible purpose.

In conclusion, we class counsel have been honored to represent the plaintiff class in this litigation over the past 15 years. After more than a decade of hard-fought litigation, we were very pleased to be able to reach an agreement to settle the case in a way that has led to significant changes to the farm loan system and to the payment of more than $680 million in damages and up to $80 Million in debt relief. After concluding the claims process, we now enter the final stage of this case, in which the unclaimed settlement funds may be used to serve Native farmers and ranchers for years to come. We want to thank you for your early and steadfast support of this case and of the interests of Native farmers and ranchers throughout the country.

Judge Emmett G. Sullivan                          Jan 11th, 2015
United States District Court for the
District of Columbia
333 Constitution Blvd. NW
Washington D.C.       20001

Reference: Keeps Eagle Settlement Cause No. 1:99CV03119

Dear Judge Sullivan,

We are writing to the court to supply you with an update on our activities in this case. Mr. Sellers called us a few days after the December 2nd hearing to advise us that he was looking in to finding us legal counsel, as directed by the court. After 2 weeks, we wrote to Mr. Sellers to ascertain if he had been able to find an appropriate law firm to represent us. We received a phone call from him a few days ago, and he gave us the name of a law firm he might recommend, but offered no contact information. He advised us that he would give them our contact information, and they would call us. They did call us on the 9th, and we are considering their offer. We are also proceeding to interview other legal counsel on our own. Perhaps between the three of us, proper counsel can be obtained.

Secondly, we wrote to Mr. Sellers and asked him to provide us with contact information for the 3600 class plaintiffs, so that we could put together an interrogatory poll to seek their input on the disbursal of the cy pres funds. Mr. Sellers advised us that he would not release this information, citing privacy concerns for those plaintiffs. We told him why we needed this information, but he was adamant that he would not release it to us. We told him that we are not seeking this information for commercial usage, or to make this information public in any way, but he still refused to provide it. We are anticipating that after we have retained legal counsel, we will have to file motions with the court to obtain the courts guidance on this issue.

Thirdly, we would like to demonstrate to the court, one of the primary reasons why we are so opposed to the establishment of the foundation proposal, proffered by class counsel, and the establishment of a panel of Native American "leaders" to oversee the cy pres funds.

In a New York Times article dated December 28th, 2014, by reporters Deborah Sontag, and Brent Mc Donald, titled "In North Dakota, a tale of Oil, Corruption, and Death", great detail is laid out about alleged corruption by Tex Hall, the former chairman on the three affiliated tribes of the Fort Berthold Reservation, former two time chairman of the National Congress of American Indians, and former chairman of the Great Plains Tribal Chairman's Association, and a former member of the Coalition of Large Tribes (COLT). This article involves allegations of kick backs, bid rigging, political cronyism, nepotism, and many other corrupt practices attributed to Mr. Tex Hall. A copy of this article is enclosed for the courts review. It will be interesting to see how the USDOJ investigation of these allegations pans out.

We now draw the courts attention to KeepsEagle docket number 646, affidavit numbers 2, 3, and 4, all from organizations which Mr. Tex Hall was a member of, and/or a past leader of. Mr. Hall is being touted by class counsel as a strong supporter of the foundation proposal. In a report, (copy enclosed), from Mr. Sellers to Tex Hall, class counsel is detailing the foundation proposal to him. This demonstrates with clarity that our cy pres funds are in the sights of Mr. Hall. Neither we nor other class members got such a report. We have no knowledge of any wrong doing by Mr. Hall.

Political corruption is wide spread and rampant on nearly all Indian reservations, nationwide. That is why there is virtually no support among grass roots native farmers and ranchers for a foundation composed of Native American "leaders". We know many native tribes leadership is tainted by corruption, cronyism, nepotism, and sometimes outright fraud. We know that if the $380 plus million dollar cy pres fund is given to this foundation, it will disappear, with no benefit to the class plaintiffs. That is why we have so strongly opposed the foundation proposal from the start. It is common practice for non tribal people to go after Tribal contracts by forming a group, finding a willing Native American to be named the "leader" and then go after Tribal contracts, or even Federal funds as an "Indian owned" business. They then have priority in gaining construction contracts, consulting contracts, and even goods and services supply contracts, often times, without competition. We can for see this happening to the $ 380 million plus dollar Cy Pres funds if the foundation proposal goes forward. The Cy Pres funds will disappear in to non Indian hands with no benefit to the class members who suffered USDA discrimination, and who are supposed to be compensated for suffering that discrimination.

In any event, we felt that it is important for the court to know that we are making progress in this matter. We are interviewing potential counsel to represent us. We have an idea on how we want to proceed, and get input from fellow class members. We are striving to work with class counsel to reach a mutually acceptable plan to move this case forward toward to a

conclusion. The court and class counsel will be advised of our new legal representation as quickly as we can contract with them.

We are praying to the great creator of us all that we are on the right path for our Indian people.

Respectfully Submitted,

George and Marilyn KeepsEagle,
P.O. Box 509
Ft. Yates, North Dakota
                    58538


Attachments:
Report from class counsel
New York Times article

# New York Times Profiles Corruption, Murder Involving Heidi Heitkamp "Friend"

North Dakota    December 29, 2014    by Rob Port



203 SHARES

 Facebook          🐦 Twitter

Political corruption is an unfortunate fact of life on many American Indian reservations, and the Fort Berthold Reservation is certainly a noteworthy example. And, as has often happened with tribal leadership around the country, when there's an influx of wealth the corrupt tribal political bosses often don't let much of it trickle down to rank-and-file tribal members.

When some of the most productive oil reserves in North Dakota's oil fields were found on the lands of the Three Affiliated Tribes their leader Tex Hall (just voted out of office earlier this year) seems to have done more to enrich himself than improve the quality of life for his mostly impoverished tribal members.

Hall's maneuvering even included people who resorted to outright murder in their dealings, and the *New York Times* has profiled those sordid affairs in an article published today.

Of course, because this is the *Times*, the driving thesis of the story is that oil's corrupting influence brought foul deeds to the reservation, but a less myopic and biased assessment would note that oil profits merely acted as fertilizer for long-standing problems with corruption

on the reservation.

Also, because the *Times* has an overweening left-wing bias, not mentioned at all is Hall's position as a long-time ally of North Dakota Democrats.

Hall was an outspoken friend to former Senator Kent Conrad and former Rep. Earl Pomeroy, and he's continued his support with current Senator Heidi Heitkamp.

In fact back in November of 2013 – just months after Hall's property was searched for the body of Kristopher Clarke, allegedly murdered by conspiracy involving former Hall business associate James Henrikson – Senator Heitkamp posted a photo of herself with Hall on Twitter calling the tribal leader her "friend."



**Sen. Heidi Heitkamp** ✔
@SenatorHeitkamp

🐦 Follow

**Great to see friend & Three Affiliated Tribes Chairman, Tex Hall at the @WhiteHouse #TribalNations Conference today.**

5:36 PM - 13 Nov 2013

**4** RETWEETS **3** FAVORITES

Early in the article authors Deborah Sontag (who wrote that previous inaccurate hit piece on North Dakota oil development) and Brent McDonald tie Hall's leadership on oil issues to that of North Dakota's state leadership.

That's a fantastically unfair connection to draw – suggesting that Hall acting as regulator for oil development on tribal lands while simultaneously owning oil industry companies is anything like the North Dakota state government's cooperative approach to regulating oil and gas development is just plain irresponsible – yet I suspect that if Hall had been out *campaigning* with the likes of Governor Jack Dalrymple or Senator John Hoeven, both Republicans, Sontag

and her colleague would have had a field day with relationship.

But Hall's decades worth of activism and support for Democrats up to and including his close and friendly relationship with Senator Heidi Heitkamp?

I guess *that* sort of thing doesn't fit the *Times'* narrative.

The *Times* profile of Hall's indiscretions simply connects the dots on a lot of things North Dakotans already knew. Sontag and her colleague aren't exactly breaking new ground here. But what would be a fascinating topic for investigation would be how much tribal corruption and suffering North Dakota Democrats ignore lest they risk upsetting one of the few reliably pro-Democrat voting blocs in the state.

It's clear that Heitkamp – a former Attorney General and no babe-in-the-woods when it comes to crime – was holding her nose when she embraced Hall even as he gave his own people the shaft.

Some reporter in the state should ask Heitkamp about this (neither she nor her staff ever bother to respond to my emails or calls), but I won't hold my breath.



203 SHARES    f Facebook    🐦 Twitter

### Rob Port

Rob Port is the editor of SayAnythingBlog.com. In 2011 he was a finalist for the Watch Dog of the Year from the Sam Adams Alliance and winner of the Americans For Prosperity Award for Online Excellence. In 2013 the Washington Post named SAB one of the nation's top state-based political blogs, and named Rob one of the state's best political reporters.

Mr. Eric H. Holder, Jr., Attorney General,                    January *15, 2015*
15,    2015
Office of the Attorney General
United States Department of Justice
950 Pennsylvania Avenue NW
Washington D.C.        20530-0001

Reference:  Keepseagle V. Vilsak Cause # 1:99CV03119

Dear Attorney General Holder,

     Our names are George and Marilyn Keepseagle. We are writing to you
about the above named case, now being heard in the court of Judge Emmett
G. Sullivan, Washington D.C. district court. We are the lead plaintiffs in this
case. We are writing to you in the hopes that you can assist us in this matter.
     After our case was settled, and the plaintiffs were all paid, there was a
balance of 380 plus million dollars left over, and placed in a cy pres fund.
Our class counsel wants to take these funds and start a philanthropic
foundation. We and a vast majority of the class plaintiffs are opposed to the
idea of a foundation getting our settlement money. Our position is that these
funds were set aside for Native American farmers and ranchers due to
discrimination by the USDA. We feel that these Cy Pres funds should be
awarded out to the class members in a second round of pay outs.
     Apparently, the DOJ attorney in this matter, Justin M. Sandberg is
opposed to a second round of payments. The reason stated for his opposition
to additional pay outs is that he wants the Keepseagle payments to be equal
to the payouts in the other class action suits relating to discrimination by the
USDA, (Pigsford I and II, Garcia, and the Women and Hispanic farmers and
ranchers suits). We would like to point out that the class members in these
other suits had opportunities that we native farmers and ranchers did not
have. Namely that they had a least some modicum of a chance to seek
outside funding that we native farmers and ranchers did not have.
     Every aspect of our lives is controlled in some manner by the federal
government. We can not lease, sell, or borrow against our land and assets
with out approval of the U.S. Bureau of Indian Affairs. Nearly all land
owned or leased by Native American farmers and ranchers are lands that are
held in trust by the BIA.
     Private lenders will not talk to us about loans against our owned assets
because of this policy. If we do not own fee patent land, we cannot use our
property as collateral for loans.

Therefore we are/were at the mercy of the federal government to finance our daily operations. This discrimination policy by the USDA was therefore far more devastating to Native farmers and ranchers than to non natives.

Most of us lost everything we had because of this policy. Since we could not get funding, our operations ceased. We fell behind on our loan payments to the USDA, and often they foreclosed on us and we were forced to sell out. Our property and assets were seized and auctioned off, and we could not start over.

Mr. Holder, there were only 3,600 successful claimants in this suit. There were only approximately 5,600 claims total. We believe that this number was so low because Native Americans have historically been punished for complaining about harsh treatment from the federal government. Simply put, American Indians have been trained to not complain about injustices.

We therefore strongly feel that in order for justice to be served in this matter, the remaining Cy Pres funds should be paid out to the successful plaintiffs in this case. Justice in this matter would stipulate that the Cy Pres funds in this case be paid to the class claimants.

Mr. Holder, you now know our hearts in this matter. We pray to the creator that you can look at the DOJ's position on this action, and see that justice is served for the Native Americans in this case.

Thank you for your kind attention in this affair.

Sincerely Yours,

*George Keepseagle 1-15-2015*

*Marilyn Keepseagle - 1-15-15*

George and Marilyn Keepseagle
P.O. Box 589
Ft. Yates, ND.

58538

CC: Justin M. Sandberg, Trial Attorney,
U.S. Department of Justice, Civil Division
Federal Programs Division
20 Massachusetts Ave. NW Rm. 7302
Washington D.C.      20001

*CC: Judge Sullivan*