**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MARILYN KEEPSEAGLE, et al., | ) |
| | ) |
| Plaintiffs, | ) Civil Action No. 1:99CV03119 |
| | ) (EGS) |
| v. | ) |
| | ) |
| TOM VILSACK, Secretary, United States | ) Judge:  Emmet G. Sullivan |
| Department of Agriculture, | ) Magistrate Judge: Alan Kay |
| | ) |
| Defendant. | ) |

## OPPOSITION TO MARILYN KEEPSEAGLE'S MOTION TO MODIFY THE SETTLEMENT AGREEMENT

# TABLE OF CONTENTS

Page

I.  Introduction ................................................................................................. 1

II.  Argument ..................................................................................................... 2

    A.  The Court Should Reject the Keepseagles' Motion to Modify the
Settlement Agreement Under Rules 60(b)(5) and 60(b)(6). ................................. 2

        1.  Because The Settlement Agreement Sets Forth A Process For
Amendment By Agreement Of The Parties, The Court Need Not
Invoke Its Rule 60(b)(5) Authority To Modify The Agreement ................ 3

        2.  If The Court Relies On Rule 60(b)(5), The Court Should Adopt
Plaintiffs' Proposed Modification Because It Is Suitably Tailored
To Address The Problems With The Agreement's Current Cy Pres
Provisions ........................................................................................... 5

        3.  The Court Cannot Rely On Rule 60(b)(6) To Grant The
Keepseagles' Motion To Modify ........................................................... 7

    B.  The Keepseagles' Preferred Distribution Is Not Supported By the Law ................ 8

        1.  Reversion and Escheatment Are Inappropriate ...................................... 9

        2.  Distribution to Claimants Deprives Non-claiming Class Members
of Benefits ........................................................................................... 9

            a.  Claimants Have No Property Interest in the Remaining
Funds ...................................................................................... 10

            b.  No Evidence Supports Claim that Claimants' Recovery to
Date Did Not Cover their Claims' Actual Value ......................... 12

        3.  Cy Pres Distribution Will Benefit the Class .......................................... 14

            a.  Trust Would Benefit Class Members ........................................... 14

            b.  Cy Pres Remedies Are Unquestionably Appropriate in
These Circumstances ................................................................ 15

        4.  No Legal Authority for Second Claims Process ..................................... 18

III.  Conclusion ................................................................................................. 19

# TABLE OF AUTHORITIES

Page

### CASES

*In re Baby Products Antitrust Litig.*,
  708 F.3d 163 (3d Cir. 2013)................................................................16

*In re BankAmerica Corp.*,
  775 F3d 1060 (8th Cir. 2015) ............................................................11

*In re Black Farmers Discrimination Litigation*,
  29 F. Supp. 3d 1 (D.D.C. 2014)........................................................4, 5

*In re Black Farmers Discrimination Litigation*,
  950 F. Supp. 2d 196 (D.D.C. 2013)...................................................3, 4

*Dahingo v. Royal Caribbean Cruises, Ltd.*,
  312 F. Supp. 2d 440 (S.D.N.Y. 2004)................................................18

*Democratic Cent. Comm. of D.C. v. Washington Metro. Area Transit Comm'n*,
  84 F.3d 451 (D.C. Cir. 1996)........................................................11, 15

*Diamond Chem. Co. v. Akzo Nobel Chemicals B.V.*,
  517 F. Supp. 2d 212 (D.D.C. 2007)............................................8, 11, 15

*Diamond Chem. Co. v. Akzo Nobel Chems. B.V.*,
  No. 01-2118 (CKK), 2007 U.S. Dist. LEXIS 49406 (D.D.C. July 10, 2007) ..................11, 15

*In re Folding Carton Antitrust Litig.*,
  557 F. Supp. 1091 (N.D. Ill. 1983) *aff'd in part*, 744 F.2d 1252 (7th Cir. 1984) ...................12

*Grace v. City of Detroit*,
  145 F.R.D. 413 (E.D. Mich. 1992) ........................................................18

*Green v. AFL-CIO*,
  287 F.R.D. 107 (D.D.C. 2012).................................................................7

*Ira Holtzman, C.P.A. v. Turza*,
  728 F.3d 682 (7th Cir. 2013) ...............................................................17

*In re Katrina Canal Breaches Litig.*,
  628 F.3d 185 (5th Cir. 2010) ...............................................................17

*Keepseagle v. Vilsack*,
  No. CV 99-3119 (EGS), 2014 WL 5796751 (D.D.C. Nov. 7, 2014) ......................................10

# TABLE OF AUTHORITIES

Page

*Keepseagle v. Vilsack,*
No. CV 99-3119 (EGS), 2015 WL 1851093 (D.D.C. Apr. 23, 2015) .................................... 10

*Klier v. Elf Atochem North America, Inc.,*
658 F.3d 468 (5th Cir. 2011) ............................................................................... 9, 10, 11

*Liljeberg v. Health Servs. Acquisition Corp.,*
486 U.S. 847 (1988) ............................................................................................................. 7

*In re LivingSocial Mktg. & Sales Practice Litig.,*
298 F.R.D. 1 (D.D.C. 2013), *appeal dismissed* (July 19, 2013), *appeal
dismissed*, 2013 WL 6825561 (D.C. Cir. Dec. 12, 2013) ........................................... 15

*In re Lupron Mktg. & Sales Practices Litig.,*
677 F.3d 21 (1st Cir. 2012) ............................................................................................... 16

*Marek v. Lane,*
134 S. Ct. 8-9 (2013) ........................................................................................................ 17

*Masters v. Wilhelmina Model Agency, Inc.,*
473 F.3d 423 (2d Cir. 2007) .............................................................................................. 17

*Nachshin v. AOL, LLC,*
663 F.3d 1034 (9th Cir. 2011) ........................................................................................... 17

*Pigford v. Veneman,*
292 F.3d 918 (D.C. Cir. 2002) ........................................................................................ 4, 7

*Powell v. Georgia-Pac. Corp.,*
119 F.3d 703 (8th Cir. 1997) ............................................................................................ 16

*Rufo v. Inmates of Suffolk Cty. Jail,*
502 U.S. 367 (1992) ................................................................................................ 3, 5, 6, 7

*Six (6) Mexican Workers v. Arizona Citrus Growers,*
904 F.2d 1301 (9th Cir. 1990) ............................................................................................ 9

*United States v. Western Elec. Co., Inc.,*
154 F.R.D. 1 (D.D.C. 1994) ................................................................................................ 5

*United States v. Western Elec. Co., Inc.,*
46 F.3d 1198 (D.C. Cir. 1995) ............................................................................................ 7

# TABLE OF AUTHORITIES

Page

**OTHER AUTHORITIES**

Alba Conte & William B. Newberg, *Newberg on Class Actions* ...................................8, 9, 16, 18

ALI *Principles of the Law of Aggregate Litigation* (2010) ........................................................11

Richard Posner, *Economic Analysis of the Law* (5th ed. 1998)......................................................9

Fed. R. Civ. P. 60(b) ...................................................................................................... *passim*

iv

I.      INTRODUCTION

Regrettably, the plaintiffs must oppose Marilyn Keepseagle's Motion to Modify the

Settlement.  While Mrs. Keepseagle continues to be held in the highest regard and the relief she

seeks is certainly among the range of options for which the unclaimed settlement funds could be

used, the USDA's opposition to her proposal and the terms of the Settlement Agreement to

which she and other members of the class agreed in 2011 foreclose the relief she seeks.  As

signatories to an agreement that they have agreed to honor, therefore, the plaintiffs must oppose

Mrs. Keepseagle's motion.

There can be no dispute that members of the class have suffered enormous harm from the

discrimination at USDA and, notwithstanding the payment of damages and the significant debt

relief provided to prevailing claimants, class members – both those who succeeded in their

claims and those who never filed claims – continue to suffer personal hardships from the

longstanding effects of discrimination.  But the hardships they suffer cannot alter the legal

principles governing this Settlement Agreement.

Moreover, the Plaintiffs' proposed use of the unclaimed funds to endow a trust (Dkt. 709)

will serve the broader Native American farming and ranching community, including class

members whether or not they filed successful claims.  The Keepseagles' primary proposal as it is

presently framed would distribute the unclaimed funds to class members who succeeded on their

Track A and B claims.  The class size, while never determined precisely because USDA did not

keep records of who sought loans, is certainly larger than those who succeeded in their claims, as

the Keepseagles have acknowledged.  Dkt. 779, Memorandum of Points and Authorities In

Support of the Keepseagles' Motion to Modify the Settlement Agreement ("Mot.") at 6.

In addition, the non-profit organizations eligible to receive funds from the proposed trust

would be well suited to serve the interests of many class members in myriad ways.  As the

1

Settlement Agreement currently provides, and the proposed modifications make clear, the organizations eligible to receive grants from the initial distribution of $38 million would be non-profit entities that have an established record of serving Native American farmers and ranchers, while the trust would be restricted to making grants to entities serving farming and ranching needs in Indian country.  Settlement Agreement, section II.I, Dkt. 576;  Addendum, section II, Dkt. 709-2.

Class counsel along with all named plaintiffs at the outset, and now class representatives Claryca Mandan and Porter Holder, have supported creation of the trust as a vehicle to distribute the cy pres funds after USDA refused to modify the Settlement Agreement to allow distribution of the funds either to the original successful claimants or to fund a new claims process for class members who had not filed claims before.[1]  While further distributions might have been a good idea in principle, USDA's opposition to the use of the unclaimed settlement funds as additional damages payable to class members who originally prevailed on their claims or to underwrite a new claims process deprives the Court of the authority to order use of the cy pres funds for the purposes the Keepseagles now propose.

## II.     ARGUMENT

### A.     The Court Should Reject the Keepseagles' Motion to Modify the Settlement Agreement Under Rules 60(b)(5) and 60(b)(6).

The Keepseagles argue that this Court has the authority under Federal Rules of Civil Procedure 60(b)(5) and 60(b)(6) to modify the Settlement Agreement and adopt their proposal for a *pro rata* distribution of the unclaimed portion of the settlement funds or, in the alternative, a reopening of the claims process.  Plaintiffs do not dispute that this Court has the general

---

[1] See Dkt. 709-1 at 3.  (Plaintiffs' Motion to Modify, documenting that USDA would not agree to further distribution to claimants).

authority under Rule 60(b)(5) to modify this or any other settlement agreement.  That authority, however, comes into play only as a last resort, when changed circumstances leave no other alternative.  No such showing has been made by the pending motion.  While the unforeseen circumstance of hundreds of millions of dollars in unclaimed settlement funds warrants a modification of the Settlement Agreement, the Agreement itself provides a mechanism for making that modification – with the consent of the parties – and an appropriate modification has been submitted to the Court.  Given that the Settlement Agreement prohibits modification without both parties' consent, and given that the proposed modification negotiated by Plaintiffs and the government is tailored to address the unforeseen problem in a manner that will provide considerable benefit to the entire class, the Keepseagles' alternative proposal for modification pursuant to Rule 60(b)(5) or 60(b)(6) should be rejected.

1.      Because The Settlement Agreement Sets Forth A Process For Amendment By Agreement Of The Parties, The Court Need Not Invoke Its Rule 60(b)(5) Authority To Modify The Agreement.

As the motion notes, Rule 60(b)(5) provides that this Court may relieve a party from a final judgment when "applying it prospectively is no longer equitable."  Fed. R. Civ. P. 60(b)(5).  The Supreme Court has held that modification of a settlement agreement pursuant to Rule 60(b)(5) is appropriate in the following circumstances: (1) "when changed factual conditions make compliance with the decree substantially more onerous"; (2) "when a decree proves to be unworkable because of unforeseen obstacles"; or (3) "when enforcement of the decree without modification would be detrimental to the public interest."  *Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 384-85 (1992); *see also In re Black Farmers Discrimination Litigation*, 950 F. Supp. 2d 196, 200 (D.D.C. 2013) (same).

Plaintiffs do not dispute that the remainder of $380 million in unclaimed settlement funds is a changed factual circumstance and an unforeseen obstacle that makes implementation of the

3

current cy pres provisions of the Settlement Agreement unworkable.  In fact, Plaintiffs

previously argued to this Court that their own motion to modify the Settlement Agreement could

be granted under Rule 60(b)(5).  However, Rule 60(b)(5) provides only an alternative source of

authority for the Court.  The Settlement Agreement itself provides the primary process for

modifying that Agreement, and resort to Rule 60(b)(5) is not necessary where the Agreement can

be modified in accordance with the Agreement and in a way that will serve the interests of the

class.  Here, the parties have agreed on a modification of the Settlement Agreement pursuant to a

process set forth in Section XIV of the Agreement, and, as contemplated by the Agreement, have

requested the approval of this Court for their proposed modification to the current cy pres

provisions.  The Court should follow this process for modification of the Settlement Agreement.

In this situation, Judge Friedman's recent opinion in *In re Black Farmers Discrimination*

*Litigation*, 29 F. Supp. 3d 1 (D.D.C. 2014), is instructive.  The Settlement Agreement in the

*Black Farmers Discrimination Litigation* contained the exact same provision regarding

modification as is present here: namely, that the Agreement "may be modified only with the

written agreement of the Parties and with the approval of the Court."  *Id*. at 3.  There the Court

held that this provision was binding on the class and that the Court would not resort to Rule

60(b)(5) to modify the Agreement where the Department of Justice had *not* agreed to the

modification proposed by the plaintiffs.  The Court noted that because the "government

oppose[d] any modification to the settlement; consequently, there can be no agreement between

the parties to modify [the finality provisions of the Agreement]."  *Id.* at 3.  In terms equally apt

here, the Court observed that "courts do not have 'free-ranging 'ancillary' jurisdiction' to enforce

or modify negotiated settlement agreements, but are constrained by the terms agreed upon."  *Id*.

(quoting *Pigford v. Veneman*, 292 F.3d 918, 924 (D.C. Cir. 2002)).

4

Here, the parties agreed that any modification of the Settlement Agreement would require their agreement and approval by the Court.  The parties have reached agreement on a proposed modification after extensive negotiations. As this Court previously recounted, when the claims process ended with $380 million in unclaimed settlement funds, "Class Counsel first proposed to the government a modification of the Agreement that would have provided for an additional distribution to members of the class, including successful claimants as well as those whose claims were denied."  Dkt. 772 at 3.  "The government strongly opposed any such modification and threatened to seek reversion of the excess funds if Class Counsel pursued such a modification unilaterally.  Faced with such a risk, along with the need for the government's consent to obtain a modification under the Agreement and the less-than-clear path for obtaining such a modification unilaterally, Class Counsel settled on an approach that would maintain the *cy pres* nature of the funds, but modify the procedures for their distribution." *Id*. at 3-4.  The government has agreed to this proposed modification and the Settlement Agreement should therefore be modified in accordance with Section XIV of the Agreement without reaching Rule 60(b)(5).  *See, e.g., United States v. Western Elec. Co., Inc*., 154 F.R.D. 1, 8 (D.D.C. 1994) (discussing resort to Rule 60(b)(5) standard set forth in *Rufo* to modify a consent decree only in situations in which there was not already a "different standard…specifically set forth in the decree").

2.  <u>If The Court Relies On Rule 60(b)(5), The Court Should Adopt Plaintiffs' Proposed Modification Because It Is Suitably Tailored To Address The Problems With The Agreement's Current Cy Pres Provisions.</u>

As discussed above, the Court need not resort to Rule 60(b)(5) to modify the Settlement Agreement because the Agreement can be amended simply by the Court's approval of the modification already proposed by the Plaintiffs with the approval of the government.  *See* Dkt. 709-1.  However, if the Court invokes its Rule 60(b)(5) authority at all, it should use that

5

authority to adopt Plaintiffs' proposed modification rather than the Keepseagles' proposed modification.

As was set forth in Plaintiffs' memorandum of points and authorities in support of their motion to modify the Settlement Agreement, "a party seeking modification of a consent decree must establish that a significant change in facts or law warrants revision of the decree *and that the proposed modification is suitably tailored to the changed circumstance*." *Rufo*, 502 U.S. at 393 (emphasis added).  In other words, "[o]nce a court has determined that changed circumstances warrant a modification in a consent decree, the focus should be on whether the proposed modification is tailored to resolve the problems created by the change in circumstances."  *Id*. at 391.  While Plaintiffs agree that there have been changed circumstances that warrant revision of the Settlement Agreement, Plaintiffs do not agree that the Keepseagles' proposal is suitably tailored to the changed circumstances.

Here, the magnitude of the unclaimed settlement funds, not their presence *per se,* renders unworkable the "precise provisions *requiring* the transfer of all unclaimed funds at the conclusion of the non-Judicial Claims Process to a Cy Pres Fund, and *requiring* the distribution of the Cy Pres Fund pursuant to cy pres procedures."  Dkt. 772 at 11.  As Plaintiffs have previously noted, the parties certainly contemplated that there would be unclaimed funds at the end of the claims process and provided for a cy pres distribution of those funds.  Dkt. 709-1 at 15.  However, the original proposal set forth in the Settlement Agreement to distribute the funds immediately and in equal amounts to approved recipients reflected the expectation that relatively small amounts of funds would be distributed to organizations without regard to their overall size or the needs of their programs.  *See* Dkt. 709-1 at 15.  It is this provision, and only this provision, that renders the current cy pres provision unworkable.  Thus, as this Court has noted, the

6

"process for distributing the *Cy Pres* Fund is the sole target of Class Counsel's pending motion for modification." Dkt. 772 at 13.

In contrast, the Keepseagles' proposal goes far beyond addressing the changed circumstance that made the cy pres provision unworkable. The Keepseagles would do away with the cy pres provisions of the Settlement Agreement in their entirety and reshape the Settlement Agreement in a fundamental way over the strenuous objection of the government. But as the D.C. Circuit has held, "[w]hatever tailoring method the district court ultimately adopts, … it must preserve the essence of the parties' bargain." *Pigford v. Veneman*, 292 F.3d 918, 927 (D.C. Cir. 2002). The Keepseagles' proposal does not preserve the essence of the parties' bargain. There is no need to reopen the entirety of the Settlement Agreement to address only the specific problems created by the current cy pres provisions of the Agreement. *See, e.g., Rufo*, 502 U.S. at 391 (holding that a court is required to evaluate "whether the proposed modification is tailored to resolve the problems created by the change in circumstances" because "a consent decree is a final judgment that may be reopened only to the extent that equity requires"); *United States v. Western Elec. Co., Inc*., 46 F.3d 1198, 1207 (D.C. Cir. 1995) (finding modification suitably tailored where it "resolve[d] the specific problems created by the change in circumstances"). Thus, to the extent the Court relies on Rule 60(b)(5) to modify the Settlement Agreement, it should adopt Plaintiffs' tailored modification of the cy pres provisions of the Agreement under Rule 60(b)(5) rather than the Keepseagles' proposed reopening of the entire Agreement.

3.    The Court Cannot Rely On Rule 60(b)(6) To Grant The Keepseagles'
      Motion To Modify

The Keepseagles argue in the alternative that their motion to modify can be granted under Rule 60(b)(6). Dkt. 779-1 at 25-26. However, relief under Rule 60(b)(6) is available only if the motion "is not premised on one of the grounds for relief enumerated in clauses (b)(1) through

7

(b)(5)." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863 (1988).   "Rule 60(b)(6) does not provide an opportunity to relitigate a motion brought unsuccessfully under one of the other provisions of Rule 60(b)." *Green v. AFL-CIO*, 287 F.R.D. 107, 109 (D.D.C. 2012).   The motion identifies no "extraordinary circumstances" under Rule 60(b)(6) that are not already encompassed by the arguments under Rule 60(b)(5).   Because all parties agree that a motion to modify the Settlement Agreement may properly be made under Rule 60(b)(5), relief under Rule 60(b)(6) is not available.

    B.    <u>The Keepseagles' Preferred Distribution Is Not Supported By the Law</u>

    The Keepseagles' argument begins by assuming the Court has free rein to choose whatever option it believes best, in its discretion, as if the Settlement Agreement approved by this Court were irrelevant.   That is not correct.   First, as discussed above, the Court does not have such wide-ranging authority to re-write the parties' agreement.   Second, the terms of the Agreement are highly relevant.   Much of the legal authority relied upon by the Keepseagles arises from cases in which the agreement or consent decree is silent about what to do with unclaimed funds, and thus the Court is indeed writing on a blank slate.   *See, e.g., Diamond Chem. Co. v. Akzo Nobel Chemicals B.V.*, 517 F. Supp. 2d 212, 215 (D.D.C. 2007) ("the settlement agreements are silent as to the disposition of any excess funds").   That is simply not the case here.   Moreover, to the extent the Court does have such a free hand, most of the Keepseagles' legal analysis of the options is nonetheless erroneous.

    The Keepseagles cite Alba Conte & William B. Newberg, *Newberg on Class Actions*, regarding alternatives that courts consider in distributing unclaimed funds.   However, in an earlier section, this treatise confirms that:

> *First*, the parties' settlement agreement will typically include a provision expressing the settling parties' preference with regard to unclaimed funds. The court will review that provision at final approval to ensure it is "fair, reasonable,

and adequate" from the perspective of the class; if it is, the court will enforce the provision and follow its distributional instructions, even if the court (or objectors) might have chosen a different path.

*Newberg on Class Actions* § 12:28 (5th ed.) (footnotes, citations omitted).  In this case of course, this portion of Newberg is applicable: the Agreement did include a provision for distribution of unclaimed funds and the Court found it fair in granting final approval.  Thus that provision (as modified by consent of the parties) should be enforced.

      1.     <u>Reversion and Escheatment Are Inappropriate</u>

Plaintiffs agree with the Keepseagles that reversion is inappropriate.  In addition to the authority the Keepseagles' brief cites, see also Richard Posner, *Economic Analysis of the Law*, 626-627 (5th ed. 1998) ("The most important point, on an economic analysis [of class actions], is that the violator be confronted with the costs of his violation – this achieves the allocative purpose of the suit – not that he pays them to his victim."); *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1307 (9th Cir. 1990); *Newberg on Class Actions* § 12:29 (5th ed.) (noting that revisionary funds are "disfavored" even if not legally prohibited).  As the Keepseagles note, escheatment would, in this case, amount to a reverter to the defendant.

      2.     <u>Distribution to Claimants Deprives Non-claiming Class Members of Benefits</u>

As the Keepseagles conceded (Mot. at 6), the class is not limited to the prevailing claimants.  Nonetheless, the Keepseagels' argument for a pro rata distribution is limited to prevailing claimants (with an alternative offered to permit new claims as well, discussed below at Section C.4).  However, because the class clearly includes individuals who are not claimants, a distribution to prevailing claimants would fail to benefit many class members, even while providing double benefits to other class members.  This is one reason why *Newberg* has found, "Intraclass redistribution does little good for those not claiming, while pro bono work on behalf

9

of the class's interests or government services may benefit the class." *Newberg on Class Actions* § 12:30 (5th ed.).

    a.    *Claimants Have No Property Interest in the Remaining Funds*

The Keepseagles once again argue that the settlement funds "belong solely to members of the class." Mot. at 8 citing *Klier*. As the Keepseagles glancingly acknowledge, this Court has squarely found in two prior rulings that the claimants have no property interest in the unclaimed funds. *Keepseagle v. Vilsack*, No. CV 99-3119 (EGS), 2014 WL 5796751, at *12-14 (D.D.C. Nov. 7, 2014) (denial of intervention by a group of Great Plains claimants); *Keepseagle v. Vilsack*, No. CV 99-3119 (EGS), 2015 WL 1851093, at *5 & n.4 (D.D.C. Apr. 23, 2015) (denial of Keepseagles' motion to remove Holder and Mandan as class representatives). The fact that the funds do not "belong to anyone other than class members," Mot. at 9, does not give the claimants a property interest. First, as previously noted, the class is far broader than the claimants. Second, the fact that the funds must be expended for the benefit of the class as a whole does not resolve the issue of whether that distribution should be made directly to claimants who already received funds, or should be made through cy pres mechanisms to benefit the claimants as well as other class members who have not yet been so fortunate.

The Keepseagles' case authority is utterly unpersuasive. *Klier v. Elf Atochem North America, Inc.*, 658 F.3d 468, 475-77 (5th Cir. 2011)), unlike the present matter, was "not a case where the settlement agreement itself provides that residual funds shall be distributed via cy pres," and instead was a case where "the district court's decision" to change the agreement and "distribute the unused funds via cy pres finds no support in the text of the settlement documents." *Klier*, 658 F.3d. at 476-77. Furthermore, there the settlement agreement allowed the settlement administrator to petition for a reallocation of the monetary relief for an additional distribution, but the district court improperly disregarded the administrator's petition when it

10

decided to award a cy pres distribution.  *Id*. at 477.  None of these factors is present here.

Indeed, the Fifth Circuit spoke strongly in favor of enforcing settlement agreements as written:

> the court cannot modify the bargained-for terms of the settlement agreement. That is, while the settlement agreement must gain the approval of the district judge, once approved its terms must be followed by the court and the parties alike. The district judge must abide the provisions of the settlement agreement, reading it to effectuate the goals of the litigation. This is not a free exercise of *cy pres*, but a determination of how the settlement agreement's many provisions define the class's property interests and allocate those interests once created. The terms of the settlement agreement are always to be given controlling effect. Cy pres comes on stage only to rescue the objectives of the settlement when the agreement fails to do so.

*Klier*, 658 F.3d at 475-76.  This language strongly supports the continued use of the cy pres provision to which the parties agreed, as modified by further agreement of the parties in order to better serve the objectives of the settlement.

The Keepseagles also briefly mention *In re BankAmerica Corp.*, 775 F3d 1060, 1064 (8th Cir. 2015).  Mot. at 9.  This case adopted the ALI *Principles of the Law of Aggregate Litigation* (2010), finding them consistent with its prior rulings.  *Id.*at 1064.  However, no case in the D.C. Circuit has adopted those principles, which are contrary to many prior D.C. Circuit rulings on cy pres.  *Compare Principles of the Law of Aggregate Litigation* (2010), §3.07 *with Democratic Cent. Comm. of D.C. v. Washington Metro. Area Transit Comm'n*, 84 F.3d 451, 456 (D.C. Cir. 1996) (approving the distribution of unclaimed settlement funds to non-profit organizations directly and to endow a trust that will, in turn, distribute the funds in the future to other non-profit organizations) *and Diamond Chem. Co. v. Akzo Nobel Chemicals B.V.*, 517 F. Supp. 2d 212, 220 (D.D.C. 2007); *Diamond Chem. Co. v. Akzo Nobel Chems. B.V.*, No. 01-2118 (CKK), 2007 U.S. Dist. LEXIS 49406, at *6-7, *15 (D.D.C. July 10, 2007).

Moreover, the very authority on which the Keepseagles rely explains the flaws in the argument for pro rata distributions that they advance here:

11

> When a class member does not claim her share of the fund, it is not at all obvious that her share therefore belongs to the other class members. If, for example, the government distributed a tax refund to a group of taxpayers but some did not cash their checks, no one would seriously propose that the unclaimed funds are the property of, and should be distributed *pro rata* to, those other citizens who received tax refunds. Such unclaimed funds generally escheat to the state. Additionally, an individual's presence as a class member in a class action hardly expands her property rights to include the property of the other class members. Even if it is the case that the claiming class members have received less than the full value of their claims by the settlement, that fact does not magically make the nonclaimants' property theirs.

*Newberg on Class Actions* § 12:30 (5th ed.).

Finally, while the district court in *In re Folding Carton Antitrust Litigation*, did indeed discuss the responsibility to exercise equitable discretion (see Mot. at 12), it specifically noted that the claimants who had received full payment of what they were due under the settlement terms, even if not the full treble damages they could have received at trial, had less of an equitable claim than the non-claiming class members, holding:

> the equitable claim on these settlement funds of the non-claiming class members is substantial. They furnished equal consideration for the settlement in this litigation in that their purchases formed part of the base of the various settlements. Moreover, they too are bound by the final judgment. Even though the settlement fund was established for their benefit and, in effect, paid for in part with consideration furnished by them, the non-claiming class plaintiffs have to date received no direct or indirect benefit from the settlement fund.

*In re Folding Carton Antitrust Litig.*, 557 F. Supp. 1091, 1107 (N.D. Ill. 1983) *aff'd in part*, 744 F.2d 1252 (7th Cir. 1984).

          b.    *No Evidence Supports Claim that Claimants' Recovery to Date Did Not Cover their Claims' Actual Value*

The Keepseagles acknowledge that even the out-of-circuit authorities on which they rely find additional payments are not appropriate if they would provide an award of damages to class members whose damages claims have been fully satisfied by the initial distribution. Mot. at 9.

The Keepseagles' next argue that damages are harder to calculate in this case than in anti-

12

trust cases and, therefore, they reason the harm suffered here may extend beyond the calculations on which the damage claims were based.  Mot. at 11.  This argument ignores the detailed economic and statistical report of Patrick O'Brien who did establish a method of calculating damages every bit as precise and reliable as the damages methodologies in anti-trust cases.  *See* Final Expert Rebuttal Report of Patrick M. O'Brien, Dkt. 551-4.  Mr. O'Brien reported a total shortfall of 5671 loans through 1999.  Report Table 2, Dkt. 551-6 at 3-4.  He also reported a total of $107,990,000 in economic losses attributable to loans (as opposed to loan servicing) at Figure III-1, Dkt. 551-5 at 30-32, for an average of $19,040 per loan lost.[2]  For loan servicing he found a shortfall of 1661 loan servicing actions for those who received loans (Report Table 91, Dkt. 551-17 at 1-2), and reported that he would have expected 17,027 additional loan servicing actions in total (Report Table 41, Dkt. 551-7 at 27-28) had the additional 5671 loans noted above been made.  There was a total of $631,205,000 in economic losses attributable to loan servicing (Figure III-1, Dkt. 551-5 at 30-32), for an average of $37,070 in losses for each denial of loan servicing (or for the value of loan servicing that would have been available had a loan not been denied).  These are, of course, averages, and an individual claimant might have been denied more than one loan, or have greater than average losses – but other claimants would have had lower than average losses.  Thus, if an average claimant was denied a loan, and also credited with the economic losses associated with loan servicing that would have been available on that loan, the total losses per person were $56,110 on average.  The average prevailing claimant

---

[2]  Mr. O'Brien's analysis took into account the number of loans that would have been ownership loans used to purchase land, and the increase in land values (discussed in the Keepseagles' Motion at nn.6-7) in calculating damages.  Thus, the Keepseagles have not identified any economic losses that have not already been accounted for in Plaintiffs' expert's damages model.

received $62,500 ($50,000 directly and $12,500 to the IRS), plus $16,460 in debt forgiveness.[3]

The total value received on average clearly exceeds the average loss from denial of a loan and

loan servicing.   While class members surely suffered additional harm from the discrimination to

which they were exposed, recompense for it would not have been recovered under the Equal

Credit Opportunity Act had the case proceeded to trial rather than settle.   Accordingly, the only

measure of damages available on which claims for relief would have been presented at trial

showed that the economic losses suffered by class members, on average, were close to the

amounts paid in damages to successful Track A claimants.

3.     Cy Pres Distribution Will Benefit the Class

a.     *Trust Would Benefit Class Members*

The Keepseagles' mischaracterize the proposed trust when they portray it as "serving a

much broader purpose than was intended by this lawsuit" and "limited in their ability to benefit

the class members."  Mot. at 5.  The mission of the proposed trust would be "to make grants to

Eligible Grant Recipients . . . to fund the provision of business assistance, agricultural education,

technical support, and advocacy services to Native American farmers and ranchers to support

and promote their continued engagement in agriculture."  Trust Agreement § 7, Ex. B to Motion

to Modify (Dkt. 709-3).  As described in greater detail in Plaintiffs' Motion to Modify (Dkt. 709-

1), the cy pres distribution to non-profit organizations would bring substantial benefits to Native

American farmers and ranchers, including those who were denied USDA loans in the past, and

the heirs of those who suffered such denials.  The distributions made by the trust, therefore,

would serve the same community that this action was intended to serve.

---

[3] A total of $59,260,840.32 in debt relief was paid, an average of about $16,460 per claimant, though of course the amounts varied widely – those with no debt received no loan forgiveness and the largest loan forgiveness award was over $1 million.

14

Moreover, the concern expressed by the Keepseagles, that the operating expenses of the trust and of the non-profit grant recipients will erode the corpus of the trust, has been addressed by the terms of the Trust Agreement.   The Trust Agreement requires that the non-profit grant recipients:

> Will make efficient use of grant funds without paying administrative overhead expenses in excess of reasonable amounts to accomplish the purposes of the grant, taking into account the amount of administrative expenses that a like organization would ordinarily pay for like expenses in like circumstances.  The Trustees will consider best practices for grant making private foundations in determining what are reasonable administrative overhead expenses.

Trust Agreement, Section 8.b.v, Dkt. 709-3.  The trust itself, furthermore, is expected to fund much, if not all, of its operations from interest generated by investments of the principal with which it is endowed.  Dkt. 709 at 10.

The Keepseagles also express concern that the cy pres distribution through the trust would take 20 years and that some class members may not survive until the end of the trust period.  Mot. at 14.  As the Motion to Modify and accompanying exhibits establish, the 20 year period establishes the maximum time period within which the funds must be disbursed.  The trustees would be authorized to distribute the funds more quickly if they determine circumstances warrant it.  Dkt. 709-1.  If anything, the original claims process and the proposed trust distribution process were designed with concern for the advanced age of some class members.  The claims process permitted heirs of class members to file claims on behalf of the estate.  Likewise, the extended period in which the trust funds can be disbursed permits both present class members and their heirs to benefit from the unclaimed settlement funds.

        b.     *Cy Pres Remedies Are Unquestionably Appropriate in These Circumstances*

The D.C. Circuit has long approved of cy pres distributions from unclaimed settlement funds.  *Democratic Cent. Comm. of D.C. v. Washington Metro. Area Transit Comm'n*, 84 F.3d

451, 456 (D.C. Cir. 1996) (approving the distribution of unclaimed settlement funds to non-profit organizations directly and to endow a trust that will, in turn, distribute the funds in the future to other non-profit organizations); *Diamond Chem. Co. v. Akzo Nobel Chemicals B.V.*, 517 F. Supp. 2d 212, 220 (D.D.C. 2007); *Diamond Chem. Co. v. Akzo Nobel Chems. B.V.*, No. 01-2118 (CKK), 2007 U.S. Dist. LEXIS 49406, at *6-7, *15 (D.D.C. July 10, 2007); *In re LivingSocial Mktg. & Sales Practice Litig.*, 298 F.R.D. 1, 13 (D.D.C. 2013), *appeal dismissed* (July 19, 2013), *appeal dismissed*, 2013 WL 6825561 (D.C. Cir. Dec. 12, 2013) (after completion of claims process and issuing payments due under the settlement, cy pres award to two organizations closely aligned with the claims was appropriate, even though the cy pres award exceeded the amount distributed to the class). *See also Newberg on Class Action*, § 12:32 (noting that cy pres distribution is the most prevalent method for disposing of unclaimed funds and that courts in every circuit have approved of it).

Notwithstanding ample authority within this Circuit permitting cy pres distributions in these circumstances, the Keepseagles cite out-of-circuit cases in mounting a challenge to the propriety of the cy pres provision altogether. Mot. at 14-15. In addition to arising in foreign circuits, these cases do not address the circumstances presented here.

Several of the cases the Keepseagles cite actually *approved* of cy pres distributions and did so on grounds, like those here, that the proposed recipients will serve the interests of the class. *See Powell v. Georgia-Pac. Corp.*, 119 F.3d 703, 706-07 (8th Cir. 1997) (use of cy pres to create scholarship fund was appropriate in lieu of pro rata distribution to claimants, and noting that because the scholarships would go to black students in the geographic area covered by the class, it would benefit class members' younger relatives); *In re Baby Products Antitrust Litig.*, 708 F.3d 163, 172 (3d Cir. 2013) (stating "We join other courts of appeals in holding that a

district court does not abuse its discretion by approving a class action settlement agreement that includes a cy pres component directing the distribution of excess settlement funds to a third party to be used for a purpose related to the class injury," and declining to adopt the ALI standard that cy pres was only appropriate when further distributions are economically infeasible); *In re Lupron Mktg. & Sales Practices Litig.*, 677 F.3d 21, 30, 33 (1st Cir. 2012) (noting settlement agreements often use cy pres provisions to cover unclaimed funds due to some class members not having filed claims, or having died; adopting "reasonable approximation" test in which the cy pres distribution must consider the purpose of the underlying statute, the nature of the injury, interests of class members, geographic scope of the class and the closeness of the fit between the class and cy pres recipient); *Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 434-36 (2d Cir. 2007) (where settlement provided complete discretion to the court in allocating any unclaimed funds, and did not direct a cy pres distribution, the court had authority to consider further distribution to claimants; thus rather than finding cy pres was abuse of discretion, the court remanded for consideration of all available alternatives).

Conversely, one case cited by the Keepseagles as opposing cy pres distributions did so specifically where the proposed beneficiaries had interests too removed from the interests of the class, a concern that's not germane here. *See Ira Holtzman, C.P.A. v. Turza*, 728 F.3d 682, 689 (7th Cir. 2013) (criticizing specific cy pres selections, as where the funds are used "to make contributions to judges' favorite charities" rather than to organizations that would benefit, at least indirectly, the class).

Still other cases cited by the Keepseagles arose in circumstances entirely different than those presented here.[4]  *See*, e.g., *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1037-39 (9th Cir. 2011)

---

[4] In addition to making no attempt to distribute any funds to class members, these cy pres

(criticizing settlement in which no funds would be paid directly to class members, but only providing for a cy pres distribution); *In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 198 (5th Cir. 2010) (notice failed even to inform class members that they might not receive any funds; distribution was solely cy pres); *Marek v. Lane*, 134 S. Ct. 8-9 (2013) (expressing concern about settlements in which no funds are paid to class members, but providing only for a cy pres distribution).  While such uses of cy pres may be questionable, they bear no relationship to the facts of this case.

### 4. No Legal Authority for Second Claims Process

The Keepseagles alternative proposal  to create a new claims process fares no better.  It relies upon two cases from other district courts, both of which found that there were some circumstances where courts could exercise equitable discretion to permit late filed claims in class action settlements, as long as there was no effect on the amount the defendant would have to pay, and the equities otherwise supported permitting the late claims.  *Dahingo v. Royal Caribbean Cruises, Ltd.*, 312 F. Supp. 2d 440, 446-47 (S.D.N.Y. 2004); *Grace v. City of Detroit*, 145 F.R.D. 413, 417-18 (E.D. Mich. 1992).  But prior rulings of this Court foreclose that option here.  The Court has already held that the Settlement Agreement provides no jurisdiction to allow consideration of late filed claims or claims with curable defects.  Order, Dkt. 633 at 7-8, 10 (Dec. 28, 2012).  Unlike the authorities on which the Keepseagles rely, there is precedent here that the Court lacks the jurisdiction to create the new claims process that is sought.

Nor can Rule 60(b)(5) save the Keepseagles' argument here.  The changed circumstances that they allege make the original agreement unworkable relate to the efficacy of the cy pres process.  None of those changed circumstances provide a basis for revisiting those portions of the

---

provisions also suffered from the problem, not present here: that the relationship between the cy pres recipient and the class's claims was too remote.

Agreement which relate to the Court's continuing jurisdiction, or the provisions regarding finality of the claims administrator's determinations.

## III.    CONCLUSION

For the forgoing reasons, the Keepseagles' Motion to Modify the Settlement Agreement should be denied.

June 2, 2015

By _/s/Joseph M. Sellers_
Joseph M. Sellers, Bar No. 318410
Christine E. Webber, Bar No. 439368
COHEN MILSTEIN SELLERS &
  TOLL PLLC
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

David J. Frantz, Bar No. 202853
CONLON, FRANTZ & PHELAN
1818 N Street, N.W.
Suite 400
Washington, DC 20036-2477
Telephone: (202) 331-7050
Facsimile: (202) 331-9306

Sarah Vogel
SARAH VOGEL LAW OFFICE
P. O. Box 385
Bismarck, ND 58502-0385
Phone:  701 355-6521
sarahvogellaw@gmail.com

Respectfully submitted,

Paul M. Smith, Bar No. 358870
Carrie F. Apfel, Bar No. 974342
Jessica Ring Amunson, Bar No. 497223
JENNER & BLOCK LLP
1099 New York Ave., N.W.
Suite 900
Washington, DC 20001-4412
Telephone: (202) 639-6000
Facsimile: (202) 639-6066

Phillip L. Fraas
STINSON LEONARD STREET, LLP
1775 Pennsylvania Ave., NW
Suite 800
Washington, DC 20036
Telephone: (202) 785-9100
Facsimile: (202) 785-9163
phillip.fraas@stinsonleonard.com

_Attorneys for Plaintiffs_