**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| _____ | | |
| MARILYN KEEPSEAGLE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:99CV03119 EGS |
| | ) | Judge Emmet G. Sullivan |
| | ) | Magistrate Judge Alan Kay |
| TOM VILSACK, Secretary | ) | |
| United States Department of Agriculture, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## BRIEF OF GREAT PLAINS CLAIMANTS AS *AMICI CURIAE* IN SUPPORT OF MARILYN AND GEORGE KEEPSEAGLES' MOTION TO MODIFY THE SETTLEMENT AGREEMENT

# TABLE OF CONTENTS

Page

STATEMENT OF INTEREST ................................................................................. 1

INTRODUCTION ................................................................................................... 2

    THE GREAT PLAINS CLAIMANTS .................................................................. 4

       A.    A Historical Perspective ............................................................................. 4

       B.    The Importance of Agriculture to the Great Plains Claimants ................... 7

       C.    The Harmful Effects of USDA's Discriminatory Lending Practices ........... 8

       D.    The *Keepseagle* Case ................................................................................. 10

       E.    Current Federal Indian Policy ................................................................. 13

ARGUMENT .......................................................................................................... 15

    THIS COURT SHOULD GRANT THE KEEPSEAGLES' MOTION TO
    MODIFY THE SETTLEMENT AGREEMENT SO THAT THE
    REMAINING FUNDS ARE DISTRIBUTED TO CLASS MEMBERS ............... 15

CONCLUSION ....................................................................................................... 17

Pursuant to this Court's Order dated November 7, 2014, Great Plains Claimants (or *Amici*) submit this brief as *amici curiae* in support of Marilyn and George Keepseagles' Motion to Modify the Settlement Agreement (the Keepseagles' Motion).

## STATEMENT OF INTEREST

Great Plains Claimants comprise 586 individuals who submitted a successful claim pursuant to the Settlement Agreement's Non-Judicial Claims Process in the above-captioned matter.  The individuals that comprise the Great Plains Claimants are enrolled members of the following tribes and nations: Apache Tribe, Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation, Blackfeet Nation, Caddo Nation, Cherokee Nation, Cheyenne and Arapaho Tribes, Cheyenne River Sioux Tribe, Choctaw Nation of Oklahoma, Comanche Nation, Colorado River Indian Tribes, Creek Nation, Crow Nation, Crow Creek Sioux Tribe, Delaware Indian Tribe, Fort Belknap Indian Community, Kiowa Tribe of Oklahoma, Lower Brule Sioux Tribe, Lumbee Tribe of North Carolina, Navajo Nation, Oglala Sioux Tribe, Prairie Band Pottawatomie Nation, Rosebud Sioux Tribe, Shoshone Northern Paiute Tribes, Spirit Lake Tribe, Standing Rock Sioux Tribe, Three Affiliated Tribes of the Fort Berthold Reservation, Turtle Mountain Band Of Chippewa Indians, Upper Brule Sioux Nation, Wichita Tribe, Yakama Nation, and Yankton Sioux Tribe.

As class members who have established that they were the victims of the U.S. Department of Agriculture's (USDA) discriminatory lending practices, this case is very personal to Great Plains Claimants.  They do not believe that the remaining funds should be disbursed through a *cy pres* distribution and feel strongly that the remaining settlement funds should be distributed to the class members who actually suffered damages from USDA's discriminatory lending practices.  Great Plains Claimants submit that Class Counsel are no longer representing their interests before this Court.  As such, Great Plains Claimants submit this brief as *amici*

*curiae* to share their views on the disbursement of the remaining settlement funds with the Court.

## <u>INTRODUCTION</u>

The historic settlement that was reached in this case was a cause for celebration in Indian Country.  USDA had tacitly acknowledged what Native American farmers and ranchers knew to be true for far too long – the United States government had engaged in discrimination against its own citizens via its agricultural lending programs.  The Settlement Agreement was an opportunity for both sides of this case to close this dark chapter of our collective history and move forward.

The funds that were generated by the Settlement Agreement were intended to compensate the class members who could prove USDA discriminated against them.  In theory, these payments were supposed to make the class members "whole" for the years of discriminatory lending practices.  However, $50,000 does not go a long way in capital-intensive farming communities, especially when the injuries they suffered were related to their livelihoods.  Nonetheless, the class members, accustomed to the system being rigged against them, were glad to receive anything.  After all, $50,000 seemed to be the going rate that the federal government was willing to pay to compensate victims of its past discriminatory lending practices.[1]

However, when Great Plains Claimants learned that the majority of the settlement funds – $380 million –was destined for charitable organizations, they were puzzled.  What did this case have to do with charity?  Individual Native American farmers and ranchers, not non-profits, suffered from governmental discrimination.  And Great Plains Claimants did not suffer their

---

[1] See *Pigford v. Glickman*, No. 97-cv-1978, Dkt. No. 167, at 14 (April 14, 1999); *see also* Press Release, United States Department of Agriculture, Agriculture Secretary Vilsack and Assistant Attorney General West Announce Process to Resolve Discrimination Claims of Hispanic and Women Farmers (Feb. 25, 2011), *available at* http://www.usda.gov/wps/portal/usda/usdamediafb?contentid=2011/02/0085.xml&printable=true&contentidonly=true.

injuries due to lack of charity.  They suffered their injuries as a result of discriminatory acts and omissions by the federal agency that was, in many cases, the only source of agricultural financing available in many parts of Indian Country.

*Amici* acknowledge that the terms of the Settlement Agreement provide that the unclaimed funds will be disbursed via a *cy pres* distribution.  However, no one involved in this matter anticipated that there would be so few successful claims filed.  Due to this unforeseen circumstance, Class Counsel, with USDA's consent, and Marilyn and George Keepseagle[2] (the Keepseagles) are each requesting that this Court modify the terms of the Settlement Agreement.  In other words, everyone agrees that the Settlement Agreement should be amended.

The *cy pres* provisions were clearly not drafted with a $380 million distribution in mind.  However, the Keepseagles' proposal and Class Counsel's proposal have two very different starting points.  Class Counsel's Motion starts with the premise that the *cy pres* distribution should be more efficient than was provided for in the Settlement Agreement.  The Keepseagles' Motion is based on the proposition that, if feasible, the remaining settlement funds should be distributed to the class members who actually suffered damages, not third parties.

As *Keepseagle* class members who have suffered injuries due to USDA's discriminatory lending practices, *Amici* submit that the remaining settlement funds should be distributed amongst the class members as set forth in the Keepseagles' Motion.  Native American farmers and ranchers do not need another charity.  Distributing the remaining settlement funds to the class members would more closely assist in making the class members whole for the actual damages they suffered due to USDA's discriminatory practices.  Furthermore, direct benefits to class members, which can be used to invest in agricultural operations or assist with living

---

[2] Marilyn Keepseagle is a class representative and the lead plaintiff in this action.  Her husband, George, previously served in this capacity, but was required to step down due to health reasons.

3

expenses, will better achieve the goals of this Equal Credit Opportunity Act (ECOA) case than providing an unprecedented and unwarranted distribution to charitable organizations that suffered no injuries at all.

### THE GREAT PLAINS CLAIMANTS

#### A.    A Historical Perspective

To understand Great Plains Claimants' perspective on this matter, it is instructive for this Court to understand the historical perspective of Native Americans.  Since the first encounters with Europeans, Indians have been subject to the ever-changing whims and ambitions of non-Native governments that failed to respect their sovereignty, culture, and struggle for self-sufficiency.

First, there were land grabs.  Colonial powers, and later the federal government, sought to claim territory for the ever-expanding population of settlers that came to North America. Treaties were purchased with financial compensation and the promise of peace so long as Indians lived within the boundaries set aside for them.  However, when the ambitions of settlers exceeded the land that was available to them, treaties were broken.  Native Americans were coerced with the threat of violence to cede away more lands.

Then, when Native Americans still controlled more land than the federal government could stand, there were reservations.  In exchange for peace, Indians were forced onto reservation lands, oftentimes distant from their ancestral homes.  More often than not, these lands were less desirable and were not conducive to maintaining their historic and cultural way of life.  Many cultural traditions were abandoned through coercion.  Without a way to carry out their traditions or way of life, government dependency for food, healthcare, and other necessary subsistence was forced on Native Americans.

When treaties and reservations were not enough, there was genocide.  The United States

Army waged a decades-long campaign against Indians that refused the federal government's demands to cede historical lands and retreat to reservations.  The United States' history is replete with campaigns designed to eradicate and massacre Indians that stood in the way of Manifest Destiny.

Once it prevailed in forcing Native Americans from their territorial lands and onto reservations, the federal government set its sights on "assimilating" the Indian people into American society.  This effort towards "assimilating" Native Americans often started with the youth.  For decades, thousands of young Native Americans were sent to boarding schools across the United States.  Although these boarding schools purported to provide vocational training for the Indians, they also sought to systematically strip away tribal culture.  The students lost their native names, were forbidden from speaking in their native tongue, and were made to adopt "American-style" haircuts and dress.[3]  All of these Western ideals and customs were forced on the Native American youth in an attempt to dilute and eradicate traditional practices.

During the same time period, the federal government failed to adhere to treaties with tribes.  Instead of providing oversight of tribal lands and ensuring that reservation properties remained with the Indians who had bargained for it, the government engaged in the practice of "allotment."  Under allotment policies, tracts of reservation lands were deeded to individual Native Americans.  Oftentimes, these allotted parcels were then sold to non-Indians, which diminished tribal land bases.  *See* STEPHEN L. PEVAR, THE RIGHTS OF INDIANS AND TRIBES 8-9 (3d ed., Southern Illinois University Press, 2002).

---

[3] One unfortunate by-product of these boarding school was that many students were subjected to physical, mental, and sexual abuse.  These abuses compounded the message that the Indians were inferior.  *See, e.g.*, Stephanie Woodward, *South Dakota Boarding School Survivors Detail Sexual Abuse*, INDIAN COUNTRY TODAY MEDIA NETWORK (July 28, 2011), *available at* http://indiancountrytodaymedianetwork.com/2011/07/28/south-dakota-boarding-school-survivors-detail-sexual-abuse-42420.

One positive development emerged in 1934 when Congress passed the Indian Re-Organization Act (IRA). The IRA was an effort to empower Native Americans by putting an end to the allotment policy, and strengthened the power and independence of tribal governments. While the IRA is credited with helping many tribes through the Great Depression, it was still inefficient at meeting its goal of instilling self-governance and economic stability in Indian Country. Reservations were still dependent on federal support and subject to burdensome oversight by federal bureaucracies.

After the IRA failed to quickly achieve its goals of self-governance and economic self-sufficiency, the federal government then turned to the policy of "termination." Based on the same premise as assimilation, termination sought to end the reservation system and fully integrate Native Americans into western society by ceasing to recognize tribal sovereignty and withholding financial aid. During this time, a series of laws were passed that gave control over tribal land to state and federal government agencies. This resulted in the termination of over 100 tribes and bands of sovereign nations. *See* Indian Land Tenure Foundation, "Termination," *available at* https://www.iltf.org/land-issues/termination (last viewed June 1, 2015). Between 1953 and 1964, over 12,000 Native Americans gave up their tribal affiliation, which equated to three percent of the Native American population at the time. *See* American Indian Relief Council, "History and Culture: Termination Policy – 1953-68," *available at* http://www.nrcprograms.org/site/PageServer?pagename=airc_hist_terminationpolicy (last viewed June 1, 2015). In addition, over 2,500,00 acres of land was removed from Indian control and sold to non-Natives. *Id.*

These efforts towards assimilation and termination were premised on the notion that Native American culture was "savage" and that the only way to save this race from itself was

through adoption of American culture and abandonment of Indian traditions.  These concepts originated from a culture of white supremacy and paternalism.  These prejudices also "justified" the federal government's violations of treaty obligations in the name of expedience when it became cumbersome to fulfill the United States' obligations.

It was not until the 1960s that the federal government appeared to take tribal sovereignty seriously.  The current policy towards tribal governments is that of "self-determination."  *See infra* The Great Plains Claimants, Part E.  Although government-to-government relations have improved to an extent, prejudices of government agencies and employees against Native Americans have persisted.  Native Americans are no longer forcefully rounded up or hunted by the cavalry.  However, Indians continue to suffer discrimination in many forms.

This pervasive discrimination and belittlement has had disastrous effects on Native Americans.  On many reservations, poverty levels and unemployment are shockingly high.  Many Native communities are plagued with substance abuse and suicides at crisis levels.  In a country of abundance, many Native Americans face food insecurity and a substantial number even lack reliable access to basic utilities, which non-Natives take for granted.

Great Plains Claimants do not discuss this history in an attempt to dredge up old conflicts or garner sympathy from this Court.  However, there is no avoiding this discussion when it comes to understanding *Amici's* perspective.

### B.     The Importance of Agriculture to the Great Plains Claimants

Given the ever-changing nature of our federal government's Indian policy and that very little of it has proven tremendously successful, Native Americans have learned that they cannot depend on the United States to provide solutions to their problems.  Instead, they have sought enterprises that allow them to operate with self-sufficiency, which protects against the whipsaw

effect of ever-shifting government policies.

Unfortunately, there are few options for enterprise in Indian Country.  In some instances, gaming has proven to be a source of steady income for tribes that are located near areas of population.  However, federal policy historically relegated most Indian reservations to the most remotely populated areas of the country.  Moreover, many reservations are not suitable for industrial investments due to the lack of infrastructure and the distance to markets for many commercial goods.

For many Native Americans on rural reservations, the only option for self-sufficiency is agriculture.  Through farming and ranching, Native Americans can make use of one of the few resources they have available: land.  By growing crops and raising livestock, Indian farmers provide for themselves and develop businesses that can be passed down through generations. Native farms also provide for jobs in support services, such as input suppliers and processors, which reduces the accompanying ills of unemployment, such as substance abuse, crime, and government dependency.

### C.    The Harmful Effects of USDA's Discriminatory Lending Practices

Because agriculture is one of the few promising means of earning an independent living in Indian Country, the effects of USDA's discriminatory lending practices have been particularly devastating.  Often overlooked by commercial lenders, many Native Americans found that USDA's Farm Service Agency (formerly the Farmers Home Administration) was one of the few sources of credit available to them.

Most farming operations, Native and non-Native, are dependent upon reliable access to credit to remain in business.  Land, if purchased, is usually financed through long-term loans. Inputs, such as fertilizer, chemicals, replacement livestock, feed, and veterinary supplies, must be

purchased every year.  These operating expenses, as well as land leases, are often financed through operating loans.  Operational improvements, such as building repairs, equipment replacement, and fencing, are also often financed.  All of this debt exposure poses a substantial financial risk.

In turn, farmers usually receive one paycheck a year when they harvest their crops or sell their livestock.  In a good year, the receipts from these sales will cover the payments that are due to the lender.  However, sufficient receipts are never guaranteed.  Market fluctuations can send commodity prices tumbling.  Floods, drought, and disease also pose a constant and substantial risk for farmers and ranchers.

Even in an ideal lending environment, operating a farming operation is a risky proposition.  However, modern farming is nearly impossible when farmers are also subjected of discrimination by lenders.  Such was the case with the *Keepseagle* class members.  Numerous studies have demonstrated that Native Americans received less favorable lending decisions than their similarly situated non-Native counterparts.  *See*, *e.g.*, U.S. Department of Agriculture, *Civil Rights at the United States Department of Agriculture* (Feb. 1997), *available at* http://www.federationsoutherncoop.com/pigford/research/CRAT%20Report%201997.pdf     (last viewed June 1, 2015).

This discrimination has had a harmful effect on Native American farmers and ranchers.  In some instances, loans that would have allowed further investment in land, equipment, or improvements were unreasonably denied.  In other cases, operating loans were withheld, forcing Indian farmers to give up leases or miss planting seasons.  Many were subject to higher interest rates than their non-Native counterparts or required to abide by burdensome repayment plans.  In other cases, Native farmers were not allowed to restructure loans in circumstances where non-

Native farmers were allowed more accommodating terms.  In the worst cases, Native American farmers were forced to sell their property or cease their farming operations, leaving nothing to pass onto the next generation.

Many farms were lost due to USDA's discriminatory lending practices.  This left many farmers and ranchers with no options for earning an independent income.  For many of the class members, farming was the only way of life they knew.  This loss left them without a source of income or any chance to pass along farming operations to the next generation.  Instead, they were required to turn to the scarce job market available on the reservations, go on government assistance, or move away.

The damages that resulted from USDA's actions also caused substantial emotional harm. Discrimination can cause frustration, humiliation, and embarrassment and lead to a sense of hopelessness.  The denial of access to necessary business lending caused substantial uncertainty for the future.  These emotional damages frequently were manifested in the form of depression, anxiety, and substance abuse.

### D.      The *Keepseagle* Case

After years of frustration with USDA and the effects its discriminatory lending practices had on Indian Country, George and Marilyn Keepseagle decided to fight back.  In 1999, through Class Counsel and as named Plaintiffs, they filed a class action lawsuit under the ECOA against USDA alleging that the Department had discriminated against Native American farmers and ranchers from 1981 to 1999 when administering agricultural loans through the Farmers Home Administration and later the Farm Service Agency.  The Keepseagles' claims were founded in allegations of discriminatory lending practices and contend that the Farm Service Agency neglected to respond to investigative reports submitted by USDA's Civil Rights Action Team

and the Office of the Inspector General.  These reports documented the existence of widespread discriminatory lending practices against Native American farmers and ranchers.

The plaintiff class was comprised of Native American farmers and ranchers from all over the country who had experienced a variety of discriminatory treatment, which affected their ability to access USDA loans.  Patterns of discrimination were brought to light whereby it became clear that USDA loan officers had not distributed loans fairly to Native Americans.  Instead, USDA used more stringent requirements when granting loans to Native Americans.  They also placed more restrictions on the loans they did provide and were not as likely to offer opportunities to re-finance and re-structure loans – oftentimes resulting in Native American loan recipients losing their farms.

The impact of this discrimination has been difficult to measure due to the longstanding financial and emotional damages that resulted.  Many victims of this discrimination lost opportunities to provide for themselves because agriculture is one of the few enterprises in much of Indian Country that provides economic stability for families and communities.

After a long fight, a settlement was reached whereby USDA agreed to pay $680 million to those who suffered harm at the hands of USDA's discriminatory lending practices.  However, for a number of reasons, the Settlement Agreement's Non-Judicial Claims Process did not succeed in distributing the majority of the settlement funds to class members.  3,587 claimants received awards under Track A and only 14 claimants received awards under Track B.  More than 55 percent of the funds – $380 million – remain unclaimed.  Now, the sole remaining issue in this case is determining how these unclaimed funds will be disbursed.

The purpose of this ECOA class action was to compensate the Native American farmers and ranchers for injuries caused by USDA's discriminatory lending practices and deter future

11

discrimination.   *Amici* are very concerned, however, that granting Class Counsel's Motion will result in an unprecedented and unwarranted payday for charitable organizations that had nothing to do with this case and were not the victims of discriminatory lending practices.   Great Plains Claimants submit that the unclaimed settlement funds, which were generated on the basis of the class members' damages, should be distributed directly to the class members.

If this Court were to deny the Keepseagles' Motion, more than 55 percent of the funds generated in this historical settlement agreement would be distributed to charitable organizations. While charities serving Native American farmers serve a noble and worthy cause, *Amici* question how they would receive even indirect benefits from such organizations.   For the most part, Great Plains Claimants have no experience with charitable organizations providing them with agricultural, business, or advocacy assistance.   Furthermore, Great Plains Claimants question how these charitable organizations would render effective assistance to farmers and ranchers in Indian Country.   *Amici's* injuries resulted in lost income, higher interest expenses, lost land, and shuttered farming operations.   Class members' damages were not sustained due to a lack of charity.   They were caused by USDA's discriminatory lending practices.   No number of grants, conferences, training programs, or bumper stickers will permit *Amici* to recover their actual damages.

As a practical manner, a *cy pres* distribution will result in an inefficient distribution of benefits to Native American farmers and ranchers.   Even the most efficient charitable organizations are burdened with overhead expenses.   Money spent on office spaces, staff salaries, travel costs, and office supplies is money that is not spent benefitting the class members. Furthermore, under Class Counsel's proposal, the majority of the funds would be directed to a foundation, with its own substantial overhead expenses, adding yet another middleman to the

12

process.  The prospect of obtaining grant funds will surely cause new, untested charitable organizations to come into existence.  It is unavoidable that a substantial portion of these funds will be used inefficiently and not benefit the class members.

In contrast, the Keepseagles' Motion provides for a distribution of the remaining settlement funds amongst the class members who actually suffered damages from USDA's discriminatory lending practices.  This would yield direct benefits to the class members who were actually injured and would not be lost to overhead expenses or wasteful projects.  These funds could be used to remedy the wrongs that resulted from USDA's discrimination.  Funds could be used to reinvest in farming operations for class members that are still in production agriculture.  For those that are no longer farming or have retired, funds could be used to supplement living expenses or invest in other enterprises.  However the class members use the unclaimed settlement funds, disbursing those funds directly to them is the most appropriate way to remedy the wrongs that underlie this action, and a far more equitable solution than disbursements to charitable organizations.

### E.    Current Federal Indian Policy

To understand the views of Great Plains Claimants, it is also important to understand current federal Indian policy.  As stated above, Great Plains Claimants and their ancestors went through periods of "termination" and "assimilation."  *See supra* The Great Plains Claimants, Part A.  However, starting in the late 1960s, the federal government shifted to its current policy of "self-determination."  Every President in recent history has recognized that Indians should be consulted on matters that pertain to them.  For instance, in 1968, President Johnson recognized that it is incumbent on the federal government to recognize Native Americans' "freedom of choice and self-determination."  *See* PEVAR, at 12.  In 1970, President Nixon announced a policy

13

of self-determination for tribal governments.  Special Message on Indian Affairs, *Public Papers of the Presidents of the United States*: Richard Nixon, 1970, pp. 564-567, 576-76.  Furthermore, President Gerald Ford signed the Self-Determination Act and issued the following statement:

> I am committed to furthering the self-determination of Indian communities but without terminating the special relationship between the Federal Government and the Indian people.  I am strongly opposed to termination.  Self-determination means that you can decide the nature of your tribe's relationship with the Federal Government within the framework of the Self-Determination Act, which I signed in January of 1975.

*See* Press Release, Remarks of the President to the American Indian Leaders (July 16, 1976).

In furtherance of this federal commitment, the 2014 Farm Bill established an Office of Tribal Relations at USDA to "advise the Secretary on policies related to Indian tribes" and Indians who farm and ranch.  *See* Agriculture Act of 2014, Pub. L. 113-79 § 12203, 128 Stat. 649 (Feb. 7, 2014).  This new statute, in effect, directly applied the Indian policy of self-determination to USDA and its programs.

Last year, President Obama traveled to North Dakota and spoke to the Standing Rock Sioux Tribe (the home of the Keepseagles and several of the Great Plains Claimants).  At Standing Rock, he said:

> I know that throughout history, the United States often didn't give the nation-to-nation relationship the respect that it deserved.  So I promised when I ran to be a president who'd change that – a president who honors our sacred trust, and who respects your sovereignty . . . My administration is determined to partner with tribes, and it's not something that just happens once in a while. It takes place

14

every day, on just about every issue that touches your lives. And that's what real

nation-to-nation partnerships look like.

Barack Obama, Remarks by the President at the Cannon Ball Flag Day Celebration (June 13,

2014) (*available at* https://www.whitehouse.gov/the-press-office/2014/06/13/remarks-president-

cannon-ball-flag-day-celebration).

Nonetheless, in the present matter, USDA is threatening to seek a reversion of the

remaining settlement funds while Class Counsel is seeking "more efficient" means of delivering

the unclaimed funds to charitable organizations.  Great Plains Claimants are concerned because

neither of these parties is asking this Court to distribute the remaining funds to the actual class

members.  It is Great Plains Claimants' hope that the Court and the parties will listen to Indian

Country.

## ARGUMENT

### THIS COURT SHOULD GRANT THE KEEPSEAGLES' MOTION TO MODIFY THE SETTLEMENT AGREEMENT SO THAT THE REMAINING FUNDS ARE DISTRIBUTED TO CLASS MEMBERS

Great Plains Claimants' argument is simple.  The settlement funds were generated on the

basis of the class members' claims against USDA under the ECOA.  If feasible, these funds

should be used to directly benefit the class members who actually suffered damages due to

USDA's discriminatory lending practices.  *See Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468,

475 (5th Cir. 2011).  A *cy pres* distribution should be a last resort, employed only when it is not

logistically or economically feasible to distribute the remaining settlement funds to the class

members.  *Id.*

Here, $380 million in settlement funds remain unclaimed.  The successful claimants are

relatively easily identifiable to the Claims Administrator.  Therefore, there is no valid argument

that a *pro rata* distribution is not viable.

15

*Amici* recognizes that the terms of the Settlement Agreement currently provide for a *cy pres* distribution of the remaining funds.  However, as all the parties recognize, there were much fewer successful claimants than anticipated.  All of the parties are asking this Court to modify the Settlement Agreement.  Great Plains Claimants submit that the Keepseagles' Motion is the best option because it will ensure that the remaining settlement funds will directly benefit the class members who suffered damages.

*Amici* have a strong distrust of the federal government based on centuries of broken promises and discrimination based on their race.  At the basis of these ills has been a lack of respect for Native Americans.  Great Plains Claimants now seek this Court to hear their voices and respect their wishes.  This case was about compensating injuries, not charity.  Direct payments to the individuals that actually suffered discrimination will demonstrate respect. Allowing a *cy pres* distribution to go forward will perpetuate the notion that someone other than the Native American class members should be in charge of spending the funds generated on the basis of their claims.

Great Plains Claimants respectfully disagree with this notion.  The class members do not need an outside entity to spend the remaining settlement funds on their behalf.  *Amici* submits that this comes down to a matter of respect for the wishes of the class members.

Both the Keepseagles' Motion and Class Counsel's Motion require an amendment to the Settlement Agreement.  The 586 Great Plains Claimants strongly support the Keepseagles' Motion and oppose any *cy pres* distribution of the remaining settlement funds.  On information and belief, the position of Great Plains Claimants is supported by the vast majority of the 3,601 successful claimants.  This is demonstrated by the tribal resolutions that have been made a part

16

of the record,[4] the comments at Class Counsel's listening sessions,[5] and the letters received by this Court.[6]

At its root, this case is about restoring respect for Native American farmers and ranchers that suffered injuries due to discriminatory lending practices.  *Amici* urge the Court to respect the request of the class members as presented by the Keepseagles Motion to Amend the Settlement Agreement.

## CONCLUSION

For the reasons stated herein, Great Plains Claimants respectfully request that this Court grant the Keepseagles' Motion to Modify the Settlement Agreement.

Respectfully submitted this 2nd day of June, 2015.

/s/ Marshall Matz, Esq.
Marshall Matz, Esq.
D.C. Bar #267955
Stewart D. Fried, Esq.
D.C. Bar #457801
John G. Dillard, Esq.
D.C Bar #1016913
Olsson Frank Weeda Terman Matz P.C.
600 New Hampshire Avenue, N.W.  #500
Washington, D.C.  20037
mmatz@ofwlaw.com
(202) 789-1212
(202) 234-3550 Facsimile

Attorneys for *Amici Curiae* Great Plains Claimants

---

[4] *See* Dkt. Nos. 779-4, 779-5, 779-6, 779-7 & 779-8.

[5] *See* Dkt. No. 709-6, at 60-65.

[6] *See* Dkt. Nos. 657, 658, 662, 666, 667, 671, 681, 690, 695, 696, 699, 708, 710, 715, 721, 735, 745, 748, 761 & 780.

## <u>CERTIFICATE OF SERVICE</u>

On June 2, 2015, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.


/s/ Marshall Matz
Marshall Matz