**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

MARILYN KEEPSEAGLE, et al.,       )
                                 )
           Plaintiffs,      )
                                 )
        v.                 )          Civil Action No. 1:99CV03119 EGS
                                 )          Judge Emmet G. Sullivan
                                 )          Magistrate Judge Alan Kay
TOM VILSACK, Secretary        )
United States Department of Agriculture,   )
                                 )
                                 )
          Defendant.     )
_____ )

**<u>MARILYN AND GEORGE KEPPSEAGLES' RESPONSE TO THE UNOPPOSED
MOTION TO MODIFY THE SETTLEMENT AGREEMENT _CY PRES_ PROVISIONS</u>**

**TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................................ 1

FACTUAL AND PROCEDURAL BACKGROUND.................................................................... 4

   I.   THE CLAIMS PROCESS ........................................................................................ 4

   II.   CLASS COUNSELS' PROPOSAL TO MODIFY THE SETTLEMENT
       AGREEMENT'S *CY PRES* PROVISIONS.......................................................... 5

   III.  THE KEEPSEAGLES' MOTION TO MODIFY THE SETTLEMENT
       AGREEMENT.......................................................................................................... 6

ARGUMENT ...................................................................................................................... 7

   I.   A *CY PRES* DISTRIBUTION IS INAPPROPRIATE........................................ 7

      A.   A *Cy Pres* Distribution Is Not Appropriate When It Is Feasible to
          Distribute the Remaining Funds to Class Members ........................................ 7

      B.   A *Cy Pres* Distribution Would Not Result in Direct Benefits
          for the Class Members ................................................................................ 11

      C.   The Vast Majority of the *Keepseagle* Class Members Favor a
          *Pro Rata* Distribution.............................................................................. 13

      D.   Class Counsel's Motion, Which Should Be Denied, Is Better
          than Preserving the Status Quo˙ ................................................................. 15

CONCLUSION.................................................................................................................. 20

## TABLE OF AUTHORITIES

CASES                                                                        Page

*Beecher v. Able*,
   575 F.2d 1010 (2d Cir. 1978).................................................................... 8

*Diamond Chemical Co. v. Akzo Nobel Chemicals B.V.*,
   517 F. Supp. 2d 212 (D.D.C. 2007) .......................................................... 7

*In re Baby Products Antitrust Litig.*,
   708 F.3d 163 (3d Cir. 2013)..................................................................... 12

*In re BankAmerica Corp. Securities Litig.*,
   775 F.3d 1060 (8th Cir. 2015) ....................................................... 8, 12, 13

*In re Folding Carton Antitrust Litig.*,
   557 F. Supp. 1091 (N.D. Ill. 1983) ............................................................ 8

*In re Katrina Canal Breaches Litig.*,
   628 F.3d 185 (5th Cir. 2010) ................................................................... 12

*In re Lupron Mktg. and Sales Practices Litig.*,
   677 F.3d 21 (1st Cir. 2012)......................................................... 10, 12, 17

*In re Pharm. Indus. Average Wholesale Price Litig.*,
   588 F.3d 23 (1st Cir. 2009)..................................................................... 10

*Ira Holtzman, C.P.A. v. Turza*,
   728 F.3d 682 (7th Cir. 2013) .................................................................. 12

*Klier v. Elf Atochem N. Am., Inc.*,
   658 F.3d 468 (5th Cir. 2011) ............................................................ 8, 9, 12

*Marek v. Lane*,
   134 S.Ct. 8 (2013)................................................................................... 12

*Marshall v. Nat'l Football League*,
   No. 13-3581, 2015 WL 2402355 (8th Cir. May 21, 2015)...................... 12

*Masters v. Wilhelmina Model Agency, Inc.*,
   473 F.3d 423 (2d Cir. 2007).................................................................... 12

*Nachshin v. AOL, LLC*,
   663 F.3d 1034 (9th Cir. 2011) .......................................................... 12, 17

*Powell v. Ga. Pacific Corp.*,
   119 F.3d 703 (8th Cir. 1997) .................................................................. 12

*Rufo v. Inmates of Suffolk County Jail*,
  502 U.S. 367 (1992) ................................................................................................ 15

*Six Mexican Workers v. Ariz. Citrus Growers*,
  904 F.2d 1301 (9th Cir. 1990) ........................................................................... 7, 17

*Van Gemert v. Boeing Co.*,
  739 F.2d 730 (2d Cir. 1984) .................................................................................... 7

*Wilson v. Southwest Airlines, Inc.*,
  880 F.2d 807 (5th Cir. 1989) .................................................................................. 12

## STATUTES

15 U.S.C. § 1691(a)(1) .............................................................................................. 18

15 U.S.C. § 1691e(a) ................................................................................................. 18

15 U.S.C. § 1691e(b) ................................................................................................. 18

## OTHER AUTHORITIES

AM. LAW INST., PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION § 3.07 ................................ 8

Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* (5th ed.) ..................................... 7

Marilyn and George Keepseagle (the Keepseagles), through undersigned counsel, hereby respectfully submit the following Response in Opposition to Class Counsel's Unopposed Motion to Amend the Settlement Agreement *Cy Pres* Provisions.[1]  See Dkt. No. 709 (Class Counsel's Motion).

## INTRODUCTION

Nearly two years have passed since Class Counsel made this Court aware that approximately $380 million in settlement funds remain undisbursed in the above-captioned case. *See* Dkt. No. 646, at 3.  Since that time, Class Counsel has endeavored to use most of these funds to endow a foundation that would provide grants to charitable organizations that provide educational and technical assistance for Native American farmers and ranchers.  First, Class Counsel proposed establishing a perpetual foundation endowed by the remaining settlement funds that would distribute interest income to charitable organizations that assist Native American farmers and ranchers.  *See* Dkt. No. 646, at 8.  Defendant, the Secretary of Agriculture (USDA), did not support Class Counsel's original proposal.  *See* Dkt. No. 649.  Now, with USDA's approval, Class Counsel has proposed a two-part plan for disbursing the remaining funds: (1) 10 percent of remaining funds ($38 million) for immediate distribution to Native American agriculture-oriented charities that existed prior to November 1, 2010; and (2) 90 percent of remaining funds (approximately $342 million) for distribution to the proposed Native American Agriculture Fund (Proposed Trust), which would distribute the remaining principal and interest to Native American agriculture-oriented charities and educational institutions over a 20-year period.  *See* Dkt. No. 709-1, at 5-8.  None of these funds would be used to directly benefit any of the class members who were the victims of USDA's discriminatory lending

---

[1] The Keepseagles acknowledge that George Keepseagle is no longer a class representative due to health reasons.  *See* Dkt. No. 772, at 6, n.2.

practices.

In addressing the remaining settlement funds, Class Counsel has offered up multiple solutions to the question of how the remaining settlement funds can most effectively fund charities that assist Native American farmers and ranchers. This, however, is not the purpose of this litigation. The Keepseagles submit that the question that should be before the Court is, instead, how the remaining funds can best serve the class members whose damages serve as the basis for this action.

A *cy pres* distribution to the proposed Initial Cy Pres Beneficiaries and the proposed Native American Agriculture Fund (Proposed Trust), as Class Counsel proposes, would ensure that none of the remaining funds directly benefit the *Keepseagle* class members. *See* Dkt. 709-2. Instead, these funds would be disbursed to third-parties that did not suffer the humiliation, embarrassment, or financial damages that resulted from the government's discriminatory lending practices. A distribution to third parties would <u>not</u> best serve the goals of this Equal Credit Opportunity Act (ECOA) class action – compensation of victims – when a *pro rata* distribution is feasible.

The Keepseagles acknowledge that Native American agriculture-oriented charitable organizations serve a worthy and noble purpose. But, centuries of federal policies that worked against the interests of Native Americans have resulted in widespread poverty, unemployment, and accompanying ills that persist to this day. For many rural Native Americans, agriculture is one of the few options available for securing a self-sufficient, economically-sustainable livelihood. Charitable organizations that improve conditions for Native American farmers and ranchers may be worthy recipients of private donations or government grants. However, an unprecedented and unwarranted payment of $380 million to charitable organizations should not

be the final outcome of this litigation when the class members have not been made whole.

Recipient charitable organizations will be limited in their ability to achieve the goals of this litigation – righting the wrongs that resulted from discriminatory governmental lending practices.  First, even the most reputable and efficient charities are burdened with overhead expenses.  Funds used to cover travel expenses, staff salaries, office space, and fundraising expenses are all funds that will not be used towards the benefit of class members.  In addition, the Proposed Trust would be overseen by an Executive Director and 13 trustees, each of whom will receive up to $10,000 annually, plus travel expenses, as compensation for their services. The Proposed Trust will almost certainly hire professional staff and outside advisors, including counsel.  Nor does Class Counsel's proposal restrict the use of such funds by recipients to reversing the effects of discriminatory lending practices.  Instead, the Proposed Trust would allow funds to be used for the general benefit of current and future Native American farmers and ranchers – beneficiaries that that are reasonably far beyond the scope of the goals of the ECOA. This will result in an inefficient use of the remaining settlement funds.

The Keepseagles have proposed a better way forward – distributing the remaining funds directly to the class members.  Although Class Counsel's proposed modification to the Settlement Agreement's *cy pres* provisions may have merit when compared to the original *cy pres* provisions, this Court is not required to determine the propriety of Class Counsel's motion in a vacuum.  While Class Counsel's Motion asks this Court to decide whether the *cy pres* provisions should be amended, the Keepseagles ask this Court to order that any *cy pres* distribution is not appropriate under the present, previously unforeseeable circumstances.  Faced with these new facts, this Court should conclude that the relief sought in the Keepseagles Rule 60(b) Motion is a superior alternative to Class Counsel's proposal.

## FACTUAL AND PROCEDURAL BACKGROUND

As this Court is already familiar with the factual and procedural background of the Settlement Agreement in the above-captioned case and the dispute over the distribution of the remaining settlement funds, the Keepseagles will dispense with a recitation of the facts of the case and its procedural posture, except as it relates to the present dispute.  The Keepseagles oppose Class Counsel's Motion in their capacity as current (Marilyn) and former (George) lead plaintiffs and class representatives in this case.

## I.     THE CLAIMS PROCESS

This Court entered an order approving the Settlement Agreement on April 28, 2011.  *See* Dkt. No. 606.  Pursuant to the terms of the Settlement Agreement, the claims process commenced on June 29, 2011, and closed on December 27, 2011.  *See* Settlement Agreement § II.B.  Less than 4,500 claims were filed by individuals and estates during the claims process.  *See* Dkt. No. 709-1, at 15, n.12.  3,587 claims were approved by the Claims Administrator under Track A and only 14 claims were successful under Track B.  *See* Dkt. No. 646, at 2.  After all Track A awards, Track B awards, IRS payments, class representative service awards, and attorneys' fees and costs were disbursed, more than $380 million of the $680 million settlement fund remained unclaimed.

Class Counsel and USDA anticipated that at least 10,000 Native American farmers and ranchers would file claims with the Claims Administrator.  *See* Dkt. No. 646, at 4, n.2. Moreover, Class Counsel anticipated that all or nearly all of the settlement funds would be distributed to class members.  *Id.*  Class Counsel has suggested several reasons why the claims process failed to generate the anticipated number of claimants, such as deaths of potential claimants, the strictures of the settlement agreement, and failed outreach on the part of USDA. *Id.* at 5, n.3.

4

## II.     CLASS COUNSELS' PROPOSAL TO MODIFY THE SETTLEMENT AGREEMENT'S *CY PRES* PROVISIONS

The Settlement Agreement's current *cy pres* provisions mandate that all remaining funds shall be distributed to the Settlement Agreement's Cy Pres Fund.  *See* Settlement Agreement, § IX.F, ¶ 7.  These funds are to be distributed in equal shares to non-profit organizations selected by Class Counsel, and approved by this Court, that "has provided agricultural, business assistance, or advocacy services to Native American farmers between 1981 and [November 1, 2010]."  *See id.* at, §§ II.I & IX.F, ¶ 7.

On September 24, 2014, more than one year after first advising the Court about the immense size of the remaining settlement funds, Class Counsel filed its Motion to Modify the Settlement Agreement's *Cy Pres* Provisions.  *See* Dkt. No. 709.  Class Counsel's proposal would significantly alter the Settlement Agreement's *cy pres* provisions.  Instead of an immediate disbursement of the remaining $380 million in equal shares to selected institutions, Class Counsel has proposed a two-part solution: (1) $342 million, 90 percent of the remaining funds, would be used to endow the Proposed Trust; and (2) $38 million, 10 percent of the remaining funds, for distribution to non-profit organizations of Class Counsel's choosing that served Native American farmers prior to entry of the Settlement Agreement.  *See* Dkt. No. 709-2, at 2.

The Proposed Trust, which would be overseen by an Executive Director and 13 trustees, would distribute the principal and all interest generated over the course of 20 years to non-profit organizations, educational institutions, and tribal organizations that "furnish assistance designed to further Native American farming or ranching activities."  *Id.* at 2.  The Proposed Trust would be prohibited from providing any direct benefits to the *Keepseagle* class members.  *See* Dkt. No. 709-3, at 4.  Most importantly, the Proposed Trust does <u>not</u> require that disbursements be directed towards benefitting Native American farmers and ranchers that were harmed by

discriminatory lending practices.  *Id*. at 2.

During the summer of 2014, Class Counsel conducted eight in-person and three teleconference "listening sessions" to explain their proposal to class members and other interested parties and receive feedback on the Proposed Trust.  *See* Dkt. No. 709-6, at 1.  Class Counsel's proposal was widely panned by the class members.  *Id.* at 2.  A vast majority of the class members that submitted public comments indicated that they opposed the Proposed Trust and favored a supplemental distribution to members of the class.  *See id*. at 60-65.

### III.   THE KEEPSEAGLES' MOTION TO MODIFY THE SETTLEMENT AGREEMENT

The Keepseagles presented this Court with an alternative that better suits the purposes and goals of this ECOA class action on May 19, 2015.  *See* Dkt. No. 779 (the Keepseagles' Motion).  Under the Keepseagles' proposal, the remaining settlement funds would be distributed directly to the class members instead of a *cy pres* distribution to third party charitable organizations.

The Keepseagles provided this Court with two options for distributing the remaining settlement funds to class members.  Under the first proposal, the Settlement Agreement would be amended to direct the remaining funds for distribution to the successful Track A and Track B claimants on a *pro rata* basis.  *See* Dkt. No. 779-2.  Under the Keepseagles' alternative proposal, the non-judicial claims process would be re-opened to allow prior unsuccessful claimants and those claimants that did not file a claim during the original claims process to submit a new claim for damages.  *See* Dkt. No. 779-3.  Under the alternative proposal, any funds that remain after the second claims process would be distributed amongst all successful Track A and Track B claimants on a *pro rata* basis.

**ARGUMENT**

**I.     A *CY PRES* DISTRIBUTION IS INAPPROPRIATE**

At this late stage in the litigation, this Court is faced with either retaining the status quo or choosing between the Keepseagles' and Class Counsel's competing motions.  Both motions offer very different solutions to the sole remaining issue in this litigation – how to best distribute the more than $380 million in unclaimed settlement funds.  Class Counsel's Motion is an attempt to establish a more efficient mechanism for distributing $380 million to charitable organizations. In contrast, the Keepseagles' Motion proposes a solution that would best approximate the goals of this case by ensuring that the unclaimed settlement funds remain with the class members, not third parties.  Because the Keepseagles' proposal is better aligned with the purpose of this litigation and more equitable, this Court should deny Class Counsel's Motion.

> **A.     A *Cy Pres* Distribution Is Not Appropriate When It Is Feasible to Distribute the Remaining Funds to Class Members**

"Federal courts have broad discretionary powers in shaping equitable decrees for distributing unclaimed class action funds." *Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1307 (9th Cir. 1990) (quoting *Van Gemert v. Boeing Co.*, 739 F.2d 730, 737 (2d Cir. 1984)); *see also* Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 12:28 (5th ed.). Generally, there are four methods available to this Court for distributing unclaimed settlement funds: (1) reversion to the defendant; (2) escheatment to the government; (3) a *pro rata* distribution to the identified class members; and (4) a *cy pres* distribution to third party charitable organizations.  *Diamond Chemical Co. v. Akzo Nobel Chemicals B.V.*, 517 F. Supp. 2d 212, 217 (D.D.C. 2007), *see also Newberg on Class Actions* § 12:30.[2]  The guiding principle in

---

[2] As more fully stated in the Keepseagles' Motion, reversion to the defendant and escheatment to the government are not appropriate solutions for ECOA actions when the government is the defendant.  *See* Dkt. No. 779-1, at 7.

choosing amongst these options should be the achievement of "substantial justice in the distribution of the funds." *In re Folding Carton Antitrust Litig.*, 557 F. Supp. 1091, 1105 (N.D. Ill. 1983) (citing *Beecher v. Able*, 575 F.2d 1010, 1016 (2d Cir. 1978)).

In the present case, this Court is faced with two competing motions that propose very different solutions for disbursing the remaining funds: (1) Class Counsel's Motion, which would result in a *cy pres* distribution to third parties, and; (2) the Keepseagles' Motion, which seeks a *pro rata* distribution.   In choosing between these two options, the Court should grant the Keepseagles' Motion, which best approximates the goals of this ECOA action by ensuring the funds directly benefit the victim's of USDA's discriminatory lending practices.  *See* AM. LAW INST., PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION § 3.07 (ALI § 3.07) ("[I]n most circumstances distributions to class members better approximate the goals of the substantive laws than distributions to third parties that were not directly injured by the defendant's conduct.").

A *cy pres* distribution of unclaimed settlement funds should be resorted to only in the event that it is not feasible to put these funds to their best use: directly benefitting the class members.  *Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468, 475 (5th Cir. 2011); *see also  In re BankAmerica Corp. Securities Litig.*, 775 F.3d 1060, 1064-64 (8th Cir. 2015) (citing ALI § 3.07).  This view is consistent with the view that "the settlement-fund proceeds, having been generated by the value of the class members' claims, belong solely to the class members." *Klier*, 658 F.3d at 474.

Here, there are $380 million in remaining settlement funds and the 3,601 class members who have proven they were discriminated against are known to the Claims Administrator.  Under these circumstances, a *pro rata* distribution is logistically feasible and economically viable.  The

funds could be distributed directly to the victims of USDA's discrimination with relative ease. Thus, there is no need to resort to a *cy pres* distribution.

The Keepseagles acknowledge that, unlike in *Klier*, the Settlement Agreement contains provisions directing the remaining settlement funds be applied to a *cy pres* distribution. However, the Keepseagles submit that the present circumstances are so extreme that special consideration is warranted under this Court's equitable discretionary powers.  Although the terms of the Settlement Agreement provide that all settlement funds that remained after the distribution of claims would be distributed via a *cy pres* distribution, the parties did not contemplate that $380 million, more than 55% of the settlement funds, would remain.  *See* Dkt. No. 646, at 4 (Class Counsel expected no more than "several million dollars in settlement funds would be unclaimed.").  The goals of this ECOA action were not to fund non-profits or establish the Proposed Trust.  The intent of the Settlement Agreement was to compensate class members for the injuries they suffered as a result of USDA's discriminatory lending practices.  Allowing a *cy pres* distribution under these circumstances, when class members are easily identifiable and a *pro rata* distribution is feasible, would not best achieve the ends of justice.

*Klier's* holding that a *pro rata* distribution is not appropriate "where an additional distribution would provide a windfall to class members with liquidated-damages claims that were 100 percent satisfied by the initial distribution" is not applicable to this case as most, if not all, class members were not made whole by their initial settlement payment.  658 F.3d at 475.  As stated in their Motion, the Keepseagles submit that the amounts paid during the claims process are not "liquidated damages" in the traditional sense of the term.  *See* Dkt. No. 779-1, at 10. Liquidated damages are typically negotiated or established prospectively and relate to contingent

events, not in hindsight like the negotiated damages in the present case.[3]

In any event, although successful claimants received the full amount required by the Settlement Agreement, the Keepseagles submit that these payments are far short of their actual damages.  *See* Dkt. No. 779-1, at 10-12; *see also* Declaration of Marilyn Keepseagle, May 19, 2015, at ¶ 12, Dkt. No. 779-9.   Class Members have proven that they were the victims of discriminatory lending practices.   Whether they were denied a loan, had a loan delayed, or received less favorable terms than their non-Indian counterparts, the class members suffered damages well in excess of the $50,000 that was made available under the Track A claims process.   USDA's discriminatory lending practices substantially harmed, and in some cases, destroyed, class members' ability to earn a living in production agriculture.   The $50,000 payments distributed to Track A claimants did not make the class members whole and did not fully restore what was lost due to USDA's discriminatory lending practices.   In most class actions, "few settlements award 100 percent of a class member's losses, and thus it is unlikely in most cases that further distributions to class members would result in more than 100 percent recovery."   *In re Lupron Mktg. and Sales Practices Litig.*, 677 F.3d 21, 32 (1st Cir. 2012) (quoting *In re Pharm. Indus. Average Wholesale Price Litig.*, 588 F.3d 23, 24 (1st Cir. 2009)). Such is the case here.   An additional payment to the class members would not result in a windfall to the class members because their actual damages exceed the actual payments received. Accordingly, a *pro rata* distribution to class members is a better and more appropriate option than the foundation proposed by Class Counsel.

---

[3] The parties' use of the term "liquidated" to describe Track A awards, such as "Track A Liquidated Award" (Settlement Agreement § II.SS), is unnecessary surplusage, and should not be controlling in determining whether damages are deemed to be liquidated.

### B.     A *Cy Pres* Distribution Would Not Result in Direct Benefits for the Class Members

A *cy pres* distribution would ensure that <u>none</u> of the remaining settlement funds directly benefit the class members whose damages serve as the basis of this case.  Instead, the primary beneficiaries of a *cy pres* distribution would be non-profit organizations unaffected by USDA's discriminatory lending practices.   These charitable organizations *may* use the remaining settlement funds in a manner which *might* provide indirect benefits to Native American farmers and ranchers.  However, it is unlikely that a significant portion of the class members would receive *any* assistance or indirect benefits from a *cy pres* distribution.

The number of charitable organizations that currently provide agricultural, business, or advocacy services to Native American farmers and ranchers is relatively small.  As a result, most of the class members have no experience with working with charitable organizations.  Many of the class members have passed away.  Others are advanced in age, with many retired from farming or ranching.  Furthermore, many of the class members were forced out of production agriculture, oftentimes due to USDA's discriminatory lending practices.  Even if all of the remaining settlement funds were distributed to charitable organizations immediately, they would provide little in the way of benefits for the class members.

However, the vast majority of the remaining settlement funds will not be put to immediate use.  Instead, $342 million in remaining funds would be distributed to the Proposed Trust, which would have 20 years to disburse the remaining settlement funds.  By 2035, many more class members will have passed away.  It is not a stretch to suggest that while the Proposed Trust may benefit current or future Native American farmers and ranchers, it would provide little in the way of benefits to the actual class members who suffered the damages that serve as the basis for this action.

11

*Cy pres* distributions, by their very nature, do not allow for direct benefits to class members. *Marshall v. Nat'l Football League*, No. 13-3581, 2015 WL 2402355, at *16 (8th Cir. May 21, 2015) (Smith, C.J., concurring).  This is likely one of the several reasons why Chief Justice Roberts has noted that there are "fundamental concerns surrounding the use of such remedies in class action litigation." *Marek v. Lane,* 134 S.Ct. 8, 9 (2013).  Furthermore, recent appellate court decisions have criticized and sharply limited the use of *cy pres* distributions as a method of disposing of unclaimed settlement funds.  *See, e.g.*, *In re BankAmerica Corp.*, 775 F.3d at 1063; *Powell v. Ga. Pacific Corp.*, 119 F.3d 703, 706 (8th Cir. 1997); *Ira Holtzman, C.P.A. v. Turza*, 728 F.3d 682, 689-90 (7th Cir. 2013); *In re Baby Products Antitrust Litig.*, 708 F.3d 163, 172-73 (3d Cir. 2013); *In re Lupron*, 677 F.3d at 29-33 (holding that distribution of funds at the discretion of the court is not a traditional Article III function and creates the appearance of impropriety); *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1038-40 (9th Cir. 2011) (finding that it was improper for a judge to approve a *cy pres* recipients charities that had nothing to do with underlying statutes because "the selection process may answer to the whims and self-interests of the parties, their counsel, or the court"); *Klier*, 658 F.3d at 473-82 (Jones, C.J. concurring) (suggesting that district courts should avoid the legal complications that assuredly arise when judges award surplus settlement funds to charities and civic organizations); *In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 196-98 (5th Cir. 2010); *Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 434-36 (2d Cir. 2007); *Wilson v. Southwest Airlines, Inc.,* 880 F.2d 807, 816 (5th Cir. 1989).

The Keepseagles and the class members fought for years to received compensation for injuries they suffered due to USDA's discriminatory lending practices.  Their goal was to be made as close to whole as possible after suffering substantial humiliation, embarrassment, and

financial damages.  They did not engage in this struggle to deliver $380 million to charitable organizations.  Nor should that be the final outcome of this case.

   C.   **The Vast Majority of the *Keepseagle* Class Members Favor a *Pro Rata* Distribution**

The Keepseagles have a continuing obligation to vigorously represent the interests of the class members.  *In re BankAmerica Corp.*, 775 F.3d at 1062, n.1.  They have taken their duty to heart and have spent countless hours of their time talking with class members and, more importantly, listening to the class members.  In their discussions with the class members, the Keepseagles have consistently heard one resounding message – the remaining settlement funds should be distributed to the class members.  Furthermore, the class members have made it known to the Keepseagles that they vigorously oppose the Proposed Trust, which they view as a vehicle to waste the remaining settlement funds.

The class members have made their views known through a variety of channels.  *Amicus curiae* Great Plains Claimants, who comprise almost 600 successful Track A claimants, support the Keepseagles' Motion and have long-favored a supplemental distribution of the remaining settlement funds to the class members who were harmed by discriminatory lending practices. *See* Dkt. No. 784.  During Class Counsel's listening sessions, the vast majority of the class members who expressed their opinions made it known that they favored a supplemental distribution and opposed the Proposed Trust.  *See* Dkt. No. 709-6, at 60-65.  In addition, many class members have reached out directly to this Court to express their views regarding the distribution of the remaining funds.  A substantial majority of these class members have expressed support for a distribution of the remaining funds amongst the class members and stand in opposition to the

13

Proposed Trust.[4]

Although this Court has ruled that the class members do not have a legally-protected interest in the remaining settlement funds, the Keepseagles submit that the views of the class members whose damages serve as the basis for this case should be considered.[5] The *Keepseagle* class members depend and/or depended on farming and ranching for their livelihoods. USDA's discriminatory lending practices harmed their ability to earn a living, and in many cases, forced them out of business. In addition to financial damages, all class members suffered the indignities of humiliation and embarrassment that accompany discrimination. These injuries have made farming and ranching, already a challenging and risk-filled occupation, far more difficult and financially uncertain.

The payments from the claims process have not made class members whole. The actual damages that they suffered from USDA's discriminatory lending practices have had a dramatic and long-lasting effect. Some of these injuries have had a multi-generational impact because many of the class members were not able to pass on farming operations to their children. Distributing the remaining settlement funds to the remaining class members would more closely make them whole.

The *Keepseagle* class members are justly skeptical of a *cy pres* distribution. Third-parties, including the Proposed Trust and other charitable organizations, did not suffer the indignities or damages of discriminatory lending practices. Based on their history with both

---

[4] *See* Dkt. Nos. 657, 658, 662, 666, 667, 671, 681, 690, 695, 696, 699, 708, 710, 715, 721, 735, 745, 748, 761 & 780.

[5] Perhaps the resolution of this dispute could have taken a more productive if USDA and Class Counsel followed the principles of "consultation," which has been widely touted under the Obama Administration. *See* Memorandum on Tribal Consultation, 2009 DAILY COMP. PRES. DOC. 887 (November 5, 2009) *available at* https://www.whitehouse.gov/the-press-office/memorandum-tribal-consultation-signed-president.

bureaucracies and non-profits, the class members have little confidence that the remaining settlement funds will be disbursed in a manner that will provide them meaningful indirect benefits. The class members rightfully believe that they will be in a far better position than non-profit third-parties or the Proposed Trust to spend the remaining settlement funds in a manner that will best achieve the goals of the ECOA and this case. Class members who are still in production agriculture know how to farm and ranch. Those that were forced out of agriculture or have retired know what their needs are and how to spend money to meet those needs. The *Keepseagle* class members did not suffer damages because of a lack of charity. They suffered damages because USDA, frequently the only source of agricultural lending services in many parts of Indian Country, denied them services on the basis of their race. As such, the Keepseagles submit that this Court should consider the views of the class members, who overwhelmingly oppose Class Counsel's Motion and support the Keepseagles' Motion.

### D.   Class Counsel's Motion, Which Should Be Denied, Is Better than Preserving the Status Quo[6,7]

If this Court were simply tasked with analyzing the merits of Class Counsel's Motion

---

[6] The Keepseagles concede that this Court has the authority to grant Class Counsel's Motion pursuant to Section XXII of the Settlement Agreement. The Keepseagles also agree that this Court has the authority to modify the Settlement Agreement pursuant to Rule 60(b) of the Federal Rules of Civil Procedure due to unforeseen circumstances. *See* Dkt. No. 779-1, at 17. However, the Keepseagles dispute that Class Counsel's Motion is "tailored to resolve the problems created by the change in circumstances" when the proper solution should be directing the remaining settlement funds to the class members who have suffered damages due to discriminatory lending practices, not third parties. *See Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 393 (1992).

[7] This Court has already held that supplemental notice is not required under Rule 23(e) of the Federal Rules of Civil Procedure. *See* Dkt. No. 776, at 8. Thus, this issue raised by Class Counsel is moot. However, the Keepseagles greatly appreciate that this Court exercised its equitable discretion by ordering a supplemental notice to be sent to the class members. *Id.* However, the Keepseagles disagree that Class Counsel fully informed class members about the proposed modification of the *cy pres* provisions at the time that their motion was filed. *See* Dkt. No. 709-1, at 23. These failures, however, have been partially ameliorated by the supplemental notice.

versus the original *cy pres* provisions, then it may have merit.   Under the current *cy pres* provisions, the $380 million would be distributed in equal amounts to charitable organizations that assist Native American farmers and ranchers.   *See* Settlement Agreement, § IX.F, ¶7.   Only organizations that pre-existed the execution of the Settlement Agreement would be eligible to receive these funds.   *See id.*, at § II.I.   Such an arrangement would be wildly inefficient.   There are a limited number of charitable organizations that would qualify to receive funds under the current *cy pres* provisions.   As Class Counsel has noted, the amount of funds these organizations have historically spent on agricultural assistance is relatively small.[8]   Such a large distribution to a small number of organizations would be unwarranted and unprecedented.   Given that these organizations operate on a relatively small scale, it would also likely overwhelm these organizations with funds beyond their commensurate needs.

The Keepseagles acknowledge that if the Court were not inclined to consider a *pro rata* distribution, then Class Counsel's Motion would likely lead to a more favorable outcome than preserving the original *cy pres* provisions.   Under the current provisions, Class Counsel is required to select the recipient organizations, subject to the Court's approval.   *See* Settlement Agreement § II.I.   The Keepseagles agree that if this decision must be made, it should be entrusted to Native Americans that are familiar with the needs of Indian agriculture.   The Keepseagles also agree that not every organization has the same purpose or needs, and thus funding decisions should be made on a case-by-case basis, not on an equal share basis.

However, if this Court were to only consider *cy pres* as the sole method to distribute the remaining funds, the Keepseagles have several concerns with Class Counsel's proposal.   First,

---

[8] *See* Dkt. No. 646, at 8 (noting that the top-ten grant-making organizations in the United States contribute less than $41 million annually to organizations serving Native Americans, in general, and speculating that only a small fraction of those funds are likely to have funded programs related to agriculture).

Class Counsel's proposal lacks nexus between the goals of this action and the proposed amendment. This ECOA case was brought on behalf of a class of plaintiffs who suffered damages from USDA's discriminatory lending practices between 1981 and 1999. Many of the class members were forced out of production agriculture due to these discriminatory governmental lending practices, leaving them with no farms or ranches to pass along to their children. Furthermore, many of the class members have passed away or retired from farming and ranching. The Proposed Trust would benefit current and future Native American farmers and ranchers and would operate until 2035.[9]  Many, if not the vast majority, of the Proposed Trust's beneficiaries will not be class members. Instead, the Proposed Trust would primarily provide services for third parties who were not subjected to discriminatory governmental lending practices.

In analyzing whether a *cy pres* distribution is appropriate, many courts employ a "reasonable approximation" test. *In re Lupron*, 677 F.3d at 33-34; *see also Nachshin*, 663 F.3d at 1040 (rejecting a cy pres distribution that did not "have anything to do with the objectives of the underlying statutes," and would not clearly "benefit the plaintiff class"); *Six Mexican Workers*, 904 F.2d at 1311-12.  Factors that courts may consider include:

> [1] the purposes of the underlying statutes claimed to have been violated, [2] the nature of the injury to the class members, [3] the characteristics and interests of the class members, [4] the geographical scope of the class, [5] the reasons why the settlement funds have gone unclaimed, and [6] the closeness of the fit between the class and the *cy pres* recipient.

*In re Lupron*, 677 F.3d at 33.

---

[9] Many of the beneficiaries of the Proposed Trust would likely be individuals who were not even born until after 1999.

The Keepseagles submit that the relief sought in Class Counsel's Motion does not satisfy the "reasonable approximation" test.  First, this class action was filed under the ECOA.  *See* 15 U.S.C. § 1691 et seq.  The underlying purpose of this Act is to eradicate lending practices that discriminate "on the basis of race, color, religion, national origin, sex or marital status, or age." *See id.* at § 1691(a)(1).  The ECOA also provides for compensation of "actual damages" to make the victims of discriminatory lending practices whole again.  *Id.* at § 1691e(a).  Furthermore, the Act provides for punitive damages, which signals a deterrent effect designed to prevent discriminatory lending practices.  *Id.* at § 1691e(b).[10]  With this understanding of the ECOA, any *cy pres* distribution should be used to assist the class members who were victims of USDA's discriminatory lending practices.  Class Counsel's Proposed Trust, to the contrary, would distribute funds to charitable institutions that serve a much broader purpose than was sought in this action.  The Proposed Trust would fund organizations that provide "agricultural, business, and advocacy services" to Native American farmers and ranchers.  The Proposed Trust contains no restrictions that would require any of the funds be used towards ameliorating the negative effects of discriminatory lending practices.  Nor does the Proposed Trust indicate that it will provide assistance for class members who have retired or lost their farms due to USDA's discriminatory lending practices.

Class Counsel's Motion also does not appear to take the nature of the victims' injuries into consideration.  The sad truth is that many of the *Keepseagle* class members lost their farming operations due to discriminatory lending practices.  Due to the high-risk nature of farming and ranching, a single loan can oftentimes be the difference between viability and

---

[10] The Keepseagles note that Congress did not waive sovereign immunity with regard to punitive damages under the ECOA.  *See* 15 U.S.C. 1691e(b).  However, the absence of this waiver does not change the deterrent nature of this statute.

failure.  Once a lease must be surrendered or deeded land is sold off, it is very difficult to recover.  As a result, many of the class members have not been able to farm or ranch for years. Rather than assisting these victims of discrimination, the Proposed Trust would largely benefit current and future Native American farmers and ranchers, most of whom are not class members. Class Counsel's Motion does not provide <u>any</u> benefits for Native American farmers and ranchers who are no longer farming or ranching, which comprise a substantial portion of the class.

The Proposed Trust is also not clearly aligned with the interests of the class members. During the summer of 2014, Class Counsel conducted several listening sessions to "explain" the Proposed Trust and receive feedback from the class members.  The vast majority of the class members who provided comments indicated that they were diametrically opposed to the Proposed Trust.  *See* Dkt. No. 709-6, at 60-65.  The class members indicated that they felt the Proposed Trust would primarily benefit non-profit organizations – not the actual victims of discriminatory lending practices.  Class Counsel made no substantive changes to the Proposed Trust despite the clear outpour of dissent against it.  It is far from clear how the Proposed Trust would provide meaningful indirect benefits to the class members or serve their interests.

In addition to the shortcomings of the Proposed Trust under the "reasonable approximation" test, Class Counsel's proposal would entrust $342 million to a new, untested entity.  Despite Proposed Trust's theoretical oversight mechanisms, including trustees, an executive director, outside consultants, and professional staff, there are limited assurances that the Proposed Trust, which is lacking in a track record, would be an effective steward of the remaining settlement funds.  The potential for waste, excessive overhead, and mission creep should cause this Court to proceed very cautiously when considering an unprecedented *cy pres* distribution to a new entity.

Notwithstanding the Keepseagles' legitimate concerns with Class Counsel's Motion, if this Court were simply tasked with choosing between granting Class Counsel's Motion or retaining the current *cy pres* provisions, then the Keepseagles believe that establishing a foundation is the lesser of two evils. However, this Court is not required to operate in a vacuum. Also pending before this Court is the Keepseagles' Motion, which seeks a distribution of the remaining funds directly to class members whose injuries served as the basis for this case. Distributing the remaining settlement funds to the class members would best approximate the goals of the ECOA and would prevent an unwarranted and unprecedented distribution of funds to third-party charitable organizations. Thus, despite any advantages that Class Counsel's proposal may have over the current *cy pres* provisions, this Court should deny Class Counsel's Motion and grant the Keepseagles' Motion.

## **CONCLUSION**

While Class Counsel's Motion may be worthy of consideration when compared to the Settlement Agreement's current *cy pres* provisions, it is not the proper solution for distribution of the remaining settlement funds. The unclaimed settlement funds, which exist solely because the class members were discriminated against, should be distributed to the class members who actually suffered injuries due to USDA's discriminatory lending practices. A *pro rata* distribution, as specified in the Keepseagles' Motion, is feasible and is the most equitable solution that best approximates the goals of this ECOA action.

For the reasons stated above, the Court should deny Class Counsel's Motion to Modify the Settlement Agreement *Cy Pres* Provisions in its entirety.

Respectfully submitted this 2nd day of June, 2015.


/s/ Marshall Matz, Esq.
Marshall Matz, Esq.
D.C. Bar #267955
Stewart D. Fried, Esq.
D.C. Bar #457801
John G. Dillard, Esq.
D.C Bar #1016913
Olsson Frank Weeda Terman Matz P.C.
600 New Hampshire Avenue, N.W.  #500
Washington, D.C.  20037
mmatz@ofwlaw.com
(202) 789-1212
(202) 234-3550 Facsimile

Attorneys for Marilyn and George Keepseagle

## **CERTIFICATE OF SERVICE**

On June 2, 2015, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.


/s/ Marshall Matz
Marshall Matz