**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ——————————————— | ) | |
| MARILYN KEEPSEAGLE, et al., | ) | |
| | ) | Civil Action No.: 1:99CV03119 |
| Plaintiffs, | ) | (EGS) |
| | ) | |
| v. | ) | |
| | ) | Judge Emmit G. Sullivan |
| TOM VILSACK, Secretary, | ) | Magistrate Judge Alan Kay |
| United States Department of Agriculture, | ) | |
| | ) | |
| Defendant. | ) | |
| ——————————————— | ) | |

***AMICUS CURIAE* BRIEF FOR INTERTRIBAL AGRICULTURE COUNCIL
AND INDIAN LAND TENURE FOUNDATION IN SUPPORT OF PLAINTIFFS'
MOTION TO MODIFY SETTLEMENT AGREEMENT CY PRES PROVISIONS
(DKT. NO. 709)**

# TABLE OF CONTENTS

Page

I.   Introduction ................................................................................................................ 1

II.  Description of Amici Organizations ......................................................................... 1

    A.   Intertribal Agriculture Council ...................................................................... 1

    B.   Indian Land Tenure Foundation..................................................................... 2

III. Argument .................................................................................................................. 4

    A.   IAC and ILTF Support Plaintiffs' Motion to Modify the Settlement
        Agreement......................................................................................................... 4

    B.   Class Members were Given Fair and Reasonable Notice and Opportunity
        to Be Heard on Cy Pres Funds ......................................................................... 5

    C.   Unforeseen Circumstances Justify Modification of Settlement Cy Pres
        Terms ............................................................................................................... 7

    D.   Plaintiffs' Proposed Modification Will Resolve Concerns About the Cy
        Pres Provisions of the Original Settlement Agreement and Yield Benefits
        for the Entire Class............................................................................................ 11

IV.  Conclusion ................................................................................................................ 14

# TABLE OF AUTHORITIES

**CASES**                                                                                      Page

*In re Black Farmers Discrimination Litigation*,
    29 F. Supp. 3d 1 (D.D.C. 2014) ............................................................................................... 10

*Pigford v. Veneman*,
    292 F.3d 918 (D.C. Cir. 2002) ................................................................................................ 10

*Rufo v. Inmates of Suffolk County Jail*,
    502 U.S. 367 (1992) ....................................................................................................... 7, 8, 10-11

*United States v. Western Elec. Co., Inc.*,
    46 F.3d 1198 (D.C. Cir. 1995) ........................................................................................... 7, 8, 11

**FEDERAL RULES**

Fed. R. Civ. P. 60(b) ...................................................................................................................... 7, 8, 10

I.      **INTRODUCTION**

The Intertribal Agriculture Council (IAC) and the Indian Land Tenure Foundation (ILTF) submit this *amicus curiae* brief in support of the Plaintiffs' Unopposed Motion to Modify the Settlement Agreement Cy Pres Provisions (Dkt. No. 709). IAC and ILTF support the proposed Addendum to Settlement Agreement (Dkt. No. 709-2) in this case because it establishes a method for distribution of cy pres funds that maximizes benefits for the Native farming and ranching community including all class members–both those who did and those who did not file claims. In doing so, it furthers an essential goal of this litigation: to counter the impact of decades of USDA discrimination by assisting Native farmers and ranchers to prosper in their agricultural endeavors. However, if the Court does not grant Plaintiffs' motion, IAC and ILTF ask that distribution of the cy pres funds be made pursuant to the existing terms of the Settlement Agreement.

II.     **DESCRIPTION OF AMICI ORGANIZATIONS**

A.      Intertribal Agriculture Council

The Intertribal Agriculture Council (IAC) is the oldest and leading intertribal organization devoted to providing education, advocacy, and technical assistance to Native American farmers and ranchers throughout the United States. Since it was founded in 1987 to promote the conservation, development, and use of agricultural resources for the betterment of Native people, IAC has worked tirelessly on behalf of individual Indian agricultural producers and tribal enterprises alike. IAC works with tribal governments and tribal members from all geographic regions of the country. Its board of directors is made up of representatives from tribal governments who have deep connections with Indian farmers and ranchers in their represented regions. Through its service to Indian agriculture over more than a quarter century, IAC has gained recognition as a highly respected voice on agricultural programs and policies for Indian

1

Country among both the American Indian community and governmental policy and decision makers.

IAC offers a wide range of programs to further its goal of improving Indian agriculture. These programs are designed (1) to protect and ensure appropriate use of natural resources on Indian lands through resource planning such as that initiated under the American Indian Agriculture Management Act of 1993, (2) to provide assistance in developing and promoting national and international markets for Native American-produced agricultural products, and (3) to help Indian farmers and ranchers maximize access to federal agriculture-related programs.

Through its Technical Assistance Program, IAC works one-on-one with Native farmers and ranchers to apply for and maintain participation in numerous federal agriculture programs including the Farm Loan Programs of the United States Department of Agriculture (USDA) Farm Service Agency (FSA) that are at issue in this case. IAC assists farmers and ranchers with financial, business, and conservation planning and maintenance of record-keeping systems necessary to participate in government agriculture programs. It helps farmers and ranchers obtain access to and develop land resources for agricultural uses through multiple USDA and Bureau of Indian Affairs (BIA) programs. Whether it is to access leases on agricultural land; loans for operating expenses or for land, equipment, or livestock; cost-share funds for conservation practices; payments for disaster losses; crop or livestock insurance; grants for "value-added" agricultural product development; or agency discrimination complaint procedures, IAC is there to provide the technical assistance and advocacy services Native farmers and ranchers need to develop, maintain, and grow their operations.

B.    Indian Land Tenure Foundation

The Indian Land Tenure Foundation (ILTF) is a national community-based organization serving American Indian nations and their people in the recovery and control of their rightful

2

homelands. ILTF works to promote education, increase cultural awareness, create economic

opportunity, and reform the legal and administrative systems that prevent Indian people from

owning and controlling reservation lands. As a community foundation, ILTF accepts

contributions from organizations and individuals to support its grantmaking and program

initiatives. *See*, https://www.iltf.org/about-us.

ILTF originated in the 1990s when a group of concerned Indian landowners, land rights

advocates, and tribal leaders came together to do something about the serious problems affecting

Indian land tenure–the terms and conditions by which Indians hold land. *Id.* Of most significant

concern were the deleterious effects of the General Allotment Act and subsequent federal actions

and policies that resulted in loss of Indian ownership of reservation lands. *Id.*

The Foundation began with, and steadfastly maintains that reservation lands were

retained by treaty and executive order for the exclusive occupation and use by native nations and

Indian people. ILTF works to re-gain the ownership of 90 million acres of reservation lands lost

through the Allotment process–generally done through willing seller, willing buyer.

Simultaneously, ILTF works with individual Indian land owners to prevent further loss of

reservation trust land through inheritance and sale; more than three-quarters of all individual

Indian landowners own an undivided interest in reservation land used for agriculture.

ILTF has taken the approach that provided sufficient objective information, Indian

landowners will make wise and appropriate decisions regarding their land; this is especially true

for those holding agricultural lands as they seem to be more "connected" to the property.

Therefore, ILTF has provided nearly 100 landowner training sessions throughout Indian Country

covering a wide variety of land ownership/management subjects related to Indian lands.

ILTF has gained a reputation in Indian Country for having the highest standards of financial management; ILTF has received an unqualified audit for every year of its operation. The Foundation is also known for its ability to earn relatively high investment returns for its endowed funds with what is considered a conservative portfolio. ILTF now manages two client foundations and 21 separate donor funds. ILTF's eleven-member board of directors, drawn from throughout Indian Country, fully appreciates what the *Keepseagle* settlement cy pres funds could mean to Indian land ownership. If Indian farmers and ranchers are assisted and financially stable, the lands they gain and maintain will remain in Indian ownership. Conversely, a weakened Indian agricultural sector will also mean that substantial reservation acreages will be in jeopardy of being lost from Indian ownership; this is an ongoing and daily concern in Indian Country.

## III.    ARGUMENT

### A.    IAC and ILTF Support Plaintiffs' Motion to Modify the Settlement Agreement

IAC and ILTF support Plaintiffs' Unopposed Motion to Modify the Settlement Agreement Cy Pres Provisions (Dkt. No. 709) and the Addendum to Settlement Agreement (Dkt. No. 709-2) because by establishing a method for distribution of cy pres funds that maximizes the benefits for the Native farming and ranching community, the settlement addendum furthers an essential goal of this litigation: to counter the impact of decades of USDA discrimination by assisting Native farmers and ranchers to prosper in their agricultural endeavors. However, if the Court does not grant Plaintiffs' motion, IAC and ILTF ask that distribution of the cy pres funds be made pursuant to the existing terms of the Settlement Agreement. *See,* Dkt. No. 576 (Nov. 1, 2010) ("Settlement Agreement"). Both organizations encourage the Court to act quickly as Indian Country continues to suffer opportunity losses as this process draws out.

4

B.       Class Members were Given Fair and Reasonable Notice and Opportunity to Be
Heard on Cy Pres Funds

The Settlement Agreement approved by this Court includes provisions for the

establishment and distribution of cy pres funds. Settlement Agreement (Dkt. No. 576) at p. 31-32

Paragraph 7 of Section IX.F. The Agreement created a compensation fund from which all awards

for attorney fees, class representatives' services, and class members' successful claims in the

non-judicial claims process were to be paid. According to the Settlement Agreement, any funds

remaining after all of these awards were paid are to be directed to the Cy Pres Fund. *Id.* The Cy

Pres Fund is to be distributed to Cy Pres Beneficiaries upon recommendation of Class Counsel

and approval by the Court. "Cy Pres Beneficiary" is defined by the Agreement as "any non-profit

organization, other than a law firm, legal services entity, or educational institution, that has

provided agricultural, business assistance, or advocacy services to Native American farmers

between 1981 and the Execution Date. . . ."  Settlement Agreement (Dkt. No. 576) at p. 2

Paragraph J of Section II. Under the current terms of the Agreement, there would be a one-time

distribution of cy pres funds in equal shares to the chosen Cy Pres Beneficiaries. *Ibid*.

It should be noted here that IAC is one of the very few organizations that fits the

Settlement Agreement's definition of Cy Pres Beneficiary. As described in more detail above,

IAC is a non-profit organization that has had the honor and responsibility of providing direct

agricultural, business assistance, and advocacy services to Native American farmers and ranchers

throughout the geographical regions of the United States continually since 1987. As such, subject

to Class Counsel's recommendation and this Court's approval, IAC could potentially receive a

large share of the Cy Pres Fund under the current terms of the Settlement Agreement. IAC is

prepared to accept any cy pres funds it might be granted under the current Settlement Agreement

terms, but it also supports the proposed settlement addendum modifying the cy pres terms of that agreement.

The Court approved the Settlement Agreement only after ensuring that a fair and reasonable notice of its terms had been provided to class members, conducting a fairness hearing at which all those in attendance were heard, and considering all submissions regarding the proposed settlement. *Order on Plaintiffs' Motion for Final Approval of Settlement, Motion for Approval of Class Representatives Service Awards, and Motion for Awards of Attorneys' Fees and Expenses*, Dkt. No. 606 (April 28, 2011). The notice provided to class members included not only a description of awards for successful claims in the non-judicial claims process and notice that failure to participate in that process would result in the resolution of the individual class member's legal claims of discrimination, but also notice of the cy pres provisions included in the Settlement Agreement. Notice to Class, Exhibit C to Plaintiffs' Unopposed Motion to Modify the Settlement Agreement Cy Pres Provisions (Dkt. No. 709-4), pp. 1, 6, 7-8, and 11. With regard to the cy pres terms, the class notice stated: "[i]f any money remains in the Settlement Fund after all payments to class members and expenses have been paid, then it will be donated to one or more organizations that have provided agricultural, business assistance, or advocacy services to Native Americans." *Id*. at p. 6. Through these procedures, class members were provided fair and adequate notice and opportunity to be heard on the Settlement Agreement terms including those regarding the Cy Pres Fund. No class members appealed the Court's settlement approval order. Thus, the cy pres provisions of the settlement have been in place and effective since April of 2011. *Order on Plaintiffs' Motion for Final Approval of Settlement, Motion for Approval of Class Representatives Service Awards, and Motion for Awards of Attorneys' Fees and Expenses*, Dkt. No. 606 (April 28, 2011).

C.    Unforeseen Circumstances Justify Modification of Settlement Cy Pres Terms

Since the Settlement Agreement became effective in April of 2011, unforeseen

circumstances have occurred that make the cy pres provisions unworkable. The Parties'

agreement to modify the cy pres provisions is set out in the Addendum to Settlement Agreement

(Dkt. No. 709-2). The Court has the authority to approve modification of the cy pres provisions

only in the manner agreed upon by the Parties as reflected in this addendum.

The Settlement Agreement authorizes modifications "only with written agreement of the

Parties and with the approval of the Court." Settlement Agreement (Dkt. No. 576) at Section

XXII. Thus, the Agreement itself provides the exclusive method to be used for modification of

its terms.

Rule 60(b)(5) of the Federal Rules of Civil Procedure provides supplemental authority for

the Court's approval of the proposed addendum agreed upon by the Parties pursuant to the

Section XXII modification provision of the Settlement Agreement. Rule 60(b)(5) provides that

"[o]n motion and just terms, the court may relieve a party or its legal representatives from

judgment" when "applying it prospectively is no longer equitable[.]" Fed. R. Civ. P. 60(b)(5).

This Rule is to be applied in a flexible manner to permit modification to a settlement agreement

that has been entered as part of a final judgment when there have been unanticipated changes in

factual circumstances which make the original terms unworkable, and the modification is

designed to resolve the problems created by the changed circumstances.  *See, e.g., Rufo v.*

*Inmates of Suffolk County Jail,* 502 U.S. 367, 384-385 and 391 (1992); and *United States v.*

*Western Elec. Co.,* 46 F.3d 1198, 1203-1204 and 1207 (D.C. Cir. 1995).

Like the Parties, IAC and ILTF anticipated that many more Native farmers and ranchers

would file claims in the non-judicial claims process resulting in a much greater amount of the

settlement funds being used to compensate successful claimants. Over its nearly thirty-year

history, IAC has worked directly with thousands of Native farmers and ranchers who applied for or attempted to apply for USDA loans and loan servicing and against many of whom it appeared that USDA discriminated based on race. Given this vast experience and extrapolating it to the well over 60,000 Native farmers and ranchers who were operating during the relevant claims period, IAC believes the Parties' expectation of much higher participation in the non-judicial claims process was justified. *See*, U.S. Census of Agriculture, Table 55, Selected Farm Characteristics by Race (2007). To promote the broadest possible participation in the claims process, IAC and its extensive technical assistance network made concerted efforts to give class members information on filing claims by organizing meetings and communicating with farmers and ranchers through its extensive mailing lists and communication networks. IAC staff and its member tribes assisted in organizing and advertising meetings at which advocates and attorneys hired by class counsel assisted claimants to complete their claims forms for submission. IAC also recruited other Native non-profit organizations, including ILTF, to disseminate the information to Indian farmers and ranchers. Despite the extensive efforts of IAC and ILTF, class counsel, and other interested organizations, participation in the claims process was lower than anticipated, resulting in a larger than anticipated Cy Pres Fund. The size of the Cy Pres Fund–a substantial change in the factual circumstances from those projected at the time of the settlement–makes the one-time, pro-rata distribution to the very few organizations that meet the current Cy Pres Beneficiary definition "unworkable" in the sense contemplated by Courts in making modification decisions under Rule 60(b)(5). *See, e.g., Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, 384-385, and 391 (1992); and *United States v. Western Elec. Co.,* 46 F.3d 1198, 1203-1204 and 1207 (D.C. Cir. 1995).

The current settlement terms require the funds be distributed in equal amounts to all approved Cy Pres Beneficiaries, without regard to the size of the fund. Settlement Agreement (Dkt. No. 576) at Section IX, Paragraph F 7, p. 31. This does not allow consideration of the number of approved organizations, their size, the needs of their programs, the geographical region their programs cover, or the number of Native farmers and ranchers they serve, when determining the amount each will receive. Some approved organizations may serve Native farmers and ranchers from multiple tribes across the country, while others may serve only those from one tribe or just those within a local community. Some may provide only one type of program, while others may provide a whole suite of programs designed to address the full range of challenges Native farmers and ranchers face in obtaining land, equipment, livestock, and operating capital needed to run successful operations. While some organizations may have a number of professional staff, a number of eligible groups are unstaffed, volunteer-run organizations. While distributing equal shares to all such groups may have made sense when the Parties anticipated there would be a relatively small amount of unclaimed settlement funds, it becomes unworkable when there is $380 million to distribute. A one-time, pro-rata distribution of this large fund to relatively few organizations, without regard to the size of the recipient organizations, areas of service, or number of farmers and ranchers assisted, is likely to result in significant inequities in the extent to which Native farmers and ranchers, including class members, experience the benefits from the Cy Pres Fund.

Once the unanticipated size of the Cy Pres Fund was known, the Parties entered into extensive negotiations regarding modification of the Settlement Agreement's cy pres terms. IAC and ILTF understand that in these negotiations USDA declined to agree to Plaintiffs' proposals to distribute the funds to successful claimants or to conduct a second claims process. USDA's

failure to agree forecloses these options pursuant to Section XXII of the Settlement Agreement which mandates that the Parties agree to any modification. As Judge Friedman noted, when refusing to call upon Fed. R. Civ. P. 60(b)(5) to force modification over the objection of one party when the settlement agreement provided for modification only upon written consent of the parties, "courts do not have 'free-ranging 'ancillary' jurisdiction' to enforce or modify negotiated settlement agreements, but are constrained by the terms agreed upon." *In re Black Farmers Discrimination Litigation*, 29 F.Supp. 3d 1 (D.D.C. 2014) (quoting *Pigford v. Veneman*, 292 F.3d 918, 924 (D.C. Cir. 2002).

Through continued negotiations USDA did agree to the Addendum to Settlement Agreement, which provides for distribution of ten percent of the Cy Pres Fund within 180 days of Court approval and for the remaining ninety percent to endow a trust to be distributed over a period of up to twenty years. Addendum to Settlement Agreement (Dkt. No. 709-2). The addendum retains the requirement that all distributions must be made to further Native American farming and ranching activities. *Id*. The addendum also expands the types of organizations that could receive funds either through the initial ten percent distribution or through grants from the trust. *Id*. Because USDA has agreed to the proposed Addendum to Settlement Agreement, the Court may approve this modification exclusively on the basis of Section XXII of the Settlement Agreement.

The Court may also invoke Rule 60(b)(5) as supplemental authority for approval because the proposed modification is tailored to address the problems resulting from the unworkable rigid distribution provisions of the current settlement given the unanticipated large size of the Cy Pres Fund. As such it fits the criteria for modification recognized by the courts. *See*, *e.g., Rufo v.*

*Inmates of Suffolk County Jail,* 502 U.S. 367, 384-385, and 391 (1992); and *United States v.*

*Western Elec. Co.,* 46 F.3d 1198, 1203-1204, and 1207 (D.C. Cir. 1995).

  D.  <u>Plaintiffs' Proposed Modification Will Resolve Concerns About the Cy Pres
      Provisions of the Original Settlement Agreement and Yield Benefits for the
      Entire Class</u>

The proposed addendum to the settlement agreement ensures distribution of the funds in

a manner that better serves the interest of the Class, including those class members that did not

file claims in the non-judicial claims process but whose legal claims have now been extinguished,

than do the current cy pres terms. By authorizing distribution of ten percent of the Cy Pres Fund

shortly after the Court's approval, the settlement addendum will provide an immediate infusion

of substantial funds into the community of non-profit and educational organizations that were

serving Native farmers and ranchers during the very period in which the USDA was

discriminating against class members. *See*, Addendum to Settlement Agreement (Dkt. No. 709-

2). This short-term fund infusion will allow these organizations to take immediate steps to help

Native farmers and ranchers, including class members and their families begin to stabilize,

improve, and/or grow their operations through a broad range of activities, including activities

such as those offered by IAC's Technical Assistance Program described above. With such

assistance Native farmers and ranchers, and class members in particular, can begin immediately

to address the devastating impact past discrimination by USDA has had on their agriculture

operations.

By establishing the Native American Agriculture Fund ("the Trust") to distribute the

remainder of the Cy Pres Fund over a period of up to twenty years, the proposed settlement

addendum creates a unique opportunity to support and strengthen Native American farming and

ranching operations long into the future. *See*, Addendum to Settlement Agreement (Dkt. No.

709-2) and Trust Agreement (Dkt. No. 709-3). Through multi-year funding, Native farmers and

ranchers will be assured that the organizations they rely on for critical technical assistance, advocacy, and education services will be there to support them as they face ongoing challenges in agricultural production, including obtaining government program benefits such as loans and loan servicing from USDA.

The Trust's authority to distribute funds over two decades through an entity that is structured to promote well-informed evaluation and assessment of the recipient organizations and funded programs is directly tailored to resolve the unworkable one-time, pro-rata distribution of the unanticipated large Cy Pres Fund that would be required by the current settlement agreement. The Trust's beneficial purpose serves the class members' interests: "to fund the provision of business assistance, agricultural education, technical support, and advocacy services to Native American farmers and ranchers to support and promote their continued engagement in agriculture." Trust Agreement (Dkt. No. 709), Section 7. This purpose ensures that the benefits of the cy pres fund will stay in Indian Country benefitting Indian farmers and ranchers, which is essential to the furtherance of the purposes of this litigation given that USDA's discriminatory actions kept government loan program benefits out of Indian Country for decades.

The Trust allows for the necessary staffing to ensure effective assessment of the types of programs needed by Native farmers and ranchers, appropriate geographical representation of recipient organizations, and accountability and transparency in evaluating whether the grants are benefitting the targeted community. *See*, Trust Agreement (Dkt. No. 709-3) Sections 12(h) and 8. By doing so, it offers the necessary staffing structure to ensure the broadest possible benefit to class members, no matter where they are geographically located or the type of service they may need, to further their agricultural operations.

12

The Trust provides an efficient and accountable mechanism to distribute funds and ensures that the funds are used for permissible purposes benefiting class members, their families, and Indian agriculture in general. For example, the terms governing the Trust require that eligible grant recipients use funds efficiently to support only programs that benefit Native farmers and ranchers and limit use of the funds for administrative costs. Trust Agreement (Dkt. No. 709-3), Section 8(b)(v).

The trustees, including Native leaders–who must have substantial knowledge of agriculture issues and the needs of Native American farmers and ranchers, and/or professional financial and investment or grantmaking experience–will engender trust and confidence from the farming and ranching community served. *See*, Trust Agreement (Dkt. No. 709-3), Section 13(f). Transparency measures will also help engender public confidence in the Trust and its trustees. For example, the terms governing the Trust require that it maintain a regularly updated website to provide the public with information about the Trust's activities and upon which annual reports and financial statements will be posted. Trust Agreement (Dkt. No. 709-3), Section 13(0).

Through the Trust, the Cy Pres Fund will finally be invested in a manner that generates significant income. This investment income can be used to pay the costs of trust administration, but more significantly, also to substantially increase the amount of fund principal available for distribution over the twenty-year period. *See*, Trust Agreement (Dkt. No. 709-3), Section 12 (a) and (c). Even modest investment of these funds can and should substantially increase the amount available to meet the beneficial purposes of supporting and promoting Native American farmers' and ranchers' continued engagement in agriculture. The proposed Trust Agreement contains broad authority for making grants that meet the Trust's mission and tax-exempt purposes, including authority to issue grants that will be used to make loans to farmers and ranchers for

purposes consistent with the Trust mission. Trust Agreement (Dkt. No. 709-3), Section 8. The Trust can and should whenever possible target its grants in a manner that builds on other trust expenditures both with regard the agricultural subject matter to be addressed in the Native farmers' and ranchers' interest and the time in which the funds are to be expended. Coupling such an approach with the Trust's broad-ranging authority for investing funds, over the twenty-year period, the $342 million principal could and should generate an impact on the Indian agriculture sector valued far in excess of that dollar amount.

Class members including those who, for whatever reason, did not file claims in the non-judicial claims process, will more likely receive benefits from the Cy Pres Fund if the money is distributed over an extended period of time to organizations offering a wide range of agriculture-related services and covering the widely dispersed geographical areas in which Native farmers and ranchers operate. The proposed settlement addendum offers this flexibility.

## IV.    CONCLUSION

For the foregoing reasons, IAC and ILTF assert that Plaintiffs' Unopposed Motion to Modify the Settlement Agreement Cy Pres Provisions should be granted.


Dated:  June 2, 2015                                    Respectfully submitted,

                                                        */s/ Matthew Handley*
                                                        Matthew K. Handley (Bar No. 489946)
                                                        WASHINGTON LAWYERS'
                                                        COMMITTEE FOR CIVIL RIGHTS &
                                                        URBAN AFFAIRS
                                                        11 Dupont Circle, N.W., Suite 400
                                                        Washington, D.C. 20036
                                                        Telephone: (202) 319-1000
                                                        Facsimile: (202) 319-1010
                                                        Matthew_Handley@washlaw.org

                                                        */s/ Lynn A. Hayes*
                                                        Lynn A. Hayes (MN Bar No. 0142372)
                                                        FARMERS LEGAL ACTION GROUP, INC.

6 West Fifth Street, Suite 650
St. Paul, MN 55102-1404
Telephone: (651) 223-5400
Facsimile: (651) 223-5335
LHayes@flaginc.org