**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

```
_____
                               )
MARILYN KEEPSEAGLE, et al.,     )
                               )
            Plaintiffs,         )
                               )
         v.                     )  Civil Action No. 99-3119 (EGS)
                               )
TOM VILSACK, Secretary, U.S.    )
Department of Agriculture,      )
                               )
            Defendant.          )
_____)
```

**MEMORANDUM OPINION**

This case places the Court in the unenviable position of enforcing a five-year-old bargain that nobody likes. The bargain at issue is not any old contract; rather, it is a settlement agreement that resolved a major civil-rights class action, was approved by the Court in accordance with the Federal Rules of Civil Procedure, and was made final by that approval and the lack of appeal therefrom. The story that led this case to its current posture is as unique as it is disappointing. In brief, the $680,000,000 in damages that were awarded under the settlement agreement was intended to compensate Native American farmers who alleged that the United States Department of Agriculture discriminated against them personally. The agreement created a claims process for distributing this money, but the claims process failed and $380,000,000 remains undistributed.

The scope of this failure is monumental; the reasons for it remain unclear.

The agreement was finalized before the claims process began, so no one anticipated such a large amount of excess funds. But the parties did anticipate that some money might be leftover, so they included in their settlement agreement a *cy pres* provision, which directs that all leftover funds be distributed in equal shares to a group of charities that serve Native American farmers and ranchers that were to be chosen by Class Counsel. Now, faced with the prospect of over half of the plaintiffs' damages being distributed in equal shares to charities nominated by Class Counsel, many class members regret that part of their agreement and want to change it. Principal among those class members is Marilyn Keepseagle, who has asked the Court to modify the agreement to create a renewed claims process to distribute more of the money to individual class members. Others, including Class Counsel, ask to modify only the charitable-distribution procedures to accommodate the large amount of money to be distributed by: (1) allowing it to be distributed in unequal shares scaled to an organization's capacity; (2) spreading the distribution over twenty years; and (3) placing distribution decisions in the hands of a trust run by Native American leaders.

Unless there is a legal basis for this Court to modify the agreement, the Court must enforce the agreement reached in 2011. Doing so would frustrate all parties' goals. Contrary to the Keepseagles's wishes, the funds would remain entirely for charitable distribution. Contrary to the goals of Class Counsel and the government, that charitable distribution would be pursuant to the arguably inefficient procedures that were designed to handle a much smaller amount of money. This result could be viewed as both unjust and inefficient. Over half of the class's damages would be distributed to third parties, despite the relative ease with which class members could be identified, the claims process reopened, and previously successful claimants permitted to prove that they suffered damages in excess of the compensation they have obtained.

The Court's role is *not* to craft a new compromise based upon the Court's own views about the appropriate amount of compensation due to class members who alleged decades-long, and, in many cases, life-altering discrimination at the hands of their federal government. Nor is it to create a preferred process for distributing the funds to charity. Before the Court is a simple question: Are any of the narrow circumstances in which a court's final judgment may be modified present in this case?

The avenues proposed by the parties for unilateral modification—Class Counsel's attempt to realign the charitable-distribution procedures pursuant to Federal Rule of Civil Procedure 60(b)(5), and the Keepseagles's attempt to reopen the claims process pursuant to the legal doctrine governing unclaimed funds as well as Rules 60(b)(5) and 60(b)(6)—are simply inapplicable, as the Court discusses in detail in Parts II.A and II.B of this Opinion. Absent a way to modify the agreement unilaterally, the parties must come to a consensus themselves, which their settlement agreement defines as "the written agreement of the Parties." As the Court finds in Part II.C, this language requires more than the agreement of Class Counsel and the government, over the objection of at least one class representative and many class members, which is what is presented by Class Counsel's proposed modification. It also requires more than an alignment between Class Counsel, the class representatives, and members of the class, who would all prefer that the money be distributed directly to class members. Because there is no consensus within the meaning of the agreement, and because the parties' proposals for unilateral modification are legally insufficient, the Court **DENIES** both pending motions for modification of the settlement agreement. The Court expects that there will be review of the legal conclusions reached in this Opinion by appellate courts. Upon resolution of appellate

proceedings, if this Court's legal conclusions are undisturbed, the Court will grant the Parties a period of time to negotiate an agreement that they may jointly present to the Court.

*     *     *

Before beginning its legal analysis, the Court makes some observations regarding the government's arguments. The government has chosen to oppose any modification of the settlement agreement that would alter the *cy pres* nature of the funds in any way, based upon concerns that class members might receive a "windfall" in excess of the damages they suffered and that reopening the claims process would undermine the government's interest in the finality of court judgments.

The Executive Branch's narrow position today stands in stark contrast to the messages of respect and reconciliation it expressed upon the settlement of this case. Upon announcement of the settlement in 2010, the President issued the following statement:

> Today, the Department of Agriculture and the Department of Justice announced a settlement agreement with the plaintiffs in the Keepseagle class action lawsuit. This suit was originally filed in 1999 by Native American farmers alleging discrimination in access to and participation in USDA's farm loan programs. With today's agreement, we take an important step forward in remedying USDA's unfortunate civil rights history.
>
> I applaud Secretary Vilsack and Attorney General Holder for their hard work to reach this settlement—a settlement that helps strengthen the nation to nation

relationship and underscores the federal government's commitment to treat all citizens fairly.

Statement by the President on Settlement Agreement in the Native American Farmers Lawsuit Against USDA, White House Office of the Press Secretary (Oct. 19, 2010), https://www.whitehouse.gov/the-press-office/2010/10/19/statement-president-settlement-agreement-native-american-farmers-lawsuit. A statement issued by Secretary Vilsack and then-Attorney General Holder expressed similar sentiments:

> "Today's settlement can never undo wrongs that Native Americans may have experienced in past decades, but combined with the actions we at USDA are taking to address such wrongs, the settlement will provide some measure of relief to those alleging discrimination," Vilsack said. "The Obama Administration is committed to closing the chapter on an unfortunate civil rights history at USDA and working to ensure our customers and employees are treated justly and equally."

> "The settlement announced today will allow USDA and the Native American farmers involved in the lawsuit to move forward and focus on the future," said Attorney General Holder.

> *      *      *

> Under Secretary Vilsack's leadership, USDA is working to address past civil rights complaints and today's announcement is a major step in that effort. The Secretary and his leadership team are committed to addressing allegations of discrimination, and shortly after he took office he sent a memo to all USDA employees calling for "a new era of civil rights" for the Department.

Agriculture Secretary Vilsack and Attorney General Holder Announce Settlement Agreement with Native American Farmers Who Claim to Have Faced Discrimination by USDA in Past Decades, USDA

Office of Communications (Oct. 19, 2010), http://www.usda.gov/
wps/portal/usda/usdamediafb?contentid=2010/10/0539.xml&printable
=true&contentidonly=true.

The Court is sympathetic to the government's *legal* argument
that the settlement is a final judgment and that respect for
final judgments is a cornerstone of our legal system. Indeed,
that argument ultimately binds the Court. That is the Court's
role: To resolve legal disputes, not make policy decisions, even
when the law dictates a result the Court may disfavor. The
Executive Branch, however, has a broader role: To defend itself
in litigation, for sure, but also to seek justice on a broader
stage. It is for that reason, the Court presumes, that the
government sometimes settles cases that implicate deep-seated
interests of justice, even where the government's legal defense
may be relatively strong.

This case was not an abstract legal dispute. It was a major
class-action seeking to remedy what many felt was the latest
chapter in the federal government's sordid history of
mistreating Native Americans. The statements of the President,
Secretary Vilsack, and then-Attorney General Holder make clear
that the government in 2010 understood this dimension of the
case. The government's position lately evinces a failure to
grapple with that dimension. The government would do well to
remove its legalistic blinders.

The result is that $380,000,000 of taxpayer funds is set to be distributed inefficiently to third-party groups that had no legal claim against the government. Although a $380,000,000 donation by the federal government to charities serving Native American farmers and ranchers might well be in the public interest, the Court doubts that the judgment fund from which this money came was intended to serve such a purpose. The public would do well to ask why $380,000,000 is being spent in such a manner.

Because these considerations move beyond the realm of the law and into the realm of politics and policy, this Court can only make observations, bound as it is to the final judgment in this case and the narrow legal doctrines for modifying a final judgment. This Court has confronted an analogous situation before and its words are equally applicable here: "Were this Court empowered to judge by its sense of justice, the heart-breaking accounts of" life-altering discrimination suffered by members of the class at the hands of their federal government "would be more than sufficient justification for granting all the relief that they request." *Roeder v. Islamic Republic of Iran*, 195 F. Supp. 2d 140, 145 (D.D.C. 2002). As in *Roeder*, however, the authority to grant such relief lies with another branch of government and "[t]he political considerations that

must be balanced prior to such a decision are beyond both the expertise and the mandate of this Court." *Id.*

## I.   Background

### A.   The Case is Hard Fought from 1999 to 2010.

On November 24, 1999, the plaintiffs filed this lawsuit against the Secretary of Agriculture on behalf of a class of Native American farmers and ranchers who applied to the United States Department of Agriculture's farm loan and benefits programs between January 1, 1981 and November 24, 1999. The plaintiffs alleged that the Department of Agriculture discriminated against them in a variety of ways in connection with these applications and its treatment of complaints of discrimination arising therefrom. The plaintiffs alleged that these actions violated the Equal Credit Opportunity Act, 15 U.S.C. § 1691e; the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq.*

On December 12, 2001, this Court granted in part the plaintiffs' motion for class certification. *See Keepseagle v. Veneman*, No. 99-3119, 2001 WL 34676944 (D.D.C. Dec. 12, 2001). Upon finding that the requirements of Federal Rule of Civil Procedure 23 had been met, the Court:

> [C]ertifie[d] the following class for plaintiffs'
> claims for declaratory and injunctive relief pursuant
> to Fed. R. Civ. P. 23(b)(2): All Native-American

> farmers and ranchers, who (1) farmed or ranched
> between January 1, 1981 and November 24, 1999; (2)
> applied to the USDA for participation in a farm
> program during that time period; and (3) filed a
> discrimination complaint with the USDA individually or
> through a representative during the time period.

*Id.* at *15. The Court did not address certification of

plaintiffs' claims for monetary relief:

> Without a developed factual record and without clear
> representation of subclasses, it is impossible for the
> Court to make a finding that claims for individual
> compensatory relief will destroy the class cohesion.
> Similarly, the Court can not ascertain whether, should
> it permit class certification on plaintiffs' claims
> for all forms of requested relief, the claims for
> monetary damages would overshadow those for
> declaratory and injunctive relief.

*Id.* at *14. Accordingly, the Court stated that it would consider

certification of the plaintiffs' monetary claims "in the event

that, after the completion of discovery and the identification

of appropriate sub-class representatives, plaintiffs are able to

demonstrate to the Court the existence of a class properly

certifiable as a hybrid class or pursuant to Rule 23(b)(3)." *Id.*

The D.C. Circuit declined the government's petition for

interlocutory review of the Court's class-certification order.

*See In re Veneman*, 309 F.3d 789 (D.C. Cir. 2002).

   For nearly ten years, the parties engaged in extensive and

contentious discovery and motions practice. A recounting of the

full history of this phase is unnecessary at this time, but this

nearly decade-long battle resulted in a narrowing of the

plaintiffs' claims. The Court granted in part a motion for judgment on the pleadings, dismissing the plaintiffs' Title VI claim, which the plaintiffs had ultimately conceded was barred by the law in this jurisdiction at that time. *See* Opinion & Order, ECF No. 275. Plaintiffs filed a series of Amended Complaints, and ultimately rested in their Eighth Amended Complaint on their Equal Credit Opportunity Act claim. Eighth Am. Compl., ECF No. 460 ¶¶ 131-36. Discovery on this claim was completed by November 2009. With certification of the plaintiffs' monetary claims still a hotly contested issue, the parties jointly sought to stay briefing on December 3, 2009, representing that "given the current status of the litigation, settlement discussions are appropriate at this time." Joint Mot. to Stay, ECF No. 548 at 2. The case was in settlement discussions for most of 2010.

**B.   The Parties Reach a Settlement Agreement.**

On October 19, 2010, the parties informed the Court that they had reached a settlement. *See* Notice, ECF No. 570. Three days later, the plaintiffs moved for preliminary approval of that settlement. *See* Mot. for Prelim. Approval, ECF No. 571. In connection with this motion, the plaintiffs noted that their expert witness had come to a conclusion that the damages suffered by the class were approximately $776,000,000, making

the $680,000,000 settlement award nearly 90% of the plaintiffs'

estimated total damages. *See* Pls.' Suppl. Br., ECF No. 572 at 4.

On November 1, 2010, the Court granted preliminary approval of

the settlement. *See* Order, ECF No. 577. In so doing, the Court

affirmed its prior certification of the class's injunctive

claims and also certified the class's claims for monetary relief

under Federal Rule of Civil Procedure 23(b)(3). *See id.* at 2.

The Court also approved the parties' plan for disseminating

notice of the Agreement, required that objections to the

Agreement and requests to opt out be postmarked by no later than

February 28, 2011, and scheduled a fairness hearing for April

28, 2011. *See id.* at 3.

The relevant provisions of the settlement agreement were

described in a prior Opinion of this Court:

> The Agreement created a Compensation Fund ("the Fund")
> of $680,000,000 "for the benefit of the Class."
> [Agreement, ECF No. 621-2] ¶ VII.F (p. 7).[1] The Fund
> was to be used in part to cover the attorney-fee award
> and individual awards to those who served as class
> representatives. *See id.* Primarily, however, the Fund

---

[1] In 2012, the Agreement was modified to alter provisions related
to the distribution of certain awards. *See* Mot. to Amend, ECF
No. 621 at 1; Amended Settlement Agreement, ECF No. 621-2. This
modification was done without opposition from any party. *See*
Minute Order of August 1, 2012. For clarity, the Court refers
throughout this Opinion to the version of the Agreement as
modified in 2012, as it has in prior Opinions. The amended
agreement contains typographical errors that resulted in
duplicative paragraph numbering. As the Court has in prior
Opinions, the Court refers in its citations to the listed
paragraph number as well as the page number on which the cited
material appears.

[2] An appeal of one of these decisions is currently pending before

would "pay Final Track A Liquidated Awards, Final
Track A Liquidated Tax Awards, Final Track B Awards,
and Debt Relief Tax Awards, to, or on behalf of, Class
Members pursuant to the Non-Judicial Claims Process."
*Id.*

The Agreement described how leftover funds, if any,
would be disbursed: "In the event there is a balance
remaining . . . the Claims Administrator shall direct
any leftover funds to the Cy Pres Fund." Agreement ¶
IX.F.9 (p. 37). "Class Counsel may then designate Cy
Pres Beneficiaries to receive equal shares of the Cy
Pres Fund." *Id.* These designations "shall be for the
benefit of Native American farmers and ranchers." *Id.*
The Agreement made eligibility as a recipient
contingent upon being "recommend[ed] by Class Counsel
and approv[ed] by the Court." *Id.* Potential recipients
were also only "non-profit organization[s], other than
a law firm, legal services entity, or educational
institution, that has provided agricultural, business
assistance, or advocacy services to Native American
farmers between 1981 and [November 1, 2010]." *Id.* ¶
II.I (pp. 6–7).

The Class received notice of all relevant provisions
of the Agreement. The Claim Form provided to potential
claimants contained a section that required the
claimant to acknowledge that "[y]ou . . . forever and
finally release USDA from any and all claims and
causes of action that have been or could have been
asserted against the Secretary by the proposed Class
and the Class Members in the Case arising out of the
conduct alleged therein." Ex. C to Agreement, ECF No.
576–1 at 63. The Agreement, moreover, provided that
the Class "agrees to the dismissal of the Case with
prejudice." *Id.* ¶ VI.A (p. 15). The Claim Form also
notified Track A claimants that they would be
"eligible for . . . [a] cash award up to $50,000." Ex.
C to Agreement, ECF No. 576–1 at 63. The Notice that
was sent to the Class similarly described the $50,000
maximum under Track A and the fact that participation
would result in a resolution of the individual's legal
claim, and stated that "[i]f any money remains in the
Settlement Fund after all payments to class members
and expenses have been paid, then it will be donated
to one or more organizations that have provided
agricultural, business assistance, or advocacy

services to Native Americans." *See* Ex. I to Agreement,
ECF No. 576-1 at 87, 88, 92.

*Keepseagle v. Vilsack* ("*Keepseagle I*"), No. 99-3119, 2014 WL

5796751, at *2 (D.D.C. Nov. 7, 2014) (alterations in original).

The Court has also summarized the proceedings that followed:

> On March 18, 2011, Class Counsel filed copies of
> thirty-five letters raising objections to the
> Agreement. *See* Notice, ECF No. 585. Class Counsel
> filed their motion seeking final approval of the
> Agreement, which also responded to those objections,
> on April 1, 2011. *See* Mot. for Final Approval, ECF No.
> 589. Only two written objections related to *cy pres*.
> *See id.* at 62-63. One objector requested that his
> organizations be granted *cy pres* funds. *See* Kent
> Objection, ECF No. 585-2 at 7-8. Class Counsel noted
> that this request was premature. *See* Mot. for Final
> Approval, ECF No. 589 at 62. Another objector
> indicated his preference that excess funds be used for
> outreach purposes and not be limited to groups that
> already existed in 1981. *See* Givens Objection, ECF No.
> 585-4 at 19-20. Class Counsel noted that this desire
> was entirely consistent with the existing *cy pres*
> provisions. *See* Mot. for Final Approval, ECF No. 589
> at 62-63.
>
> The Court held a fairness hearing on April 28, 2011.
> *See* Minute Entry of April 28, 2011. The issue of *cy
> pres* was not raised by any objector. *See generally*
> Transcript of April 28, 2011 Fairness Hearing, ECF No.
> 609. After hearing from all who attended the fairness
> hearing, the Court found that the Agreement was fair
> and reasonable and approved it pursuant to Federal
> Rule of Civil Procedure 23(e). *See* Order, ECF No. 606.
> No appeal was filed from the Court's approval of the
> Agreement.

*Id.* at *3.

**C.    The Settlement Fund is Distributed, Leaving $380,000,000 Leftover.**

By design under the Agreement, the Court was largely uninvolved in the distribution process that followed final approval of the Agreement, with one exception. Over the course of the distribution, a handful of potential claimants petitioned this Court for relief from allegedly erroneous determinations made during the Non-Judicial Claims Process. *See* Smith Mot. to Intervene, ECF No. 622; LaBatte Mot. to Intervene, ECF No. No. 635; Jones Mot. to Intervene, ECF No. 693. The Court rejected these requests for similar reasons. *See* Order Denying Smith Mot., ECF No. 633; Order Denying LaBatte Mot., ECF No. 692; Order Denying Jones Mot., ECF No. 720.

Because this case had settled, the Court's jurisdiction was limited. *See* Order Denying LaBatte Mot., ECF No. 692 at 7-8. The putative intervenors had to rely on the Court's ancillary jurisdiction, but "[a]ncillary jurisdiction . . . is a relatively limited source of jurisdiction[,] aris[ing]: '(1) to permit disposition by a single court of claims that are, in varying respects and degrees, factually interdependent . . . and (2) to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees.'" *Id.* at 8 (quoting *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 379-80 (1994)). Neither criterion was

satisfied, however. The first was inapplicable because the facts alleged by each putative intervenor—erroneous determinations during the Non-Judicial Claims Process—were distinct from the underlying claims of discrimination. *See, e.g.*, *id.* The second was inapplicable because "'[d]istrict courts enjoy no free-ranging 'ancillary' jurisdiction to enforce consent decrees, but are instead constrained by the terms of the decree and related order.'" *Id.* at 8-9 (quoting *Pigford v. Veneman*, 292 F.3d 918, 924 (D.C. Cir. 2002)). "The Agreement sharply limits the circumstances under which the Court may exercise jurisdiction," and although the Court retained jurisdiction "'to supervise the distribution of the Fund and to ensure that Debt Relief Awards issued by the Track A and Track B Neutrals are applied by USDA,'" "that provision is limited by a more specific provision of the Agreement precluding the Court from reviewing any 'Claim Determinations, and any other determinations made under th[e] Non-Judicial Claims Process.'" *Id.* at 9 (quoting Agreement, ECF No. 621-1 ¶¶ V.A.7 (p. 40), IX.A.9 (p. 19)). These provisions, the Court held, are reconciled by "foreclos[ing] judicial review of certain decisions as to who is entitled to receive an award, while permitting judicial supervision over distribution of the Fund . . . after those decisions have been made." *Id.* (quoting Order Denying Smith Mot., ECF No. 633 at 8).[2]

---

[2] An appeal of one of these decisions is currently pending before

The Court previously described what occurred at the end of the distribution process:

> On August 30, 2013 Class Counsel filed a status report, notifying the Court that nearly all distributions from the Fund had been made and approximately $380,000,000 remained leftover. *See* Status Report, ECF No. 646 at 3.[3] Class Counsel asserted that this "render[ed] some of the conditions for *cy pres* distribution impractical." *Id.* at 5. Class Counsel also outlined a potential modification of the Agreement, which would have involved the endowment of a new foundation "which could fund non-profit organizations serving the needs of Native American

the D.C. Circuit. *See Keepseagle v. Vilsack*, No. 14-5223 (D.C. Cir. filed Sept. 11, 2014).

[3] It remains unclear why such a large amount was left over. Class Counsel proposes four causes: (1) "many of the farmers and ranchers who were otherwise eligible to participate in the settlement were deceased by the time the claims process began in mid-2011," and although their heirs could file claims on behalf of their estate, "the heirs simply lacked sufficient information in order to complete the claim form"; (2) "[s]ome Native American farmer[s] and ranchers who believed they had been denied loans for discriminatory reasons regarded it futile to lodge complaints with the USDA," so they were unable to prove their claim in the Non-Judicial Claims Process (which required some proof of having filed such a claim); (3) "the USDA's historic failure to conduct sufficient outreach to much of the Native American farming and ranching community," which, Class Counsel asserts, meant "that otherwise eligible Native Americans never applied or attempted to apply for loans" (such individuals were "included in the expert analysis of people eligible for loans," but could not make a claim under the Agreement because they had never applied for a loan); (4) "there were some potential claimants who were so distrustful of the federal government for historic reasons, that they did not have confidence in the validity of the settlement process, and thus did not submit claims." Class Counsel's Status Report, ECF No. 646 at 5 n.3. The government has proposed an additional explanation: "[T]he simplest [explanation] is that there are simply fewer people with claims than Plaintiffs originally argued." Gov't Opp. to Keepseagle Mot. to Modify, ECF No. 786 at 8 n.5.

farmers and ranchers." *Id.* at 8. The Department of Agriculture opposed this proposal. *See* Response to Status Report, ECF No. 649.

The filing of the August 30, 2013 status report prompted the [Choctaw Nation of Oklahoma and its affiliated Jones Academy Foundation] and [a group of class members calling themselves the] Great Plains Claimants to move to intervene. *See* Mot. to Intervene, ECF No. 647; Mot. to Intervene, ECF No. 654. These motions, however, sought to intervene in proceedings that did not yet exist. No one had proposed any modification to the Court and the hypothetical proposal outlined by Class Counsel was opposed by the defendant. Accordingly, the Court allowed the parties additional time to come to an agreement on whether and how to modify the Agreement.

On September 24, 2014, Class Counsel filed an unopposed motion to modify the Agreement. *See* Mot. to Modify, ECF No. 709. The modification proposes that 10% of the Cy Pres Fund be distributed immediately to non-profit organizations "proposed by Class Counsel and approved by the Court" that must also meet the following criteria:

> (1) they must have "provided business assistance, agricultural education, technical support, or advocacy services to Native American farmers or ranchers between 1981 and November 1, 2010 to support and promote their continued engagement in agriculture"; and

> (2) they must be "either a tax-exempt organization described in Section 501(c)(3) of the Internal Revenue Code . . . educational organization described in Section 170(b)(1)(A)(ii) of the Code; or an instrumentality of a state or federally recognized tribe, including a non-profit organization chartered under the tribal law of a state or federally recognized tribe, that furnishes assistance designed to further Native American farming or ranching activities."

Proposed Addendum to Agreement, ECF No. 709-2 ¶ II.A.

The modification utilizes the remainder of the Cy Pres Fund to create a trust "for the purpose of distributing the *cy pres* funds" which "shall seek recognition as a non-profit organization under § 501(c)(3)." *Id.* ¶ II.B. The trust would be required "to distribute the funds over a period not to exceed 20 years" and would be charged with disbursing the funds to "not-for-profit organizations that have served or will serve Native American farmers and ranchers." Mot. to Modify, ECF No. 709-1 at 1. The Trust would be authorized to make grants subject to the following restrictions:

> (i) "grants must be to a tax-exempt organization described in Section 501(c)(3) of the Code; educational organization described in Section 170(b)(1)(A)(ii) of the Code; or an instrumentality of a state or federally recognized tribe, including a non-profit organization chartered under the tribal law of a state or federally recognized tribe, that furnishes assistance designed to further Native American farming or ranching activities"; and

> (ii) "the organization must use the funds to provide business assistance, agricultural education, technical support, and advocacy services to Native American farmers and ranchers, including those seeking to become farmers or ranchers, to support and promote their continued engagement in agriculture."

Proposed Addendum to Agreement, ECF No. 709-2 ¶ II.B.

Shortly before the motion to modify the Agreement was filed, the Great Plains Claimants filed a renewed motion to intervene. *See* Second Great Plains Mot. to Intervene, ECF No. 705. On September 18, 2014, the Court denied without prejudice the earlier motions to intervene of the Great Plains Claimants and the Choctaw Movants and set a schedule for the briefing of renewed motions to intervene. *See* Minute Order of September 18, 2014. The Choctaw Movants filed a renewed motion to intervene on October 1, 2014. *See* Second Choctaw Mot. to Intervene, ECF No. 714.

*Keepseagle I*, 2014 WL 5796751, at *3-4.

D.   **The Court Denies Requests to Intervene**.

On November 7, 2014, the Court issued an Opinion denying both requests to intervene for lack of standing, which the Court found was a prerequisite for intervention as of right and for permissive intervention. *See id.*

The Choctaw Movants lacked Article III standing "because any injury [they may face] will arise only if a multitude of speculative events occur." *Id.* at *6. Their purported economic injury was conjectural: "The Choctaw Movants have no existing involvement with the Cy Pres Fund. They have not received a *cy pres* distribution, been approved to receive one, or had their eligibility assessed. Accordingly, modification of the *cy pres* provision would not affect them in the direct ways described in the cases they cite." *Id.* It was unclear whether they would even satisfy the requirements for obtaining a *cy pres* distribution under the existing agreement as the Choctaw Nation was a tribal government and "the Agreement does not include tribal governments as potential recipients of *cy pres* distributions." *Id.* at *7. In any event, the Choctaw Movants had not yet been recommended by Class Counsel to receive a distribution, which was "problematic for standing, as the Supreme Court is 'reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment.'" *Id.* at *8 (quoting *Clapper v. Amnesty Int'l,* 133 S.

Ct. 1138, 1150 (2013)). The Court also noted the "highly speculative" nature of predicting what amount the Choctaw Movants might receive if they were approved under the Agreement. *See id.* "These twin uncertainties—whether the Choctaw Movants would receive an award at all and, if so, how large an award they would receive—render[ed] it highly speculative to assert that the proposed modification would harm them." *Id.* At the same time, it was hypothetical at best to say that the procedures as modified would harm, rather than help, the Choctaw Movants's ability to receive a *cy pres* distribution and to say whether they would be likely to receive a larger or smaller amount if they were approved. *See id.* Finally, the Court rejected the argument that the Choctaw Movants would suffer a lost opportunity to compete, as they "lose no opportunity to compete under the modification" and their ability to compete under the original Agreement appeared to be "illusory." *Id.*

The Choctaw Movants also independently lacked prudential standing because they sought to "assert a legal right to compete under the existing procedures for *cy pres* distribution that were created by a settlement (which has nothing to do with them), to be distributed for the benefit of a class (of which they are not a part), to remedy claims of discrimination (which they did not suffer)." *Id.* at *9. "In doing so, they assert rights under the Agreement that do not belong to them." *Id.* Because the Choctaw

Movants could not show that they were in any way intended beneficiaries they could not seek to enforce rights purportedly created by that Agreement. *See id.* at *9–10. The Court rejected their argument that the Agreement created a trust of which the Choctaw Movants were intended beneficiaries: Both the purpose of *cy pres* and the text of the Agreement itself "confirm[ed] that [the *cy pres* provision's] purpose was geared toward the Class." *Id.* at *10.

The Court also found that the Great Plains Claimants lacked Article III standing. Those individuals were all class members who had successfully pursued claims under the Agreement. *See id.* at *12. Although none had objected to the *cy pres* provision when the Agreement was approved and none had filed an appeal from that approval, they sought to intervene to undo the *cy pres* provision, on the ground that they had a legally protected interest in the leftover funds. *Id.* The Court noted, however, that the class members had "intentionally satisfied their legal claims" by entering into the Agreement and thereby gave up any legal claim they may have had. *See id.* This Court also surveyed the law governing unclaimed settlement funds, which counseled strongly in favor of finding that "'neither the class members nor the settling defendants have any legal right to unclaimed or excess funds.'" *Id.* (quoting *Diamond Chem. Co. v. Akzo Nobel*

*Chems. B.V.*, 517 F. Supp. 2d 212, 217 (D.D.C. 2007)).

Accordingly, the Court held:

> The Great Plains Claimants have received the full
> value of their claims pursuant to the Agreement and
> thereby fully satisfied those legal claims. The fact
> that their claims, if ultimately successful at trial,
> could have resulted in higher damages awards changes
> nothing. As the Court emphasized during the April 28,
> 2011 fairness hearing: "There are risks in litigation
> as we all know. This case could have gone to trial,
> presumably, and the Plaintiffs not recovered anything.
> Class certification was not a foregone conclusion, and
> you're aware, I'm sure, of other cases in this court,
> not before this judge, wherein class certification
> issues were not as successful as the class members
> would have liked. . . . So there were no guarantees
> that this case went forward at all."

*Id.* at *13 (quoting Transcript of April 28, 2011 Fairness

Hearing, ECF No. 609 at 24:9–18). In sum, the Court found that

the Great Plains Claimants "cannot now claim a property right in

funds that were intended to pay the claims of other class

members who did not claim their award." *Id.*

The Choctaw Movants timely appealed the Court's intervention

decision. *See* Notice of Appeal, ECF No. 746. Their appeal

remains pending before the D.C. Circuit, *Keepseagle v. Vilsack*,

No. 15-5011 (D.C. Cir. filed Jan. 20, 2015), and they have

indicated that they will not move to stay proceedings before

this Court unless and until the Court grants any motion for

modification of the Agreement. *See* Choctaw Mot. to Extend

Deadline for Mot. to Stay, ECF No. 750 at 2. The Great Plains

Claimants did not appeal the Court's decision.

**E.   Ms. Keepseagle Obtains Separate Counsel.**

Shortly before the Court issued its Opinion denying the motions to intervene, the Court scheduled a status hearing for December 2, 2014 and informed the parties that once the intervention issue was resolved, the Court would address the following issues:

> (1) whether the Court must direct notice to the Class and hold a fairness hearing pursuant to Federal Rule of Civil Procedure 23(e); (2) whether, if Rule 23 does not permit the Court to require such notice and a hearing, the Court may nonetheless exercise discretion to direct notice to the class and to permit class members to give their thoughts on the proposed modification during a status hearing or motion hearing; and (3) what content and form any notice—whether required by Rule 23(e) or permitted by the Court's discretion—should take.

Minute Order of October 20, 2014.

In advance of the December 2, 2014 status hearing, the Court's staff was contacted by individuals on behalf of class representative Marilyn Keepseagle, who indicated that Ms. Keepseagle would attend the December 2, 2014 hearing, and requested an opportunity to be heard by the Court. A recent Opinion of this Court summarized what transpired next:

> The Court began the status hearing by permitting Ms. Keepseagle to speak. Ms. Keepseagle discussed her opposition to Class Counsel's proposed modification and her support for a proposal under which the *cy pres* funds would instead be distributed to members of the class. *See* Transcript of Dec. 2, 2014 Hearing, ECF No. 756 at 5:12-8:5, 9:19-10:3. The Court responded:

> I'm not suggesting at all by any stretch of the imagination that the theory has legal support. I don't know. But I very clearly heard [Ms. Keepseagle] tell me in her words very eloquently, as she is, that she wants relief from this judgment which sounds like a Rule 60(b) motion. So, the thought then is, what should the Court do at this juncture to enable her to develop her theory? I'm not going to lose sight of the fact that she's without individual counsel, from what I can determine based on our brief discussion in open court.
>
> *Id.* at 12:25-13:18. Accordingly, the Court held further proceedings in abeyance, and granted Ms. Keepseagle time to secure legal representation. *See id.* at 22:4-9.

*Keepseagle v. Vilsack* ("*Keepseagle II*"), No. 99-3119, 2015 WL 1851093, at *2 (D.D.C. Apr. 23, 2015).

Ms. Keepseagle's new attorneys entered their appearances on February 9, 2015 and indicated their desire to file two preliminary motions before proceeding to address the settlement-modification issue. *See id.* Over the objection of Class Counsel and the government, the Court set an expedited schedule for separate adjudication of those motions. *See id.* One motion sought "a Court Order removing Porter Holder and Claryca Mandan as class representatives" on the grounds that they were inadequate because they supported Class Counsel's proposed modification, while the other motion sought "an Order compelling Class Counsel to produce certain materials" related to public gatherings at which Class Counsel discussed their proposed modification with members of the class. *Id.*

On April 23, 2015, the Court denied both motions. *See id.* The Court found that Porter Holder and Claryca Mandan remained adequate class representatives because their position—while unpopular with many class members—was a principled outgrowth of their representation of the entire class and consideration of various litigation risks. *See id.* at *5-8. In any event, the Court found that it would lack the authority to remove class representatives at this stage of litigation because Federal Rules of Civil Procedure 23(a)(4) and 23(c)(1)(C) do not "permit the Court to modify the class certification order in light of allegedly inadequate representation by a class representative . . . where post-judgment actions will not affect class members' legal rights." *Id.* at *3. This was such a situation, as "the class members in this case have no legal right to the Cy Pres Fund," and thus "the proposed modification would not implicate a class member's legal right." *Id.* at *5. As for the motion to compel, the Court found that the Keepseagles failed to supply an appropriate legal basis for such discovery at this stage of proceedings. *See id.* at *8-11.

**F.   The June 29, 2015 Hearing and the Pending Modification Proposals.**

Having resolved all pending requests for intervention, Ms. Keepseagle's representation status, and the preliminary motions filed by her counsel, the Court set a schedule for the

26

simultaneous briefing of the Keepseagles's motion to modify and
Class Counsel's motion to modify. *See* Order, ECF No. 771 at 1-2.
The Court also scheduled a hearing on these motions for June 29,
2015. *See id.* at 2.

In anticipation of this hearing, the Court resolved the last
preliminary issue: the applicability of Federal Rule of Civil
Procedure 23(e). Agreeing with the government and Class Counsel,
the Court found Rule 23(e) inapplicable to Class Counsel's
proposed modification. *See Keepseagle v. Vilsack* ("*Keepseagle
III*"), No. 99-3119, 2015 WL 1969814, at *4-8 (D.D.C. May 4,
2015). The Court first held that Rule 23(e) "applies only when a
modification materially hinders a class member's legal right."
*Id.* at *4. This is so because the entire purpose of Rule 23—and
in particular Rule 23(e)—is to provide procedural protections at
various stages of class-action litigation to ensure that the
rights of absent class members are appropriately protected. *See
id.* Unless a proposed modification would hinder such a class
member's legal right in some way—whether by expanding the scope
of the *res judicata* effect of the judgment or otherwise limiting
the remedy available to a class member—there would be no need
for such protections. *See id.* at *5-6. The Court found—for
reasons similar to its findings that the Great Plains Claimants
lacked a legal interest in the Cy Pres Fund and that the
Keepseagles could not remove class representatives at this stage

of proceedings—that Class Counsel's proposed modification would not have such an effect. *See id.* at *6-7. Notwithstanding this finding, the Court held that it had the authority, under both Rule 23 and the Agreement itself, to order Class Counsel to provide notice to the class of its motion to modify and of the June 29, 2015 hearing, and also to permit class members to speak during the hearing to provide their perspectives on the issue. *See id.* at *7-9. The Court's Order provided that class members could submit written comments to the Court's chambers—which have been posted on the docket—and could also speak during the June 29, 2015 hearing. *See* Order, ECF No. 775.

The June 29, 2015 hearing lasted the entire day in the Court's Ceremonial Courtroom. After hearing extensive argument from counsel, the Court was able to hear oral statements from all individuals who wished to give them. *See generally* Transcript of June 29, 2015 Hearing, ECF No. 806. Many individuals spoke in favor of a proposal akin to Ms. Keepseagle's, under which the excess funds would be distributed to class members directly. Many also shared the heart-wrenching stories of discrimination they allegedly suffered at the hands of the federal government, and the lasting effects of that discrimination.

The motions for modification of the settlement agreement are now ripe for resolution. As described above, Class Counsel seeks a modification of the procedures for the *cy pres* distribution,

and the government does not oppose that motion. *See* Class
Counsel Mot., ECF No. 709. The Keepseagles request a
modification that would either provide *pro rata* distribution to
class members who were successful under the initial Claims
Process or, in the alternative, provide for a second claims
period for those who were not successful under the original
process and then distribute the remainder *pro rata* to all who
were successful in either round of the distribution process. *See*
Keepseagle Mot., ECF No. 779. The Court has received *amicus
curiae* briefs from three groups—(1) the Association of American
Indian Farmers, (2) the Great Plains Claimants, and (3) the
Indian Land Tenure Foundation and Intertribal Agriculture
Council. *See* Assoc. of Am. Indian Farmers Br., ECF No. 740;
Great Plains Claimants Br., ECF No. 784; Indian Land Tenure Br.,
ECF No. 787. Finally, the Court has received extensive
correspondence from class members and others expressing their
views on the proposals.[4]

---

[4] *See* First Set of Letters, ECF No. 780; Second Set of Letters,
ECF No. 789; Third Set of Letters, ECF No. 790; Fourth Set of
Letters, ECF No. 791; Fifth Set of Letters, ECF No. 794; Sixth
Set of Letters, ECF No. 795; Seventh Set of Letters, ECF No.
796; Eighth Set of Letters, ECF No. 797; Ninth Set of Letters,
ECF No. 798; Tenth Set of Letters, ECF No. 799; Eleventh Set of
Letters, ECF No. 800; Twelfth Set of Letters, ECF No. 801;
Thirteenth Set of Letters, ECF No. 802; Fourteenth Set of
Letters, ECF No. 803; Fifteenth Set of Letters, ECF No. 804;
Sixteenth Set of Letters, ECF No. 805; Seventeenth Set of
Letters, ECF No. 807.

## II.  Analysis

The Court begins with the undisputed proposition that the
Agreement is a final judgment. As this Court has noted on two
recent occasions, "[a]n agreement between the parties dismissing
all claims is the equivalent of a decision on the merits and
thus claims settled by agreement are barred by *res judicata*."
*Chandler v. Bernanke,* 531 F. Supp. 2d 193, 197 (D.D.C. 2008);
*see Keepseagle II*, 2015 WL 1851093, at *4; *Keepseagle I*, 2014 WL
5796751, at *12. The Supreme Court has made this issue clear
with regard to consent decrees similar to the Agreement in this
case. "A consent decree no doubt embodies an agreement of the
parties and thus in some respects is contractual in nature. But
it is an agreement that the parties desire and expect will be
reflected in, and be enforceable as, a judicial decree that is
subject to the rules generally applicable to other judgments and
decrees." *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367,
378 (1992); *see also Pigford*, 292 F.3d at 923 (treating a
settlement of a very similar case involving the claims of
African-American farmers under *Rufo*'s standard for consent
decrees).

Because the Agreement is a final judgment, the Court's
authority is circumscribed. "[D]istrict courts enjoy no free-
ranging 'ancillary' jurisdiction to enforce consent decrees, but
are instead constrained by the terms of the decree and related

order." *Pigford*, 292 F.3d at 924 (quoting *Kokkonen*, 511 U.S. at 381). "As our court of appeals has rhetorically asked: 'Who would sign a consent decree if district courts had free-ranging interpretive or enforcement authority untethered from the decree's negotiated terms?'" *In re Black Farmers Discrim. Litig.*, 950 F. Supp. 2d 196, 200 (D.D.C. 2013) (quoting *Pigford*, 292 F.3d at 925). Indeed, the importance of respecting the finality of a judgment is deeply embedded in our legal system. *See, e.g.*, *Massaro v. United States*, 538 U.S. 500, 504 (2003) (noting "the law's important interest in the finality of judgments"). Any party seeking to overrule, modify, or rescind the Agreement therefore bears the burden of demonstrating a legal basis for doing so. Three avenues have been raised by one or more of the parties: (1) the law governing the disposition of unclaimed settlement funds; (2) Federal Rule of Civil Procedure 60(b); and (3) the modification provision of the Agreement itself. The Keepseagles rely upon the first and second avenues, while Class Counsel relies upon the second and third.

## A. The Law Governing the Disposition of Unclaimed Settlement Funds Does Not Override the Mandatory Language of the Agreement.

The Keepseagles focus a large portion of their arguments—both in favor of their proposal and in opposition to Class Counsel's proposal—on the legal doctrine governing the distribution of excess funds. Their argument is that this doctrine has become

increasingly inhospitable to the use of *cy pres* except as a last resort. They assert that the current circumstances of this case do not render other distribution methods unworkable, so the Court should not utilize a *cy pres* remedy. Class Counsel and the defendant note that the Keepseagles are eliding an important fact that renders this case unique: The question is not which distribution method the Court should choose in a vacuum; rather, the Court is presented with specific and mandatory language in a final settlement that was never challenged or appealed.

    1.   *Questions Have Arisen Regarding the Legal Rules Applicable to* Cy Pres *Remedies*.

  Courts in this Circuit have approved generally of the use of *cy pres* in distributing leftover settlement proceeds. *See Democratic Cent. Comm. of D.C. v. Washington Metro. Area Transit Comm'n*, 84 F.3d 451, 455, 457 (D.C. Cir. 1996); *In re Living Social Marketing & Sales Practice Litig.*, 298 F.R.D. 1 (D.D.C. 2013); *Diamond Chem. Co.*, 517 F. Supp. 2d 212; *Diamond Chem. Co., Inc. v. Akzo Nobel Chems. B.V.*, Nos. 1-2118, 2-1018, 2007 WL 2007447 (D.D.C. July 10, 2007). The Keepseagles are not wrong to suggest that *cy pres* has fallen out of favor in recent years, however. In a statement concurring in the denial of *certiorari*, Chief Justice Roberts summarized the many legal issues lurking to be decided:

> Granting review of this case might not have afforded
> the Court an opportunity to address more fundamental

concerns surrounding the use of such remedies in class
action litigation, including when, if ever, such
relief should be considered; how to assess its
fairness as a general matter; whether new entities may
be established as part of such relief; if not, how
existing entities should be selected; what the
respective roles of the judge and parties are in
shaping a *cy pres* remedy; how closely the goals of any
enlisted organization must correspond to the interests
of the class; and so on. This Court has not previously
addressed any of these issues. . . . In a suitable
case, this Court may need to clarify the limits on the
use of such remedies.

*Marek v. Lane*, 134 S. Ct. 8, 9 (2013) (Roberts, C.J.). The

American Law Institute has also set forth principles to govern

the use of *cy pres*, which limit the circumstances in which a

court may choose *cy pres* over other distribution methods:

- (a) If individual class members can be identified
  through reasonable effort, and the distributions are
  sufficiently large to make individual distributions
  economically viable, settlement proceeds should be
  distributed directly to individual class members.

- (b) If the settlement involves individual
  distributions to class members and funds remain after
  distributions (because some class members could not be
  identified or chose not to participate), the
  settlement should presumptively provide for further
  distributions to participating class members unless
  the amounts involved are too small to make individual
  distributions economically viable or other specific
  reasons exist that would make such further
  distributions impossible or unfair.

- (c) If the court finds that individual distributions
  are not viable based upon the criteria set forth in
  subsections (a) and (b), the settlement may utilize a
  cy pres approach. The court, when feasible, should
  require the parties to identify a recipient whose
  interests reasonably approximate those being pursued
  by the class. If, and only if, no recipient whose
  interests reasonably approximate those being pursued

> by the class can be identified after thorough
> investigation and analysis, a court may approve a
> recipient that does not reasonably approximate the
> interests being pursued by the class.

Principles of the Law of Aggregate Litigation § 3.07 (2010). The

Keepseagles urge the Court to follow these Principles and

thereby decline to utilize a *cy pres* remedy in this case because

individual distributions to class members would not be

especially difficult. Their argument is reasonable: This is not

a case where further distribution of unclaimed funds to the

class would be terribly inefficient. The large amount of money

remaining to be distributed, combined with the large number of

identifiable potential claimants would make further

distributions relatively straightforward. Those who were

unsuccessful during the previous claims process could be put

through a renewed process, while those who previously received

compensation could prove that they suffered damages in excess of

the award they already received. Were this case in a traditional

posture, the issue would be relatively clear.

> 2. *This Case Involves the Unique Circumstance in which a*
> Cy Pres *Remedy Has Already Been Approved and Neither*
> *Objected to Nor Appealed from.*

In urging the Court to resort immediately to the ALI

Principles—which address *whether* to use a *cy pres* remedy in the

first place—the Keepseagles gloss over a key fact that places

this case in a unique posture: "[T]his is not a case where

parties seek to . . . address whether *cy pres* is appropriate in the first instance," *Keepseagle I*, 2014 WL 5796751, at *1, nor is it one in which the Court is presented with a settlement agreement that contains a *cy pres* provision and must assess whether it is "fair, reasonable, and adequate" before approving it. Fed. R. Civ. P. 23(e)(2); *cf. Keepseagle III*, 2015 WL 1969814, at *6 ("The question . . . is not whether choosing to utilize a *cy pres* remedy in the first instance would alter the class's legal rights if the Settlement Agreement were silent on the disposition of excess funds (that ship sailed in 2011)."). If the Court were presented with such a blank slate and asked to decide how to distribute $380,000,000 in leftover funds, the Keepseagles would likely be correct that of the four general options available to a court considering how to distribute unclaimed funds—(1) allowing the funds to revert to the defendant; (2) *pro rata* distribution to class members who filed claims; (3) escheat to the state or federal government; or (4) *cy pres* distribution—the Court would choose a *pro rata* distribution. *See* Newberg on Class Actions § 12:28 (5th ed. 2015) (as a general matter, "a court's goal in distributing class action damages is to get as much of the money to the class members in as simple a manner as possible").

As Professor Rubenstein notes in Newberg on Class Actions, the existence of mandatory language in a final settlement agreement cannot be ignored:

> [T]he parties' settlement agreement will typically include a provision expressing the settling parties' preference with regard to unclaimed funds. The Court will review that provision at final approval to ensure it is 'fair, reasonable, and adequate' from the perspective of the class; if it is, the court will enforce the provision and follow its distributional instructions, even if the court (or objectors) might have chosen a different path.

*Id.* The Keepseagles ignore the fact that a final judgment speaks directly to the issue in this case and mandates the use of a *cy pres* remedy. The Court, however, must recognize the powerful force of a final judgment agreed upon by all parties, approved by the Court, and neither objected to nor appealed from, "even if the court (or objectors) might have chosen a different path" knowing what is known now. *Id.*

> 3.  *Most Case Law Regarding the Use of* Cy Pres *Does Not Address the Circumstance in Which* Cy Pres *Has Already Been Finally Approved.*

The authorities on which the Keepseagles rely for the proposition that a *cy pres* distribution is inappropriate in this case largely addressed situations in which no final settlement agreement spoke to the issue. *See, e.g.,* *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 169, 172, 173 (3d Cir. 2013) (reviewing objector's direct appeal of the district court's approval of a settlement that directed excess funds to "one or

more charitable organizations proposed by the parties and
selected by the Court," finding "that a district court does not
abuse its discretion by approving a class action settlement
agreement that includes a *cy pres* component directing the
distribution of excess settlement funds to a third party to be
used for a purpose related to the class injury," but vacating
the approval of the settlement because the district court "did
not have the factual basis necessary to determine whether the
settlement was fair to the entire class"—namely, the district
court's approval came before it was informed of the unexpectedly
high amount of unclaimed funds because "counsel did not provide
this information to the Court"); *Nachshin v. AOL, LLC*, 663 F.3d
1034, 1037–38 (9th Cir. 2011) (reviewing objector's direct
appeal of a district court's approval of a settlement in which
no damages would go to the class and would instead be
distributed entirely as *cy pres*); *Masters v. Wilhelmina Model
Agency, Inc.*, 473 F.3d 423, 428, 435–36 (2d Cir. 2007)
(reviewing objector's direct appeal of a district court's
approval of a settlement that provided that if there were excess
funds "the Court shall, in its discretion, determine the
disposition . . . after hearing the views of the parties hereto
as to such disposition" and reversing insofar as the district
court viewed its hands as tied in rejecting a request for an

award of treble damages to the class, in lieu of *cy pres*).[5] Two decisions warrant a more detailed review, as they frame the fact-specific inquiry that is required when assessing whether *cy pres* is mandated or permitted by a settlement.

In the case *In re Lupron Marketing & Sales Practices Litigation*, 677 F.3d 21 (1st Cir. 2012), a class of "medical patient consumers . . . alleging fraud in overcharging for the medication Lupron" reached a settlement agreement which the district court approved. *Id.* at 23–24. A fairness hearing was held, at which time a group of dissident class members—one of whom had been allowed to intervene to "participat[e] in the process established by the court for the evaluation of the proposed settlement"—objected "that the amount of the settlement allocated to the class of consumer purchasers of Lupron was inadequate." *Id.* at 25. After the district court approved the settlement over objection, the dissidents "said they would pursue appeals of the settlement agreement unless they received more," so the parties negotiated an "implementation agreement"

---

[5] *In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 196–98 (5th Cir. 2010) is wholly distinct. That decision declined to consider "whether a cy pres distribution of the settlement fund, without any monetary distribution would be fair, reasonable, and adequate" as such a decision "would be premature" and later found that a proposed notice of class-action settlement was inadequate because it failed to inform class members of the possibility that excess funds would be distributed *cy pres*. The notice in this case did not suffer from such deficiencies. *See Keepseagle I*, 2014 WL 5796751, at *2.

which increased the payments available to the consumer class in exchange for the withdrawal of the objectors' appeals and objections. *See id.* at 26. The district court approved the settlement and the implementation agreement. *See id.* After a four-year-long claims period, over $11,000,000 remained in unclaimed funds. *See id.* The district court heard proposals on the disposition of those funds and ultimately "decided to make a cy pres award of all of the unclaimed settlement funds" to a hospital. *See id.* at 27. Three of the dissidents noted an appeal of this decision. *See id.* at 28. The First Circuit affirmed the decision to use *cy pres* because class members had received the full amount of their damages and the class's relief "was established for the benefit of all consumer purchasers of Lupron, not just the 11,000 who filed claims." *Id.* at 34. Although the First Circuit found that application of the ALI Principles was appropriate at that stage, it was presented with a settlement agreement, unlike the one before this Court, that directed that unclaimed funds "shall be distributed in the discretion of the Settlement Court as it deems appropriate," noting that "*[i]f* all or part of any unclaimed funds is distributed to one or more charitable organizations," the defendant reserved the right to claim a tax deduction. *Id.* at 26. Thus, unlike the *Keepseagle* settlement, the district court in *Lupron* had to make a threshold determination whether to

39

utilize *cy pres* or another distribution mechanism. Were the
Court presented with such a circumstance, this case would be
very different.

The issue is therefore very fact-specific when it arises in a
case resolved by a settlement agreement, as the Fifth Circuit
explained in *Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468
(5th Cir. 2011). In *Klier*, the Fifth Circuit was presented with
a class-action settlement resolving "claims of persons
assertedly injured by the toxic emissions of an industrial plant
near Bryan, Texas." *Id.* at 471. The settlement created three
subclasses and allocated monetary relief among them. *See id.* One
subclass—of individuals who did not yet have medical conditions
resulting from the emissions—obtained medical monitoring as
relief. *See id.* at 472. Another class included individuals
"suffering serious injuries," who received direct payments. *See
id.* at 470, 472. Upon completion of the medical-monitoring, the
funds allocated to that subclass were not exhausted, but the
fund for the subclass of individuals who suffered injury was
exhausted. *See id.* at 473. The district court then granted the
defendant's request to distribute the funds as *cy pres*, and a
class member opposed the proposal, arguing "that an additional
distribution to members of [the injury subclass] was
economically feasible and would be equitable since the members
of [that subclass] had been found to suffer [serious injuries]

that are compensable under the settlement." *Id.* The Fifth Circuit reversed the district court's decision to utilize a *cy pres* remedy, focusing on the fact that the settlement agreement itself contained no such remedy and in fact contained three interrelated provisions that counseled in favor of redistribution to members of the other subclass. *See id.* at 476– 77 (one provision required "that any money left over in any subclass fund 'shall be distributed pro rata to all Claimants in that subclass," another provision permitted the court to "make changes to the terms of this protocol as necessary for the benefit of the Settlement Class Members," and a third provision allowed the settlement administrator to petition the court "for reallocation of available funds among the [subclasses] on a showing of good cause if . . . he determines that considerations of equity and fairness require reallocation") (alterations in original). The Fifth Circuit emphasized a district court's role in administering a class-action settlement:

> Because a district court's authority to administer a class-action settlement derives from Rule 23, the court cannot modify the bargained-for terms of the settlement agreement. That is, while the settlement agreement must gain the approval of the district judge, once approved its terms must be followed by the court and the parties alike. The district judge must abide the provisions of the settlement agreement, reading it to effectuate the goals of the litigation. This is not a free exercise of *cy pres*, but a determination of how the settlement agreement's many provisions define the class's property interests and allocate those interests once created. The terms of

41

the settlement agreement are always to be given
controlling effect.

*Id.* at 475-76; *see also id.* at 476 ("This is not a case where
the settlement agreement itself provides that residual funds
shall be distributed via *cy pres*.").

   4.   *The Eighth Circuit's Decision in* In Re Bank America
        Corporation Securities Litigation *Is Unpersuasive.*

   Only one decision cited by the *Keepseagles* addressed the
situation in which a settlement agreement mandated the use of *cy
pres*. That decision found it appropriate to overrule an
agreement that had been approved by a district court and
affirmed as fair by the Eighth Circuit, all without objection to
the *cy pres* provision.

   *In re BankAmerica Corp. Securities Litigation* ("*BankAmerica
II*"), 775 F.3d 1060 (8th Cir. 2015) involved a settlement of a
securities-fraud class action, resulting in a $333,200,000 fund
for a subclass of shareholders of NationsBank. *See id.* at 1062.
A class representative objected that the class should receive
more money because of the strength of its claims. *See id.* That
objection was overruled, and the objector appealed. *See id.* at
1069. "At that time[, the objector] did not raise any objection
to . . . the provision that settlement funds remaining after one
or two distributions 'may be contributed as a donation to one or
more non-sectarian, not-for-profit 501(c)(3) organizations as
determined by the Court *in its sole discretion*.'" *Id.* (emphasis

in original). The Eighth Circuit affirmed the district court's
approval of the settlement agreement, which included that term.
*See In re BankAmerica Secs. Litig.* ("*BankAmerica I*"), 350 F.3d
747, 752 (8th Cir. 2003). A round of distributions occurred in
2004 and another took place in 2009, after which approximately
$2,400,000 remained. *See BankAmerica II*, 775 F.3d at 1062. In
2012, class counsel moved, over objection of the same objector
who brought the appeal in *BankAmerica I*, to distribute the
remainder as *cy pres*, and the district court agreed and ordered
the funds distributed to Legal Services of Eastern Missouri. *See
id.* The objector appealed from that determination and the Eighth
Circuit reversed. In so doing, the Eighth Circuit discussed
extensively the ALI Principles and the Court's belief that *cy
pres* was inappropriate in the case. *See id.* at 1063–66.

The Eighth Circuit addressed only briefly the fact that the
language of the final settlement agreement, to which the very
same objector had failed to object originally and failed to
mention in his prior appeal, "stat[ed] that the balance in the
settlement fund 'shall be contributed' to non-profit
organizations 'determined by the court in its sole discretion."
*Id.* at 1066. The Eighth Circuit's reasoning for ignoring the
settlement agreement was as follows:

> In the first place, the agreement and order stating
> that a *cy pres* distribution would be made in the
> district court's 'sole discretion' was contrary to our

43

controlling decisions in *Airline Tickets I* and *Airline Tickets II*; that provision was void *ab initio*. *See In re Lupron*, 677 F.3d at 38 ("Distribution of funds at the discretion of the court is not a traditional Article III function."). More importantly, we agree with the Ninth Circuit that "[a] proposed *cy pres* distribution must meet [our standards governing *cy pres* awards] regardless of whether the award was fashioned by the settling parties or the trial court." *Nachshin*, 663 F.3d at 1040. In arguing to the contrary [Class Counsel] misstates the holding of *Klier*, which *overturned* the district court's *cy pres* award because 'a cy pres distribution to a third party of unclaimed settlement funds is permissible only when it is not feasible to make further distributions to class members." 658 F.3d at 475.

*Id.* The Court is not persuaded by this reasoning.

*First*, the Court is not persuaded that it has any authority to declare void portions of an agreement that was negotiated by the parties, approved by the Court pursuant to Federal Rule of Civil Procedure 23, and finalized on appeal (either by affirmance of the Court of Appeals or by the lack of any timely appeal). The Eighth Circuit's finding that the *cy pres* provision with which it was presented was nonetheless "void *ab initio*" is difficult to square with this reality, and the Eighth Circuit cited no authority for the proposition that courts may line-item-veto final settlements in this manner.[6] To the extent that the Eighth

---

[6] Even if this reasoning were persuasive, the D.C. Circuit does not appear to have any precedent that would have rendered the *cy pres* provisions of the *Keepseagle* settlement void *ab initio*. Furthermore, the *Keepseagle* settlement does not devote the *cy pres* distribution to the Court's discretion; rather, it mandates that the funds be transmitted to a *cy pres* fund by the claims administrator, makes Class Counsel responsible for soliciting

Circuit relied upon *In re Lupron* for such authority, this Court is unconvinced. The general statement in *Lupron* cited by the Eighth Circuit—that "[d]istribution of funds at the discretion of the court is not a traditional Article III function"—does not establish the authority for a court to find a provision of a settlement agreement void after that very court had approved the agreement. *Lupron*, moreover, affirmed the application of *cy pres* consistent with the ALI Principles when dealing with a settlement that gave the district court discretion in discerning how excess funds should be distributed. 677 F.3d at 30-36.

*Second*, the Eighth Circuit's reliance on a decision of the Ninth Circuit for the proposition that *cy pres* distributions must comply with legal standards governing whether *cy pres* is appropriate "regardless of whether the award was fashioned by the settling parties or the trial court," *Nachshin*, 663 F.3d at 1040, is unhelpful because that decision was a direct review of a district court's approval of a settlement agreement, so it was the Ninth Circuit's job to confirm whether the entire settlement, including the *cy pres* provision, was fair, reasonable, and adequate in the face of objections. At that stage, a court obviously must apply the doctrine governing the appropriate disposition of unclaimed funds. *Nachshin* does not

---

applications and making recommendations, and places the Court in a minor administrative role of approving those recommendations.

address a court's role after final approval and affirmance on appeal (or when no appeal is filed).

*Third*, the final sentence of the Eighth Circuit's reasoning on this point criticizes class counsel in that case for "misstat[ing] the holding of *Klier*, which *overturned* the district court's *cy pres* award because 'a cy pres distribution to a third party of unclaimed settlement funds is permissible only when it is not feasible to make further distributions to class members." 658 F.3d at 475. *Klier*, however, is a paean to the sanctity of class-action settlement agreements. Indeed, the Fifth Circuit in that case found that the applicable settlement agreement not only failed to provide affirmatively for a *cy pres* distribution, but actually contained provisions indicating that *pro rata* distribution to another subclass was appropriate. *See id.* at 476–77. The Fifth Circuit specifically distinguished the circumstance presented in *BankAmerica II* and in this case: "This is not a case where the settlement agreement itself provides that residual funds shall be distributed via *cy pres*." *Id.* at 476. And the Fifth Circuit could not have been clearer on the importance of following the settlement agreement's terms:

> Because a district court's authority to administer a class-action settlement derives from Rule 23, the court cannot modify the bargained-for terms of the settlement agreement. That is, while the settlement agreement must gain the approval of the district judge, once approved its terms must be followed by the court and the parties alike. The district judge must

> abide the provisions of the settlement agreement,
> reading it to effectuate the goals of the litigation.
> . . . The terms of the settlement agreement are always
> to be given controlling effect.

*Id.* at 475-76.

In this Court's view, the Eighth Circuit's reasoning for overruling a final settlement is unpersuasive. Courts are appropriately bound by the language of final settlement agreements and may deviate from them only when authorized by law. In the context of class actions, settlement agreements reflect the considered judgment of the class, its counsel, the defendant, and the Court, after following extensive procedural protections. The truly terrible facts of the case before this Court arguably cry out for a resolution that does not result in $380,000,000 being distributed as *cy pres* where class members are readily identifiable and may either prove their previously unsuccessful claims or prove that they suffered damages in excess of what they already received. Notwithstanding this reality, the Court must resist the temptation to allow these bad facts to make bad law. Following the Eighth Circuit's holding would make bad law by undermining the finality of a judgment without a clear legal basis for doing so.

*        *        *

For these reasons, the Court is bound to the final judgment proposed by the parties and approved by the Court after full

compliance with Rule 23 procedures—an approval to which no class

member objected in relevant part or appealed from at all.

Whether the *cy pres* doctrine as it exists in 2015 may bar a

finding that a *cy pres* provision like the one approved by this

Court in 2011 is fair, reasonable, and adequate is not an issue

before the Court.[7]

---

[7] This case should serve as a cautionary tale to litigants in
complex class actions. It should be the rare case where a major
settlement agreement is completely finalized, only to find that
a massive amount of unclaimed funds are leftover due to starkly
lower-than-expected turnout by members of the class. Parties
must do a much better job of predicting turnout and facilitating
class-member participation in settlements. Such settlements are
presented to district courts in a non-adversarial posture unless
there are vocal objectors, making district courts especially
ill-equipped to assess the reasonableness of a settlement's
predictions for class-member participation.

That does not leave district courts at the mercy of the accuracy
of the parties' predictions, however. To reduce the chances of
the circumstances of this case repeating themselves, the Court
suggests one of two paths. One option is "to withhold final
approval of a settlement until the actual distribution of funds
can be estimated with reasonable accuracy." *In re Baby Prods.*,
708 F.3d at 174; *see also In re Living Social*, 298 F.R.D. at 14
(giving final approval to a settlement that included a *cy pres*
remedy only after the claims process had completed, at which
point the court knew that $1,900,000 would be distributed to
class members while $2,500,000 would be distributed as *cy pres*).
This could allow the parties to modify certain portions of the
preliminary settlement to reflect especially high or low
turnout. Another option is for parties to include in the
settlement terms that would be triggered in the event of a
larger-than-expected excess to ensure that, similar to the
result in *Klier*, class members who did participate are able to
benefit, so long as that benefit would not exceed their actual
damages. *See In re Baby Prods.*, 708 F.3d at 174 ("[A] court may
urge the parties to implement a settlement structure that
attempts to maintain an appropriate balance between payments to
the class and *cy pres* awards."). These approaches would have

**B.   Federal Rule of Civil Procedure 60(b) Does Not Provide a
Method for Modifying the Agreement.**

The parties each seek modification of the Agreement pursuant
to Federal Rule of Civil Procedure 60(b). Class Counsel relies
upon Rule 60(b)(5), while the Keepseagles invoke Rules 60(b)(5)
and 60(b)(6). Under Rule 60(b)(5), both parties argue that the
far-larger-than-expected amount of excess funds is a changed
circumstance that renders prospective application of the
Agreement inequitable. Under Rule 60(b)(6), the Keepseagles
argue that the issue is so important that it meets the
extraordinary-circumstances test necessary for application of
that Rule. Neither party has a convincing argument.

"'[T]he decision to grant or deny a Rule 60(b) motion is
committed to the discretion of the District Court.'" *Green v.
AFL-CIO*, 287 F.R.D. 107, 109 (D.D.C. 2012) (quoting *Kareem v.
FDIC*, 811 F. Supp. 2d 279, 282 (D.D.C. 2011)) (alteration in
original). "'The movant has the burden to establish that [he is]
entitled to relief under Rule 60(b).'" *Cohen v. Bd. of Trustees
of Univ. of D.C.*, No. 14-754, 2014 WL 6890705, at *2 (D.D.C.
Dec. 9, 2014) (quoting *F.S. v. District of Columbia*, No. 10-
1203, 2014 WL 4923025, at *2 (D.D.C. Oct. 2, 2014)) (alteration
in original). Ultimately, "under Rule 60(b) the trial judge must

---

prevented the result in this case. Unfortunately, because this
issue arose after final judgment, the ability of the parties and
the Court to rectify the problem is much more limited.

strike a 'delicate balance between the sanctity of final judgments and the incessant command of a court's conscience that justice be done in light of *all* the facts.'" *Twelve John Does v. District of Columbia*, 841 F.2d 1133, 1138 (D.C. Cir. 1988) (alteration omitted; emphasis in original).

> 1. *Federal Rule of Civil Procedure 60(b)(5) Does Not Apply Because the* Cy Pres *Provision Is Not Prospective and Circumstances Have Not Changed in a Manner Warranting Relief.*

Federal Rule of Civil Procedure 60(b)(5) provides: "On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding [when] the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable." The parties rely only on the final clause—when prospective application of the judgment is inequitable due to changed circumstances. Two elements are inherent in this clause: (1) that the judgment has prospective application; and (2) that circumstances have changed to make that application inequitable. Neither element is satisfied here.

> a. The *Cy Pres* Provision Does Not Have Prospective Effect.

"Rule 60(b)(5) allows a court to amend any judgment that has prospective effect." *Kapar v. Islamic Republic of Iran*, No. 2-cv-78, 2015 WL 2452754, at *3 (D.D.C. May 22, 2015) (quotation

marks omitted). "Although the principal significance of this portion of the rule is with regard to injunctions, it is not confined to that form of relief, nor even to relief that historically would have been granted in courts of equity." 11 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2863 (3d ed. 2015)). A judgment may also be prospective only in part, in which case Rule 60(b)(5) could permit modification only of the portion of the judgment that has prospective effect. *Cf. Pennsylvania v. Wheeling & Belmont Bridge Co.*, 59 U.S. 421, 431 (1855) (in a decision that forms the foundation for the changed-circumstances doctrine, the Supreme Court found that a prior judgment ordering the removal of a particular bridge could be reconsidered insofar as the prior judgment "direct[ed] the abatement of the obstruction," but portions of the judgment regarding payment of costs were not subject to reconsideration).

   The D.C. Circuit has described the prospective-effect requirement as follows:

> Virtually every court order causes at least some reverberations into the future, and has, in that literal sense, some prospective effect; even a money judgment has continuing consequences, most obviously until it is satisfied, and thereafter as well inasmuch as everyone is constrained by his or her net worth. That a court's action has continuing consequences, however, does not necessarily mean that it has 'prospective application' for the purposes of Rule 60(b)(5).

*Twelve John Does*, 841 F.2d at 1138. Reviewing the Supreme Court's decision in *Wheeling & Belmont*, as well as a subsequent decision, *United States v. Swift & Co.*, 286 U.S. 106 (1932), the D.C. Circuit concluded that "the standard we apply in determining whether an order or judgment has prospective application within the meaning of Rule 60(b)(5) is whether it is 'executory' or involves 'the supervision of changing conduct or conditions.'" *Twelve John Does*, 841 F.2d at 1139; *see Swift*, 286 U.S. at 114 ("A continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need," but will be found to be continuing only if it "involve[s] the supervision of changing conduct or conditions and [is] thus provisional and tentative"). Accordingly, the D.C. Circuit concluded that an order dismissing the Attorney General as a party to a prison-conditions lawsuit involving District of Columbia inmates "did not have the requisite prospective application": "The order did not compel him to perform, or order him not to perform, any future act; it did not require the court to supervise any continuing interaction between him and the other parties to the case; rather, it definitively discharged the Attorney General from any further involvement in the case." *Twelve John Does*, 841 F.2d at 1139. By contrast, a prototypical example of a consent decree that is prospective under Rule 60(b)(5) is one that resolved a church's challenge to the denial

of building permits by allowing construction with limitations: "[I]t imposes ongoing restrictions on Northridge's ability to build or undertake various activities, all of which are supervised by the district court." *Northridge Church v. Charter Twp. of Plymouth*, 647 F.3d 606, 613 (6th Cir. 2011).

The application of these principles to the case at bar is somewhat novel. "The consensus among Courts of Appeal, including the D.C. Circuit, is that a claim for money damages is not 'prospective' for the purposes of Rule 60(b)(5)." *Kapar*, 2015 WL 2452754, at *3; *see also, e.g. Twelve John Does*, 841 F.2d at 1138; *Stokors S.A. v. Morrison*, 147 F.3d 759, 762 (8th Cir. 1998); *Marshall v. Bd. of Educ.*, 575 F.2d 417, 425 (3d Cir. 1978); *Ryan v. U.S. Lines Co.*, 303 F.2d 430, 434 (2d Cir. 1962). The *cy pres* provision of the Agreement addresses the final step in the payment of damages. Thus, in one sense, it is an execution of the award of money damages, not a prospective judgment.

The *cy pres* provision arguably has some characteristics of a prospective order, however, insofar as the distribution process requires Class Counsel to solicit and recommend *cy pres* recipients and creates an administrative task for the Court to approve the recommendations. In that regard, Class Counsel pointed the Court to the D.C. Circuit's decision in *Pigford*, 292 F.3d 918, in which the D.C. Circuit applied Rule 60(b)(5) to a

damages-distribution process very similar to the Non-Judicial
Claims Process in this case. The D.C. Circuit did not discuss
the prospective-effect requirement in applying Rule 60(b)(5) in
*Pigford*, but it was dealing there with a request to reconsider
deadlines that very clearly had prospective effect. If those
deadlines were not modified, they would have barred a number of
class members from participating in the claims process under the
settlement, even though their failure to meet deadlines was due
to their counsel's apparent malpractice. *See id.* at 925–27.
Ultimately, the *cy pres* provision in this case lacks this type
of binding effect on a party's future behavior that makes a
judgment prospective within the meaning of Rule 60(b)(5). It
does not, in the language of the D.C Circuit, "compel [anyone]
to perform, or order [anyone] not to perform, any future act; it
d[oes] not require the court to supervise any continuing
interaction between [anyone] and the other parties to the case."
*Twelve John Does*, 841 F.2d at 1139. Although Class Counsel has a
limited responsibility to propose recipients under the
Agreement, that is not the same thing as a party to the case
being subject to limitations on future conduct, and courts have
emphasized the need for such limitations if a judgment is to be
considered prospective. *See, e.g., Comfort v. Lynn Sch. Comm.*,
560 F.3d 22, 28 (1st Cir. 2009) ("[W]e have limited the
provision's application to injunctions and consent decrees that

involve long-term supervision of changing conduct or
conditions.") (quotation marks omitted). The *cy pres* portions of
the Agreement are thus akin to unpaid damages: The mere fact
that they have yet to be paid out, leaving some administrative
responsibilities to be executed, does not render them
prospective. *See Kapar*, 2015 WL 2452754, at *3; *Marshall*, 575
F.2d at 425 n.7 ("A 'prospective' injunction envisions a
restraint of future conduct, not an order to remedy past wrongs
when the compensation payment is withheld from the beneficiaries
until some subsequent date.").[8] The Court therefore finds that
the *cy pres* provision of the Agreement is not prospective within
the meaning of Rule 60(b)(5), making that Rule inapplicable.

> ### b.    The Parties Have Not Demonstrated Changed
> ### Circumstances Within the Meaning of Rule 60(b)(5).

Even if the *cy pres* provision was prospective, it is not clear
that the larger-than-expected excess is the type of factual

---

[8] It is telling that Class Counsel and the government have argued
repeatedly that the modification proposed by Class Counsel would
have no binding effect on the legal rights of any class member.
That argument, which the Court accepted, served to support
findings that class members lacked standing to intervene,
*Keepseagle I*, 2014 WL 5796751, at *11-14; that Rules 23(a)(4)
and 23(c)(1)(C) did not apply to police the adequacy of a class
representative at this stage of proceedings, *Keepseagle II*, 2015
WL 1851093, at *3-5; and that Rule 23(e) did not require the
provision of renewed notice and the holding of another fairness
hearing, *Keepseagle III*, 2015 WL 1969814, at *4-7. That the
proposed modification would have no binding effect on the legal
rights of class members in the future is consistent with the
Court's finding that the *cy pres* provision it sought to modify
has no prospective effect.

change that warrants relief under Rule 60(b)(5). Rule 60(b)(5) requires truly changed circumstances, not a difference in degree of what was expected that renders a judgment less efficient, and certainly not mere disagreement with the judgment: "We are asking ourselves whether anything has happened that will justify us now in changing a decree. The injunction, whether right or wrong, is not subject to impeachment in its application to the conditions that existed at its making. We are not at liberty to reverse under the guise of readjusting." *Swift*, 286 U.S. at 119. The inquiry is twofold: "[A] party seeking modification . . . bears the burden of establishing that a significant change in circumstances warrants revision. . . . If the moving party meets this standard, the court should consider whether the proposed modification is suitably tailored to the changed circumstance." *Rufo*, 502 U.S. at 383. The initial factor may be met "by showing either a significant change . . . in factual conditions or in law." *Id.* at 384.

A change in factual conditions—the only change pressed here—may support modification when it "make[s] compliance with the decree substantially more onerous," when "a decree proves to be unworkable because of unforeseen obstacles," or "when enforcement of the decree without modification would be detrimental to the public interest." *Id.* For example, where a state agency was under a consent decree regarding housing

facilities, modification of that decree was warranted where it was not possible to find appropriate housing facilities for certain patients. *See id.* (citing *N.Y. State Ass'n for Retarded Children v. Carey*, 706 F.2d 956, 969 (2d Cir. 1983)). Another example cited by the Supreme Court was where modification of a prison-conditions decree was necessary to avoid the need to release individuals accused of violent felonies. *See id.* at 385 (citing *Duran v. Elrod*, 760 F.2d 756, 759-61 (7th Cir. 1985)). Unlike in these decisions, nothing about the need to distribute significantly more money via a *cy pres* provision is unworkable or against the public interest. To be sure, it may be difficult to distribute under the existing *cy pres* provision and it may result in an inefficient distribution in view of the need to distribute the funds all at once and in equal shares, but the essence of the provision would still be served: The leftover funds would go to the types of organizations the parties initially contemplated when they entered the Agreement.

The D.C. Circuit's decision in *Pigford*, 292 F.3d 918 illustrates this distinction. There, the Court addressed the application of Rule 60(b)(5) to a substantially similar settlement of the claims of African-American farmers. Class counsel in that case had failed adequately to represent the many class members whom it was obliged to assist in proving their claims under that settlement's claims process. *Id.* at 925. The

failure to assist the class through that process was "an 'unforeseen obstacle' that makes the decree 'unworkable'" because it resulted in many class members missing the deadline for filing claims. *Id.* at 927. In *Pigford*, the very purpose of the settlement—distributing damages to class members—was totally undermined by the lawyers' actions. The larger-than-expected excess in this case does not undermine the purpose of the settlement in the same way, even if a modification would make the settlement more efficient. Accordingly, circumstances have not changed in a manner that would trigger the application of Rule 60(b)(5).

> c.   If The Parties Had Demonstrated Changed Circumstances, the Keepseagles's Proposal Is Not Tailored to that Change.

It is not enough simply to show that the judgment has prospective effect and that circumstances have changed. "Once a moving party has met its burden of establishing either a change in fact or in law warranting modification of a consent decree, the district court should determine whether the proposed modification is suitably tailored to the changed circumstance." *Rufo*, 502 U.S. at 391. A change in circumstances is not a free pass to rewrite a consent decree; rather "the focus should be on whether the proposed modification is tailored to resolve the problems created by the change in circumstances." *Id.* The D.C. Circuit has applied this rule stringently, rejecting an attempt

in *Pigford* to correct Class Counsel's failure to represent class members through the claims process by "vesting arbitrators with generic authority to revise deadlines 'so long as justice requires.'" *Pigford*, 292 F.3d at 927. "Whatever tailoring method the district court ultimately adopts," the Circuit held, "must preserve the essence of the parties' bargain." *Id.*

Under this standard, even if the *cy pres* provision were prospective and the parties had demonstrated changed circumstances under Rule 60(b)(5), the Keepseagles's proposals would be inappropriate subjects of a Rule 60(b)(5) motion. The changed circumstances cited by the parties are the fact that far more money is leftover than was expected. This would render application of the judgment inequitable, if at all, by virtue of the difficulty it causes under the existing *cy pres* distribution plan, which requires an immediate distribution in equal shares to a limited set of entities. Neither of the Keepseagles's proposals—an immediate *pro rata* distribution to successful claimants or a second claims process followed by a *pro rata* distribution—are tailored to those changed circumstances. Although the Court is very sympathetic to the perspective of class members that the larger-than-expected excess provides an opportunity to distribute more compensation to class members, the goal of Rule 60(b)(5) is to "preserve the essence of the parties' bargain," while accommodating the changed circumstance.

*Pigford*, 292 F.3d at 927. If, as the D.C. Circuit held, it was not properly tailored in *Pigford* for a court to respond to class counsel's representational failings that caused missed deadlines by permitting the arbitrators to extend the deadlines as justice required, *id.*, it is surely not tailored to respond to a larger-than-expected excess by deleting the entire *cy pres* provision that the parties included in the Agreement, did not object to, and did not appeal from, and replace it with a term directing a very different disposition of the leftover funds. Whether due to concern with ensuring that excess funds would be used to provide some indirect benefit to those who did not participate in the claims process, or the government's concern that a distribution process that could result in Track A claims exceeding $50,000 in the event of a surplus might lead to pressure to provide similarly higher compensation to participants in the settlements involving other farmers, the parties specifically agreed upon a *cy pres* remedy for the disposition of excess funds. Whatever the reasons for the provision initially, the Court would not be empowered to undo the bargain entirely, even if Rule 60(b)(5) were otherwise applicable.

> 2.   *The Keepseagles Have Not Demonstrated the Extraordinary Circumstances Necessary to Invoke Rule 60(b)(6).*

Federal Rule of Civil Procedure 60(b)(6) provides: "On motion and just terms, the court may relieve a party or its legal

representative from a final judgment, order, or proceeding for .
. . any other reason that justifies relief." To avoid allowing
this exception to swallow the rule, "[r]elief under Rule
60(b)(6) . . . require[s] a showing of 'extraordinary
circumstances.'" *Kapar*, 2015 WL 2452754, at *3 (quoting *Kramer
v. Gates*, 481 F.3d 788, 791 (D.C. Cir. 2007)); *see also Twelve
John Does*, 841 F.2d at 1140 (Rule 60(b)(6) "should be only
sparingly used") (quotation marks omitted). Such extraordinary
circumstances have been found due to "an adversary's failure to
comply with a settlement agreement that was incorporated into a
court's order, fraud by the 'party's own counsel, by a
codefendant, or by a third-party witness[,]' or 'when the losing
party fails to receive notice of the entry of judgment in time
to file an appeal.'" *More v. Lew*, 34 F. Supp. 3d 23, 28 (D.D.C.
2014) (quoting 11 Charles Alan Wright & Arthur R. Miller,
*Federal Practice and Procedure* § 2864 (3d ed. 2015))
(alterations in original); *see also, e.g.*, *Austin v. Donahoe*,
No. 5-1824, 2014 WL 6779132, at *3 (D.D.C. Dec. 2, 2014)
(finding extraordinary circumstances where a party "asserts that
[her counsel] not only was negligent in failing to oppose the
[defendant's] motion, resulting in the dismissal of her case,
but that he consistently misled her into believing that her case
was progressing when, in fact, it had long since been removed
from the Court's docket"). Finally, "[c]laims under Rule

60(b)(6) must not be 'premised on one of the grounds for relief enumerated in clauses (b)(1) through (b)(5).'" *Green*, 287 F.R.D. at 109 (quoting *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863 (1988)).

The Keepseagles appear to rely on the same argument they made under Rule 60(b)(5)—that the larger-than-expected excess is extraordinary. This is simply insufficient for relief under Rule 60(b)(6), which cannot be premised on the bases enumerated in other portions of the Rule. *See Green*, 287 F.R.D. at 109. Even if the larger-than-expected excess were a cognizable reason for modification under Rule 60(b)(6), all parties to this case chose the terms of the Agreement, which included the *cy pres* terms. That they no longer like those terms because of factual developments does not constitute an extraordinary circumstance, and Rule 60(b)(6) "may not be employed simply to rescue a litigant from strategic choices that later turn out to be improvident." *Salazar ex rel. Salazar v. District of Columbia*, 633 F.3d 1110, 1120 (D.C. Cir. 2011) (quotation marks omitted). There has been no suggestion of the kinds of extraordinary representational failings or complete lack of notice that has animated prior grants of relief under Rule 60(b)(6). Accordingly, Rule 60(b)(6) does not provide an avenue for modification.

**C.    The Settlement Agreement Permits Its Own Modification Only with the Consent of "the Parties," Not Just Class Counsel and the Defendant.**

The final legal avenue that was proposed lies in the Agreement itself. The Agreement's modification provision states: "This Settlement Agreement may be modified only with the written agreement of the Parties and with the approval of the District Court, upon such notice to the Class, if any, as the District Court may require." Agreement ¶ XIV (p. 49). The government does not oppose the use of this provision for Class Counsel's proposed modification, so Class Counsel asks the Court to rely on it to grant its motion.

The Court briefly notes that, as all parties appear to agree, the Court retains jurisdiction to enforce this provision. "Federal courts are courts of limited jurisdiction" and "[i]t is to be presumed that a cause lies outside this limited jurisdiction." *Kokkonen*, 511 U.S. at 377. As the Court has analyzed previously, the Court's ancillary jurisdiction over the Agreement is limited. *See* Order Denying LaBatte Mot., ECF No. 692 at 8 (citing *Kokkonen*, 511 U.S. at 379-80). "[D]istrict courts enjoy no free-ranging 'ancillary' jurisdiction to enforce consent decrees, but are instead constrained by the terms of the decree and related order." *Pigford*, 292 F.3d at 924. Although the Agreement's retention-of-jurisdiction provision did not specifically mention the modification provision, Agreement ¶¶

V.A–B (pp. 40–42), the modification provision can only be used with Court involvement and approval, *id.* ¶ XIV (p. 49), so any interpretation of the Agreement as withholding jurisdiction to enforce the modification provision would render that provision a complete nullity. Unlike the requests for review of determinations made during the Non-Judicial Claims Process, moreover, exercising jurisdiction over requests for modification would not contradict another of the Agreement's terms. *See* Order Denying LaBatte Mot., ECF No. 692 at 9–12. Therefore, although the Court's jurisdiction at this stage of proceedings is limited, that jurisdiction extends to approving a modification that is properly reached.

Class Counsel's "unopposed" motion does not meet the substantive requirements for obtaining modification under the Agreement, however. Although the modification provision requires consent of "the Parties," the three represented groups—the government, Class Counsel, and the Keepseagles—all seem to have operated under the assumption that the provision requires consent of Class Counsel and the government alone. The Agreement, however, defines "the Parties" as "the Plaintiffs and the Secretary," Agreement ¶ II.DD (p. 10), and further defines "the Plaintiffs" as "the individual plaintiffs named in Keepseagle v. Vilsack, No. 1:99CV03119 (D.D.C.), the members of the Class, and the Class Representatives." *Id.* ¶ II.EE (p. 10).

The plain language of the Agreement, therefore, does not support a reading that would allow Class Counsel to enter unilaterally into an "unopposed" agreement to modify. Here, the Court is presented with stark disagreement, including a class representative and named plaintiff who has obtained separate counsel and specifically opposed the proposed modification.

   The Court raised this issue during the June 29, 2015 hearing and gave the parties time to review the Agreement before responding. The parties' responses were unconvincing. The Agreement plainly does not say that a modification may be approved as "unopposed" when a class representative—who happens to be the named plaintiff who gives this lawsuit its name—has expressed written opposition through separate counsel.[9] Class Counsel and the government ultimately rested on the position that Class Counsel serves as a representative of the entire class and may therefore enter into an Agreement on behalf of "the Plaintiffs." This certainly squares with the general nature of representative litigation, and the usual case would involve a modification proposal by Class Counsel to which no class member raised any objection. In that circumstance, the Court could—as it did in 2012—approve the modification. But the posture of this

---

[9] Indeed, Class Counsel's response to certain of the Court's questions made clear the vital status of, at a minimum, the class representatives, as "parties" to this case. *See* Transcript of June 29, 2015 Hearing, ECF No. 806 at 41:16–47:17.

case demonstrates that Class Counsel's view does *not* represent

the view of even all of the class representatives. The parties

in drafting this Agreement chose to require the consent of "the

Parties," defined to include more than just Class Counsel and

the government. This choice must be given effect, much as Class

Counsel and the government have argued strenuously that the

Court must give effect to the Agreement's *cy pres* provision.

As the Court's discussion with Class Counsel regarding another

provision of the Agreement illustrated, even the

representational nature of class-action litigation counsels in

favor of recognizing that the class representatives must also be

on board with a proposal:

> MR. SELLERS: Okay. In the middle of that paragraph it
> says, "Class counsel and class representatives, as
> defined earlier, will be appointed to represent the
> class in its pursuit of monetary relief under Rule
> 23(b)(3)," which is consistent with the introduction I
> mentioned, that is, we and the class representatives
> have been appointed to represent the class, whether
> the class is individually or separately or
> collectively in connection with this agreement and the
> pursuit of monetary relief.
>
> THE COURT: All right. Does that mean that all class
> representatives must agree?
>
> MR. SELLERS: Do all class representatives, as opposed
> to the individuals?
>
> THE COURT: Right.
>
> MR. SELLERS: Um...
>
> THE COURT: Ms. Keepseagle was a class representative,
> correct?

MR. SELLERS: Right.

*    *    *

THE COURT: So does this mean, then -- putting aside parties and plaintiffs, putting aside that plain language -- does this plain language mean that all class representatives must, indeed, approve a request for modification?

MR. SELLERS: I don't think so, because the –

THE COURT: What number must approve it, then, if not all, and where does it say so?

MR. SELLERS: I don't think it contemplates a majority or minority. It treats them as a group.

THE COURT: Which begs the question, then: Do all members of that group need to approve?

MR. SELLERS: Right.

THE COURT: And the answer is?

MR. SELLERS: The answer is: I don't think the agreement provides that they all have to agree.

Transcript of June 29, 2015 Hearing, ECF No. 806 at 66:10–67:19

(discussing Agreement, ECF No. 621-2 ¶ VI.A.7 (p. 43).[10]

The Court agrees that the modification provision would be

absurd were it to recognize the consent of "the Parties" only

---

[10] It is telling that Class Counsel could not clearly answer the following question about how the Court could interpret the modification provision: "So the Court would have to say something like this: Notwithstanding the plain language of the agreement that identifies plaintiffs as the individual plaintiffs named in Keepseagle v. Vilsack, the members of the class and class representatives, notwithstanding that, comma, the true plaintiffs are -- now how would you finish that sentence?" Transcript of June 29, 2015 Hearing, ECF No. 806 at 54:21–55:1.

upon written consent from every single member of the Class. The
Agreement, as Class Counsel argued, is representational in
nature. But the representational nature of the case does not end
with Class Counsel. This Court appointed class representatives
for a reason, and the breadth of the modification provision
counsels in favor of requiring their consent, as do the other
portions of the Agreement cited by Class Counsel during the June
29, 2015 hearing. Were the Court presented with an agreement to
which all class representatives agreed, Class Counsel's
assertions regarding the representational nature of this
litigation would be convincing. Because the Court is not
currently presented with such an agreement, it cannot grant
relief under the Agreement's modification provision at this
time.[11]

## III. Conclusion

For the foregoing reasons, the Court **DENIES** the pending
motions for modification of the Agreement. The Agreement speaks

---

[11] The Keepseagles indicated in one of their pleadings that they
may ultimately prefer Class Counsel's proposal to the existing
Agreement, if the choice comes down to the two options alone.
*See* Keepseagle Opp., ECF No. 785 at 15-20. This conditional
statement is not, in the Court's view, sufficient to constitute
consent of "the Parties." During the June 29, 2015 hearing,
moreover, one of the Keepseagles's attorneys expressed openness
to renewed negotiations with the government and Class Counsel,
and also seemed to hint at potential appellate proceedings. In
the event the case returns to this Court with this Opinion's
legal conclusions intact, the Parties will be permitted time to
present whatever agreement they deem appropriate.

directly to this issue and existing doctrine regarding *cy pres* cannot overrule a final agreement that was neither objected to nor appealed from. Rule 60(b)(5) cannot be used to alter the Agreement because the *cy pres* provision does not have prospective effect and circumstances have not changed such that the provision is inequitable. Rule 60(b)(6) does not apply because the Keepseagles have not cited any "extraordinary circumstance" that could trigger its application. Finally, on the current record, the Court cannot grant Class Counsel's motion under the Agreement itself because the Agreement requires consent of more than just Class Counsel and the government.

   These legal rulings are not the end of the matter, however. Over the past year, the Court has issued four published Opinions that addressed a number of legal issues. Some of these conclusions will likely be reviewed by appellate courts. The simplest resolution, however, is the same path that took this case from one of the hardest-fought cases on this Court's docket to one of the more monumental civil-rights settlements in recent memory. *The Parties* have the ability to reach a compromise that the Court can approve and which would give this case finality. In considering this option, the Executive Branch would do well to consider the remarks of President Obama, given in June 2014 while on the Standing Rock Sioux Reservation (the tribe to which Marilyn Keepseagle and many other class members belong):

I know that throughout history, the United States often didn't give the nation-to-nation relationship the respect that it deserved. So I promised when I ran to be a President who'd change that -- a President who honors our sacred trust, and who respects your sovereignty, and upholds treaty obligations, and who works with you in a spirit of true partnership, in mutual respect, to give our children the future that they deserve.

\*     \*     \*

We've responded and resolved longstanding disputes. George Keepseagle is here today. (Applause.) A few years ago, my administration reached a historic settlement with George and other American Indian farmers and ranchers.

\*     \*     \*

There's no denying that for some Americans the deck has been stacked against them, sometimes for generations. And that's been the case for many Native Americans. But if we're working together, we can make things better. We've got a long way to go. But if we do our part, I believe that we can turn the corner. We can break old cycles.

Remarks by the President at the Cannon Ball Flag Day Celebration, The White House (June 13, 2014), https://www. whitehouse.gov/photos-and-video/video/2014/06/13/president-obama-speaks-cannon-ball-flag-day-celebration#transcript.

\*     \*     \*

An appropriate Order accompanies this Memorandum Opinion.


**SO ORDERED.**

**Signed:   Emmet G. Sullivan**
**United States District Judge**
**July 24, 2015**