**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MARILYN KEEPSEAGLE, et al., | ) |
| | ) |
| | ) |
| Plaintiffs, | ) |
| | ) Civil Action No. 1:99CV03119 |
| v. | ) (EGS) |
| | ) |
| TOM VILSACK, Secretary, United States | ) |
| Department of Agriculture, | ) Judge: Emmet G. Sullivan |
| | ) Magistrate Judge: Alan Kay |
| | ) |
| Defendant. | ) |
| | ) |

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF THEIR UNOPPOSED MOTION
TO MODIFY THE SETTLEMENT AGREEMENT CY PRES PROVISIONS**

# TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................................................. 1

FACTUAL AND PROCEDURAL BACKGROUND.................................................... 4

I.     The Proposed Addendum to the Settlement Agreement...................................... 4

II.    Distribution of the Initial $38 Million of Cy Pres Funds.................................... 6

III.   Creation and Operation of the Trust to Distribute the Balance of the Cy Pres
       Funds.................................................................................................................... 7

ARGUMENT ................................................................................................................. 10

I.     The Supplemental Distribution will benefit prevailing claimants ................... 10

II.    The Proposed Addendum Will Make the Cy Pres Distribution More Effective,
       Accountable, Transparent and Beneficial Than Under the Current Agreement.............. 11

III.   The Court May Approve the Proposed Amendment Pursuant to Section XXII of
       the Settlement Agreement................................................................................. 13

IV.    The Court May Approve the Proposed Amendment Without
       Requiring Supplemental Notice........................................................................ 18

CONCLUSION.............................................................................................................. 19

2077408.1

# TABLE OF AUTHORITIES

Page

CASES

*Amchem Products, Inc. v. Windsor,*
  521 U.S. 591 (1997)...........................................................................17

*Carpenter v. Boeing, Co.,*
  456 F.3d 1183 (10th Cir. 2006) .........................................................15

*Democratic Cent. Comm. of D.C. v. Washington Metro. Area Transit Comm'n,*
  84 F.3d 451 (D.C. Cir. 1996)................................................................3

*Diamond Chem. Co. v. Akzo Nobel Chems. B.V.,*
  No. 01-2118 (CKK), 2007 U.S. Dist. LEXIS 49406 (D.D.C. July 10, 2007) ..........................4

*Lowery v. City of Albuquerque,*
  No. CIV 09-0457 ...........................................................................16, 17

*Perkins v. American Nat'l Ins. Co.,*
  No. 3:05-cv-100 (CDL), 2012 U.S. Dist. LEXIS 95039 (M.D. Ga. July 10, 2012) ...........................................................................................4

*Reed v. Gen. Motors Corp.,*
  703 F.2d 170 (5th Cir. 1983) ..............................................................16

*Thomas v. Albright,*
  139 F.3d 227 (D.C. Cir. 1998)............................................................16

RULES

Fed. R. Civ. P. 23(a)(4)........................................................................15

Fed. R. Civ. P. 23(e) .......................................................................16, 17, 19

Fed. R. Civ. P. 23(g) ......................................................................15, 16, 17

2077408.1

## INTRODUCTION

Plaintiffs respectfully submit the following Memorandum in Support of Plaintiffs'

Unopposed Motion to Modify the Settlement Agreement Cy Pres Provisions, pursuant to Section

XXII of the Settlement Agreement in this action.[1]  *See* Dkt. No. 576 (Nov. 1, 2010) ("Settlement

Agreement"); Aug. 1, 2012 Minute Order (approving Plaintiffs' Unopposed Motion to Modify

Settlement Agreement); Plaintiffs' Unopposed Motion to Modify Settlement Agreement, Dkt.

No. 621 (July 31, 2012).

On September 24, 2014, Plaintiffs filed a motion to modify the Settlement Agreement Cy

Pres Provisions pursuant to an Addendum that was agreed to between USDA and counsel for the

class after lengthy negotiations.  Dkt. 709.  Following subsequent briefing, and a competing

motion to modify the Settlement Agreement filed by Marilyn Keepseagle, the Court denied both

motions to modify, with a recommendation that the parties engage in further discussions.  Dkt.

811 at 69.  The parties have spent many hours in constructive discussions since the Court's July

24, 2015 ruling.  The parties reached an agreement on a new proposed Addendum to the

Settlement Agreement that would serve to modify the cy pres provisions of the Settlement

Agreement.

The Proposed Addendum, attached hereto as Exhibit A, provides for a compromise

between the original proposal included in the September 2014 motion and Mrs. Keepseagle's

motion.  The Addendum provides for additional payments to prevailing claimants of $18,500, in

addition to $2775 in payments to the IRS on their behalf.  This will be a total award to each

---

[1] The Plaintiff Class and Plaintiff Marilyn Keepseagle are both dismissing their pending appeals on December 15, 2015.  Once effective, those dismissals will return jurisdiction to this Court to address this Motion to Modify.  Therefore, there is no need for the more cumbersome process of requesting an indicative ruling under Rule 62.1, Fed. R. Civ. P. which we discussed at the status hearing.

1

prevailing claimant of $21,275.  The remaining funds would be available for cy pres

distribution, but the proposed amendment will help to ensure that the funds will be distributed in

an effective and accountable way.[2]

Rather than distribute the entire cy pres fund now in equal shares to non-profit

organizations that assisted Native American farmers and ranchers in the past, as the Settlement

currently provides, the Proposed Addendum calls for an additional payment to each prevailing

claimant, as well as the creation of a trust that will be endowed by the remainder of the

unclaimed settlement funds and that will be directed to distribute the funds over a period not to

exceed 20 years to non-profit organizations that have served or will serve Native American

farmers and ranchers.  Individuals with substantial knowledge of the needs of Native American

farmers and ranchers (hereafter referred to as "community leaders") rather than Class Counsel,

will oversee the Trust and select recipients of the cy pres distributions in accordance with well-

defined parameters, and will ensure that the distributed funds are expended for the agreed-upon

purposes.  In addition, under the Proposed Addendum, Class Counsel would recommend to the

Court for its approval a faster distribution of $38 million of the unclaimed settlement funds –

approximately 10% of the total available cy pres funds – to non-profit groups that have served

Native farmers or ranchers prior to November 1, 2010.

The Trust the parties propose to create would operate exclusively for the benefit of

Native American farmers and ranchers and would be governed by a Board of Trustees comprised

of community leaders with knowledge of agriculture, grant making, investment management and

---

[2] In addition, the Addendum provides for supplemental service awards, subject to Court approval, for Class Representatives Marilyn Keepseagle, Claryca Mandan and Porter Holder, for their extensive time commitment over the last few years in addressing the disposition of the cy pres funds.

other fields relevant to making grant decisions and managing the Trust.[3] The Trust is designed to benefit the class as a whole, including those who did not file claims or did not succeed in establishing their claims, as well as the prevailing claimants.

This latest round of negotiations began with competing proposals, and the current resolution is a compromise that does not fully reflect what any one party wanted.  As the Settlement Agreement requires the agreement of all the parties to modify the Settlement Agreement, some of the desires expressed by class members in their comments or at the June 29, 2015 hearing could not be fully met.  Settlement Agreement § XXII.

The current proposal is to divide the unclaimed funds so that a portion will be distributed to prevailing claimants, a portion will be distributed quickly to non-profit organizations, and the remainder will endow a Trust.  All the funds will thus serve the same community of Native American farmers and ranchers that brought this action and will ensure that the cy pres funds are used to serve their agricultural interests and needs.  Moreover, in this Circuit the parties' proposal for how to distribute the unclaimed settlement funds constitutes a permissible use of cy pres funds.  *See Democratic Cent. Comm. of D.C. v. Washington Metro. Area Transit Comm'n*, 84 F.3d 451, 456 (D.C. Cir. 1996) (approving the distribution of unclaimed settlement funds to non-profit organizations directly and to endow a trust that will, in turn, distribute the funds in the future to other non-profit organizations).[4]

---

[3] Under the terms of the Addendum, Class Counsel would recommend candidates for the Board of Trustees, which must be approved and appointed by the Court.  The names of approximately 100 individuals were submitted as Trustee candidates.  Class Counsel vetted the candidates and submit their recommendations to the Court as Exhibit C hereto.

[4] The practice of endowing a trust or foundation to distribute cy pres funds has been followed by courts in this and other Circuits.  *See, e.g.*, *Diamond Chem. Co. v. Akzo Nobel Chems. B.V.*, No. 01-2118 (CKK), 2007 U.S. Dist. LEXIS 49406, at *6-7, *15 (D.D.C. July 10, 2007); *Perkins v. American Nat'l Ins. Co.*, No. 3:05-cv-100 (CDL), 2012 U.S. Dist. LEXIS 95039, at *4, *15-16 (M.D. Ga. July 10, 2012).

In the following sections of this Memorandum, Plaintiffs discuss the Proposed Addendum, explain why this proposed modified process for disbursing the unclaimed settlement funds will serve the same interests as those served by this action, will entrust the disbursement decisions to community leaders with knowledge of American Indian agricultural needs, and will ensure that the funds are used for permissible purposes.  In addition, Plaintiffs address the Court's authority to approve the Proposed Addendum.  Finally, Plaintiffs address the issue of whether formal supplemental notice is required in order for the Court to approve the Proposed Addendum, explain that such notice is not necessary, and describe the significant outreach Plaintiffs have undertaken to inform Class Members and the Native American community about the proposed changes to the cy pres terms.

**FACTUAL AND PROCEDURAL BACKGROUND**

As the Court is familiar with the factual and procedural background of the Settlement Agreement in the instant action and its cy pres provisions, Plaintiffs refer the Court to the filings that discuss the unexpectedly large amount of unclaimed settlement funds and the claims process that left these funds undisbursed.  Plaintiffs' Status Report, Dkt. No. 646 at 4-9 (Aug. 30, 2013).  Herein, Plaintiffs describe the Proposed Addendum regarding the cy pres provisions that the parties have agreed upon and for which they seek the Court's approval.

**I.      THE PROPOSED ADDENDUM TO THE SETTLEMENT AGREEMENT**

The proposed modifications to the cy pres terms of the Settlement Agreement are set forth in an Addendum.  See Exhibit A.  The proposed amendment is styled as an addendum to the Settlement Agreement, as opposed to an amendment that replaces particular language of the original Settlement Agreement, in order to make it easier for the Court, Class Members, and other interested individuals to understand what the parties are specifically proposing regarding

4

the distribution of the cy pres funds.[5]  As noted above, the first payments made would be

supplemental awards to prevailing claimants in the amount of $18,500 in a direct payment, and

$2775 paid to the IRS on behalf of each prevailing claimant, for a total of $21,275.  If the

Addendum is approved, the Claims Administrator appointed by the Court for the initial

settlement implementation will prepare an accounting of all prevailing claimants to receive

supplemental awards, and, following review by counsel, will mail checks to all prevailing

claimants, as well as make the required payments to the IRS.  In addition, service awards of

$100,000, subject to approval of the Court, would be paid to Class Representatives Marilyn

Keepseagle, Claryca Mandan, and Porter Holder.  Each of these Class Representatives has

devoted countless hours to addressing the disposition of the cy pres funds, including: (a) joining

numerous phone calls with Class Counsel as we were evaluating what could be done and

negotiating with USDA; (b) responding to dozens, if not hundreds, of phone calls from class

members interested in the decision, and (c) participating in several of the meetings held

throughout the summer of 2014 at which class members were invited to attend to learn about the

possible trust for cy pres funds, and to express their views.[6]

Second, $38 million would be distributed to eligible non-profit groups after approval by

the Court upon the recommendation by class counsel within 180 days of the Court's approval of

this process.[7]

---

[5] In addition, the use of a separate Addendum avoids creating confusion given the number of provisions in the Settlement Agreement that refer to events happening a set number of days after the Court approves "this Agreement."  If the parties incorporated their new cy pres language into the text of the Agreement and presented it for Court approval in that fashion, they would have to make additional amendments to avoid confusion.

[6] In addition to their time, each incurred some expenses in traveling to these meetings and taking time away from their regular work.

[7] The Proposed Addendum defines "Initial Cy Pres Beneficiary" as any non-profit organization that (i) has provided agricultural, business assistance, or advocacy services to

The remaining funds would endow a trust.  Attached hereto as Exhibit B is the Trust

Agreement that, upon approval by the Court and submission to a state for incorporation, would

establish a Trust to distribute approximately 70 percent of the cy pres funds pursuant to the terms

of the Proposed Addendum and the Trust Agreement ("Trust").  Under the Proposed Addendum,

instead of the current requirement that distribution of the unclaimed settlement funds be made

immediately in equal shares to each of the cy pres beneficiaries, the parties have agreed that

approximately 70% of the funds would go to the Trust to be distributed over no more than 20

years, at the direction of an independent Board of Trustees.

## II.    DISTRIBUTION OF THE INITIAL $38 MILLION OF CY PRES FUNDS

To determine which non-profit organizations Class Counsel will recommend to receive

the initial $38 million of cy pres funds, Class Counsel and Plaintiffs intend to undertake a multi-

step process that will be fair to potential cy pres beneficiaries and ensure that Class Counsel's

recommendations are well-informed and based on a careful analysis about which projects will be

most beneficial to Native American farmers and ranchers.

First, Class Counsel will publicize the existence of the $38 million fund and the

opportunity for non-profit organizations to submit applications to receive funds.[8]  The publicity

---

Native American farmers between 1981 and November 1, 2010, (ii) is either a tax-exempt
organization described in Section 501(c)(3) of the Code; educational organization described in
Section 170(b)(1)(A)(ii) of the Code; an instrumentality of a state or federally recognized tribe,
including a non-profit  organization chartered under the tribal law of a state or federally
recognized tribe, that furnishes assistance designed to further Native American farming or
ranching activities, provided, however, that the use of any grant funds by such grant recipient
shall be restricted exclusively to charitable and educational purposes described in Section
170(c)(2)(B) of the Code; and (iii) is proposed by Class Counsel and approved by the Court.
Proposed Amendment § II.A.

[8] With respect to the initial distribution of $38 million, only groups that had provided
services to Native American farmers and ranchers before the Settlement Agreement was
executed on November 1, 2010 may receive cy pres funds—a temporal limitation that is the
same as under the current Settlement Agreement.  *See* Settlement Agreement § II.I.  This

6

will include e-mailing all parties that have previously expressed interest, posting a notice and a

copy of the grant application on the case website, www.indianfarmclass.com, e-mailing an

announcement of the fund to all federally and state recognized tribes, tribal colleges, and to a list

of relevant non-profit groups.  A deadline for submitting grant applications will be established.

Once applications are submitted, an advisory committee composed of five members who have a

deep commitment to and knowledge of the Native American farming and ranching community

and professional grant making practices in Indian Country[9] will review the grant applications and

make recommendations to Class Counsel on which applications to fund and in what amounts.

Class Counsel will review the recommendations of the advisory committee and then submit

those recommendations or modified recommendations to the Court for its approval.

## III.   CREATION AND OPERATION OF THE TRUST TO DISTRIBUTE THE BALANCE OF THE CY PRES FUNDS

Under the Proposed Addendum, the balance of the cy pres funds, approximately $265

million, would be transferred to the Trust, which would be established pursuant to the Trust

Agreement, attached as Exhibit B ("Trust Agreement").

The mission of the Trust would be "to make grants to Eligible Grant Recipients . . . to

fund the provision of business assistance, agricultural education, technical support, and advocacy

services to Native American farmers and ranchers to support and promote their continued

---

provision is designed to ensure that only groups with an established track record will receive funds during this initial round of funding.

[9] The Advisory Committee will be composed of the following individuals who are serving in their individual capacities, but whose relevant professional affiliations are noted: (1) Marilyn Keepseagle, class representative; (2) Claryca Mandan, *Keepseagle* class representative (3) Porter Holder, *Keepseagle* class representative and Vice Chair of the Council for Native American Farming and Ranching, which was established as a result of the *Keepseagle* Settlement; (4) Mark Wadsworth, Chair of the Council for Native American Farming and Ranching; (5) Carly Hare, former Executive Director of Native Americans in Philanthropy; and (6) Gary Cunningham, former Vice President at Northwest Area Foundation, current Executive Director of the Metropolitan Economic Development Association.

engagement in agriculture." Trust Agreement § 7, Ex. B.

In general, the same types of organizations will be eligible to receive cy pres funds under the Proposed Addendum as under the existing Settlement Agreement – non-profit organizations that provide agricultural, business assistance, or advocacy services to Native American farmers and ranchers.   The Proposed Addendum, however, would expand the types of organizations eligible to receive distributions from the Trust to include educational institutions and new organizations that serve Native farming and ranching but may not have existed when the Settlement Agreement was originally executed.   Addendum § II.B; Trust Agreement § 8. *See* Trust Agreement § 8(a)(2).  The provision of legal services, except for litigation, may also be supported by funds disbursed by the Trust.  *Id.* §§ 7, 9(e).  In addition, certain instrumentalities of tribal governments would be eligible to receive distributions from the Trust so long as provision is made to ensure the funds are used for charitable and educational purposes in support of Native American farmers and ranchers.  *Id.* § 8(a)(4); Addendum § II.B.

The proposed amendment retains the same constraints on the purposes for which the unclaimed settlement funds may be used that currently exist in the Settlement Agreement – to provide business assistance, agricultural education, technical support, and advocacy services to Native American farmers and ranchers, including those seeking to become farmers and ranchers. *See* Addendum § II.B.

The Trust would intend to qualify for recognition as a 501(c)(3) tax-exempt organization under the Internal Revenue Code, would be administered in order to exempt earnings from the invested funds from federal taxation, and would be operated exclusively for charitable and educational purposes.  Trust Agreement § 5(a).  The Trust would terminate no later than 20 years and six months after this Court approves the Proposed Addendum to the Settlement Agreement

and the approval becomes effective.  Addendum § II.B; Trust Agreement § 10.  The situs of the

Trust would be North Dakota, and the Trust would be governed by the laws of North Dakota.

Trust Agreement § 14. [10]  Under the Trust Agreement, the Trust could not lobby, engage in

political activity, make grants to support litigation, or engage in self-dealing.  *Id.* § 9.

The Trust initially would be governed by 14 Trustees who would operate the Trust in a

professional manner and represent the varied interests of the Native American farming and

ranching community throughout the United States.  Under the Trust Agreement, at least two-

thirds of the Trustees would "have substantial knowledge of agricultural issues, the needs of

Native American farmers or ranchers, or other substantive knowledge relevant to accomplishing

the Trust's Mission."  *Id*. § 13(f)(1).  At least one Trustee would "have professional financial and

investment experience.  *Id.* § 13(f)(2).  And at least one Trustee would "have professional

grantmaking experience."  *Id.* § 13(f)(3).

The Trustees would hold staggered terms; after the first set of Trustees, who would have

terms of two, three or four years to create the staggered terms, each subsequent term would be

three years.  *Id.* § 13(c).  The Trust Agreement provides that no Trustee may serve more than two

consecutive terms or serve more than three terms overall.  And any Trustee could be removed for

cause by a vote of the majority of the Trustees.  *Id.* § 13(e).  The Trust Agreement limits the

compensation of the Trustees to prevent the Trust from spending excessive amounts of its

resources on administration.  Initially, Trustees would be compensated in amounts not to exceed

$10,000 per year for performing their ordinary duties, with adjustments allowed for inflation

over time.  *See id.* § 13(h)(1).  Like other Trusts, this Trust would be required to hold annual

---

[10] Class Representative Claryca Mandan and a substantial number of other Class
Members are residents of North Dakota, providing that state with a substantial nexus to the
Trust.  While other states have Class Members, North Dakota has a well-developed body of trust
law that makes it a suitable choice to effectuate the purposes of the Trust.

9

meetings, be empowered to form advisory committees, and be authorized to employ staff in order to carry out the work of the Trust, evaluate and fund grant proposals, hold grant recipients accountable for the manner in which they expend the funds they receive, and analyze the needs of the Native American community for various types of programs.  *Id.* § 8, 12, 13.

## ARGUMENT

## I.    THE SUPPLEMENTAL DISTRIBUTION WILL BENEFIT PREVAILING CLAIMANTS

The Supplemental Distribution of $18,500 to each prevailing claimant will provide substantial direct monetary benefit to each prevailing claimant.  The amount of the supplemental payment is 37% of the original $50,000 payment that each prevailing Track A claimant has received already.  While it is a smaller fraction of the Track B award, which was over $100,000 for everyone, and the full $250,000 for most prevailing Track B claimants, those claimants already received a much larger award.

The Supplemental Service Awards to the Class Representatives are well supported by case authority on service awards.  *See* Dkt. 582, 590.  The awards are also well supported by the factual record demonstrating the devotion that each has shown to ensuring the best possible outcome for the class during this unexpected additional phase of the litigation regarding the cy pres funds.  As the Court is well aware from the June 29, 2015 hearing and many comments filed leading up to then, many class members were unhappy that so much of the settlement fund was directed to cy pres purposes, and that Plaintiffs had been unable, initially, to obtain consent from USDA to a further distribution to prevailing claimants.  It is worth noting that much of that unhappiness was vented directly at the Class Representatives throughout the past two years, as they were present in the community where these concerns were growing.  In short, they have provided additional service that well justifies the additional award.

## II.   THE PROPOSED ADDENDUM WILL MAKE THE CY PRES DISTRIBUTION MORE EFFECTIVE, ACCOUNTABLE, TRANSPARENT AND BENEFICIAL THAN UNDER THE CURRENT AGREEMENT

Use of a Trust governed by community leaders and authorized to distribute the cy pres funds over an extended time period better serves the interests of the Class than the current terms of the Settlement Agreement that provide that the funds be disbursed in equal amounts and within a brief time period to recipients selected by Class Counsel.  *See* Plaintiffs' Status Report, Dkt. No. 646 at 4-9 (Aug. 30, 2013).

First, the Proposed Addendum would transfer decision-making authority over distribution of nearly 70% of the remaining funds from Class Counsel to a Board of Trustees with expertise in agriculture and the specific needs of Native American farmers and ranchers.  The proposed Board of Trustees will have far greater expertise, permitting better decision-making about how the funds can be used most effectively.  Because the Board will include Native leaders, it should command greater trust and confidence from the community it seeks to serve.

Second, Plaintiffs anticipate that the creation of the Trust, which can employ professional staff, would permit a thorough needs assessment to identify areas that warrant funding. Moreover, such staff provides for accountability and transparency to ensure that the Trust has as beneficial an impact as possible and that granted funds are used as intended.  Non-profit organizations that seek funds from the Trust would be required to submit detailed grant proposals, and the Trust's staff and Trustees would analyze those proposals and determine which applications should be funded.  There would also be regular reporting by the grant recipients and oversight by the Trust's staff to ensure that grantees use the funds as promised and also to assess the impact of the funds and programs.  This type of analysis would permit the Trust to identify which programs are most effective, and thus inform future decisions about grants.  Over time, these procedures would help to ensure that the cy pres funds are appropriately used for the

11

specific purposes set forth in the Settlement Agreement, and that the funds disbursed and spent by national, regional, and local organizations are consistent with the capacity of the relevant organizations to deliver quality services and assistance to Native American farmers and ranchers.

Third, the Trust is authorized to disburse the funds over an extended period of time, if the Trustees elect to do so, permitting the funds to serve the needs contemplated by the Settlement Agreement.  The Trustees would decide how quickly to spend down the principal, consistent with the goal of putting cy pres money to use in a timely fashion, which would affect the amount of interest that could be generated each year.  Nonetheless, it is reasonable to expect that, for most of its existence, the funds would generate interest well in excess of the cost of running the Trust, providing additional resources for distribution.  Consequently, the Trust would create the opportunity to distribute a greater amount of overall funds to non-profits that serve Native American farmers and ranchers than the amount of the initial endowment.

Fourth, the Trust would be permitted to disburse funds to eligible non-profits that currently exist and those that do not yet exist, stimulating development of organizations to serve Native farmers and ranchers in areas that may currently be underserved.  Today there are numerous places in Indian Country where not a single non-profit organization provides assistance to Native American farmers and ranchers.  The Trust would have the resources and the staff to provide seed funding to new non-profits and help them grow into viable organizations that help Native American farmers and ranchers even after the Trust has completed its work.

Finally, the Proposed Addendum would avoid pitfalls inherent in the original cy pres provision, such as the rigid regime currently in place that would require distribution in equal amounts to each organization.  Instead, the Trust would permit disbursement of funds to organizations in amounts that serve the actual and varied needs of each program.

12

The Proposed Addendum serves the same goal as the *Keepseagle* litigation:  to overcome the effects of longstanding discrimination by assisting Native farmers and ranchers to become more successful in agriculture.  Whereas many Native American farmers and ranchers currently receive little or no assistance with their businesses, the resources that they would receive from the Trust over a multi-year period could dramatically change that dynamic and ensure that Native American farmers and ranchers have a significant and sustained connection to national, regional, and local non-profit groups that deliver critically needed services, education, advocacy, and assistance.  New farmers and ranchers, who face a range of challenges in obtaining land, capital, equipment, and the knowledge needed to embark upon a career in farming or ranching, may also benefit from the Trust.

## III.   THE COURT MAY APPROVE THE PROPOSED AMENDMENT PURSUANT TO SECTION XXII OF THE SETTLEMENT AGREEMENT

The modifications to the Settlement Agreement that the parties propose may be approved by the Court pursuant to Section XXII of the Agreement.  Under that section, "[t]his Settlement Agreement may be modified only with the written agreement of the Parties and with the approval of the District Court, upon such notice to the Class, if any, as the District Court may require." Settlement Agreement § XXII.

The parties previously agreed to a modification of the Settlement Agreement, which the Court approved, pursuant to this provision of the Agreement.  In July 2012, Plaintiffs proposed, with USDA's consent, that the Settlement Agreement be amended to allow the earlier distribution of Track A awards and to permit the Track B neutral additional time to complete its evaluation of a small number of Track B claims.[11]  *See* Dkt. No. 621 at 1.  The Court approved

---

[11] This amendment was made under exigent circumstances where a severe drought created a pressing need for making funds available as soon as possible and the Track A determinations had been completed, but the Neutral needed time to complete the Track B

the amendment in an August 1, 2012 Minute Order.  As in July 2012, here the Parties have

reached a written agreement on a proposed amendment, which is the only prerequisite to seek the

Court's approval of the amendment.

In light of the concerns expressed by the Court in its July 24, 2015 ruling regarding

whether the Settlement Agreement itself permits approval of a modification without specific

consent from all named plaintiffs, we address at greater length the authority the Plaintiff class

rests upon in confirming this agreement qualifies as an agreement of the Parties, leaving it only

to the Court's discretion as to whether to approve the modification or not, after considering the

views expressed by named plaintiffs or class members.

It is well established that that class litigation differs in significant respects from ordinary

bi-lateral litigation.  The presence of additional parties in class litigation, both those personally

before the Court, and those who are absent class members, alters the relationship between the

lawyer and his or her client(s).  In litigation in which the Court finds that the named plaintiffs

and counsel qualify as adequate representatives of the class pursuant to Rule 23(a), Fed. R. Civ.

P., both the class representatives and class counsel are obligated to act in the best interests of the

class as a whole.  While class counsel are charged with serving the interests of the class

representatives, counsel are ultimately responsible to take action that serves the interests of the

class as a whole, even where that action differs from the preferences of one or more of the class

representatives.[12]

The mandate directing the class representatives and class counsel to serve the interests of

---

determinations.

[12] Indeed, where courts find that class representatives have put their personal pecuniary
interests above the interests of the class as a whole, courts have removed those class
representatives.  *See, e.g., Carpenter v. Boeing, Co.*, 456 F.3d 1183, 1204 (10th Cir. 2006).

14

the class as a whole is clearly set forth Rule in Rule 23.  Rule 23(a)(4) requires the class

representatives to "fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23.

Rule 23(g) was added in 2003 to clarify the duties of class counsel.  Specifically, Rule

23(g)(1)(B) directs the Court to consider "any other matter pertinent to counsel's ability to fairly

and adequately represent the interests of the class" when appointing class counsel, and Rule

23(g)(4), titled the "Duty of Class Counsel," states that "Class counsel must fairly and

adequately represent the interests of the class."

> The Advisory Committee Notes address the import of Rule 23(g):
>
> Paragraph 1(B) recognizes that the primary responsibility of class counsel, resulting from appointment as class counsel, is to represent the best interests of the class. The rule thus establishes the obligation of class counsel, an obligation that may be different from the customary obligations of counsel to individual clients. ***Appointment as class counsel means that the primary obligation of counsel is to the class rather than to any individual members of it. The class representatives do not have an unfettered right to "fire" class counsel. In the same vein, the class representatives cannot command class counsel to accept or reject a settlement proposal***. To the contrary, class counsel must determine whether seeking the court's approval of a settlement would be in the best interests of the class as a whole.

Fed. R. Civ. P. 23, advisory committee notes to 2003 amendment(emphasis added).  While

ideally class representatives and class counsel work in concert, the Federal Rules and in

particular the Advisory Committee Notes make clear how conflicts are to be resolved.  As noted

commentators such as Newberg have explained:

> But in the Advisory Committee note quoted above, the Committee suggests that class counsel, once appointed, is now the paramount representative of the class, not the class representatives: class counsel's obligations are to the class, not the representative; the representative cannot fire class counsel; and class counsel can settle a case over the representative's objections.  The Advisory Committee note implies, quite strongly, that it is class counsel who speaks for the class, not the class representatives.

Newberg on Class Actions § 3:82 (5th ed.).

    Recognizing that class counsel, rather than class representatives, speak for the class in

15

negotiating settlement agreements and making other decisions does not leave the class at the mercy of potentially unscrupulous class counsel. As Newberg explains, the "counsel-monitoring function" rests not with the class representatives but the court, and "the rule sets forth explicit standards and procedures for monitoring class counsel." Newberg on Class Actions § 3:82 (5th ed.). In addition, of course, Rule 23(e) ensures that no settlement agreement can be final without approval of the Court, which can only be granted if the Court finds the settlement is "fair, reasonable, and adequate" after a fairness hearing, at which objections of class members and class representatives can be heard and duly considered. Fed. R. Civ. P. 23.

Even prior to the addition of Rule 23(g), this division of responsibility between the class representatives, class counsel, and the Court was well recognized by the courts. The D.C. Circuit, for example, affirmed approval of a consent decree over objections of some named plaintiffs, noting that a class settlement "can be fair even though a significant portion of the class and some of the named plaintiffs object to it." *Thomas v. Albright*, 139 F.3d 227, 232 (D.C. Cir. 1998) (collecting cases); *see also Reed v. Gen. Motors Corp.*, 703 F.2d 170, 174-75 (5th Cir. 1983) (affirming approval of settlement despite opposition by twenty-three of twenty-seven named plaintiffs). More recently, courts have cited Rule 23(g) and Newberg § 3:82 in approving class settlements over the objections of class representatives. *Lowery v. City of Albuquerque,* No. CIV 09-0457 JB/WDS, 2013 WL 1010384, at *33-34 (D.N.M. Feb. 27, 2013) (noting it was the counsel's "duty, as Class Counsel, to fairly and adequately represent the class' interests above those of K. Lowery [the lead plaintiff].") In *Lowery*, the class counsel had entered into a retainer agreement with the class representative which stated that no settlement would be entered without plaintiff's approval. Class counsel later acknowledged their error in using a retainer agreement prepared to represent an individual rather than a class. Nonetheless, the Court

16

overruled plaintiff's objections which sought to enforce the terms of that retainer agreement,

because class counsel "would have violated its duties to the class if he had put K. Lowery's

opinion and interests above those of the class, as K. Lowery contends his retainer agreement

provides." *Id.* at *35.   While interests of the class representatives must be considered by class

counsel in determining the direction of and terms on which class actions are resolved, Rule 23

charges the courts with entrusting to the class counsel they appoint the non-delegable

responsibility for serving the interests of the entire class.

While the parties in a class action have broad discretion in formulating the terms on

which they reach a settlement, as long as the terms satisfy the Court pursuant to Rule 23(e), they

cannot alter the requirements of Rule 23.   Indeed, even the courts lack this authority to modify

the requirements of Rule 23, let alone the parties.   *Amchem Products, Inc. v. Windsor*, 521 U.S.

591, 620-22 (1997) ("courts must be mindful that the Rule as now composed sets the

requirements they are bound to enforce").   Rule 23 forbids parties, for example, from entering

agreements that become effective without a fairness hearing or court approval, as they would run

afoul of the requirements of Rule 23(e).   Likewise, an agreement that empowers class

representatives to interfere with entry into a settlement agreement or the modification of a

settlement agreement would contravene the mandate of Rule 23(g).   Where a conflict arises

between the views of one or more class representatives and the views of class counsel about how

best to serve the interests of the class as a whole, Rule 23 reflects an expectation that class

counsel present to the Court the views of the class, after duly considering any objections from

the class representatives or members of the class.   Class representatives may present any

disagreement with class counsel as objections to the course of action recommended by class

counsel, which the Court may consider in determining whether to approve or reject the action

recommended by class counsel.   But Rule 23 does not permit approval of an agreement in which one or more named plaintiffs may block, or alone dictate, action taken on behalf of the class as a whole.  The Settlement Agreement approved by the Court should therefore not be given any interpretation at odds with Rule 23 and governing authority.

Rule 23 does not permit class counsel or the Court to endow individual class representatives with authority to make decisions that can dictate the terms on which the class claims are settled or modified.   Nonetheless, the parties to the Settlement Agreement provided an important role for the Court in determining whether the cy pres terms may be modified. Section XXII of the Agreement provides that its terms "may be modified only with the written agreement of the Parties and with the approval of the District Court."  The concern the Court expressed in its July 2015 decision – that the interests advanced by Mrs. Keepseagle, and others who registered their support for her position – should be addressed, could warrant the Court's exercise of its discretion to withhold approval of changes to the cy pres provision that were originally proposed.  Such a result would be consistent with the framework created by Rule 23 and the jurisprudence interpreting it.  That same analysis should lead the Court to conclude, however, that the present proposed modification – supported by three of the four remaining active class representatives – should be approved by the Court.

## IV.    THE COURT MAY APPROVE THE PROPOSED AMENDMENT WITHOUT REQUIRING SUPPLEMENTAL NOTICE

Although the Settlement Agreement gives the Court discretion to order supplemental notice in the case of an amendment proposed by the parties, the Settlement Agreement does not prescribe the circumstances when supplemental notice should be given.  Plaintiffs set forth in prior briefing the governing legal standards for whether notice was required by Rule 23(e).  Dkt. 709 at 19-22.  Since the proposed modification does not make any adverse change, but only

2077408.1

provides greater benefits to those class members who were prevailing claimants, notice is not legally required as the Court previously ruled.  Dkt. 776.

Of course, the Court retains authority to issue notice nonetheless, as it chose to do in response to the prior motion to modify.  Dkt. 776.  That notice alerted claimants not only of the proposed Trust, but also to other proposed uses of the unclaimed funds, including Mrs. Keepseagle's request that the funds be distributed to prevailing claimants.  Dkt. 778.  This notice was mailed to all claimants, and a short version also appeared in publication.[13]  The Court received numerous comments both in writing and at a lengthy hearing held on June 29, 2015. Those comments made clear the desire of many class members for a supplemental distribution, a desire that this second proposed Addendum addresses, at least in part.  While we understand from the comments that most of those commenting would prefer a larger supplemental distribution, or one that permitted new claims to be made, we do not believe that any new information would be gleaned by providing for a renewed notice and comment period.

Given the specific opportunity already provided to class members to comment on how cy pres funds would be handled, including specifically identifying the two uses that are combined in the current proposed Addendum, class members have already had a full and fair opportunity to comment on the two proposals that are combined in the current proposed Addendum.  In light of the extensive notice already provided, and the extensive record available to the Court regarding claimants' views on the case, there is no need for further notice to be provided.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Unopposed Motion to Modify the Settlement

---

[13] This was in addition to Class Counsel's efforts to educate class members about the changes to the cy pres provisions that include creation of a Trust to distribute funds.  Those efforts are described in detail in Plaintiffs' prior motion.  Dkt. 709 at 23-25.

2077408.1

Agreement Cy Pres Provisions should be granted.  Plaintiffs have attached a proposed order that would approve the proposed modification in the form of the Proposed Addendum, including the Trust Agreement that is attached to the Addendum.


December 14, 2015                                              Respectfully submitted,


By  */s/Joseph M. Sellers*
Joseph M. Sellers, Bar No. 318410                     Paul M. Smith, Bar No. 358870
Christine E. Webber, Bar No. 439368              Jessica Ring Amunson
COHEN MILSTEIN SELLERS &              JENNER & BLOCK LLP
   TOLL PLLC                                            1099 New York Ave., N.W.
1100 New York Avenue, N.W.                       Suite 900
Suite 500, EastWest Tower                            Washington, DC 20001-4412
Washington, DC 20005                                  Telephone: (202) 639-6000
Telephone: (202) 408-4600                             Facsimile: (202) 639-6066
Facsimile: (202) 408-4699                              psmith@jenner.com
jsellers@cohenmilstein.com
cwebber@cohenmilstein.com


David J. Frantz, Bar No. 202853                     Phillip L. Fraas
CONLON, FRANTZ & PHELAN             LAW OFFICES OF PHILLIP L. FRAAS
1740 N Street, N.W.,                                      888 Sixteenth St., NW, Suite 800
Suite One                                                       Washington, DC, 20006
Washington, DC 20036                                  Telephone: (202) 280-2411
Telephone: (202) 331-7050                             Facsimile (202) 355-1399
Facsimile: (202) 331-9306                              phil@phillipfraaslaw.com
dfrantz@conlonfrantz.com


Sarah Vogel
SARAH VOGEL LAW OFFICE
PO Box 385
Bismarck ND. 58502-0385
Telephone:  (701) 355-6521
sarahvogellaw@gmail.com


                                    *Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

On December 14, 2015, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record. Furthermore, physical copies of the foregoing will be served on the currently active named plaintiffs at the following addresses:

Porter Holder
HC 71 Box 186-1
Soper, OK  74759

Marilyn Keepseagle
PO Box 509
Fort Yates, ND 58538

Claryca Mandana
PO Box 70
Newtown, ND 58763

Keith Mandan
PO Box 518
Mandaree, ND 58757

*/s/ Joseph M. Sellers*
Joseph M. Sellers